*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

# EXPERT OPINION REPORT

Court:          United States District Court – Eastern District of California
Case Number: 2:12-cv-01629-LKK-GGH
Case Name:   **V.W. Represented by Ad Litem, Tenaya Barber**
Vs:             **City of Vallejo et al.**
Date:           January 18, 2015

A. I, Jared L. Zwickey am an adult over 18 years of age and would be competent to testify if called as a witness in this matter.  I have prepared this report on behalf of the defendants in the matter of *V.W. represented by Ad Litem & Tenaya Barber v. City of Vallejo, et al.* in the United States District of California, Sacramento Division, Sacramento, California.

B. The San Joaquin Delta College District in Stockton, California employs me as an Associate Professor in the Administration of Justice Discipline.  I retired as the Director of Police Services and Public Safety Programs several years ago after serving fifteen years with the District. My duties included, but are not limited to, managing the Campus Police Department, the Basic Police Officer Training program at Delta College and the Stanislaus Sheriff's Regional Training Center, the California Department of Corrections-Juvenile Justice Basic Institutions Academy, the Fire Technology program, and the Administration of Justice and Corrections academic programs.

In addition to writing curriculum and teaching college courses for the San Joaquin Community College District, I teach firearms, defensive tactics, criminal law, search and seizure, and use of force in the Basic Police Officer Academy program and for numerous law enforcement agencies, including the California Department of Corrections, Fire Service agencies, state and federal law enforcement personnel and members of the United States Military service.

C. The Yosemite Community College District in Modesto, California also employs me as an Administration of Justice adjunct instructor where I teach Administration of Justice courses at Modesto Junior College.  I am also employed by the Institute of Technology as a use of force and firearms instructor.

D. I work closely with the California Commission on Basic Police Officer Standards and Training (POST) as a consultant to develop Basic Police officer Academy course curriculum. I currently serve as the use of force subject matter expert representing the Basic Police Officer Academy sponsored programs in the State of California.

E. I hold all of the Commission of Police Officer Standards and Training Certifications that can be issued to a law enforcement officer in the State of California, which certify my multiple areas of expertise.  I have a F.B.I. Firearms Instructor Certificate, and a POST Defensive Tactics Instructor, Impact Weapon Instructor, Basic and Advanced Narcotics & Dangerous Drugs Certificate.  I also have been issued certificates for being a POST Test Proctor, Basic Course Academy Instructor of Perishable Skills and Racial Discrimination Profile Instructor.

1

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

F.  I served on numerous POST committees during the past forty years as a K-9, tactics, use of force, firearms and scenario training expert, and as a subject matter expert for Basic Academy Course training materials. The focus of these committees is to develop program guidelines for law enforcement basic and in-service certification programs.

I am a member of the POST Consortium Advisory Committee and subject matter expert evaluation team to ensure consistency between training specifications and workbook training materials for the Basic Academy Course amongst the forty training academies in the State of California.

I serve on several POST training committees as a subject matter expert and participate in focus training groups to develop in service and basic training programs for the Basic Academy training academies, PC 832 programs and K-12 regional occupational programs.

G.  As a retired law enforcement officer I hold a Basic, Intermediate, Advanced, Supervision, Management, Executive, California Command College, Firearms Instructor, Defensive Tactics/Impact Weapon, Narcotics & Dangerous Drugs, Advanced Narcotics & Dangerous Drugs, Basic Academy Director, and Academy Instructor of Perishable Skills Certificate. I have a Bachelor's Degree in Administration of Justice from Golden Gate University and I am a graduate of the California Command College and the Federal Bureau of Investigation National Academy.

H.  I have thirty-eight years of law enforcement experience, and forty years of training experience as an Administration of Justice Instructor at the Community College level. I have participated in thousands of hours of law enforcement related training programs during my tenure as a law enforcement officer.

I.  During the past forty years that I have acted as a law enforcement procedures and use of force expert, I reviewed hundreds of internal affairs investigations conducted by numerous California, Alaska, Texas, Washington State and Louisiana law enforcement agencies, to determine if the investigations were complete, thorough and met the objectives of a fair and balanced internal affairs investigation (*determination of inappropriate conduct, violations of department policy, evaluation of patterns of conduct and failure to discipline*).

J.  During my twenty-eight years of law enforcement service with the City of Concord, I participated in the internal affairs investigation process involving alleged acts of officer/employee misconduct. In my capacity as a Patrol and Traffic Sergeant, Special Investigation, Operations and Administrative Lieutenant, Captain of the Operations Division and acting Chief of Police, I routinely reviewed citizen complaints and I investigated alleged acts of misconduct that required imposing progressive discipline in those matters that allegations were sustained.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

K. During my tenure as Chief of Police for the City of Tracy I conducted and directed internal affairs investigations into alleged acts of misconduct of civilian and city employees. Based on the sustained findings of the investigations I reviewed or conducted, I administered progressive discipline to police employees, to include, but not limited to letters of reprimand, demotions and terminations.

L. During my tenure as Director of Police Services at San Joaquin Delta College, I was responsible for the oversight of personnel in the police department, full-time and adjunct employees assigned to the Administration of Justice program and students attending the POST Basic Police Officer Academy. During the past fourteen years as an employee of San Joaquin Delta College, I have directed numerous internal affairs investigations into alleged acts of misconduct. In those incidents where alleged acts of misconduct were sustained, I administered progressive discipline, including, but not limited to written letters of reprimand up to and including termination. The attached resume contains a more complete listing of my training and qualifications, and is provided for reference of my experience and skills.

M. I have thirty-eight years of law enforcement experience and forty years training experience as a K9 trainer, a use of force, firearms and tactics instructor. My area of expertise includes but not limited to: establishing probable cause for arrest and use of force; laws of arrest and search and seizure; less-lethal alternatives to deadly force (equipment and tactics); modern police administration and supervision, including policies, procedures, and current law enforcement practices; firearms; internal affairs investigations and disciplinary matters; police K-9 administration, training, and tactics; special weapons and tactics administration and training.

N. I have testified in approximately seventy-three cases over the past forty years involving, but not limited to, use of force, law enforcement policies and practices, and tactical and investigation procedures. I have reviewed thousands of use of force incidents involving the use of controlling and deadly force during my career as a law enforcement officer and use of force/tactics instructor. I have testified in state and federal courts for the defense and for plaintiffs.

O. The Office of the Vallejo City Attorney retained me on August 7, 2014, as a law enforcement expert. I was asked to review the facts and circumstances surrounding the arrest and subsequent death of Michael White on June 15, 2010, to determine if the level of force used by the defendant officers was consistent with law enforcement practices, department policy, state and federal statutes and case law. At the time of completing this report I have reviewed a variety of documents and things to reach an opinion in this matter.

P. The statements made herein are based on my personal knowledge, which is based upon a review of the documents, and things listed on the attachment entitled documents and things reviewed. A copy of my Curriculum Vitae is attached including the number of cases I testified in state and federal court.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Q. On August 7, 15, 2014, and on September 8, 15, 2014, I received a variety of written materials, and photographic materials from the Office of the Vallejo City Attorney.

R. On October 21, 2014, I met with Lieutenant Whitney at the Office of the Vallejo City Attorney's Office to discuss the structure of in-service training programs.

S. On November 3, 2014, I met with Captain O'Connell and Lieutenant Iacono at the Vallejo Police department to determine the level of training that is provided to department personnel and to clarify department policies regarding the contact, assessment and arrest of individuals who commit criminal acts.

T. Based on the materials reviewed, as well as other related opinions, I was requested to provide my opinion, whether it was favorable or unfavorable, as to the law enforcement policies and practices the defendant officers of the Vallejo Police Department used to locate and arrest Michael White on June 15, 2010, in the City of Vallejo, California.

## DOCUMENTS AND THINGS REVIEWED

1. Plaintiffs' First Amended Complaint for Damages
2. Defendants' Responses to Request for Production of Documents
3. CD Disk of documents produced by Defendants
4. Vallejo Fire Department Report and Pre Hospital Care Report
5. CD Disk of Photographs
6. CD Disk of Dispatch and Radio Communications
7. Letter from the Solano District Attorney Dated December 27, 2010
8. Deposition Testimony of Corporal Boersma taken on August 27, 2014
9. Deposition Testimony of Officer Cunningham taken on August 28, 2015
10. Deposition Testimony of Elizabeth Claros taken on November 6, 2015
11. Deposition Testimony of Officer Keutnik taken on August 27, 2014
12. Deposition Testimony of Officer Munoz taken on August 27, 2014
13. Deposition Testimony of Lieutenant Robinson taken on August 28, 2014
14. Deposition Testimony of Corey Gentry taken on October 26, 2015
15. California Penal Code Section 69
16. California Penal Code Section 148
17. California Penal Code Section 240
18. California Penal Code Section 245c
19. California Penal Code Section 664
20. California Penal Code Section 834
10. California Penal Code Section 834a
11. California Penal Code Section 835a
12. California Health & Safety Code Section 11350
13. California Health & Safety Code Section 11550
14. *Graham v. Connor,* (1989) 490 U.S. 386, 396-7
15. *Deorle v. Rutherford,* 272 F.3d 1272, 1279 (9th Cir. 2001).
16. *Scott v Harris,* 550 U.S. 372 (2007)

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

17.   *Smith v The City of Hemet,* 394 F.3d 689 (9th Cir, 2005)
18.   *Scott v. Heinrick* 39 F. 3d 912, 914 (9th Cir. 1994), cert. en 1995 U.S. Lexis 4312 (19585)
19.   *Forrester v City of San Diego,* 25 F. 3d 804 (1994)
20.   *Draper v. Reynolds,* 369 F .3d 1270 (11th Cir. 2004)
21.   *Magee v. City of Daphne*, 2006 U.S. Dist. Lexis 93183, Civil No. 05-0633-WS-M (S.D. Ala. December 20, 2006).
22.   *Durruthy v. Pastor*, 351 F .3d 1080, 1094 (11th Cir. 2003)
23.   *Garrett v. Athens-Clarke County,* 378 F.3d 1274, 1280, n. 12 (11th Cir. 2004).
24.   *Marquez v City of Phoenix*, U.S.D.C No. 2:08-CV-01132 NVW (9th Circuit 2008)
25.   *Skelly v. Okaloosa County, Florida Board of County Commissioners* (2010)
26.   *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L.Ed.2d 628 (1989)
27.   *Johnson v. Glick*, 481 F.2d 1028 (2nd Cir. 9173), cert denied, 414 U.S. 1033, 94 S. Ct 462, 38 L Ed 2d 324 (1973)
28.   *Bryan v. MacPherson*, 2010 U.S. App. LEXIS 12511 (June 18, 2010)
29.   *Illinois V. Gates* (1983) 462 U.S. 213, 231
30.   *Alabama v. White* (1990) 496 U.S. 89, 91
31.   *U.S. v. Elmore* (2nd Cir. 2007) 482 F.3d 172, 180
32.   *Illinois v. Rodriguez* (1990) 497 U.S. 177, 185, Edited.
33.   *United States v. Cortez* (1981) 449 U.S. 411, 418
34.   *Massachusetts v. Upton* (1984) 466 U.S. 727, 734
35.   *Florida v. J.L.* (2000) 529 U.S. 266
36.   *Navarette v. California* (Apr. 22, 2014) U.S. [2014 U.S. Lexis 2930]
37.   Sudden Death During Restraint: do some positions affect lung function? By John Parkes, BA (Hons) M. Med Sci RMN & Ray Carsnon BSC (Hons) PhD FIBMS Faculty of Health and Life Sciences, Coventry University, Priory Street, Coventry CV 5FB

## THE COMPLAINT FOR DAMAGES

The plaintiff alleges on June 15, 2010, at approximately 4:24 pm, Vallejo Police Officers contacted Michael White in his friend's home and repeatedly tased him for several minutes and then collapsed.  The officers reportedly applied a Carotid restraint on Mr. White's neck while he was face down on the ground and while officers applied their body weight on Mr. White's back and chest area, which impaired Mr. White's ability to breathe.  It is alleged that Mr. White was placed in unreasonable restraints and was placed on a stretcher were he lost all vital signs of life.

It is further alleged that the defendant officers claim that Mr. White was attempting to swallow drugs when they contacted him is untrue, because there was no object or obstruction in his airway and no remnants of any object or drugs were present when Mr. White's body was examined at the hospital.

The plaintiff believes Mr. White was not breathing properly after Officer Boersma applied the carotid restraint on his neck and that Mr. White posed no threat of serious physical harm to anyone prior to or during the restraint.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

## INCIDENT SUMMARY

This incident occurred on June 15, 2010, at approximately 4:24 pm when 53year old Elizabeth Claros called the 911 dispatcher to report that she needed an ambulance for a man right away because he hit, grabbed and choked her. She told the dispatcher that she didn't know the man but stated he fled from her trailer to another trailer located across the street.

Officer Cunningham was dispatched to the scene to investigate the incident while the fire department and ambulance staged in the area. He contacted Ms. Claros to determine if she suffered any injuries; she declined medical care. Corporal Boersma was also dispatched to assist Officer Cunningham investigate the incident.

The Vallejo Fire Department Communication Center Dispatched Engine 53 to respond to 392 San Marcus Drive, a trailer park, for an unknown medical with no further information. Fire personnel were requested to stage in the area as a matter of protocol. The dispatcher notified the fire personnel that the police department was enroute to the address and that they would advise when it was clear for them to respond into the scene. The dispatcher advised that the call involved some sort of choking of a victim and that they still needed to stage in the area.

When Vallejo Police Officers arrived on the scene, Ms. Claros told them how Mr. White had attacked her and attempted to choke her. The officers contacted Mr. White's friend to locate him and learned from Ms. Villasenor that she believed Mr. White was under the influence of drugs. The officers asked for Ms. Villasenor's assistance to enter the residence to contact Mr. White so that they could talk with him and arrest him for assaulting Ms. Claros. Ms. Villasenor asked the defendant officers to remove White from her trailer; she also agreed to assist the officers and they entered her trailer and found Mr. White inside the bathroom. Ms. Villasenor attempted to convince Mr. White to leave the bathroom and speak with the police but he refused to leave the trailer.

Mr. White became physically uncooperative and resisted Ms. Villasenor and the officers' efforts to open the bathroom door to take him into custody. At one point during the defendant officers' efforts to push open the bathroom door, one of the defendant officers saw what he believed to be Mr. White ingesting what appeared to be Methamphetamine, an illegal drug. During the struggle to remove Mr. White from the bathroom the door became dislodged from the hinges and was used by Mr. White as a shield to prevent the officers from grabbing a hold of him.

Two of the defendant officers used their electronic control devices to overcome Mr. White's violent resistance; they were not effective in controlling him. A lateral vascular restraint was attempted by one of the defendant officers but the restraint also proved to be ineffective in rendering Mr. White under control. Mr. White was eventually taken to the floor after one of the defendant officers struck Mr. White in the side multiple times with his fist, which allowed the officers to pull his arms behind his back and handcuff him.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

After Mr. White was handcuffed he appeared to momentarily go limp, but when the officers attempted to assess his breathing, White became alert and assaultive with his legs and kicked a firefighter who was attempting to check his vitals. Mr. White was eventually hobbled with a nylon strap around his legs so that the medics could evaluate his medical condition and he was carried out of the residence to an ambulance where he lost consciousness. Mr. White later died after being treated by medical personnel at Kaiser Hospital.

The facts and circumstances surrounding Mr. White's death were investigated pursuant to the Solano County Officer Involved Fatal Incident Protocol by investigators from the Vallejo Police Department and Criminal Investors from the Solano County District Attorney's Office. After a thorough review of the facts and circumstances of this incident, including the toxicology and autopsy report, the Solano County District Attorney's Office determined that Mr. White's death cannot be attributed to any improper or unlawful conduct by the defendant officers.

The coroner's report determined the cause of Michael White's death as "Excited Delirium Syndrome" and not from the lack of medical care, not from the effects of the electronic control device or from positional asphyxiation syndrome. The Toxicology report showed that Mr. White had recently ingested Cocaine and had a potentially toxic level of Cocaine in his blood at the time of his death. An analysis of Mr. White's blood that was drawn from the Solano County Coroner's Office was sent to Central Valley Toxicology for analysis. Their analysis revealed that Mr. White had 0.54mg/L of Cocaine in his system. According to Central Valley toxicology a potentially toxic level starts at 0.25 mg/L.

**OPINIONS:**

**ANY REASONABLE WELL TRAINED PEACE OFFICER FACED WITH THE SAME OR SIMILAR FACTS AMD CIRCUMSTANCES KNOWN BY THE DEFENDANT OFFICERS WOULD HAVE FOLLOWED THE SAME APPROPRIATE POLICIES AND PROCEDURES AS THE DEFENDANT OFFICERS FOLLOWED IN THIS INCIDENT TO RESPOND TO AN EMERGENCY CALL FOR SERVICE THAT INVOLVED A VIOLENT CRIME.**

**THE DEFENDANT OFFICERS QUESTIONED THE VICTIM AND WITNESSES AND THEN DETERMINED IF INDIVIDUALS WERE INJURED, IF A CRIME HAD BEEN COMMITTED AND WHEN IT IS SAFE TO ALLOW MEDICAL PROVIDERS TO ENTER THE SCENE.**

**THE PRACTICE TO STAGE MEDICAL PERSONNEL IN THE IMMEDIATE AREA OF A REPORTED VIOLENT INCIDENT UNTIL THE SCENE CAN BE SECURED BY LAW ENFORCEMENT PERSONNEL, IS A REASONABLE AND EFFECTIVE STRATEGY TO ENSURE THE SAFETY OF FIRE AND MEDICAL RESPONDERS, AND IS CONSISTENT WITH LAW ENFORCEMENT PROTOCOL POLICY AND PROCEDURES.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**THE INTITIAL DETAILS THAT POLICE DISPATCHERS PROVIDE FIRST RESPONDER POLICE OFFICERS ARE NOT ALWAYS COMPLETE OR ACCURATE REGARDING A REPORTED CRIME, AND REQUIRES AN OFFICER NOT TO PREJUDGE OR MAKE ASSUMPTIONS THAT THE INFORMATION IS ACCURATE.**

**WHEN REASONABLE OFFICERS ARE CONFRONTED BY A REPORT OF A VIOLENT CRIME AND MEDICAL ASSISTANCE THEY ARE TRAINED TO INVESTIGATE THE FACTS AND CIRCUMSTANCES OF THE REPORT. THE FIRST STEP OF THEIR INVESTIGATION IS TO CONTROL THE INCIDENT SCENE AND THEN ALLOW MEDICAL PROVIDERS TO ENTER THE SCENE.**

On June 10, 2010, the City of Vallejo Police Department received a call from a female citizen who reported that she was attacked by an unknown individual who came into her unit; he choked her and then fled across the street. She said the man was acting crazy; she requested an ambulance to respond for him. In order to determine if the call for service was authentic and to evaluate what medical assistance was actually needed, the police dispatcher notified fire and medical services to respond to the incident scene. Patrol officers were the next units to be notified of the request to respond to investigate the reported crime.

It is well known that at times citizens who call the police for help are excited, afraid and angry and will at times exaggerate the seriousness of a situation in order to have peace officers respond quicker. At other times the caller is honestly mistaken or inaccurate about what they saw or experienced due to their emotional state of mind, or their requests could be misinterpreted or statements they make can be taken out of context; the reported facts and circumstances may not actually reflect what actually occurred.

Regardless of how many crimes an officer investigates and finds the original information reported to them by the dispatcher is not an accurate account of the facts and circumstances, the officer must not be dismissive about what has been reported. A peace officer must use their critical decision-making skills to determine if a criminal act occurred, who is involved in the incident, and if an individual is injured and in need of immediate medical care even if they reported that they were not injured. If an officer assumes an incident is strictly medical in nature and doesn't adequately assess and investigate the circumstances of the request, it could result in innocent citizens, medical personnel and law enforcement personnel being injured or killed.

The police officer who arrives on the scene of any call for service must take a leadership role for the initial assessment, make contact with the involved parties, and determine if law enforcement action or medical care is required. To accomplish these tasks safely, the officer may need to rely on additional support from one or more officers. Crimes involving violent domestic disturbances and violent assaults are some of the most dangerous and threatening conditions where peace officers are killed or assaulted in the line of duty.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

The first police officer to arrive at the scene of a reported violent incident will generally take on the role of the primary unit as Corporal Boersma did in this incident. That officer will gather as much information as is reasonably possible regarding the welfare of the reporting party or victim.  If medical care has been requested prior to a police response, it is appropriate for fire and ambulance personnel to stage in the immediate area until the incident scene is secured by the police and it is determined to be safe to enter.   The staging of fire and paramedic first responders near the scene of an incident is a common practice that is employed by law enforcement in California and throughout the United States to ensure the safety for medical personnel to enter the scene.

In the early years of policing, fire and paramedic personnel have been assaulted and injured upon entering an incident scene too early prior to law enforcement entering the scene, which prompted a change in a national emergency response strategy.  In this incident, despite the fact that the victim stated her attacker needed an ambulance, medical personnel were appropriately staged in the immediate area and did not respond into the scene until the defendant officers could determine if medical assistance was needed and it was safe for them to enter.

It is the primary officer who will usually take charge of a criminal investigation and initiate the appropriate steps toward controlling the situation including requesting additional officers or summon medical assistance if they have not already been notified to respond.  Some crime scenes or disturbances involving several subjects may require additional peace officers to locate and question witnesses before a potential suspect can be located and questioned to determine if a crime occurred.

Once officers have located, stopped or detained a suspect, they may take whatever investigative actions are reasonable under the circumstances to determine the suspect's identity and possible participation in a crime.  If a suspect is in need of medical care due to an illness or a physical injury they must be located, assessed and restrained if necessary before they can be safely treated.  It should be noted that a peace officer has a duty to summon medical care for an individual but he/she does not have a duty to provide the care due to their lack of having the medical expertise.

**OPINIONS:**

**THE DEFENDANT OFFICERS WORE DEPARTMENT APPROVED UNIFORMS AND THEY CARRIED A CHEMICAL AGENT, IMPACT AND CONTROL WEAPONS AND FIREARMS ON THEIR DUTY BELT.  ANY REASONABLE PERSON WHO SAW THE DEFENDANT OFFICERS WEARING THEIR UNIFORMS WOULD IMMEDIATELY IDENTIFY THEM AS PEACE OFFICERS.**

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD CONCLUDE THAT MR. WHITE KNEW OR SHOULD HAVE REASONABLE KNOWN THAT THE DEFENDANT OFFICERS WERE PEACE OFFICERS TRYING TO ARREST HIM AND THAT HE HAD A DUTY NOT TO RESIST ARREST.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD CONCLUDE THAT THE DEFENDANT OFFICERS HAD PROBABLE CAUSE TO ARREST MICHAEL WHITE FOR A VIOLENT AND UNPROVOKED ASSAULT ON ELIZABETH CLAROS BASED ON HERS AND WITNESS ACCOUNTS OF THE FACTS AND CIRCUMSTANCES OF THE ATTACK.**

**THE DEFENDANT OFFICERS WERE GRANTED PERMISSION BY MS. VILLASENOR TO ENTER HER TRAILER WHERE MR. WHITE HAD FLED TO REMOVE HIM AS AN UNWELCOMED GUEST IN HER HOME IN ADDITION TO ARRESTING HIM FOR A FELONY ASSAULT VIOLATION, DOMESTIC VIOLENCE AND POSSESSION OF A CONTROLLED SUBSTANCE.**

On June 15, 2010, Corporal Boersma was employed with the City of Vallejo as a police officer. He was working on the swing shift, which was 2 pm to midnight as a uniformed peace officer in the Patrol Division where he was assigned to work Beat 3. He wore a department authorized uniform that has two colored Vallejo Police patches on the shoulders, a badge on the left side of the chest along with his badge number.

Corporal Boersma wore a duty belt with a handgun, extra magazines, pepper spray, handcuffs, a portable radio and a Taser. Any reasonable person who saw Corporal Boersma wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Corporal Boersma was dispatched as a cover unit to assist Officer Cunningham to investigate a report of a man who had choked a neighbor "acting strangely" and ran back into his residence located at 392 San Marcus Drive, in the City of Vallejo, California. Corporal Boersma stated that he was the first officer to arrive on the scene, and arrived almost simultaneously with Sergeant Robinson and Officer Cunningham. Corporal Boersma said that as he drove near the victim's residence, a man later identified as Mr. Carter flagged him down stating, "That guys crazy, he lost his mind from dope, and he attacked this lady over here." The man pointed towards trailer 395 and stated, "You had better do something or something bad is going to happen."

Corporal Boersma saw a woman, later identified as Ms. Claros, standing on her porch. He approached her and asked her what had happened. Ms. Claros told him that a man, later identified as Michael White, came through her gate and attacked her for no reason. She stated that Mr. White grabbed her around the throat and shoved her against the wall of her trailer and then down to the ground. She said he "Looked like he was crazy" and she stated "He was high on drugs." Ms. Claros said she does not know the man by his name, but she said she knows that he lives in a trailer across the street. Based on the information Ms. Claros provided Corporal Boersma it was determined that the suspect committed a felony crime of assault against Ms. Claros.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

While Officer Boersma was interviewing the victim, Officer Cunningham saw a female standing in the doorway at 392 San Marcos Drive, which is located across the street from the victim's residence. He pointed at her to gain her attention and then motioned for her to come over to speak with him and she complied. The woman, later identified at Linda Villasenor, told Officer Cunningham that Michael White was acting crazy and possibly high on narcotics, and just assaulted a neighbor. Ms. Villasenor stated she let Michael stay at her residence. Officer Cunningham asked Ms. Villasenor if she could go into the house with him to find Michael so that he could speak with him.

While speaking with Ms. Claros, Corporal Boersma noticed that Sergeant Robinson and Officer Cunningham walked over to Mr. White's trailer to contact the suspect to determine the reason for his assaultive behavior. After interviewing Ms. Claros, Corporal Boersma met with Ms. Villasenor as she stood in front of her trailer. Ms. Villasenor was asked if she knows the person who attacked Ms. Claros. Ms. Villasenor told Corporal Boersma that the man's name is Michael White. She said Mr. White is on parole and is on dope and is "Going Crazy." She said that when she was in the trailer with Mr. White he shoved her so she left to avoid being hurt. She mentioned that the trailer belonged to her and she was allowing Mr. White stay there to help him out. Linda Villasenor also told Officer Cunningham that Michael White was acting crazy and possibly high on narcotics and had just assaulted a neighbor.

Officer Cunningham asked Ms. Villasenor if she could go into the house with him to find Michael so that he could speak with him. Ms. Villasenor told the defendant officers that she wanted Mr. White out of her trailer and she granted the officers permission to enter the trailer to contact him. At this point Sergeant Robinson arrived at the scene and accompanied Officer Cunningham and Ms. Villasenor into her residence.

Based on the information Ms. Claros and Ms. Villasenor provided to the defendant officers, Corporal Boersma determined that probable cause existed to arrest Michael White for felony assault, and for domestic violence and to remove him from Ms. Villasenor's trailer per her request. In order to determine if Mr. White was under the influence of drugs to the extent he needed medical assistance, the officers needed to contact him inside the trailer and evaluate his state of mind before they could determine what if any was the appropriate medical care he needed.

**Peace Officer Training on Probable Cause for Arrest & Reasonable Use of Force**

Probable cause for arrest is a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a crime. Probable cause is required before an arrest and is based on the totality of the circumstances.

Facts required establishing probable cause may include, but are not limited to:
- Direct investigation or reports and statements from victims and witnesses
- Circumstantial evidence, or
- Secondhand statements from reliable informants

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Probable cause is a higher level of suspicion than reasonable suspicion. However, factors that contribute to establishing reasonable suspicion can also be used to establish probable cause or can escalate into probable cause.

A peace officer's training and experience factors into the equation for determining probable cause. For officers versed in a specific field of law enforcement, an activity, which might otherwise appear innocent, may help provide probable cause.

Although some courts continue to cite the old definition which requires an "honest and strong suspicion", the trend is toward incorporating the "fair probability" standard that applies to probable cause to search; specifically, probable cause to arrest exists if there is a "fair probability" that the suspect committed a crime. In the absence of direct evidence, officers must rely on circumstantial evidence to establish reasonable suspicion and probable cause. In determining whether probable cause and reasonable suspicion exist, the courts apply the following principles:

**The need for Facts:** The building blocks of both probable cause and reasonable suspicion are specific facts. Sometimes one is enough. Sometimes it takes a combination of facts, but in every case, officers must have something concrete upon which to base a determination that probable cause or reasonable suspicion exist.

**Hunches:** Hunches, unsupported conclusions and rumor are meaningless.

**Good Faith:** An arrest is not justified merely because officers had a "good faith" belief that reasonable suspicion or probable cause existed.

**Common-Sense Interpretation:** Although facts are essential, officers are permitted, actually, required to interpret the facts in light of common sense. In the words of the United Sates Supreme Court:

"Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a practical, non-technical conception. In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act".

## Communicating with Michael White

Corporal Boersma concluded his brief interview with Ms. Villasenor and entered the trailer along with Officer Munoz who just arrived on the scene. Officer Cunningham told Corporal Boersma that Mr. White was in the bathroom and was refusing to come out. Corporal Boersma asked Officer Cunningham and Sergeant Robinson if they had contacted him already. They said they were trying to, stating that he was in this bathroom and he wasn't coming out. They stated White was really agitated and they had a bad feeling about it. That is when Sergeant Robinson called for additional assistance, because White was agitated and he had a feeling that the situation was going to get bad.

*Expert Opinion Report -- V.W. v. City of Vallejo, et al.*

Corporal Boersma said they identified themselves as "Vallejo Police Officers" and they told Mr. White that they just wanted to talk with him and they asked him to please come out of the bathroom. Mr. White repeatedly replied, "Okay, okay" "Wait a minute", but he would not come out of the bathroom. The defendant officers tried to establish cooperation by communicating with him in a manner that reflected both authority and courtesy but Mr. White would not reciprocate.

It was noted that the bathroom door was not closed all the way, but every time the defendant officers pushed on the door to better communicate with Mr. White he would push back on the door preventing the door from opening. All of the defendant officers were concerned about Mr. White's demeanor and his agitated state and they felt that the situation could escalate. Mr. White was not being cooperative and he was not communicating with the defendant officers other than stating he would come out of the bathroom in a minute; it was unknown if he was armed.

Corporal Boersma began pushing on the bathroom door after there was no response from Mr. White to come out of the bathroom to see what he was doing. He stated that as he pushed on the door he looked into the bathroom via the small opening in the door and he saw Mr. White holding a plastic bag in his right hand containing what appeared to be a golf ball size piece of a yellowy, white substance believed to be Methamphetamine. Corporal Boersma loudly announced to his fellow officers that Mr. White was "Eating dope!" He described Mr. White as being husky and muscular; he was shirtless and was approximately 5'8" or taller and approximately 220 pounds.

When Mr. White saw Corporal Boersma he appeared surprised that the officer saw him, and he quickly ducked behind the bathroom door. He stated when he observed what he believed Mr. White was eating suspected methamphetamine he told White to "Throw the dope down, we don't care about the dope, just come on out." The defendant officers began pushing the bathroom door open and Mr. White continued to push back against the door towards the officers until the hinges came off of the door frame.

Mr. White was yelling and screaming loudly. Corporal Boersma described White as not just being under the influence, but as being in "An altered state, seeing things that were not there, and having super human strength", "Superhuman high on dope strength." Corporal Boersma said he believed that Mr. White was in "Another world."

When Corporal Boersma pushed on the bathroom door, White pushed back and refused to allow the officers to enter the bathroom. The combined force applied on the door by the defendant officers and Mr. White pushing on the door was so great that the door was separated from its hinges. Mr. White and Corporal Boersma struggled with one another for control of the loose door. Officer Cunningham was afraid that due to White's great strength and his violent resistance, he believed he yelled, "Taser, Taser" at which time he believed Officer Munoz discharged his Taser at Mr. White.

13

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Officer Cunningham stated he deployed his own Taser at Mr. White when he noticed that Officer Munoz's Taser was not having an effect on White, which caused White to growl and grit his teeth. After the Taser cycled for five-second duration White immediately started resisting again. It was at this point that Mr. White violently resisted Corporal Boersma and Officer Munoz's efforts to take him into custody.

**Symptoms of Bizarre Behavior**

On August 27, 2014, Corporal Boersma gave oral deposition testimony regarding Michael White's demeanor when he contacted him. He stated that during his tenure as a peace officer he did not receive any training on dealing with persons with mental breakdowns, but based on his past experiences as a patrol officer, he has taken conservative approaches when dealing with disturbed or irrational individuals. In this incident Corporal Boersma did not know the exact reason for Mr. White's erratic and bizarre behavior, but he chose to take a low key approach while dealing with him, because he did not want to get White agitated. He said he would use verbal Judo techniques that he was taught and he kept Mr. White contained and not just rush into the bathroom; he wanted to give Mr. White more time to come out of the bathroom on his own terms. Corporal Boersma's approach in dealing with Mr. White is consistent with the recommended approach as outlined in the basic police academy training curriculum when dealing with irrational individuals.

While Corporal Boersma was trained to recognize the signs and characteristics of a condition known as Excited Delirium, he didn't have the level of medical expertise to actually assess whether or not Mr. White was suffering from such a condition. In the calendar year 2010, little was actually known by police officers about this medical diagnosis. Excited Delirium is not a medical condition that peace officers have the duty or the level of expertise to diagnose and is only diagnosed by a medical doctor post-mortem.

On July 16, 2010, at approximately 10:31 a.m. the Solano County Coroner conducted an autopsy by Forensic Pathologist Dr. Susan Hogan. On July 30, 2010, a toxicology report that was conducted by Central Valley Toxicology on Mr. White's blood sample tested positive for Cocaine (0.54mg/L). Dr. Hogan concluded that Mr. White had a massive amount of Cocaine in his body at the time of his death, certainly more than enough to kill him.

**Agitated Chaotic Event or Excited Delirium**

Excited Delirium Syndrome (ED) is widely used in litigation matters involving an in-custody police death and is frequently identified as the primary symptoms an officer should be able to recognize when officers come in contact with individuals displaying bizarre behavior.

In 2010, little was actually known by law enforcement about what would cause an individual to fall into a delirium state. In-service and academy training in 2016 has evolved and is much more extensive than it was in 2010 to identify the causes and characteristics of individuals suffering from delirium.

14

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

An agitated chaotic event (ACE) describes an individual who appears to be in a state of active delirium, but the basis (es) of the cause is unknown. It is important to know that many times people who experience an ACE may demonstrate behavioral cues that mirror those of excited delirium. Regardless of the symptoms, it does not change a reasonable officer's approach when confronting such an individual. A reasonable officer is trained not to attempt to diagnose the cause of an individual's mental state. It is often difficult for even the trained professional to define the causes of delirium in a given individual.

Delirium may be caused by one or variables, such as medications, illicit drugs, synthetic drugs, alcohol withdrawal, infection, autism, head injury, etc. Excited delirium is a mental state a person is in and is not a medical or psychiatric diagnosis. The difficulty surrounding the clinical identification of excited delirium conditions is that the spectrum of behavior and signs overlap with many other clinical disease processes.

Based on the information provided by Ms. Claros, Mr. Wagner and Ms. Villasenor, in addition to their own observations, the defendant officers reasonably believed Michael White was under the influence of a stimulant drug when he committed criminal acts. The toxicology report that was conducted by Central Valley Toxicology, determined that Mr. White's blood tested positive for Cocaine (0.54mg/L) confirms the defendant officer's assessment.

Everything that the defendant officers observed and were told by the involved parties in this incident led them to believe that Michael White was under the influence of an illegal drug that caused him to be aggressive and highly unpredictable. Mr. Wagner told the officers that Mr. White was spitting out small pieces of material that is similar in shape, color and size of rock Cocaine. Ms. Villasenor told Corporal Boersma that Michael White was high on cocaine. Corporal Boersma saw Mr. White in the bathroom holding a golf-sized object in his hand that resembled that of Methamphetamine, and several small twisted plastic bags containing a substance that resembled that of rock Cocaine were found at the incident scene.

Officer Munoz is a drug recognition expert who also reasonably believed Michael White was under the influence of a stimulant drug, based on his demeanor and his aggressive and combative behavior; his actions is consistent with an individual under the influence of stimulant drugs. He said Mr. White was acting very irrational and abnormal. He stated that Mr. White never complained of pain nor did he make any statements to him during the struggle to control him. Any reasonable officer who developed the same facts and circumstances known to the defendant officers at the time of this incident would have reasonably believed the deceased was out of control while under the influence of a dangerous drug.

Even if the plaintiff's argument that the decedent was suffering from mental illness is accepted, the defendant officers would still have to follow proper and safe police practices to determine if the victim who was choked needed medical care, and then locate, control and assess Mr. White before they could provide him with medical care.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

The cause of death due to Excited Delirium is determined post mortem by trained medical practitioners and not by first responder peace officers, because they are not doctors.  It would have been beyond the experience and training of a reasonable officer to attempt to diagnose the decedent's mental condition.

The defendant officers are not trained medical professionals capable of diagnosing the variety of symptoms that may affect an individual's mental state, but they are experienced in how to recognize the obvious indicators that officers may consider when contacting individuals in an agitated chaotic state who may be under the influence of drugs and alcohol.

The objective of every officer who confronts an individual who is violent and out of control, and jeopardizes his safety and that of others, regardless as to the cause of the behavior, is to bring the individual under control and then provide the person with immediate medical care when it is safe for medical professionals to do so.

**OPINIONS:**

**ANY REASONABLE WELL TRAINED PEACE OFFICER FACED WITH THE SAME FACTS AND CIRCUMSTANCES AS THE DEFENDNAT OFFICERS FACED WOULD HAVE CHANGED THEIR ARREST STRATEGY INSTANTLY FROM TRYING TO COMMUNICATE WITH MR. WHITE TO CONVINCE HIM TO SUBMIT TO ARREST, TO USING FORCE WHEN THEY WITNESSED MR. WHITE ATTEMPTING TO INGEST A DANGEROUS AND ILLEGAL SUBSTANCE.**

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD CONCLUDE THAT THE DEFENDANT OFFICERS HAD A DUTY TO PREVENT MR. WHITE FROM CONSUMING AN ILLEGAL SUBSTANCE THAT COULD HAVE CAUSED HIM TO SUFFER A MEDICAL EMERGENCY RESULTING IN HIS DEATH DUE TO AN OVERDOSE.**

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD CONCLUDE THE DEFENDANT OFFICERS HAD PROBABLE CAUSE TO TAKE THE PLAINTIFF INTO CUSTODY FOR THE DESTRUCTION OF EVIDENCE, POSSESSION OF A DANGEROUS AND ILLEGAL SUBSTANCE, RESISTING AN EXECUTIVE OFFICER IN THE PERFORMANCE OF HIS DUTIES, AND FOR A FELONIOUS ASSAULT ON MS. CLAROS.**

**THE FORCE OPTIONS THAT THE DEFENDANT OFFICERS WERE TRAINED TO USE RANGED FROM VERBAL COMMANDS, CONTROL HOLDS AND RESTRAINT DEVICES, ELECTRONIC CONTROL DEVICES, IMPACT WEAPONS AND PERSONAL WEAPONS TO DEADLY FORCE.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**DUE THE FACT THAT MICHAEL WHITE POSITIONED HIMSELF IN THE BATHROOM AND WAS NOT RESPONDING TO VERBAL COMMANDS HE CREATED AN OBSTRUCTION BETWEEN HE AND THE DEFENDANT OFFICERS THAT PREVENTED THEM FROM ENTERING THE BATHROOM TO CONTROL HIM AND UTILIZE CONTROL HOLDS OR LESSER INTRUSIVE FORCE OPTIONS.**

**ANY REASONABLE WELL TRAINED OFFICER WOULD CONCLUDE THAT IT WAS REASONABLE FOR THE DEFENDANT OFFICERS TO ESCALATE TO THE USE OF AN ELECTRONIC CONTROL DEVICE TO OVERCOME MICHAEL WHITE'S VIOLENT RESISTANCE.**

**A REASONALBLE WELL TRAINED OFFICER WOULD BELIEVE MR. WHITE POSED AN IMMEDIATE AND CREDIBLE THREAT TO HIMSELF, TO THE DEFENDANT OFFICERS SAFETY, AND TO THE PUBLIC WHEN THEY DEPLOYED AN ELECTRONIC CONTROL DEVICE TO OVERCOME MR. WHITE'S RESISTANCE.**

The defendant officers became deeply concerned that the longer Michael White remained in the bathroom he could possibly be armed or that he may have gained access to items in the bathroom that could be used as a weapon against the officers. Items that can be commonly be found in a bathroom are scissors, tweezers, nail files, razors and razor blades, combs and brushes, curling irons, tooth brushes, drinking glass, hair spray and cleaning liquids, etc. Any of these items if located and obtained by Mr. White could be used as a weapon against the defendant officers. In spite of their concern, the defendant officers continued to try to convince White to exit the bathroom while they attempted to peer into the bathroom via the partially opened bathroom door to survey his movements.

The dynamics of the defendant officers' strategy of non-confrontation and not immediately challenging Mr. White with force rapidly shifted from a static containment strategy involving calm and low key communications to a dynamic and rapid life threatening event requiring exigent tactics involving an immediate response; the defendant officers reasonably believed Mr. White was destroying illegal drugs by ingestion that could have caused him to experience a drug overdose and possibly cost him his life.

The defendant officers had a duty to control Mr. White so that medical personnel can assess him for his own safety. The defendant officers should not have retreated and backed away from Mr. White and let him calm down while he ingested additional dangerous drugs beyond what he had already taken. It would have been irresponsible for the officers to delay entry into the bathroom to prevent the destruction of evidence and to ignore the threat that the consumption of an illegal substance could have cost him his life. It would be also compromise the peace officer's code of ethics to allow Mr. White to intentionally cause him to harm himself while the officers wait for him to come out of the bathroom.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Due to the fact that Mr. White was violent, uncooperative and acting irrationally, Michael White posed a credible threat to the defendant officers' safety requiring a higher level of restraint. The defendant officers made the decision to use an electronic control device force option that would quickly bring Mr. White under control without him or the officers getting injured.

Corporal Boersma said that as he and Officer Munoz attempted to gain entry into the bathroom to apprehend Mr. White and to prevent him from ingesting what was believed to be a dangerous drug and from destroying the suspected illegal contraband he possessed.

Mr. White's prior assaultive attack on Ms. Claros, his aggressiveness with Ms. Villasenor and his willingness to resist the defendant officers' attempts to take him into custody, caused the defendant officers to use a force option that was reasonably calculated to effect White's arrest while minimizing risks of physical injury to him or the officers. Mr. White pushed back on the door as the officers pushed the bathroom door inward causing the door hinges to pull away from the door frame.

It was at this point that Officer Munoz saw an opening between the door and the door frame and discharged his Taser at Mr. White in the probe mode. Officer Munoz believed that a least one of the probes made contact with his body, because when Mr. White was struck by the Taser probes he screamed, but he continued to push against the door. It was obvious that the Taser did not have the desired effect. Mr. White's reaction to being tased was not a typical reaction; he was not immobilized by the discharge of the Taser. Mr. White was either able to fight through the Taser, the Taser malfunctioned or the wires at the probes were possibly broken causing the Taser to be ineffective.

Due to the ineffectiveness of Officer Munoz's Taser deployment, Officer Cunningham discharged his Taser at Mr. White in hopes of bringing him under immediate control, but White continued resisting the officers by pushing back on the door to prevent the officers from entering the bathroom.

Corporal Boersma told investigators that at one point during the struggle with Mr. White he also tried to activate his Taser, but it would not discharge when he pulled the trigger. He said the display screen illuminated, but the cartridge would not activate; it is possible the Taser failed due to improper positioning of the cartridge or the safety was not completely disengaged.

The use of Taser by both Defendant Officers was in compliance with the City of Vallejo Police Departments Deployment Policy General Order C-3 (Rev February 8, 2010) **Section I.  Policy**:

> **Subsection A:** The department authorizes the use of certain less-lethal control devices, including the Taser in order to reduce and minimize injuries to members, arrestees and persons who present a danger to themselves or others.

> **Subsection B:** The use of the Taser is intended to control persons who are actively violent, actively resistive, or who present a danger to themselves or others.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

> **Subsection C:** Members shall use the Taser only when it appears reasonably necessary, given the facts and circumstances known to the member at the time.

At one point during the back and forth pushing of the door, Mr. White lost his balance and fell to the floor allowing Corporal Boersma and Officer Munoz the opportunity to enter the small confined bathroom.

Officer Munoz tried to grab White's arms but Mr. White began kicking at Officer Munoz and pushing away the officer's arms away from him to avoid being grabbed. Corporal Boersma stated he removed his handcuffs from his duty belt and tried to grab Mr. White's left hand to handcuff it, but because his skin was so sweaty and greasy Mr. White was able to pull his arm free from his grasp.

Corporal Boersma dropped his handcuffs onto the floor so that he had both hands free to control Mr. White, but he was unable to gain control over his left arm. Mr. White used his left elbow to strike Corporal Boersma to prevent being controlled. He struck the Corporal's hand and the left side of his chest at his ribcage several times during the struggle causing stiffness and soreness to both of the Corporal's body parts. A reasonable and well trained peace officer would conclude that Mr. White's violent resistance was criminal in nature and constituted a violation of resisting arrest and a felony violation of resisting an executive officer.

> [**California Penal Code 148a (1):** Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment]

> [**California Penal Code 69:** Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment.]

## OPINIONS:

## THE USE OF A LATERAL NECK RESTRAINT WAS ATTEMPTED BUT NOT APPLIED ON MICHAEL WHITE'S NECK. THE ATTEMPTED APPLICATION DID NOT RENDER MR. WHITE UNCONSCIOUS DURING THE STRUGGLE TO CONTROL HIM.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**THE USE OF A LATERAL NECK RESTRAINT WAS A LAST RESORT WHEN PHYSICAL CONTROL TECHNIQUES AND THE USE OF AN ELECTRONIC CONTROL DEVICE FAILED TO STOP MICHAEL WHITE'S VIOLENT RESISTANCE.**

**THE USE OF THE NECK RESTRAINT WAS CONSISTENT WITH THE VALLEJO POLICE DEPARTMENT'S USE OF FORCE POLICY AND IS A REASONABLE FORCE TECHNIQUE USED BY LAW ENFORCEMENT TO CONTROL A VIOLENT AND OUT OF CONTROL INDIVIDUAL.**

**ANY REASONABLE WELL TRAINED OFFICER FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO CORPORAL BOERSMA WOULD HAVE USED THE LATERAL NECK RESTRAINT TO OVERCOME MICHAEL WHITE'S VIOLENT RESISTANCE.**

**MICHAEL WHITE KNEW OR HE SHOULD HAVE HAD REASONABLY KNOWN THAT HE WAS BEING ARRESTED BY A PEACE OFFICER AND THAT HE HAD A DUTY NOT TO DELAY, OR RESIST THE OFFICERS TRYING TO ARREST HIM. MR. WHITE HAD THE OPPORTUNITY TO SUBMIT TO ARREST AT ANY POINT DURING HIS CONTACT WITH THE DEFENDANT OFFICERS BUT INSTEAD HE RESISTED THEIR EFFORTS TO TAKE HIM INTO CUSTODY.**

Corporal Boersma managed to maneuver behind White in an attempt to control his upper body. Mr. White continued to violently resist both officers' attempts to overcome his resistance. Due to the fact that Mr. White was exhibiting super human strength and could not be controlled by control holds, or the Taser, Corporal Boersma attempted to apply a lateral neck restraint on Mr. White. He said he encircled his arm around Mr. White's neck, but he could not apply the technique, because Mr. White dropped his chin to his chest defeating the application of the restraint. He said his arm encircled White's chin, and as he flexed his arm the focus of the pressure was on both sides of his jaw and not on the sides of his neck. Mr. White continued to struggle with Corporal Boersma as he attempted to break free from his hold.

Corporal Boersma estimates that after an approximate a thirty second struggle on the floor Mr. White stopped resisting, enabling Corporal Boersma to position White prone to the floor and handcuff him. He said he notified the police dispatcher that he did not need additional officer assistance. Corporal Boersma stated that he did not place his knee on Mr. White's back during handcuffing, nor did he see any other officer place their knee into his back.

**The Lateral Vascular Neck Restraint**

The Lateral Vascular Neck Restraint (LVNR) taught by Law Enforcement Training Centers in California is unique as a vascular neck restraint system in a number of ways. First, the goal of the LVNR is not to render a person unconscious but to gain compliance of the subject and to cease their resistance. The LVNR is a control hold that restraints subjects by controlling their neck and limiting their movement.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

It appears that Mr. White managed to defeat the restraint because he was not wearing a shirt and he had excess perspiration on his upper body. He was demonstrating exceptional strength, and by positioning his chin towards his chest he prevented Corporal Boersma from applying adequate pressure to the sides of Mr. White's neck. Had the LVNR been applied to Mr. White's neck he would have become unconscious within seconds during the application of the technique and the defendant officers would have been able to handcuff him without any further struggle with him.

It is my opinion, based on my martial arts training and over forty years of law enforcement experience and defensive tactics training that Corporal Boersma attempted, but was not able to apply the LVNR to Mr. White's neck during the struggle. I have personally applied the LVNR on numerous occasions during my law enforcement tenure and have found that when the restraint is applied, a resisting individual will rapidly lose unconsciousness due to the lack of oxygen in their bloodstream referred to as Ischemic Hypoxia. This condition is caused by arterial or arteriolar obstruction or vasoconstriction.

Mr. White was brought up into a seated position with his head down to his chest. Corporal Boersma became concerned about White's breathing when he noticed that he was clenching his jaws together. He said he became worried that Mr. White had stopped breathing so he quickly ran from the trailer to get a CPR mask. As he left the trailer Officer Melville arrived on the scene. As they both entered the trailer, Mr. White was awake and breathing.

Mr. White was pulled out of the bathroom onto the bedroom floor and placed onto his back as fire personnel entered the trailer. Mr. White was rocking back and forth on the floor, which made it difficult for the medics to grab a hold of him to check his vitals. Mr. White's behavior is described as being demonic. He began screaming loudly and would not allow the medics to touch him. He began kicking at the medics making it impossible for them to check his vitals.

Medical personnel stated Mr. White began "Crazy screaming" and he started kicking at medical personnel in the trailer as they tried to grab a hold of Mr. White to render him medical help. He said White appeared to be consciously kicking at medical personnel as if he was deranged and did not know who the medical personnel were. Officers Koutnik and Melville arrived at the scene and entered the trailer and were able to control Mr. White's legs by turning him over and pinning his legs and then restraining them with a nylon strap. Corporal Boersma stated he left Mr. White and went into the bathroom to recover the suspected contraband but it could not be found.

**Officer Cunningham's Perspective of the Facts**

On June 15, 2010, Officer Cunningham, a veteran peace officer with thirty years of service, was working on the swing shift for the City of Vallejo Police Department as a uniformed peace officer in the Patrol Division. He was assigned to patrol beat 3 with a call sign as 3P3. Officer Cunningham was wearing a department authorized uniform that has two colored Vallejo Police patches on the shoulders on the uniform shirt, and a badge on the left side of the chest along with his badge number.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Officer Cunningham wore a duty belt with a handgun, extra magazines, pepper spray, handcuff, a portable radio and a Taser. Any reasonable person who saw Officer Cunningham wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Officer Cunningham was at Fire Station 28 on Fulton Avenue when he noted the fire department was being dispatched to San Marcus Drive. As Officer Cunningham left the fire station he radioed the dispatch center that he was driving to the police station to exchange his portable radio battery, the police dispatcher contacted him via radio and assigned him to a call for service.

The police dispatcher advised Officer Cunningham to respond with the fire department to 395 San Marcus Drive where an elderly victim had requested an ambulance for a man who allegedly came into her trailer and choked her and fled to his trailer located at 392 San Marcus Drive. He was told the fire department was going to stage in the area of the victim's residence per department protocol.

Officer Cunningham stated that the fire department arrived at the scene ahead of him and then staged in the area while he drove to the victim's residence. When he first arrived on the scene Corporal Boersma and Sergeant Robinson also arrived at the scene. He stated that he saw Corporal Boersma go into the victim's trailer to speak with her.

Sergeant Robinson arrived at the scene and accompanied Officer Cunningham and Ms. Villasenor into her residence. Ms. Villasenor stood in the hallway near the bedroom where Michael who was in the bathroom; the door was partially open. Ms. Villasenor yelled at Michael telling him that the police were in the trailer and they wanted to talk with him.

Ms. Villasenor pushed on the bathroom door and Michael pushed the door back towards her but it would not close all of the way due to clothing items hanging on the door. Officer Cunningham pushed the door partially open and was able to see Mr. White standing in the bathroom shirtless.

Officer Cunningham described Mr. White appearance as sweating and manipulating something in his hand. Upon seeing Officer Cunningham Mr. White immediately attempted to push the bathroom door closed again. Due to Mr. White's physical statute and the fact that it was unknown if Mr. White was in possession of a dangerous weapon or if he had access to objects in the bathroom that could be used as a weapon against the officers. Officer Cunningham told Sergeant Robinson that he feared that Mr. White may become violent and would resist their efforts to take him into custody. He told Sergeant Robinson that he should ask for additional units to respond to assist them.

Officer Cunningham stated he believes he cycled his Taser a total of two or three times. He said that when his Taser was activated Mr. White would grit his teeth, he would tense up and scream, but when the Taser stopped cycling Mr. White continued to violently struggle with the officers. At one point Corporal Boersma attempted to apply a vascular neck restraint on Mr. White's neck but Mr. White was able to prevent the application of the restraint; the attempt proved to be ineffective in stopping Mr. White's resistance.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

It should be noted that every use of force, however minute, poses some risk of serious injury or death. Deploying an ECD on a moving and violently resisting individual who poses an immediate and credible threat to the defendant officers in a small bathroom trailer resulted in Taser probes being lodged in the left side of Mr. White's torso and into his right arm.

It would be reasonable to believe that a police officer, although trained in the use of the Taser, does not always hit precisely a target they aim at when the target individual is moving. There have been numerous cases each year in the United States where law enforcement officers deployed an ECD at a moving, resisting and violent subject and the probes struck an area of the body that was not the intended target.

Accuracy is dependent on the stability of the target, distance from the target and reaction time of the individual and the officer at the times the probes are discharged. Law enforcement officers have known for decades, since the introduction of the ECD, that during a tense and rapidly unfolding violent physical confrontation, it is difficult or impossible to precisely perceive or recall how many force applications or the duration of force applications have occurred.

A common misperception is that the Taser download data showing multiple or prolonged trigger pulls somehow, or to some degree implies excessive delivery of current. In fact, the opposite is true. The primary reason for multiple or prolonged trigger pull is that the fragile wires are broken early on in the encounter and the officer continues to pull the trigger hoping for a response or the individual is not affected by the electrical discharge.

The tiny wires that extend out of the Taser cartridge to the probes are 36 gauges (127microns in diameter, about the diameter of some human hair) and are easily broken during any struggle with an individual, and are typically broken when a subject turns and falls. The tensile strength of the wires is weaker (less than 1 kg) than the weakest fishing line (2kg or 4.5lbs breaking strength) and thus are very easily snapped. There are instances were prisoners currently teach other prison inmates that they should roll over, or spin if they are tased in order to break the wires.

ECD trigger pull records only show that the device was activated, it does not provide any evidence of how many times an ECD was actually applied to a person, for what duration, or in which mode. A trigger pull on an X26 Taser simply indicates that the trigger was pulled and the device was activated, not that any portion of the Taser discharge was effectively delivered to an individual.

In a typical Taser deployment, an officer anticipates his/her actions utilizing the reasonableness and risk-benefit standard. The use of personal force carries with it some risk of injury to the officer himself, and requires that the officer get close enough to the subject to apply the force.

To use a chemical agent such as pepper spray, requires the officer to get fairly close to the individual and carries some risk of the spray hitting and incapacitating an officer and could cause complications in an individual with asthma or some breathing impairment condition.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Normally there is little risk of lasting harm to the subject; although pain is felt until the substance is flushed away. The proper use of a Taser requires neither a close proximity nor carries any serious risk of lasting injury to the individual.

The Taser causes incapacitation and strong muscle contractions making secondary injuries a possibility. These injuries include but are not limited to: cuts, bruises, impact injuries, and abrasions caused by falling, and strain-related injuries from strong muscle contractions such as muscle or tendon tears, or stress fractures.

While the Taser probes entered Mr. White's body, it is unknown why he didn't exhibit intense, acute and even severe physical pain as expected to the point where he was unable to control his muscles. The current flow did not incapacitate Mr. White's neuromuscular system nor did it commandeer his muscles and nerves as anticipated. Mr. White's large muscles did not render him helpless and he did not experience temporary paralysis, nor did Mr. White fall uncontrollably to the floor.

All of the above factors would lead a reasonable officer to conclude that the Taser connection may have been broken between the wires and the probes, or that Mr. White displayed an ultra-exceptional tolerance to the electric charge.

Based on the confined area where the defendant officers were struggling to control Mr. White, it would have been reasonable to continue to activate the Taser to overcome Mr. White's violent resistance until some degree of control could be achieved. If none of the physical control techniques were effective, including the Taser, there was little the officers could have used, short of deadly force, to bring Mr. White under control.

I reviewed the printout of the discharge times of the X-26 Taser device that was deployed in this incident and noted that Officer Cunningham discharged his Taser once for a 5 second period. The printout for Corporal Boersma's Taser did not record a discharge from his Taser. Officer Munoz's Taser didn't record any discharges from his Taser which is contrary to his statements that he discharged his Taser but proved to be ineffective.

**The physical Struggle Continued**

During the struggle in the tight quarters of the hallway and bedroom in the trailer, Officer Cunningham said he managed to pull the door that was knocked off the hinges out of the way of the officers struggling to control Mr. White and move it to the bedroom. After a lengthy struggle with Mr. White kicking and pushing the officers away from him, Officer Munoz and Corporal Boersma managed to handcuff Mr. White's hands behind his back.

After Mr. White was handcuffed, Officer Cunningham pulled up Mr. White from his prone position to a seated position to evaluate his breathing. He said he saw Mr. White clinching his teeth in a very pronounced way as if he was trying to bite though an object.

24

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Officer Cunningham said he didn't know if Mr. White was breathing properly as he clinched his jaw tightly, so he attempted to massage the sterno-mastoid nerves at the base of his ears in an attempt to get him to open his jaw.

Officer Cunningham said as he attempted to massage White's jaw at the base of his ears, he became alert and began to struggle with the officers again and violently kicked at the officers. It is unknown if Mr. White became exhausted or if he fell unconscious momentarily due to over exertion or if his limpness was a ruse.

Due to the fact that Mr. White continued to struggle and kick at the defendant officers and fire personnel, he was laid on his stomach while Officer Cunningham used a hobble strap to secure his feet to his handcuffs. White was then placed onto his side at which time he was observed to be still breathing. Officer Cunningham stated than an officer was kneeling on Mr. White's legs while he attached the nylon strap to his ankles, but none of his fellow officers were seen kneeling on Mr. White's back restricting his ability to breathe freely.

After Mr. White's legs were brought under control, the defendant officers placed White onto his side and later carried him to the gurney were his handcuffs were removed from his back and attached to the gurney for security reasons and to allow the medics to provide White with prompt medical care.

## Victim Elizabeth Claros Perspective of the Facts

Ms. Elizabeth Claros lived at her San Marcus Drive address for over twenty years and knows most of her neighbors. She stated that she is good friend with Linda Villasenor and her nine year old son, who lives across the street from her trailer located at 392 San Marcus Drive. Ms. Claros told investigators she had known Michel White for the past several months, ever since he moved in with Ms. Villasenor. She said she has seen Michael several occasions, but they rarely spoke with one another at any length. Ms. Claros said she did not like Mr. White and always had a "Bad feeling" about him. She said she didn't feel comfortable around him; she did not trust him and considered him to be dangerous.

Ms. Claros was interviewed by criminal investigators on June 15, 2010, at approximately 7:45 pm regarding the facts and circumstances surrounding her encounter with Mr. White. Ms. Claros told the investigators that earlier in the day she was picking plumbs from her tree along with her neighbor Kenneth Carter, when Michael White walked past her residence. Ms. Claros said that she asked White if he would like to have some plumbs but he replied "No" and continued to walk away.

The investigators learned that a short time after the brief encounter with Mr. White, Mr. Carter returned to his trailer, which was located across the street, while Ms. Claros walked down the street to visit with an elderly female neighbor. Ms. Claros' neighbor friend was not home so she returned to her trailer.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

As Ms. Claros walked through her front gate onto her porch she was attacked from behind. She said someone ran up behind her and reached over her right shoulder and grabbed her neck. Ms. Claros described the attack as being so forceful that it bent her neck violently toward her left shoulder. Realizing that she was being attacked, she looked behind her and saw that Michael White was the sole attacker. Ms. Claros did not know why White would attack her and she told the investigators that she was in fear for her life. She said she looked at White's eyes and she believed he was "Out for blood" and "Wanted to kill somebody."

It was learned that during the attack Ms. Claros heard White say, "Help Me" and "Let me in." Ms. Claros said she resisted White by ducking and pulling away from his grasp. Once she broke free she ran away. Mr. White turned and ran across the street toward 392 San Marcus Drive. Mr. White ran to the rear of a vehicle parked in the driveway of 392 San Marcus Drive. He bent down and tightly hugged Linda Villasenor around the waist. She said she saw Mr. Carter arrive at Ms. Villasenor's trailer and noted that he attempted to calm White down by repeatedly telling him to "Calm down man."

Ms. Claros said she called 911 and told the dispatcher that she needed an ambulance for a man who just hit, grabbed and choked her. She said she didn't know the reason why he assaulted her and she stated she didn't know the man but knew he lived at 932 San Marcus Drive. When the first group of officers arrived at the scene Ms. Claros told them that Mr. White attacked her and she directed them to his trailer located across the street from her trailer. Shortly thereafter, more police officers, fireman and ambulance personnel arrived at White's residence.

Ms. Claros said she remained on her porch and was looking through the lattice fence when she saw four police officers carry Mr. White out of his residence by each of his limbs to an ambulance gurney. Mr. White appeared to be "Lifeless."

**Witness Kevin Carter's Perspective of the facts**

Mr. Carter was interviewed by investigators from the District Attorney's Office regarding his knowledge of the facts and circumstances surrounding the attack on Ms. Claros. Mr. Carter told investigators that he was watering the grass on his property when he heard someone located a few trailers from his trailer yelling loudly. He said he looked in the direction of the noise and saw Michael White run from the porch located at 395 San Marcus Drive.

Mr. Carter said Michel grabbed a woman that he lives with in front of trailer #392 by the shoulders and appeared to be "Kind of wrestling" with her. Mr. Carter walked over to the trailer where Michael was located and asked him, "Dude, what's up man?" "Calm down", "Calm down." Mr. Carter told the woman, later identified as Ms. Villasenor to step aside, which she did as Michael ran towards the back door of the trailer. The woman started to walk towards the back door and Mr. Carter told her not to follow Michael; he told her to let him handle Michael.

Mr. Carter approached Mr. White and told him to sit down and relax and he explained that no one was trying to hurt him. Mr. Carter told investigators that Michael's "Mind had snapped." Mr. Carter lightly touched Michel's arm as he talked with him trying to calm him down.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Mr. White pushed Mr. Carter away and yelled, "Get off of me!" "Get away from me." He said Michael was mumbling and continuously checking his pockets as if he was looking for something. He described his speech and behavior as incoherent. Mr. Carter believed Michael was "Scared" but Mr. White never said he was scared nor did he say he was trying to get away from anyone. Mr. Carter described Michael's behavior as "Paranoid." He also said he was "Sweating profusely' even though the temperature outside was mild.

The investigators learned that Mr. Carter observed Michael spitting "White things" from his mouth that resembled a tiny white rock. Mr. Carter further described the object in his mouth similar to "A piece of tooth or something." Michel ran away from Mr. Carter into the trailer and he heard Ms. Villasenor yelling at Michael to get out of her house. Ms. Villasenor went into the trailer and came back out stating Michael was in the bathroom. Both Ms. Villasenor and Mr. Carter waited outside the trailer until the police arrived.

Mr. Carter stated that the next time he saw Michael was when the police carried him out of the trailer in handcuffs. He stated it appeared to him that Michael was alive, because he lifted his head up as he was being carried. The officers put Michael face down on the gurney, but as the gurney was being placed in the ambulance approximately thirty seconds later, Michael was seen lying on his back on the gurney.

Mr. Carter believes that "Something snapped" in Michael's mind and that "It triggered something very violent inside his head." Kenneth said that he personally spent time in prison and has been around men who have "Snapped"; he believes Michael was having a "Psychotic episode."

## Linda Villasenor's Perspective of the Facts

Ms. Villasenor lives at 392 San Marcus Drive with her son Kenneth Araujo. When Ms. Villasenor was interviewed, she informed the investigators that Michael White is her boyfriend who comes and goes from the house on occasions. She said she was aware that Michael was on parole and that he used her home address for his place of residence.

Ms. Villasenor stated that on June 15, 2010, Michael White call her asking if he could come over to the house to have a plate of food, and she agreed. Michael arrived at Ms. Villasenor's trailer and he walked into the house without knocking. She said she was cooking when all of a sudden Michael got up and ran out of the house for no apparent reason.

At first Ms. Villasenor thought Mr. White was going to jump the fence located at the rear of her trailer that leads to Lemon Street, but a short time later she heard her neighbor Elizabeth Claros yelling.

Ms. Villasenor went outside and saw Michael leaving Ms. Claros' yard. She heard someone yelling something in terms of the word "Crazy" as he left Ms. Claros' property. Michael reportedly crossed the street to where Ms. Villasenor was standing and hugged her firmly to the point that it scared her. She described Michael's behavior as being "Crazy."

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Ms. Villasenor stated that as Michael White hugged her, it was so hard that he scratched her on her right chest. Mr. White told her that someone was chasing him; however she did not see anyone in the immediate area. Ms. Villasenor yelled into the house and told her son to lock the door and not let Michel in the trailer. She stated that Mr. White would not let go of her and ran into the house via a door that was unlocked. When Michael ran into the trailer Ms. Villasenor's son ran out of the trailer via the other door holding a baseball bat.

Ms. Villasenor told investigators that a male neighbor, later identified as Kenneth Carter walked up to her and told her that she had better stay clear of Mr. White, because he felt he looked like he snapped and he warned her not to go in the trailer. Ms. Villasenor remained outside and yelled at Mr. White to calm down; she stated she did not understand what was happening and his behavior scared her.

When the defendant officers arrived at the scene they contacted Ms. Villasenor and asked her if she would assist them to convince Mr. White to come out of the house. She said she led the officers into the house and into her bedroom where Mr. White was located in the bathroom. She said she yelled at him and told him that the police were present in the trailer and she asked him to come out of the bathroom; he did comply with her request. Ms. Villasenor also recalls the defendant officers shouting at Mr. White to come out of the bathroom but he did not comply.

Ms. Villasenor said she met Michael White in March 2010 at a party and he later moved in with her. She said Michael needed a place to stay to satisfy his parole requirement. She said Mr. White has been staying at her trailer every night since he moved in. She stated that when she saw Mr. White today he looked "Like the devil." She described his eyes as cold, he had a stiff appearance to him in his movement, and his body was shaking prior to the incident occurring.

**Kenneth Araujo's Perspective of the Facts**

Kenneth Araujo is the nine year old son of Ms. Villasenor. He was interviewed by investigators regarding his knowledge about the incident involving Michael White. He stated that on June 15, 2010, he was inside his bedroom watching television and playing video games. He said his mother was in the kitchen cooking when Michael arrived.

Kenneth stated his mother and Michael both went into her bedroom and Kenneth saw Michael White "Dash" out of the bedroom and out the front door. He said his mother told him that Mr. White had been choking her, "Not that much though." He said he didn't hear any arguing or yelling between Mr. White and his mother.

After Michel ran out of the trailer Kenneth heard Mr. White and Ms. Claros yelling through an open window in the trailer. He said he was yelling very loudly, but she couldn't understand what he was saying. Kenneth said it seemed like Mr. White was "Kinda scared" and mad but he said he didn't know why. He said his mother followed Mr. White outside and was trying to calm him down when Mr. Carter came over and told Mr. White that he wasn't going to hurt him.

28

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Ms. Villasenor reportedly told her son to lock the doors to the front door to prevent Mr. White from entering the trailer.  Kenneth said he locked the front door but Mr. White entered the trailer through the backdoor before he could lock it.  Kenneth said he ran out of the trailer holding a baseball bat in case he had to defend him or his mother from Mr. White.  His mother told him to run next door to Ms. Claros' house so that he would be safe.  He said he went inside Ms. Claros' home and hid under a table in a corner of her home.

**OPINIONS:**

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD BELIEVE THE DEFENDANT OFFICERS HAD PROBABLE CAUSE TO ARREST MICHAEL WHITE FOR A VIOLENT ASSAULT ON A CITIZEN, A PEACE OFFICER AND A FIREFIGHTER, FOR DOMESTIC VIOLENCE, FOR POSSESSION OF A CONTROLLED SUBSTANCE, FOR BEING UNDER THE INFLUENCE OF A CONTROLLED SUBSTANCE AND FOR OBSTRUCTING DELAYING AND RESISTING A PEACE OFFICER.**

**A REASONABLE WELL TRAINED PEACE OFFICER WOULD BELIEVE THE AMOUNT AND THE TYPE OF FORCE USED BY THE DEFENDANT OFFICERS TO TAKE MICHAEL WHITE INTO CUSTODY AND TO OVERCOME HIS VIOLENT RESISTANCE WAS CONSISTENT WITH THE OFFICERS' TRAINING AND WAS APPROPRIATE AND IMMEDIATELY NECESSARY.**

**THE USE OF FORCE USED BY THE DEFENDANT OFFICERS IS CONSISTENT WITH THE VALLEJO POLICE DEPARTMENT'S USE OF FORCE AND "RIPP" HOBBLE RESTRAIN POLICY, LAW ENFORCEMENT PRACTICES, STATE AND FEDERAL STATUES AND CASE LAW.**

**ANY REASONABLE WELL TRAINED PEACE OFFICER, FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO THE DEFENDANT OFFICERS AT THE TIME OF THIS INCIDENT, WOULD RESORT TO USING CONTROLLING AND INJURING FORCE AND A LEG RESTRAINT DEVICE TO PROTECT THEMSELVES AND MEDICAL PERSONNEL FROM BEING SEVERELY INJURED AND TO TAKE MR. WHITE INTO CUSTODY.**

**THE USE OF AN ELECTRONIC CONTROL DEVICE IS AN EFFECTIVE LAW ENFORCEMENT FORCE OPTION TO CONTROL AN INDIVIDUAL WHO IS RESISTING ARREST AND POSES AN IMMEDIATE AND CREDIBLE THREAT TO AN OFFICER'S SAFETY AND TO THE SAFETY OF THE PUBLIC.**

**THE USE OF AN ELECTRONIC CONTROL DEVICE TO CONTROL AN INDIVIDUALWHO IS RESISTING ARREST IS CONSISTENT WITH THE VALLEJO POLICE DEPARTMENT'S USE OF FORCE POLICY AND LAW ENFORCEMENT POLICIES AND PROCEDURES.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**ANY REASONABLE OFFICER, FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO OFFICERS CUNNINGHAM AND MUNOZ, WOULD HAVE DEPLOYED AN ELECTRONIC CONTROL DEVICE TO OVERCOME MICHAEL WHITE'S ACTIVE AND VIOLENT RESISTANCE.**

On June 15, 2010, Officer Munoz, a 22 year law enforcement veteran, was working on the swing shift from 2 pm to midnight as a uniformed peace officer in the Patrol Division. Officer Munoz wore a department authorized uniform that has two colored Vallejo Police Department patches on the shoulders, a badge on the left side of the chest along with his badge number. He wore a duty belt with a handgun, extra magazines, pepper spray, handcuff, a portable radio and a Taser. Any reasonable person who saw Officer Munoz wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Officer Munoz was in the 300 block of Hilary Way, in the City of Vallejo, when he heard the dispatcher assign Officer Cunningham as the primary officer to investigate a reported battery at the Vallejo Mobile Estates located on San Marcus Drive. He stated he heard Officer Cunningham tell the dispatcher that his portable radio was not working properly due to a battery problem, and he also heard Sergeant Robinson and Corporal Boersma notify the dispatcher of their arrival at the incident scene. Due to the fact that Officer Munoz had just cleared a call he had responded to, and the nature of the call for service, he decided to drive to San Marcus Drive to assist his fellow officers.

When Officer Munoz arrived on San Marcus Drive he noted that Officer Cunningham was located inside Mr. White's trailer and he heard Sergeant Robinson radio a request for additional units to respond to the scene for assistance. He said he observed Corporal Boersma standing in front of a trailer speaking with an older white female, and when he contacted Corporal Boersma he told him to come with him into the trailer to assist Sergeant Robinson and Officer Cunningham.

Officer Munoz stated he and Officer Boersma entered the trailer through a side door located adjacent to the carport to assist his fellow officers. He said he walked down the hallway into the master bedroom and heard Officer Cunningham and Sergeant Robinson talking with a person, later identified as Michael White, asking him several times to come out so they could speak with him but he refused to come out of the bathroom.

As Officer Munoz was standing near the open bathroom door, Mr. White attempted to close the door to prevent the officers from reaching him but the door would not close all the way. He could hear Mr. White mumbling sounds that were unintelligible. He said he told Mr. White to come out of the bathroom to talk with him but he did not respond to him. Due to the fact that Mr. White was not searched nor was the bathroom, Officer Munoz feared Mr. White may be armed or may arm himself with a dangerous weapon or other injurious items while inside the bathroom.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

As Mr. White attempted to close the bathroom door, Officer Munoz grabbed ahold of the door to prevent the door from closing. Mr. White also grabbed the door with both of his hands and the two of them struggled for control of the door.

Officer Munoz believes Mr. White managed to rip the door hinges off of the door jam, and while holding onto the door with both of his hands, he twisted the door downward and thrust it forward nearly parallel to the floor and directed it at Officer Munoz. Officer Munoz continued to grab onto the door and tried to hold onto it to avoid being struck with the door.

Mr. White's resistance continued as he failed to obey Officer Munoz's commands to get down on the floor. He said Mr. White was not wearing a shirt and appeared very muscular and very sweaty. Based on Officer Munoz's experience and training as a drug recognition expert during his twelve year employment with the California Highway Patrol, it was Officer Munoz's opinion that Mr. White appeared to be in a rage while under the influence of a stimulant drug. Due to the immediate threat that Mr. White posed to Officer Munoz and his fellow officers, Officer Munoz made the decision to deploy his Taser to overcome Mr. White's violent resistance.

Officer Munoz stated he aimed the Taser at Mr. White's stomach area and discharged the Taser at him. He said he saw one of the probes strike White in the stomach and one impacted the upper portion of his chest. When the Taser charge was activated, Mr. White tensed up, he flexed his muscles and stood up and began pushing the door against the officers again. At one point Officer Munoz said he managed to pull the door away from Mr. White and then backed away from him to avoid being struck by the door. Mr. White began to charge forward toward the threshold of the bathroom, and he believed he had to stop him from leaving the bathroom, because he reasonably believed Mr. White would overpower him and possibly disarm him.

Officer Munoz activated his Taser for a second cycle, but the Taser appeared not to affect him, so he activated the Taser a third time, but it had no effect on overcoming Mr. White's resistance. It is unknown if one or both probe wires became separated from the probe to the Taser during the struggle, or if Mr. White's nervous system was not affected by the current flowing through his body due to his high pain threshold.

Officer Munoz stated that all of the officers present in the trailer identified themselves as police officers and were yelling and ordering Mr. White repeatedly to get down on the floor but he would not comply. Due to the fact that all of the defendant officers were wearing police uniforms, and there was ample lighting conditions in the bedroom and the bathroom, Mr. White should have reasonably known that he was being arrested by police officers. Officer Munoz stated that Mr. White looked directly at him and Corporal Boersma; he should have reasonably recognized both of them as peace officers.

Officer Munoz stated that at one point during the struggle, he heard Corporal Boersma remark that Mr. White had something in his right hand, and he thought that he saw drugs in a plastic bag that he was holding onto but he wasn't certain.

31

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

At one point he described White going to the floor but still resisting the officers' efforts to take him into custody. Officer Munoz stated that he cycled his Taser a fourth time but it had no physical effect on controlling Mr. White, which again could possibly have been the result of a faulty Taser or a broken probe wire or Mr. White's tolerance to the Taser.

While Mr. White was prone on the floor, Officer Munoz handed his Taser to Officer Cunningham and told him don't activate it, because Mr. White was trying to push himself up from the floor. When Mr. White placed his left hand on the floor and appeared to try to push himself up from the floor, Officer Munoz grabbed White's hand and attempted to push him to the floor. He then used both hands and his upper body to bring one of Mr. White's arms behind his back to handcuff him.

Mr. White continued to pull his arm away and tried to get up from the floor. Officer Munoz delivered three distraction blows to the side of Mr. White's upper body in an attempt to bring him into submission. After the third blow was delivered, Mr. White's extreme resistance and subsided and he was able to bring him arm to his back and attach a handcuff on Mr. White's wrist. After the one handcuff was applied Mr. White's resistance immediately resumed and he continued to resist Officer Munoz's efforts to handcuff him.

Mr. White was yelling and he violently resisted the officers' efforts to bring him under control. Officer Munoz had to use both hands to pull with all his strength on the handcuff to bring Mr. White's arm behind his back. Corporal Boersma helped Officer Munoz bring Mr. White's unsecured arm behind his back where it was handcuffed. Once Mr. White was secured in handcuffs, Officer Munoz called for medical assistance due to the fact that he had deployed his Taser.

Moments after Mr. White was handcuffed, Officer Munoz noticed that Mr. White was unresponsive. Officer Munoz and his fellow officers sat Mr. White up into a seated position where he was propped up against Officer Munoz's legs while in a seated position with his head back. Officer Munoz checked Mr. White for a pulse; a strong pulse was felt. As Officer Cunningham tried to open Mr. White's jaw and to maintain an open airway, Mr. White became alert and responsive and his resistance continued.

The fire department paramedics arrived on the scene when Mr. White regained consciousness. Mr. White kicked and assaulted the paramedics, which forced the officers to place Mr. White back onto the ground in a prone position. Officer Munoz said he placed his knee on Mr. White's back to pin him to the floor to prevent him from committing any further assaults on the officers and the paramedics.

It was at this point that Officers Koutnik and Melville came into the trailer and placed a RIP hobble restraint around Mr. White's legs and ankles, and then attached the hobble up and around the handcuffs to prevent Mr. White from using the power of his feet and legs to assault the officers. Once the strap was attached to the handcuffs, Mr. White was immediately turned onto his side to that he would not be in a prone position on his stomach.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

## Sergeant Robinson's Perspective of the facts

On June 15, 2010, Sergeant Robinson was working on the dayshift for the City of Vallejo Police as a uniformed peace sergeant in the Patrol Division. He was wearing a department authorized uniform that has two colored Vallejo Police patches on the shoulders, a badge on the left side of the chest along with his badge number.

Sergeant Robinson wore a duty belt with a handgun, extra magazines, pepper spray, handcuff, a portable radio and a Taser. Any reasonable person who saw Sergeant Robinson wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Sergeant Robinson said that at approximately 3:16 pm to 3:20 pm, he heard the dispatcher assign officers to investigate a report of an assault at 392 San Marcus Drive, in the City of Vallejo, California. A large black male adult reportedly grabbed the victim by the neck and assaulted her. He stated Officer Cunningham and Corporal Boersma were dispatched to handle the call. Due to the fact that Officer Cunningham was having portable radio problems, Sergeant Robinson decided to respond to the call to assist the officers.

Sergeant Robinson stated that when he arrived at the scene, an unknown citizen flagged him down and stated, "That guys crazier than hell, he's high on dope." The officers contacted the victim who was highly upset. She told them that a large black man, later identified as Michael White, had "Come across the "Way" and for no reason came onto her property.

Ms. Claros said the man grabbed her by the neck and started choking her and then threw her onto the floor. She said she didn't know the man's name but she said he was staying at 392 San Marcus Road. Corporal Boersma remained with the victim while Sergeant Robinson attempted to contact Mr. White.

Sergeant Robinson contacted the female resident at 392 San Marcus Drive, later identified as Linda Villasenor who told him that Michael White is a homeless transient and was staying with her. She said that White looked like he was wild and crazy and looked like he was on drugs. Ms. Villasenor said Mr. White was located inside her trailer and she said she did not want Mr. White to remain in her home any longer.

Officer Cunningham and Sergeant Robinson entered Ms. Villasenor's trailer and found Mr. White in the master bedroom bathroom. The bathroom door was closed. Officer Cunningham attempted to talk to Mr. White by telling him, "We're here to help you, we're the police, and that we only want you to come out and talk to us." Mr. White responded irrationally to Officer Cunningham stating that the officers could not get him to exit the bathroom.

Sergeant Robinson said both he and Officer Cunningham tried to open the bathroom door but Mr. White pushed back on the door preventing them from entering the bathroom. After Officer Cunningham was able to look into the bathroom and view Mr. White's physical statute, Sergeant Robinson contacted the dispatcher and requested extra units respond to assist them. Officer Munoz arrived at the scene shortly after making the request for extra help.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Sergeant Robinson made the decision to enter the bathroom and detain Mr. White. He said the bathroom door was forced open enough so that one of the officers could discharge their Taser as Mr. White. When the Taser was fired at Mr. White, he began screaming but he continued to resist the officers' attempts to push open the bathroom door. Sergeant Robinson said it was his impression that Mr. White was high on some sort of controlled substance, he was irrational, extremely heavily built and that he was actively resisting officers.

Mr. White continued to struggle with the officer even after the bathroom door came off of the hinges at which time a second Taser was fired at Mr. White. Officer Munoz managed to grab the door from Mr. White's grasp and hand it off to Sergeant Robinson. He said the Taser appeared to affect Mr. White, but only momentarily, because White would be able to fight through the Taser discharges.

Sergeant Robinson stated that due to the level of Mr. White's resistance, and his mental state of mind, and his sweaty and oily body, physical force had to be used to get his arms into control holds. Mr. White continued to actively resist the officers by ripping his arms away from the officers' grasp as they struggled with him.

It was extremely difficult to control White, even with four officers struggling to control him. He stated that he observed Corporal Boersma attempt to apply a lateral vascular restraint on Mr. White's neck but it was not effective. He also saw Officer Munoz punch Mr. White two to three times with distraction blows in an attempt to overcome his resistance; no other weapons were used by the officers.

Sergeant Robinson said that after Mr. White was handcuffed he was sat upright and he noticed that he went limp. When Officer Munoz moved Mr. White's head he regained consciousness and he began resisting again and tried to get up from the floor. It was at this point that Sergeant Robinson called for medical assistance. Mr. White was rolled onto his stomach just as Officers Koutnik and Melville and medical personnel arrived at the trailer.

As the medics attempted to render aid to Mr. White he began resisting again and kicked at them. The officers were able to restrain White's legs by hobbling them with a strap. Even with his legs restrained, Mr. White continued to resist the officers.

The defendant officers carried Mr. White out of the trailer and placed him on his side onto the gurney. Sergeant Robinson said White appeared conscious and "He looked fine." A short time later, the medics told him that Mr. White had stopped breathing in the ambulance.

## Officer Melville's Perspective of the Facts

On June 15, 2010, Officer Melville was working on the swing shift for the City of Vallejo Police Department as a uniformed peace officer in the Patrol Division. He was wearing a department authorized uniform that has two colored Vallejo Police patches on the shoulders, a badge on the left side of the chest along with his badge number.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Officer Melville wore a duty belt with a handgun, extra magazines, pepper spray, handcuff, a portable radio and a Taser. Any reasonable person who saw Officer Melville wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Officer Melville was on patrol when he heard the tone of the emergency button activation on a portable radio of an officer investigating a call for service at 395 San Marcus Drive. After hearing a second activation, he drove to the location code three. As he neared the trailer park, an officer put out a code four radio code indicating that the situation was under control. A short time later an officer radioed he needed a code three response from the medics.

When Officer Melville arrived on the scene he obtained his CPR mask and entered the residence at 392 San Marcus Drive. He said she saw Corporal Boersma, Officers Munoz and Cunningham and Sergeant Robinson in the bedroom along with Michael White who was lying on the floor on his side. Mr. White was agitated and Officer Melville could see that his eyes were open and he was breathing.

Officer Melville stated that since Mr. White wasn't struggling with his fellow officers, he went outside the residence and waived the medics over to enter the residence. He said that when he re-entered the residence he heard a struggle occurring. Officer Melville said he saw Officer Munoz struggling with Mr. White who was on his stomach trying to get up from the floor. He said he tried to grab Mr. White's legs to control him but White kicked Officer Melville away from his legs.

When Officer Koutnik arrived at the residence both he and Officer Melville were able to overpower him and place his legs in a figure four position towards the small of his back in a crossed leg position. Officer Melville obtained a hobble from Officer Cunningham and secured it to White's legs and then to White's handcuffs. Officers Melville, Koutnik and another officer carried Mr. White out of the residence and placed him on a gurney located outside the residence. While transporting Mr. White from the residence Officer Melville reported that even though White's legs and arms were restrained, he continued to wiggle and struggle with the officers in an attempt to break free from the officers.

When Mr. White was placed on the ambulance gurney Officer Melville said he was asked to release the handcuffs on White's wrists so that he could lie on his back. He removed the handcuff on one of Mr. White's arms and attached it to the side of the gurney. He then wrapped the foot hobble around the bottom of the gurney. Officer Melville entered the ambulance while Mr. White was being transported to Kaiser Hospital. He removed the handcuffs from Mr. White when it became apparent that he was in distress.

## Officer Koutnik's Perspective of the Facts

On June 15, 2010, Officer Koutnik was working on the swing shift for the City of Vallejo Police Department as a uniformed peace officer in the Patrol Division. He was wearing a department authorized uniform that has two colored Vallejo Police patches on the shoulders, a badge on the left side of the chest along with his badge number.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Officer Koutnik wore a duty belt with a handgun, extra magazines, pepper spray, handcuff, a portable radio and a Taser. Any reasonable person who saw Officer Koutnik wearing his uniform and driving his patrol car would have immediately recognized him as a peace officer.

Officer Koutnik stated the heard the original dispatch assignment on San Marcus Drive and he heard the emergency activation code from an officer's portable radio. He said the police dispatcher directed all available units to go to 392 San Marcus Drive; he drove code three to the scene.

Prior to arriving to the scene, Officer Munoz put out a code-four response and then he heard someone request medics. He then heard Sergeant Robinson make a code-three request for medics to respond. When Officer Koutnik arrived on the scene, he entered the residence and heard a person yelling and screaming in the rear bedroom and he heard someone ask the officers to take Mr. White to the gurney.

As Officer Koutnik began moving household items out of the hallway in order to get a gurney inside the residence, Mr. White became aggressive and was screaming as he lay on the floor kicking his legs. He said he saw Mr. White kicking a firefighter who was attempting to hold onto his legs. He also saw Officer Melville attempt to grab Mr. White's legs but was kicked to the side by Mr. White.

Officer Koutnik, with the assistance of Officer Melville, managed to grab Mr. White's legs and cross them and pin them towards his back. While positioning the legs was effective, Mr. White continued yelling out of frustration, but there were no audible words that could be understood. While holding onto Mr. White's crossed legs, Officer Cunningham handed Officer Melville a leg restraint and they secured it around his legs and handcuffs per department procedure. Mr. White continued to attempt to get out of the restraints but he was contained and unable to break free.

Mr. White was carried out of the trailer and placed on the gurney and a medic or a fire fighter stated that Mr. White had a good airway. Officer Koutnik rolled Mr. White over onto his side at which time his body rolled on the gurney and almost rolled onto his back; he then stopped moving. Officer Koutnik recalls getting into the ambulance and unlocking the handcuff and attaching it to the gurney while another officer removed the leg restraint from Mr. White's legs.

**EMT Waggener's Perspective of the Facts**

EMT Waggener and his partner, Paramedic Steele, responded Code three to the incident scene regarding a victim that had been "Choked." Waggener said while waiting to enter the scene, he overheard a radio broadcast from an officer requesting the medics to enter the residence.

Mr. Waggener stated that he drove to the San Marcus address, he parked in front of 392 San Marcus Drive and when he entered the trailer to see what equipment he needed he saw Mr. White struggling with the defendant officers and the firefighters.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

EMT Waggener said he left the trailer to get the gurney out of the ambulance. He said the defendant officers carried Mr. White out of the trailer and placed him on the gurney where he stopped breathing. He said the officers held onto Mr. White by his armpits and the leg areas, and he said he never saw the officers make contact with Mr. White's head or neck.

## Paramedic Steel's Perspective of the Facts

Paramedic Steel stated that after arriving at the incident scene, she went inside Mr. White's trailer to assist the defendant officers. She said there were several officers and firefighters in the room which made it difficult for her to see what was occurring because the room was so small. She stated that she accompanied EMT Waggener and left the residence to get the gurney ready to transport Mr. White.

Paramedic Steel said she saw the defendant officers carry Mr. White from the residence handcuffed; he was placed on the gurney and he was not breathing. Paramedic Steel doesn't recall seeing Mr. White moving or speaking during the transport. She said the officers were not touching Mr. White's neck or head.

## Fire Captain Matt Fenzl's Perspective of the Facts

On July 15, 2010, at approximately 9:30 pm Vallejo Fire Captain Matt Fenzl was interviewed by investigators. He stated that he was dispatched to 392 San Marcus Drive for an unknown medical event and was told to stage and wait for officers to call him into the residence.

Captain Fenzl stated he was staged at the trailer park for about five minutes before the officers requested he respond to the residence code three. Captain Fenzl was the first fireman to enter the residence. He said he saw Mr. White lying on his side on the bedroom floor and described Mr. White as breathing and calm. He said additional fireman entered the residence and were trying to get a pulse and blood pressure reading on Mr. White when he became agitated; he was kicking, grunting and arching his body and rolling around. Captain Fenzl said Mr. White was using every bit of his energy to keep the firemen and the police officers away from him.

Due to Mr. White's aggressive posture, the firemen were unable to obtain his vital signs and backed away from him for their safety. He said the officers strapped Mr. White's feet, they carried him out of the trailer and placed him on the gurney and then rolled him onto his back. It was at this point it was noticed that Mr. White was not breathing and had no pulse. CPR was started and Mr. White was put in an ambulance and transported to Kaiser Hospital. He stated he accompanied Mr. White in the ambulance and assisted the paramedic perform CPR on him.

## Paramedic/Firefighter Hill's Perspective of the Facts

On June 15, 2010, Paramedic Hill stated his engine company was sent to the area of the trailer park where they staged at the entrance to the mobile home for approximately five to seven minutes. While on standby, he heard the police dispatcher broadcast an "11-99" requesting all available officers respond to 392 San Marcus Drive.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Paramedic Hill stated that when he and Paramedic Libby pulled up to the address, they were directed into the residence; he saw multiple officers standing in the bedroom and the hallway. Hill stated that he saw Mr. White lying on the floor handcuffed; he was face down and groaning and rolling around the floor. He said there was nobody on top of White as he continued to kick and roll around on the floor. Mr. White was yelling and groaning in an "Incomprehensible speech."

Paramedic Hill said Engineer Libby began cutting the Taser wires off of Mr. White to prevent them from getting tangled with them. Hill stated as when he tried to roll Mr. White over to assess his airway Mr. White became combative and he began kicking at them and thrashing around the floor. The defendant officers in the room assisted Hill in rolling him over.

As Paramedic Hill began assessing Mr. White, he became more aggressive and combative by thrashing his body and he was kicking in a violent manner. Even though Mr. White was handcuffed with his hands behind his back, he continued thrashing his upper body around. The defendant officers made the decision to use a nylon strap device to restrain Mr. White's legs so that Paramedic Hill could safely access his vital signs. Hill stated that as the officers attempted to restrain his legs, Mr. White continue kicking and thrashing around the floor.

Paramedic Hill stated that based on the confined area of the trailer and the fact that White continued to be combative, it would be more advantageous to remove White and take him outside to the awaiting ambulance. The defendant officers lifted White up from the ground and carried him out of the trailer.

During the transport out of the residence, Mr. White was groaning and he continued moving around. Mr. White was placed face down on the gurney and then rolled over. It was at this point that Mr. White appeared to be in distress. When Paramedic Hill attached an EKG monitor to Mr. White it indicated that he had no heart rate. CPR was immediately administered and Mr. White was transported to Kaiser Hospital in Vallejo where he was pronounced dead by the emergency room medical team.

**Fire Engineer Mark Libby's Perspective of the Facts**

On June 15, 2010, Mark Libby was working as an Engineer/Driver for Engine number 6 when he and Paramedic Hill were dispatched to 392 San Marcus Drive, but were asked to stage outside the trailer park. The police eventually asked him to enter the trailer park and come to the residence. Libby said he walked into the mobile home and saw Mr. White lying face down on the floor handcuffed. He stated that there were several officers in the room and he saw Paramedic Hill along with other emergency personnel attempting to assess Mr. White's medical condition.

Fire Engineer Libby said he cut the Taser wires off of Mr. White that appeared to be tangled around him to allow the medics to perform their duties. Libby stated that as the medics began assessing Mr. White he began kicking at them as he made comments that he could not understand. Libby saw Mr. White violently kicking as he began cutting the Taser wires.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Mr. Libby said that he was able to get out of the way from being kicked, but Mr. White's combativeness prevented the medics from assessing Mr. White's medical condition. Libby stated that Mr. White continued to kick at him as he rolled him onto his side. He said he tried to hold Mr. White's feet but due to the level of his resistance, the decision was made to apply leg restraints on him, because Mr. White was too combative for the medics to assess his vital signs.

Engineer Libby stated that after Mr. White was restrained he was carried out of the residence face down, and placed on a gurney, White's vital signs indicated that he was in distress. CPR was performed when Mr. White stopped breathing. It was Engineer Libby's opinion that due to Mr. White's behavior he appeared to be under the influence of some kind of drug.

When Corporal Boersma and Officer Munoz arrived at the residence they went into Ms. Villasenor's trailer to assist Sergeant Robinson and Officer Cunningham. Officer Cunningham saw Corporal Boersma push the bathroom door partially open and heard the Corporal announced to his fellow officers that he saw Michael White eating what appeared to be drugs. Officer Cunningham and Corporal Boersma started shouting at Mr. White that they were the police and that they just wanted to talk with him. The officers told him that they didn't care about the drugs he was in possession of; they just wanted to talk to him.

OPINIONS:

**MICHAEL WHITE HAD THE ABILITY TO SUBMIT TO ARREST AT ANY POINT DURING THE CONTACT WITH THE DEFENDANT OFFICES AND WHEN HE FOUND HIMSELF IN A POSITION WHERE HE COULDN'T ESCAPE FROM THE TRAILER.**

**MICHAEL WHITE'S WILLINGNESS TO RISK INJURY TO HIMSELF AND TO THE DEFENDANT OFFICERS LEFT THE DEFENDANT OFFICERS WITH NO OTHER REASONABLE ALTERNATIVE BUT TO USE HIGER LEVELS OF FORCE TO STOP THE IMMEDIATE THREAT THAT HE POSED TO HMSELF, THE OFFICERS AND INNOCENT CITIZENS.**

**ANY REASONABLY WELL TRAINED PEACE OFFICER FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO THE DEFENDANT OFFICERS AT THE TIME OF THIS INCIDENT WOULD HAVE REASONABLY BELIEVED THAT USING PHYSICAL FORCE TO CONTROL A RESISTING AND VIOLENT PERSON TO OVERCOME HIS RESISTANCE WAS NECESSARY AND REASONABLE.**

**IN MY OPINION THE DEFENDANT OFFICERS RESPONDED APPROPRIATELY TO THEIR TRAINING AND EXPERIENCE WHEN THEY EVALUATED ALL THE FACTS AND CIRCUMSTANCES BEFORE THEY USED HIGHER LEVELS OF FORCE TO PREVENT MR. WHITE FROM CAUSING GREAT BODILY INJURY TO HIMSELF AND THE DEFENDANT OFFICERS.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**IN MY OPINION, BASED ON MY EXTENSIVE LAW ENFORCEMENT EXPERIENCE AND TRAINING THAT ANY REASONABLE WELL TRAINED PEACE OFFICER, FACED WITH THE SAME OR SIMILAR CIRCUMSTANCES AS THE DEFENDANT OFFICERS FACED, WOULD HAVE REASONABLY BELIEVED THAT THE LEVEL OF FORCE USED TO CONTROL THE RESISTING DECEDENT WAS NECESSARY AND REASONABLE.**

Law enforcement personnel have a variety of force options available to them when dealing with dangerous, combative, and violent subjects they come in contact with.  On a continuum of increasing levels of force, these force options (not in any particular sequence) include officer presence, verbal dialogue, physical control and restraint, chemical agents, impact weapons, and lethal force.

While higher levels of force are likely to subdue and control subjects more swiftly, they increasingly place both subject and officer at greater risk for injury.  An officer should consider the following in deciding whether to resort to using injuring force.

- The individual's overall demeanor
- If the individual is hostile or assaultive
- Is the individual verbally or physically threatening officers or others?
- Is the individual responsive to verbal commands?
- Has the individual made aggressive motions toward the officer?
- Is the individual actively or passively resistant?
- Is the individual generally compliant and/or threatening?
- Is the individual responding to officer commands?
- Whether or not the individual is armed or likely to be armed
- Whether other, less invasive methods of control can be used before resulting to the use of injuring or deadly force

**The Purpose of Using Force is to Gain Control**

General control is the degree of influence that peace officers must exert over an individual in order to take them safely into custody. The individual may still have options for movement while under the general control of a peace officer.

The primary objective of using controlling force is to gain compliance of a subject. Peace officers must be prepared to use physical force to overcome resistance and gain control of a subject. Basic use of force philosophy defines the degree or amount of force, which may be reasonable to overcome resistance.

Once control is obtained, the degree of force used should be reevaluated. When using controlling force, officers must be constantly aware that they are close to the subject and therefore vulnerable to attack.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

The primary goal of using force is to gain compliance and control of a subject. Officer considerations for using force include, but are not limited to, the:

- Subject's display of aggressive or assaultive behavior
- Physical size of the subject (compared to the officer)
- Need for immediate control of the subject due to tactical considerations
- Officer's perception of the subject's knowledge of the martial arts or other skills
- Inability to control a subject by other means

Directional force, using stunning blows with an impact weapon to a body part, or applying pressure using a physical control hold are methods for physically controlling an individual by applying pressure on their upper body until the peace officer has control over the subject. The primary objective of applied force is to gain control of an out of control individual, using only that amount of force that is reasonable under the circumstances.

In this case, physical contact by the defendant officers to control and stop Michael White from evading arrest was not possible. The defendant officers were unable to control Mr. White's active and violent resistance through their command presence, and their verbal commands, and they did not escalate to the use of their Tasers until it was evident that Mr. White posed an immediate and credible threat to their safety.

Any reasonably well trained peace officer, faced with the same or similar circumstances as the defendant officers, would have used the same level of force to overcome Michael White's aggressive, assaultive and life threatening resistance.

Each set of circumstances will require peace officers to exercise judgment in the decision of the force to use. Peace officers must be aware of and follow their agency's policies regarding the use of any force option, as the defendant officers did in this matter. In my opinion, the defendant officers used only that level of force that was necessary to overcome Michael White's active level of resistance. (See the attached Use of Force Diagram)

From the vantage point of an officer whose personal safety is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and even death. Furthermore, government officials are not required to err on the side of caution.

The reasonableness inquiry in an excessive force claim is an objective one. To evaluate the reasonableness of the officer's conduct, the amount of force used must be balanced against the need for that force, with reference to clearly established law at the time of the conduct in question.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

The following facts should be considered, but not limited to when gauging reasonableness.
- The severity of the crimes that Michel White committed prior to and during his arrest
- The nature and extent of the threat Michael White posed to the officers
- The degree to which Michael White resisted detention or arrest
- Any attempts by Michael White to evade arrest by fleeing and hiding

When the level of force applied in any given situation is reasonable, a peace officer should not be considered the aggressor. A peace officer has a right to stand his/her ground against any aggressor; and they are not required to retreat or desist. Peace officers also have a legal right to use reasonable force to overcome resistance, to affect an arrest, and for protection; the right of self-defense is not lost. (*Scott v Heinrick* 9th Cir 1994)

The objective for the use of force by peace officers in any situation is to ultimately gain or maintain control of an individual and therefore the situation. Peace officers are required to use force only when authorized to overcome resistance and gain or maintain control to a lawful process, and to use the type of force that is reasonable under the circumstances. Further, peace officers should only use the amount and type of force permitted by department policy, state and federal statute and case law.

**Officer Training on the Reasonable Force Standard**

In 1989, the United States Supreme Court applied an objective standard to a non-deadly force situation and further established how reasonable force must be judged objectively.

The Court's analysis began by considering the suspect's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

The Court noted that determining the objective reasonableness for the use of force must be fact specific and established the following four components for determining reasonableness.

- Judged from the perspective of a reasonable officer
- Examined through the eyes of an officer on the scene at the time the force was applied
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation
- Based on the knowledge that the officer acted properly under the established law at the time

In the 1995 case of *Tennessee v Garner*, the United States Supreme Court set a four part legal standard based on a person's Fourth Amendment protection from unreasonable acts by police officers. The court established the following components and prerequisites to an officer using lethal force in the line of duty.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

In order for police officers to employ deadly force, they must meet the following:

- The officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others
- If the suspect threatens the officer with a dangerous weapon
- The Court imposes a constitutional requirement that some warning be given, where feasible
- In order for lethal force to be constitutionally permissible there must be probable cause to believe that the use of lethal force is reasonably necessary

Due to the imminent and immediate threat that Michael White posed, Officers' Munoz and Cunningham discharged their conductive energy devices at White to overcome Mr. White's violent resistance. Mr. White was extremely violent, he appeared to be under the influence of a drug, and he posed an immediate and credible threat to the defendant officers and innocent citizens and to himself.

Reasonableness must be considered in the context of the "dangerous and complex world" peace officers face every day, because what constitutes reasonable actions might seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure" (*Martinez v. County of Los Angeles*, supra 47 Cal. App 4th at 343 (quoting *Smith v Freeland* (6th Cir.1992) 954 F.2d 343, 347.)

To my knowledge, and based on my thirty-eight years of law enforcement experience there is no requirement for law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are however, cases that support the assertion that where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-injuring alternatives first.

**Police Officers Must Use Reasonable Force**

Police officers are often forced to make split-second decisions that must be reasonable under the circumstances. In my opinion, it was reasonable for the defendant officers to escalate to using an ECD to control Michael White when his level of resistance elevated from being non-compliant to assaultive. When a higher degree of risk to a peace officer or to the public exists, a greater use of force is justified by a peace officer.

Michael White could have followed the defendant officers' orders to come out of his hiding place in the bathroom and to show his hands, but instead, he chose to force the bathroom door close and resist the officers' attempts to enter the bathroom and place him under arrest. Instead of submitting to arrest, Michael White made a conscious decision to remain in the bathroom and attempt to eat suspected "Rock Cocaine" to avoid being charged with possession of a controlled substance as he prevented the defendant officers from opening the bathroom door.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Peace officers are vulnerable to potential harm when attempting to control a violent, resisting and potentially armed suspect.  The primary goal of using force is to gain compliance of a suspect, not to cause unreasonable pain or to inflict punishment.

When using controlling force, peace officers must be constantly aware that when they attempt to verbally control a resisting and non-compliant suspect, and are extremely close to or and physically engaged with the suspect, they are vulnerable to attack.  Conducting an arrest where the individual is extremely unpredictable, assaultive, and non-compliant can be a dangerous moment for police officers.  A peace officer's actions and reactions in these situations should always allow for a margin of safety while maintaining a position of advantage over the suspect.

A reasonable well trained officer would properly rely on their prior training and experience when they have to make a split-second decision to try to control the plaintiff who suddenly changed his behavior from being non-compliant to resistant and assaultive.  The defendant officers did not have the time to determine why Mr. White was refusing to leave the bathroom or if in fact he was arming himself with a dangerous weapon, because any delay in reacting could have meant life or death to the officers and to Mr. White.

The defendant officers quickly ran out of options as they attempted to stop and control Mr. White who demonstrated an immediate and credible threat to their safety and to the safety of innocent citizens.  It would appear that if all of the verbal commands and show of force options that they employed during the attempt to arrest Mr. White proved ineffective or inappropriate, the only reasonable force option left available to the officers when Mr. White resisted the defendant officers with a wooden door was to escalate the level of force needed to take him into custody.

## OPINIONS:

**MICHAEL WHITE'S FRIEND, A CONCERNED NEIGHBOR AND THE DEFENDANT OFFICERS MADE MULTIPLE ATTEMPTS TO VERBALLY COMMUNICATE WITH MR. WHITE TO CONVINCE HIM TO CALM DOWN AND SUBMIT TO ARREST BEFORE INJURING FORCE WAS USED TO OVERCOME HIS RESISTANCE.**

**MICHAEL WHITE HAD THE OPPORTUNITY TO EXIT THE BATHROOM AND SURRENDER TO THE DEFENDANT OFFICERS BUT HE CHOSE TO REMAIN INSIDE THE TRAILER AND RESIST ATTEMPTS BY THE DEFENDANT OFFICERS TO ARREST HIM.**

Communications with an individual is often a critical element to gain compliance, but in this incident, Michael White ignored the defendant officers' commands to show his hands and to submit to arrest.  The defendant officers made reasonable attempts to communicate with Michael White to convince him to submit to arrest through repeated loud verbal commands, their command presence, and a display of Tasers.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

It was apparent that Mr. White must have reasonably known the police were present when Ms. Villasenor told him that police were present in the trailer and after repeated attempts were made by the defendant officers to convince him to come out of the bathroom.  At one point when the bathroom door was pushed open, the defendant officers saw Mr. White eating what appeared to be an illegal drug.

Effective communication is a basic element of the use of force.  A major goal of law enforcement is to generate voluntary compliance without resorting to physical force.  However, there are situations where communication through words is not effective.

The acronym **SAFER** summarizes five conditions that require more than words.

- **Security** - Whenever others are in imminent jeopardy

- **Attack** - Whenever the officer's personal danger zone is violated. (Determined by the officer's training and the totality of the situation)

- **Flight** - Whenever a suspect unlawfully flees from the officer's presence

- **Excessive repetition** - No voluntary compliance is forthcoming and all verbal options are exhausted

- **Revised Priorities** - Whenever a matter of higher priority requires immediate attention or presence

The primary objective for the application of force is to gain or regain control of an out of control person.  The totality of the circumstances must be evaluated from the perspective of the officer at the scene, rather than from an outsider's benefit of hindsight.

**Multiple Attempts Were Made To Convince Michael White to Surrender**

Mr. White refused to comply with the defendant officers' orders to come out of the bathroom and to submit to arrest and when he used a broken door to actively resist the officers.   Mr. White posed an immediate and credible threat to the officers, to himself and the medical providers, it was appropriate to use higher levels of force to gain control over him, to stop his active resistance and to take him into custody.

The selection and the amount of force used by the defendant officers was based on the amount or degree of advantage and resistance that Mr. White possessed, and the threat level that he posed to the defendant officers' safety as his level of his violent resistance increased.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

Due to the immediacy of the threat of Mr. White using a standard size wooden door as a shield to prevent the officers' entry into the bathroom, the use of additional force options was necessary to bring him under immediate control.

Michael White knew or he should have reasonably known that he was being confronted by armed peace officers who were trying to arrest him, and that he had a legal responsibility to submit to arrest. The defendant officers were in uniform, they identified themselves as peace officers and Mr. White's friend told him that the police were present outside the bathroom.

A reasonable well trained officer would conclude that the defendant officers properly relied on their prior training and experience when they made a split-second decision to use a Taser to control him when he suddenly changed his behavior from being non-responsive to assaultive. The defendant officers did not have the medical training to diagnose or determine the cause of the plaintiff's mental or physical condition. The officers took prudent and reasonable actions, and used minimal amounts of force to stop Mr. White's aggressive resistance before they found it necessary to use injuring force.

**OPINONS:**

**THE TRAINING PROCEDURES AND POLICIES OF THE VALLEJO POLICE DEPARTMENT REGARDING THE USE OF FORCE WERE ADEQUATE IN THE CALLENDAR YEAR 2010.**

**THE DEFENDANT OFFICERS WERE PROPERLY TRAINED TO PERFORM THEIR DUTIES AS LICENSED PEACE OFFICERS IN THE STATE OF CALIFORNIA.**

**A REASONABLE WELL TRAINED OFFICER WOULD BELIEVE THE DEFENDANT OFFICERS USED FORCE IN THIS INCIDENT IN ACCORDANCE WITH THE VALLEJO POLICE DEPARTMENT'S USE OF FORCE, RESTRAINT AND TASER POLICY TO CONTROL MR. WHITE WHEN HE POSED AN IMMINENT AND CREDIBLE THREAT TO HIS AND THEIR SAFETY.**

**THERE IS NO EVIDENCE THAT CHIEF NICOLINI CAUSED, ENCOURAGED OR PARTICIPATED IN THE APPREHENSION OF MICHAEL WHITE OR THAT HE CAUSED OR WAS RESPONSIBLE IN ANY WAY FOR THE LEVEL OF FORCE USED TO CONTROL HIM.**

**THE CRIMINAL INVESTIGATION THAT WAS CONDUCTED INTO THE DEATH OF MICHAEL WHITE WAS IN ACCORDANCE WITH THE SOLANO COUNTY CRITICAL INCIDENT PROTOCOL.**

**THE DEFENDANT OFFICERS PROVIDED MICHAEL WHITE WITH IMMEDIATE MEDICAL CARE AFTER HE WAS PLACED UNDER CONTROL.**

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

**THERE IS NOTHING IN THE DEFENDANT'S ACTIONS THAT WOULD SUGGEST A PURPOSE TO HARM MR. WHITE OTHER  THAN WHAT WAS NECESSARY TO ACCOMPLISH THEIR LAW ENFORCEMENT OBJECTIVE.**

**MICHAEL WHITE WAS A CONVICTED FELON WHO HAD AN EXTENSIVE CRIMINAL HISTORY OF VOLENCE AGAINST POLICE OFFICERS, DOMESTIC VIOLENCE, POSSESSION OF DANGEROUS WEAPONS VIOLATIONS, ASSAULT WITH A DEADLY WEAPON AND THE USE/SALE/TRANSPORTATION OF DANGEROUS AND RESTRICTED DRUGS.**

In my opinion the use of force by the defendant officers in this incident is consistent with law enforcement practices and training, and the Vallejo Police Department's Use of force policy General Order C-1 (Revised January 26, 2009) and the "RIPP" Hobble Restraint Policy General Order C-4 (Revised September 9, 2008)

**[DEPARTMENT USE OF FORCE POLICY Section I. Policy:**  It is the department policy to accomplish public safety and law enforcement objectives with minimal reliance on the use of force.]

**[DEPARTMENT USE OF FORCE POLICY Section IV.** Use of Force:  Members shall utilize force based on but not limited to the Nature and gravity of the offense, the suspect's demeanor and apparent mental state, circumstances of the encounter, proximity of weapons, the safety of involved and uninvolved persons and the availability of alternatives.]

**[DEPARTMENT "RIPP" HOBBLE RESTRAINT POLICY** Section I. Policy:  Members shall use the "Ripp" Hobble Restraint in a Manner Consistent with the manufacturer's recommendation, Department training and pertinent General Orders.

Members shall not us the "RIPP" Hobble Restraint or any similar device to secure a suspect's legs to, or around handcuffs, in a manner that "hogties" the suspect.]

**Section II. Definitions**:  *Hogtie* is the securing, attaching, or restraining of a subject's feet behind their back to within 12" of their hands.  *TARP* is the "Total Appendage Restraint Position/Procedure" wherein a handcuffed subject's feet is restrained using the "RIPP" Hobble Restraint and the clip of the bobble restraint is attached to the handcuffs.

The department-approved hobble is the "Ripp Hobble" which is made of one-inch wide polypropylene webbed belting with a tested strength of 700 pounds. The hobble has a one-inch wide steel, alligator-jawed, friction-locking clip and steel-snap swivel. The overall length of the hobble shall be a minimum of 42 inches. All other hobbles are unauthorized.

In conclusion, Michael White committed a violent crime against a female neighbor by trying to choke her while under the influence of toxic levels of Cocaine and fled into his trailer where he refused to come out of the bathroom.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

The defendant officers attempted to communicate with Mr. White by first allowing his friend to try to coax him to come out of the bathroom by telling him that the police was present and that they wanted to speak with him. When her efforts failed, the defendant officers identified themselves as Vallejo Police Officers, and they tried repeatedly to get him to come out of the bathroom and surrender to them peacefully. Mr. White acknowledged their presence and agreed to come out of the bathroom, but he never came out of the bathroom to surrender to the police.

When Ms. Villasenor attempted to open the bathroom door to speak with Mr. White, he repeatedly tried to close the door to prevent her and the officers from entering the bathroom. When one of the defendant officers pushed the bathroom door open to observe Mr. White they saw him attempting to eat what is believed to be an illegal substance that could endanger his life. When the officers saw Mr. White consuming and destroying what they believed was a dangerous drug, they felt compelled to force their way into the bathroom and take Mr. White into custody.

Mr. White resisted the officers' efforts to enter the bathroom by pushing back on the door while the officers tried to push the door open. During the struggle to enter the bathroom the door came off of the hinges and Mr. White used the bathroom door as an object to block the officers' entry. Due to Mr. White's physical statute and his aggressiveness, he left the officers with no other alternative but to use injuring force to take him into custody.

Two of the defendant officers discharged their Tasers at Mr. White but both Tasers failed to incapacitate him for unknown reasons. As Mr. White's level of resistance increased, an attempt was made by one of the defendant officers to apply a lateral neck restraint on Mr. White's neck; Mr. White was able to defeat the attempt. One of the officers resorted to three distraction blows to Mr. White's rib cage in order to gain control over his arm so that he could be handcuffed. After a lengthy struggle, Mr. White was eventually handcuffed and placed in a seated position where he became inactive momentarily and appeared to have passed out.

The defendant officers did not use impact weapons to control Mr. White, nor did they kick him or place any unnecessary weight onto his back that would restrict his breathing after he was handcuffed with his legs secured. After Mr. White was handcuffed he was immediately placed into a seated position and after his legs were secured with a nylon strap he was placed on his side to enhance his breathing.

The defendant officers immediately requested medical personnel to respond to the scene after Mr. White was handcuffed due to the fact that Mr. White was tased. Suddenly and without warning, Mr. White came active and began kicking at the officers and medical staff who were on the scene trying to provide him with medical care. The paramedics had to stop attending to Mr. White until his legs were restrained; he was carried out of the trailer and placed into the care of fire department personnel where his medical condition rapidly deteriorated.

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

At the time of this incident none of the defendant officers recognized Mr. White from prior contacts with him. The criminal investigation revealed that Mr. White has an extensive criminal history, and is well known to the Vallejo Police Department.  Mr. White's criminal arrests and incarceration in jail and state prison illustrates his propensity for violence, including assaulting and resisting police officers, possession of dangerous weapons and assaults with a dangerous weapon.

Mr. White was sentenced to over nine hundred and twelve days in jail and eleven years in state prison for numerous violent crimes of battery against a peace officer, domestic violence, assault with a deadly weapon, possession and transportation and sales of dangerous drugs and resisting arrest.  Mr. White was granted parole on multiple occasions, but he violated the conditions of his parole by committing additional misdemeanor and felony crimes and was returned to prison to serve the full terms of the court imposed sentences.

Michael White was on active parole from the California Department of Corrections and Rehabilitation at the time of this incident.  The parole agent that was assigned to supervise Mr. White described him as a difficult parolee to manage.  Mr. White missed several appointments with his case agent, he had substance abuse problems and he did not follow directions clearly. The parole agent visited Mr. White at his residence on June 10, 2010, and believed that he appeared to be under the influence during his contact with him.

Mr. White reportedly received psychiatric outpatient assistance through the parole office, and it was learned that Mr. White was on his sixth term of parole.  The parole record shows that Mr. White had a poly-substance dependency, which included Cocaine, Marijuana, Ecstasy and alcohol.  Mr. White has been disruptive in the parole office on several occasions and is known by corrections staff for not following directions clearly.

Mr. White was also diagnosed by a parole psychiatric doctor as having a depressive disorder and was prescribed Remeron, which is a severe anti-depressant drug. Mr. White was given a thirty day supply of the drug when he was diagnosed, but it is unknown if he ever took the medication, because he never returned to the parole office for a follow-up visit with the doctor.  None of these factors were known to the defendant officers prior to them contacting Mr. White on June 15, 2010.

It is my understanding that I may have additional opinions if I am provided with further documentation for review.  I am prepared to testify to the opinions expressed in this report in deposition or at trial if called upon to do so.

**EXHIBITS:**

Use of Force Diagrams
Taser Training Photographs
Taser Cartridges
Action/Reaction Steps
OODA Loop Concept

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*

## QUALIFICATIONS:

See Attached Vitae

## EXPERT TESTIMONY

See Attached Vitae

## PUBLICATIONS:

Police officer's Use of Force Reference Guide, 2006
Dog Sport Magazine, 1990-1993

## COMPENSATION:

Case Review          $150 per hour
Deposition Fee       $200 per hour
Court Testimony      $200 per hour

Jared L. Zwickey

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*



*Expert Opinion Report – V.W. v. City of Vallejo, et al.*



*Expert Opinion Report – V.W. v. City of Vallejo, et al.*



*Expert Opinion Report – V.W. v. City of Vallejo, et al.*



Reaction time of the athlete in the sprint start

*Expert Opinion Report – V.W. v. City of Vallejo, et al.*



*Expert Opinion Report – V.W. v. City of Vallejo, et al.*





# JARED L. ZWICKEY

*1047 Harvest Mill Drive, Manteca, California, 95336 • (209) 665-4160*

## POLICE ACADEMY

1968 Los Medanos Regional Training Facility, Concord, CA

## EDUCATION



DIABLO VALLEY COLLEGE, PLEASANT HILL, CA
*1970, AA Degree, Police Science Major*

GOLDEN GATE UNIVERSITY, SAN FRANCISCO, CA
*1977, BA Degree, Criminal Justice Major*

CALIFORNIA STATE UNIVERSITY, HAYWARD, CA
*1980, 19 Units, Public Administration Major*

POST COMMAND COLLEGE, SAN LUIS OBISPO, CA
*1987, Organizational Leadership Major*

FBI NATIONAL ACADEMY, QUANTICO, VIRGINIA
*1988, Organizational Leadership Major*

UNIVERSITY OF VIRGINIA
*1988, 15 Units, Administration of Justice*

## LAW ENFORCEMENT & TEACHING EXPERIENCE

CITY OF CONCORD
*Police Reserve Officer (1965-1967) (2005-2007) (2007-2009)*
*Police Officer          1967-1977*
*Police Corporal         1977*
*Police Sergeant         1977-1982*
*Police Lieutenant       1982-1991*
*Police Captain          1991-1993*

CITY OF TRACY - *Police Chief, 1993-1997*

CITY OF LODI - *Police Reserve Officer    2005-2007*

CONTRA COSTA COMMUNITY COLLEGE DISTRICT-*Defensive Tactics Instructor, 1974-1993*

COUNTY OF STANISLAUS – *Stanislaus County Sheriff - Reserve Sheriff Deputy, 2007-2009*

YOSEMITE COMMUNITY COLLEGE DISTRICT - *Administration of Justice Instructor*

LOS MEDANOS COMMUNITY COLLEGE DISTRICT - *Administration of Justice Instructor*

SAN JOAQUIN COUNTY DELTA COLLEGE – *DIRECTOR OF PUBLIC SAFETY/ADMINISTRATION OF JUSTICE TRAINING PROGRAMS & POLICE CHIEF - 1997TO 2011–Administration of Justice Associate Professor2011-2015, California Licensed Private Investigator*

1

## POLICE TRAINING

1967- Civil Defense Emergency Course
1969 - Weaponless Defense Instructor Course
1970 - K-9 Training Course
1971 - CHP Motorcycle Training School
1972 - Federal Narcotics & Dangerous Drugs
1973 - Polygraph Examiner Course
1973 - FBI Firearms Instructor Course
1973 - Executive Development Course
1974 - Police Self Defense Institute
1975 - Techniques of Teaching
1975 - Sergeant Supervisory Training
1976 - FBI Basic SWAT Training
1977 - FBI Firearms Instructor Course
1978 - Baxter School of Lie Detection
1978 - Traffic Program Management Institute
1979 - Police Dog Handlers Course
1980 - Police Management Course
1981 - Police Dog Training
1981 - Supervising Traffic Control
1982 - Scent Detection Training
1982 - Basic Traffic Accident Investigation
1982 - K-9 Training in Europe, Canada
1983 - K-9 Training in Europe
1983 - Side Handle Baton Instructors Course
1986 - Records Management Training
1986 - Property Management Training
1986 - Middle Management Training
1987 - Critical Incident Management/Tactics
1987 - California Command College
1988 - Earthquake Preparedness
1988 - FBI National Academy
1989 - Police Facility Design & Construction
1990 - Vice/Narcotics Commander's Course
1995 - Executive Development Course
1995 - OJJDP Gang/Drug Policy Training
1995 - Non Lethal Weapons - Instructor
1997 - POST Monthly Video Training
1998 - POST Monthly Video Training
1998 - POST Basic Academy-Director
1998 - POST Firearms Training Seminar
1998 - POST 1998 Legal Update
1999 - POST 1999 Legal Update
1999 - POST Monthly Video Training
1999 - POST Suicide By Cop - V
1999 - POST Viol in a Workplace -V
2000 - POST Domestic Violence,
POST- Preliminary Investigation Course -V
2000 - POST Instructor Symposium
2000 - POST Monthly Video Training
2001 - POST Verbal Judo Techniques
2001 - POST Positional Asphyxiation-V

2001 - POST Unmarked Vehicle Ops – V
2001 - POST CDL Falsifications-V
2001 - POST Building Search Techniques-V
2001 - POST Jail/Courtroom Searches-V
2001 - POST Domestic Violence-V
2002 - POST Instructor Symposium - LA
2002 - POST Legal Update- V
2002 - POST Voluntary Instructor Update
2003 - POST Anti-reproductive Crimes-V
2003 - POST Case Law Update-V
2003 - POST Vehicle Theft -V
2003 - POST PC 832 Workshops
2003 - POST Recognizing Terrorism-V
2003 - POST Public Safety Dispatcher-V
2003 - POST Achieving Training-V
2003 - Crowd Management-V
2003 - Civil Disobedience-V
2003 - POST Leadership & Supervision-V
2003 - POST 832 Arrest/Control/Firearms
2003 - POST Use of Chemical Agents (D)
2004 - POST Basic IA Investigations
2004 - POST Case Legal Update (D)
2004 - POST Racial Profiling Trainer
2004 - Pistol Qualification (832pc)
2005 - POST Warrant Service/Bld Search (D)
2005 - POST Preliminary Investigations (D)
2005 - POST Use of Force (D)
2005 - Gang Members (D)
2005 - Illegal Street Racing & Sideshow (D)
2005 - Domestic Violence Update (D)
2005 - Firearms Seizure and Disposition (D)
2005 - Case Law Today - April - June (D)
2005 - Pistol/Long Rifle Qualification
2006 - Legal Update (D)
2006 - Case Law Today (D)
2006 - Terrorism - Suicide Bombers (D)
2006 - Case Law Today (D)
2006 - Custodial and Courtroom Security (D)
2006 - Instructor Development Training
2006 - Electronic & Projectile Weapons
2006 - Shock Knife Instructor Certification
2007 - Legal Update
2007 - NIMS & SIMS Mandated Training
2008 - LEGAL UPDATE
2008 - Firearms Training DSS Qualification
2008 - Driver Training Update
2009 - Perishable Skills Training
2009 –Diagnostic Training for Firearms
2009 - NIMS/SIMS Levels of Training
2009 – Human Dynamics/Behavioral Science
2009 – Firearms Scenario Training

2

**POLICE TRAINING**

2009 -- X26 Taser Recertification Training
2009 – Pistol, M-4, LT-Shotgun Qualification
2010 – Legal Update & Pistol Qualification
2011 -- Legal Update & Pistol Qualification
2012 – TECLOSE - Intermediate Search &
     Seizure –Houston Texas
2012 – DCPD Firearms Qualifications
2012 – Legal Update
2013 – Legal Update
2013 – Firearms Qualifications/Use of force
2013 – Best Practices of Good Training
2013 – Learners First: Facilitation Skills for
     Learner-Centered Instruction
2013 -- Target Your Teaching
2013 – POST - Mental Health Update
2013 – Idaho POST Excited Delirium
     Instructor's Course
2014 – Stress Management
2014- Firearms Qualification
2014 – Crowd Control Management
2014 – First Aid/CPR Certification

3

## POST CERTIFICATES:

BASIC, INTERMEDIATE, ADVANCED, SUPERVISION, MANAGEMENT, EXECUTIVE, COMMAND COLLEGE. FIREARMS, DEFENSIVE TACTICS, IMPACT WEAPONS, LESS LETHAL WEAPONS, NARCOTICS & DANGEROUS DRUGS, ADVANCED NARCOTICS & DANGEROUS DRUGS, ACADEMY DIRECTOR, RACIAL PROFILING, ACADEMY INSTRUCTOR OF PERISHABLE SKILLS.

## FIELDS OF EXPERTISE

| | |
|---|---|
| Arrest and Control Techniques | Detentions, Stop & Frisk, Laws of Arrest |
| Defensive Tactics/Field Tactics | Less than Lethal Weapons |
| High and Low Risk Stop Techniques | K-9 Training, Tactics, Program Management |
| SWAT Tactics & Management | Tactical Use of Firearms |
| Critical Scene Management | Law Enforcement Policies and Practices |
| Use of Force/Executive Protection | Property/Evidence Management |
| Impact and Dangerous Weapons | Criminal and Administrative Investigations |
| Riot and Crowd Control | Search Warrants & Consent Searches |
| Tactical Communications | Narcotic Dog Detection, Training |
| Transportation of Prisoners | Law Enforcement Policies and Procedures |
| Restraint Devices | Supervision and Leadership |
| Dealing with the Emotionally Disturbed | Response to Critical Incidents |
| Narcotics and Dangerous Drugs | Traffic Management/Accident Investigation |

## INSTRUCTOR/CONSULTANT EXPERIENCE

CHIEF ZWICKEY HAS BEEN AN INSTRUCTOR IN THE LAW ENFORCEMENT COMMUNITY SINCE 1967. HE HAS INSTRUCTED AT LOS MEDANOS COLLEGE IN PITTSBURG, CA, FROM 1974 TO PRESENT, OHLONE COLLEGE, CALIFORNIA STATE UNIVERSITY LONG BEACH, INSTITUTE OF TECHNOLOGY, MODESTO JR. COLLEGE AND DELTA COLLEGE. CHIEF ZWICKEY PROVIDED K-9 OFFICER SURVIVAL TRAINING TO OFFICERS FROM NUMEROUS LAW ENFORCEMENT AGENCIES AT THE CALIFORNIA INSTITUTE AT SAN LUIS OBISPO. HE IS ALSO A SUBJECT MATTER EXPERT CONSULTANT TO THE COMMISSION ON CALIFORNIA PEACE OFFICER AND TRAINING. HE HAS CONDUCTED TRAINING FOR THE F.B.I., MEMBERS OF THE UNITED STATES ARMED SERVICES AND THE FOLLOWING LAW ENFORCEMENT/GOVERNMENT AGENCIES:

| | |
|---|---|
| FREMONT POLICE DEPARTMENT | RICHMOND POLICE DEPARTMENT |
| UNIVERSITY OF CALIFORNIA POLICE | VACAVILLE POLICE DEPARTMENT |
| BERKELEY POLICE DEPARTMENT | HAYWARD POLICE DEPARTMENT |
| GLENDALE POLICE DEPARTMENT | SAN LEANDRO POLICE DEPARTMENT |
| HUMBOLDT COUNTY SHERIFF'S DEPT. | CONTRA COSTA SHERIFF'S DEPT. |
| LOS ANGELES SHERIFF'S DEPARTMENT | NAPA POLICE DEPARTMENT |
| CSTI FOR OFFICER SURVIVAL | NAPA COUNTY SHERIFF'S DEPT. |
| LOS ANGELES POLICE DEPARTMENT | LODI POLICE DEPARTMENT |
| SAN DIEGO POLICE DEPARTMENT | ANTIOCH POLICE DEPARTMENT |
| EL MONTE POLICE DEPARTMENT | POMONA POLICE DEPARTMENT |
| ROSEVILLE POLICE DEPARTMENT | EL MONTE POLICE DEPARTMENT |
| MODESTO POLICE DEPARTMENT | SUSD POLICE DEPARTMENT |
| SAN FRANCISCO POLICE DEPARTMENT | FEDERAL BUREAU OF INVESTIGATION |

4

## COURT CERTIFICATION AS AN EXPERT WITNESS

**WEAVER V. CITY OF SANTA CLARA** –USE OF FORCE, LE POLICIES & PRACTICES (JULY 2014)

**MANESS V MUNICIPALITY OF ANCHORAGE, AK** –USE OF FORCE, LE POLICIES & PRACTICES (NOV 2010)

**HERBOLD V CITY OF RHONERT PARK** –USE OF FORCE, LE POLICIES & PRACTICES (JANUARY 2011)

**SANDRA FEE  V STATE OF CALIFORNIA** – PROBABLE CAUSE LE POLICIES/PRACTICES (MAY  2010)

**SEALS V LAKE COUNTY,  CA** – USE OF FORCE, LE POLICIES & PRACTICES (June 2011)

 **RUTHA CARROLL V HARRIS COUNTY** – USE OF FORCE, LE POLICIES & PRACTICES (March 2013)

**ADAMS V STATE OF CALIFORNIA** -USE OF FORCE, LE POLICIES/PRACTICES (JANUARY 2009)

**GUITEIRREZ V SACRAMENTO COUNTY, CA** POLICIES & PRACTICES (MARCH 2011)

**BECKWAY V LAKE COUNTY  CA** –USE OF FORCE, LE POLICIES & PRACTICES (Jan 2011)

**TUATA  V CITY OF ANCHORAGE, AK** –USE OF FORCE, LE POLICIES & PRACTICES (MARCH 2011)

**VALIAVICHARSKA V CELAYA/BENNETT**–USE OF FORCE, LE POLICIES & PRACTICES (Jan 2011)

**MONDELL V CITY OF SIMI VALLEY**–USE OF FORCE, LE POLICIES & PRACTICES (April 2012)

**PINASCO V STATE OF CALIFORNIA**-USE OF FORCE, LE POLICIES & PRACTICES (January 2011)
l

 **JACKSON  V CITY OF PITTSBURG** –USE OF FORCE, LE POLICIES & PRACTICES (JULY 2010)

**ADAMS V CA /STATE PARKS** –USE OF FORCE, LE POLICIES & PRACTICES (MAY 2011)

**GREGORY & MOLLNER V CITY OF VALLEJO** PROBABLE  CAUSE LE POLICIES/PRACTICES DEADLY FORCE V DOG  (JANUARY(2014)

**SAUCER V CITY OF OAKLAND** –PROBABLE CAUSE LE POLICIES/PRACTICES (JUNE 2010 (2014)

## DEPOSITIONS PROVIDED

**ADAMS V. STATE OF CALIFORNIA** – USE OF FORCE, LAW ENFORCEMENT POLICIES AND PROCEDURES
**BELL V. CITY OF WOODLAND** – WRONGFUL TERMINATION, SEXUAL HARRASSMENT
**BLUEFORD V CITY OF OAKLAND** – USE OF FORCE, POLICE PRACTICES
**FEE V. CALIFORNIA HIGHWAY PATROL** - ARREST/TRANSPORTATION PROCEDURES
**FLORES V UNION PACIFIC RAILROAD** - HIRING STANDARDS, ACADEMIC PERFORMANCE
**GUITERREZ V. SACRAMENTO COUNTY**- POLICY AND PRACTICES, SEARCH WARRANTS
**GREGGORY V. CITY OF VALLEJO** – POLICY AND PRACTICES, USE OF FORCE
**McKAY V. CITY OF HAYWARD** -- USE OF FORCE, K-9 TRACKING, POLICY AND PRACTICES
**MILLER V. BUTTE COUNTY** - USE OF FORCE, POLICY AND PRACTICES
**PINASCO V. STATE OF CALIFORNIA** – USE OF FORCE, POLICY AND PRACTICES
**POSEY V.  CITY OF OAKLAND** - POLICY AND PROCEDURES, PROBABLE CAUSE, USE OF FORCE
**RUTHA CARROLL V. HARRIS COUNTY, TX** – LAW ENFORCEMENT POLICIES AND PROCEDURES, USE OF FORCE
**SEALS V. COUNTY OF LAKE** – USE OF FORCE LE POLICY AND PRACTICES
**SKALLERUD V. CITY OF PINOLE** - USE OF FORCE, LE POLICY AND PRACTICES
**WEAVER V. CITY OF SANTA CLARA** – USE OF FORCE, LE POLICY AND PRACTICES, K-9 USE
**TUATA V CITY OF ANCHORAGE, AK** - USE OF FORCE, POLICY AND PRACTICES

6

**DEPOSITIONS PROVIDED**

COURT CERTIFICATION AS AN EXPERT WITNESS

Case 2:12-cv-01629-MCE-AC   Document 55-2   Filed 01/19/16   Page 65 of 65

9