EXHIBIT G

1                  UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

     V.W., a minor, by and        )
4    through her Guardian Ad      )  CASE NO. 2:12-cv-01629-LKK-GGH
     Litem, Tenaya Barber,        )
5    Individually and as          )
     Successor in Interest of     )
6    Decedent MICHAEL WHITE,      )
                                  )
7                  Plaintiffs,    )
                                  )
8    vs.                          )
                                  )
9    CITY OF VALLEJO, a municipal )
     corporation; ROBERT          )
10   NICHELINI, in his individual )
     and official capacity as     )
11   Chief of Police; Officers    )
     DOES 1-25, individually,     )
12   jointly and severally,       )
                                  )
13                  Defendants.   )
     _____)

14

15

16                       DEPOSITION OF

17                     ROGER A. CLARK

18                   SAN DIEGO, CALIFORNIA

19                    FEBRUARY 10, 2016

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  GINA MARIE DE LUCA, RMR, CRR, CSR NO. 6973

25   FILE NO.:     AA0135E

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
    V.W., a minor, by and      )
 4  through her Guardian Ad    ) CASE NO. 2:12-cv-01629-LKK-GGH
    Litem, Tenaya Barber,      )
 5  Individually and as        )
    Successor in Interest of   )
 6  Decedent MICHAEL WHITE,    )
                               )
 7        Plaintiffs,          )
                               )
 8  vs.                        )
                               )
 9  CITY OF VALLEJO, a municipal )
    corporation; ROBERT        )
10  NICHELINI, in his individual )
    and official capacity as   )
11  Chief of Police; Officers  )
    DOES 1-25, individually,   )
12  jointly and severally,     )
                               )
13        Defendants.   )
    _____)
14
15
16
17        Deposition of ROGER A. CLARK, taken on behalf of
18  Defendants Barry Boersma, Herman Robinson, John Cunningham,
19  Mike Koutnik, Raul Munoz, and Robert Nichelini at 105 West F
20  Street, Fourth Floor, San Diego, California 92101, commencing
21  at 1:04 p.m., Wednesday, February 10, 2016, before Gina M.
22  De Luca, RMR, CRR, CSR No. 6973.
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S :
 2
    FOR PLAINTIFFS (telephonically present):
 3
    LAW OFFICES OF JOHN L. BURRIS
 4  BENJAMIN NISENBAUM, ESQ.
    7677 Oakport Street
 5  Suite 1120
    Oakland, California 94621
 6  510.839.5200
    510.839.3882 Fax
 7
 8  FOR DEFENDANTS BARRY BOERSMA, HERMAN ROBINSON, JOHN
    CUNNINGHAM, MIKE KOUTNIK, RAUL MUNOZ, AND ROBERT
 9  NICHELINI (Skype and telephonically present):
10  GIBBONS & CONLEY
    SEAN C. CONLEY, ESQ.
11  2185 North California Boulevard
    Suite 285
12  Walnut Creek, California 94596
    925.932.3600
13  925.932.1623 Fax
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2
 3  WITNESS:  Roger A. Clark
 4  EXAMINATION                        PAGE
 5    By Mr. Conley                      5
 6
 7          E X H I B I T S
 8  NUMBER         DESCRIPTION        PAGE
 9  Exhibit 1  Thumb drive containing Items 6     16
               through 10 of the category of
10             "Material Reviewed Thus Far" from
               the report of Roger A. Clark dated
11             1/19/16; Basic Learning Domains from
               Item 5; updated list of sworn
12             testimony by Roger A. Clark
13                    * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1  SAN DIEGO, CA; WEDNESDAY, FEBRUARY 10, 2016; 1:04 P.M.
 2          ROGER A. CLARK,
 3       having first been duly sworn, was
 4       examined and testified as follows:
 5                  -oOo-
 6             EXAMINATION
 7  BY MR. CONLEY:
 8     Q.  Mr. Clark, you have been deposed many, many
 9  times before; is that correct?
10     A.  Yes.
11     Q.  And you know how the procedure works?
12     A.  Yes.
13     Q.  Do you feel that you need any reminders about
14  how depositions work?
15     A.  No.
16     Q.  All right.  Now, we're here on a case entitled
17  V.W. vs. Robert Nichelini, et al.
18         And this involves an encounter between the
19  Vallejo Police Department and a man named Michael White;
20  correct?
21     A.  Yes.
22     Q.  And you've written a report concerning your
23  opinions on this matter; correct?
24     A.  Yes.
25     Q.  And that's a report dated January 19, 2016?
```

Atkinson-Baker Court Reporters
www.depo.com

**Page 6**

1    A.  Yes.
2    Q.  Do you have that with you?
3    A.  I have it.
4    Q.  Great.  Let's look at the first page under
5  "Material Reviewed Thus Far."
6        The first item is the "Complaint for Damages."
7        Is that the original complaint or first amended
8  complaint?
9    A.  I believe that's the first amended complaint.
10   Q.  Okay.  Second item indicates "Police Reports,
11  911 calls/dispatch and scene photographs."
12       Are those all documents and photographs, or
13  were there recordings for that?
14   A.  There were -- actually, let me be more precise.
15  I have Bates-stamped material 1 through 298.  I have
16  disks that contain the recordings of the dispatch, radio
17  transmissions, tel- -- 911 call.  And -- and in the -- I
18  also have a disk that has, in addition to the
19  Bates-stamped material, photographs.  I didn't number
20  them.  There are quite a few color photographs.  I
21  printed out about three of them.
22   Q.  Okay.
23   A.  I have those with me if you --
24   Q.  Okay.
25   A.  -- wanted me to show you.

**Page 7**

1    Q.  Can you identify which three you printed?
2    A.  Yes, I can.  Just one second.
3        Actually, it's Bates stamped 515, which is
4  the -- just a sign of the location.  I also did a -- I
5  did a Google Map thing, No. 387, which displays wires on
6  the bed, TASER wires; 363, which is the threshold into
7  the bathroom from the -- from the bedroom; and 360,
8  which is a copy of the two cartridges on the floor.
9    Q.  And what was your purpose in printing the
10  photograph with the wires on the bed?
11   A.  That it documents that the TASER was deployed
12  in the probe mode.  And those are the wires from the
13  cartridges.
14   Q.  Is that why you took the photograph of the
15  cartridges also?
16   A.  Yes.  It physically documents a minimum of two
17  TASER uses -- two different TASERS used.
18   Q.  Okay.  All right.  And the purpose of
19  photographing the threshold of the bathroom?
20   A.  Just to get an orientation of the TASER
21  cartridges in relation to the bathroom itself and also
22  the size.  It's a -- it's a trailer.  It's pretty small.
23   Q.  Item 3 is the "Reports by [the] Coroner," which
24  is autopsy and toxicology; correct?
25   A.  Yes.  And that's included in the Bate --

**Page 8**

1  Bates-stamped material that I mentioned as well.
2    Q.  Okay.  Can you tell me what Bates range that
3  is?
4    A.  Yeah, I can.  Hold on one second.
5        It starts, I think -- I have it marked -- 142.
6  It begins there.  Let me make sure I'm not giving you
7  the wrong -- yeah.  And that -- that's the -- and then
8  there's a lab report with a number, et cetera.
9        And you want me to go to the end point?
10  It's --
11   Q.  Yes, if you could tell me the total range of
12  those documents.
13   A.  I think the toxicology ends at 162 -- right in
14  that area.  Right there.  Yeah.
15   Q.  So those are -- are those all of the
16  Bates-stamped documents you have?  1 through 298 and 142
17  to 162?
18   A.  No.  It's -- it -- no.  The rest were
19  photographs.  I didn't bother to -- it goes into the 500
20  range, if I remember.  It goes quite a bit -- there's
21  quite a few.  I could key up the disk and tell you, if
22  you like.
23   Q.  Well, yeah, all I wanted to do is make sure I
24  knew exactly which documents you had or if there were
25  any that you didn't have.

**Page 9**

1    A.  My understanding -- it was the complete set of
2  documents provided -- Bates stamped and provided by --
3  by the defense.
4    Q.  Okay.  And it goes up to what number?
5    A.  It's over the 500 range.  Maybe it would be
6  wise for me to just put in the disk.
7        Would you like me to?
8    Q.  Well, if you could tell me what the entire
9  range is, that would actually --
10   A.  Well, yeah, it ends -- okay.  Then hold on a
11  second.
12       518 is what I have on the disk.  The disk says
13  "518."  I think that's about accurate.
14   Q.  Okay.  So that's 1 through 518?
15   A.  Well, I got to be careful here.  One disk says
16  "Dispatch, Bates stamped 518."  The other says "Dispatch
17  call (fire), Bates stamped 518."  I think -- yeah, I
18  think it goes up to the 520 range.
19   Q.  Okay.  518 is dispatch recordings, and 519 is
20  paramedics?
21   A.  Yes, "Dispatch call (fire)."
22   Q.  And are there more documents after that?  520
23  and so forth?
24   A.  Let me see.
25       Ah.  This is -- so I have -- I think the ending

3 (Pages 6 to 9)

1    is 518 -- 519. 519 is the end.
2        Q.  Okay.  All right.  Thank you.
3        All right.  And then Item 4 on your list is a
4    number of depositions.
5        Those are all the depositions you've gotten;
6    correct?
7        A.  Yes.
8        Q.  Okay.  And then Item 5 is a list of POST
9    learning domains.
10       And are those dated?
11       A.  Yes.  I used the -- I didn't put the -- the
12   date of that particular learning domain.  I can provide
13   that for you if you like.  But everything I mentioned in
14   the learning domain goes back decades, not just to 2010.
15       Q.  Okay.  For all of the learning domains you're
16   using -- well, strike that.
17       Learning domains sometimes change over time;
18   correct?
19       A.  Yeah, there are some changes.  I keep that in
20   mind.  But that's why I just mentioned that everything I
21   referred to in learning domains goes back decades, not
22   just to 2010.
23       Q.  So you're saying that as to all of these
24   learning domains listed under Category 5, they are all
25   as they were in 2010; is that correct?

Page 10

1        A.  Yes.
2        Q.  Have any of these learning domains changed
3    since 2010?
4        A.  Yes, there have been a few changes, some in
5    just the way terms are set.  For example, "use of force"
6    has changed in terms of "resisted behavior," what they
7    call it now.
8        There -- there aren't any other changes in any
9    of these topics that I have -- that I can think of at
10   all.
11       Q.  Okay.
12       A.  "Use of force" just has a -- nomenclature
13   changes.
14       Q.  And in your report, wherever you use "use of
15   force" nomenclature, do you use it as it existed as of
16   2010?
17       A.  Yes.  As you know, I -- on page 8, I quoted --
18   that now they call it "resistive non-compliant," but
19   back in those days it was called "resistive, passive and
20   active."
21       Q.  Okay.  Item 7 says "Additional TASER
22   International Training Materials."
23       What is that?
24       A.  Well, a TASER has different versions, and it
25   was not in the record what version of the TASER training

Page 11

1    was given.  So that's why I mentioned it that way.  I
2    have everything from 1 to 19.  I was -- expect it was
3    probably Version 14 that the officers were trained on at
4    that -- in 2010.
5        Q.  And when you say "version," version of what?
6        A.  TASER.  The TASER version.  TASER puts out a
7    training module.  How much it's used by departments
8    is -- that was also not in the record but -- and they
9    started out with Version No. 1, and now they're at
10   Version 19.  And then they put out warning bulletins as
11   well.
12       Q.  Okay.  Circling back for a second, so when you
13   say "Additional TASER...Training Materials," you're
14   talking about TASER International Training Material
15   versions which are periodically updated by TASER?
16       A.  Yes.
17       Q.  Okay.  All right.  And you're using all of
18   them?
19       A.  Well, I mentioned all of them insofar as -- it
20   would, obviously, stop at the point where they were
21   trained.  I have them all, if necessary.
22       Q.  Do you know whether, as of 2010, these
23   materials were used in POST certified courses?
24       A.  The POST certified courses embraces some of the
25   TASER training because it is the model, it is the

Page 12

1    company that produces the model used.  I did not mention
2    POST, and I don't know that the Vallejo department used
3    in its -- for its training on TASER or certification for
4    TASER.
5        Q.  Okay.  All right.  But if I can ask again, do
6    you know whether, as of 2010, POST courses actually use
7    the training materials themselves as opposed to
8    incorporating ideas from them and so forth?
9        A.  My understanding is that TASER does use quite a
10   bit -- excuse me.  POST takes into its module, training
11   module, significant material from TASER itself.
12       Q.  Okay.  My question is a little bit different,
13   which is whether the manual itself is used for the
14   training or as opposed to taking ideas from it and
15   turning it into the POST manual.
16       A.  The POST manual is a standalone document.  It
17   is -- it is not segmented.  It's a standalone document.
18       Q.  Okay.  Item 8 is identified as "The Los Angeles
19   Police Department Training Bulletin."
20       Do you have any information about whether the
21   Vallejo Police Department or any of its officers were
22   aware of this training bulletin as of 2010?
23       A.  No.
24       Q.  And do you know whether this training bulletin
25   is used in POST training?

Page 13

4 (Pages 10 to 13)

| | |
|---|---|
| 1   A.  The -- the concepts are trained, not -- the | 1     MR. CONLEY:  Okay. |
| 2  document is not quoted. | 2     (Reporter interruption) |
| 3     Q.  Okay.  No. 9 is a "Training Video...the Georgia | 3     MR. NISENBAUM:  I guess the question is, Will |
| 4  Bureau of Investigation." | 4  the witness send the disk directly to the court |
| 5        Again, do you have any information about | 5  reporter? |
| 6  whether the Vallejo Police Department was aware of this | 6     MR. CONLEY:  That's fine. |
| 7  training video as of 2010? | 7     MR. NISENBAUM:  Okay. |
| 8     A.  I am not -- I have no information that they | 8  Can you do that, Roger? |
| 9  were aware of it, although it would be hard to imagine | 9     THE WITNESS:  I can do that. |
| 10  they wouldn't be.  But I -- there's nothing in the | 10     MR. NISENBAUM:  All right.  Excellent. |
| 11  record. | 11     MR. CONLEY:  Thank you. |
| 12     Q.  Okay.  Do you know whether this training video | 12     (Exhibit 1 marked) |
| 13  was used as part of POST certified instruction? | 13  BY MR. CONLEY: |
| 14     A.  No, it's not for POST basic. | 14     Q.  All right.  And then Item 11 is "Overview of |
| 15     Q.  Next we have a "Training Video...by the | 15  the incident scene." |
| 16  New York Police Department." | 16        And that was the Google map you testified about |
| 17        And do you know whether the Vallejo Police | 17  earlier? |
| 18  Department had any knowledge of this video as of 2010? | 18     A.  It's just a Google map overview.  I didn't |
| 19     A.  Again, it would be hard to imagine they would | 19  bother to print anything out.  It shows that it's a |
| 20  not, but I saw nothing in the record one way or the | 20  trailer park and a lot of trailers. |
| 21  other. | 21     Q.  Okay.  All right.  And so those are all of the |
| 22     Q.  Do you know what the date of that video is? | 22  material you have reviewed for purposes of your opinion; |
| 23     A.  I could key it up.  It's -- I don't know it off | 23  correct? |
| 24  the top of my head. | 24     A.  Yes. |
| 25        Would you like me to key it up and get the | 25     Q.  And then on page 3 and going on to page 4, you |
| Page 14 | Page 16 |
| 1  date? | 1  provide a summary of the facts, and these are what you |
| 2     Q.  Sure. | 2  considered to be the major facts upon which you base |
| 3     A.  Okay. | 3  your opinions; right? |
| 4        I am going off Skype here just for a second. | 4     A.  Yes. |
| 5        Okay.  Just one second here.  It's not in the | 5     Q.  So let's look at Opinion 1, which appears on |
| 6  beginning. | 6  page 4. |
| 7        2002. | 7        And this looks to me a little bit like kind of |
| 8     Q.  Okay.  Thank you. | 8  a catchall opinion, which is that the officers didn't |
| 9        Now, as to this training video from the | 9  follow training. |
| 10  New York Police Department, do you know whether it is | 10        Is there something in Opinion 1 that is not |
| 11  used in POST certified courses? | 11  otherwise covered in the following opinions? |
| 12     A.  Not for POST basic. | 12     A.  No.  In fact, you're correct.  Opinion 1 in my |
| 13     Q.  Do you have electronic copies of all of Items 6 | 13  reports is always intended to be a global view or a net |
| 14  through 10? | 14  over all the other issues, and then they're parsed out |
| 15     A.  Yes. | 15  in subsequent opinions. |
| 16     Q.  Okay.  I would like to have that marked as a | 16     (Reporter interruption) |
| 17  group as Exhibit 1 and ask the court reporter to make an | 17  BY MR. CONLEY: |
| 18  electronic-only copy of it for my purposes, and I don't | 18     Q.  All right.  So if we want to go over your |
| 19  need a printout of all that material. | 19  opinions, we'll start with the remainder of them. |
| 20     MR. NISENBAUM:  Just a duplicate of the disk or | 20        There's nothing new in 1; correct? |
| 21  whatever? | 21     A.  That's correct.  I think there -- pieces of |
| 22     MR. CONLEY:  Yes, that would be fine. | 22  that major opinion are 2 through 9. |
| 23     MR. NISENBAUM:  Okay. | 23     Q.  Okay.  Now, you have listened to the dispatch |
| 24     THE WITNESS:  Well, I'll have to burn the disk | 24  recording; correct? |
| 25  off of my computer. | 25     A.  Yes. |
| Page 15 | Page 17 |

5 (Pages 14 to 17)

1    Q.   Is it your understanding that the dispatcher
2  announced the male subject needed an ambulance and
3  reportedly something was not right with him, that he had
4  come into the reporting party's apartment and choked her
5  and then returned to his unit?
6    A.   Yes.
7    Q.   All right.  And the announcement was made that
8  fire and medical were being staged?
9    A.   Yes.
10    Q.   And then several officers came to the scene to
11  respond; correct?
12    A.   Yes.
13    Q.   Do you have a criticism of the fire and medical
14  services being staged?
15    A.   No.
16    Q.   And one of the officers, when he arrived, was
17  approached by a neighbor, who reported that Mr. White
18  appeared to be drugged and had attacked Ms. Claros.
19        Do you recall that?
20    A.   That was Kenneth Rucho -- Rucho I guess the way
21  you pronounce it -- is my understanding.
22    Q.   And other officers went to talk to Ms. Claros,
23  who was the originally reporting party; right?
24    A.   Yes.
25    Q.   And she indicated that Mr. White had attacked

Page 18

1  her and appeared to be high on drugs; is that -- is that
2  right?
3    A.   Something to that effect, yes.
4    Q.   Do you have criticism of the officers speaking
5  to Ms. Claros when they arrived?
6    A.   No.
7    Q.   And then the officers were told that Mr. White
8  had gone over to another -- I guess it's a trailer.
9        And so they went over to that trailer, where
10  they met Linda Villasenor, who identified herself as the
11  owner; is that right?
12    A.   Yes.
13    Q.   Do you have any criticism of their going over
14  and talking to Ms. Villasenor?
15    A.   No.
16    Q.   All right.  And she reports that Mr. White was
17  a guest of hers?
18    A.   Yes.
19    Q.   And she told them that Mr. White was on parole?
20    A.   I don't recall.
21    Q.   Did she also tell the officers that Mr. White
22  appeared to be acting crazy and was high on drugs and
23  had just assaulted a neighbor of hers?
24    A.   Something to that effect, you're correct.
25    Q.   Did she also report that Mr. White had shoved

Page 19

1  her and that she had -- had to leave her trailer in fear
2  for her safety?
3    A.   I did not see that in the police reports, but I
4  wouldn't contest it.
5    Q.   Did she ask the officers to remove Mr. White?
6    A.   She -- my recollection is she pointed Mr. White
7  out in the -- where he would be in the bathroom --
8  bedroom bathroom.
9    Q.   Did she give the officers permission to go into
10  her house?
11    A.   Yes, she did.
12    Q.   And you can't recall whether she specifically
13  asked whether -- specifically asked the officers to
14  remove Mr. White?
15    A.   No.  And I think that -- I read the police
16  reports.  That's not indicated, as I recall, and it's
17  not -- certainly wasn't inquired enough to see if he had
18  paid any rent or had any rights as a tenant.
19    Q.   Did Mrs. Villasenor go inside and -- with the
20  officers -- and ask Mr. White to leave?
21    A.   I can't remember.  That's -- that is -- doesn't
22  appear in the police reports, as I remember.
23        MR. NISSENBAUM:  I would object to -- the line
24  of questioning asserts -- appears to be asserting facts
25  or, rather, verified statements that are made in the

Page 20

1  police reports as being -- as being offered for the
2  truth of the matter asserted, but they're clearly
3  hearsay.
4        As I recall -- I don't think Ms. Villasenor was
5  deposed but certainly --
6        (Reporter interruption)
7        MR. NISENBAUM:  I don't recall that Villasenor
8  was deposed.  If she was, then it was a while back, but
9  I don't believe that that was a deposition, if she was
10  deposed, that Mr. Clark was given.  So this is all just,
11  basically -- it's assuming the truth of a hearsay
12  statement.
13        (Reporter interruption)
14  BY MR. CONLEY:
15    Q.   Okay.  Going forward, the officers when they
16  got inside, asked Mr. White to come out of the bathroom?
17    A.   Yes.
18    Q.   Up to the point that the officers stepped into
19  the trailer and asked Mr. White to come out, do you have
20  any criticism of what the officers did?
21    A.   Come out of the bathroom to talk to them, no, I
22  am not critical of that.
23    Q.   And there was some period of time where
24  the officers who were there asked Mr. White to come out
25  and he refused; is that right?

Page 21

6 (Pages 18 to 21)

Page 22

```
 1        A.  Well, they -- they can -- the question, I took
 2   it, was that they can ask him anything, to come out, but
 3   I didn't see anything in the police reports that they
 4   were told by anybody he had contact with that they
 5   wanted him arrested.  So it's a reasonable suspicion
 6   type of contact at most.
 7        Q.  Well, they had been told that he had attacked
 8   two people; right?
 9        A.  Right.  But there's noth- -- I would agree.
10   But there's nothing indicated that -- well, if you're
11   attacked, A, are you hurt?  B, do you want an arrest?
12        Q.  So, in your view, these officers could not
13   reasonably think that they could arrest Mr. White?
14        A.  Not without further investigation certainly.
15   It would be a -- this is a reasonable suspicion inquiry
16   at most right at this point.
17        Q.  All right.  And after there was a discussion or
18   some request for him to come out, at some point one of
19   the officers tried to open the bathroom door to go in
20   and Mr. White pushed back on the door?
21        A.  Yes.
22        Q.  Are you critical of the officer pushing on the
23   door to try to get in?
24        A.  Well, again, this is reasonable suspicion.  It
25   would have to be force for the purpose of a detention.
```

Page 23

```
 1   He's there, not going anywhere.  I would have expected
 2   they would get him to voluntarily come out for the
 3   inquiry or getting enough information that he's subject
 4   to arrest and push the door open for the purpose of an
 5   arrest.
 6        Q.  Did you -- do you have information that he was
 7   responding to any inquiries by them?  Using any kind of
 8   words or articulation of thoughts?
 9        A.  I can't recall specific language, but I do -- I
10   did read that he pushed back on the door.  As they
11   pushed in, he would push back to prevent their entry and
12   his exit.
13        Q.  All right.  And then the officer who pushed on
14   the door reported that he saw Mr. White putting an
15   object in his mouth that appeared to be drugs, and he
16   announced that to the other officers present.
17        Do you remember that?
18        A.  Yes.
19        MR. NISENBAUM:  That's from the report;
20   correct?
21        THE WITNESS:  That's correct.
22        MR. NISENBAUM:  Again, that assumes the truth
23   of a hearsay -- of the statement.
24   BY MR. CONLEY:
25        Q.  Well, I am not asking you to assume the truth
```

Page 24

```
 1   of a hearsay statement.  I am trying to understand what
 2   facts are going into your opinion.
 3        And you understood that the officer had said
 4   that he saw an object that appeared to be drugs which
 5   Mr. White was putting into his mouth and he announced
 6   that fact to the other officers there; correct?
 7        A.  The --
 8        MR. NISENBAUM:  Hold on, Roger.
 9        The objection is that that is -- that's an
10   alleged fact that the officers contend, not whether or
11   not it actually happened.  He can't testify to whether
12   or not it actually happened, which seems to me is what
13   you're asking.
14   BY MR. CONLEY:
15        Q.  Well, let me be perfectly clear, Mr. Clark.  I
16   am not asking you to tell me what happened out there.
17        You're not an eyewitness; correct?
18        A.  That's right.
19        Q.  So I am just trying to understand what facts
20   you understand to be the case that is the basis for your
21   opinions.
22        And your understanding is that the officer
23   reported that he saw Mr. White putting an object in his
24   mouth that appeared to be drugs and he announced that
25   fact to the other officers; correct?
```

Page 25

```
 1        A.  There -- as you know, I addressed this in the
 2   brief overview that -- that the police reports
 3   indicate -- and I can't remember which officer -- that
 4   an officer observed him in possession of what they
 5   considered contraband and putting the drug in -- putting
 6   a substance into his mouth they considered to be
 7   contraband and that that was conveyed; but, as you know,
 8   the autopsy indicates no object or drugs in his airway
 9   or his throat or his esophagus.
10        Q.  Okay.  Are you offering a medical opinion on
11   this?
12        A.  No.  But it's -- would be -- I'm not.  But as
13   an investigator, it is -- this statement was made, and
14   you would expect, then, if that happened, that there
15   would be physical evidence of it happening which would
16   be in his -- in his body.
17        Q.  Okay.  Well, in any event, the statement was
18   made that that's what the officer perceived, and he
19   announced it to the other officers; right?
20        A.  Let -- no.  Let me be precise.  Here we go.  On
21   page 3, bottom paragraph, "The Defendant Officers have
22   testified that when they opened the door, Michael was
23   attempting to swallow something, which they believed to
24   be evidence and/or illegal drugs."  Then I put
25   parenthetically, "(However this belief" is -- "was
```

7 (Pages 22 to 25)

1   revealed to be untrue when Michael's body was examined
2   at the hospital shortly after the incident."
3        And then there's a few --
4        (Reporter interruption)
5   BY MR. CONLEY:
6        Q.   And this officer reported that after he saw
7   Mr. White putting this material he suspected of being
8   drugs to his mouth, Mr. White then moved back behind the
9   door; right?
10       A.   Mr. White was still in the bathroom behind the
11  door.
12       Q.   Is it your opinion that while the officers were
13  still outside the bathroom and there was pushing back
14  and forth on the door, that the officers should have
15  called the medics in at that time?
16       A.   No.
17       Q.   And why would it be premature to call the
18  medics in at that point?
19       A.   Well, I am taking that they were trying to
20  arrest Mr. White. The paramedics would be in the way of
21  that, the way I would view your question. If they were aware
22  that he's taken something -- he swallowed something,
23  they would certainly convey it immediately.
24       Q.   At the point that the officers were outside the
25  door and there's this pushing and pulling going on -- or

Page 26

1   I guess just pushing -- on either side of the door and
2   given Mr. White's recent history of violence, is it
3   reasonable for the officers to conclude that they needed
4   to get Mr. White under control before they brought the
5   medics in?
6        MR. NISENBAUM: Objection; misstates the facts
7   and testimony.
8        THE WITNESS: Well, first, they knew nothing
9   about his history. They only knew about the episode and
10  that the episode was that he is in need of medical care.
11  And there was nothing in the -- I am just sort of
12  paraphrasing. And there's nothing in the record of
13  anybody indicating they wanted him arrested, both in the
14  911 call and the officers present. So I would have
15  expected that the medics would be on notice, "This --
16  we're going to -- this is a medical call. Stand by.
17  We're going to get him to you." So whether they would
18  stage in the living room or where, I would expect they
19  would be close at hand.
20  BY MR. CONLEY:
21       Q.   Do you know where they were staged?
22       A.   I don't know exactly where they were staged. I
23  know the gurney was outside the -- the trailer.
24       Q.   Okay. So you consider it an issue of medical
25  care when someone who's acting crazy and apparently on

Page 27

1   drugs attacks two people? That's a medical --
2        MR. NISENBAUM: Objection; argument, vague.
3   BY MR. CONLEY:
4        Q.   For the assailant; is that right?
5        MR. NISENBAUM: Same objection.
6        THE WITNESS: Well, I believe that was the
7   issue for the call and the issue as conveyed while
8   present. And the assumption of criminal conduct was the
9   officers' for purposes of making an arrest. But, again,
10  I saw nothing in the record that they wanted him
11  arrested.
12       Let me add this: That, arrest or not,
13  medical -- the medical issues, once there's no assault
14  going on, is the primary issue, medical care.
15  BY MR. CONLEY:
16       Q.   But medical care can't be provided to someone
17  who's out of control --
18       MR. NISENBAUM: Objection; argument, vague.
19  BY MR. CONLEY:
20       Q.   -- and has just attacked a couple of people.
21       MR. NISENBAUM: Objection; argument, vague,
22  misstates testimony, misstates evidence, no foundation.
23       THE WITNESS: I think I answered the issue of
24  "just attacked" someone. He had not attacked anyone
25  when the officers encountered him. He was isolated in a

Page 28

1   bathroom, and the issue was his medical care, medical
2   need -- put it that way -- his any medical need.
3   BY MR. CONLEY:
4        Q.   The officers had been told that he just
5   attacked a couple of people and appeared to be out of
6   control on drugs and he was in a bathroom and wouldn't
7   cooperate with verbal instructions.
8        At that point --
9        MR. NISENBAUM: Objection; incomplete
10  hypothetical, misstates testimony, compound, argument.
11       MR. CONLEY: And I haven't finished my question
12  yet. So I would appreciate it if you would hold off.
13  BY MR. CONLEY:
14       Q.   All right. With all of those facts and
15  Mr. White is in a bathroom and is not cooperating, is it
16  your view that reasonable officers would be concerned
17  about the safety of someone such as medical
18  professionals going into that bathroom?
19       MR. NISENBAUM: Objection --
20       Are you done with the question? I'm sorry.
21       MR. CONLEY: Yes.
22       MR. NISENBAUM: Objection; incomplete
23  hypothetical, misstates testimony, compound, argument,
24  no foundation, and misstates the evidence.
25       THE WITNESS: I would not expect the --

Page 29

8 (Pages 26 to 29)

1 inserting medical people into the bathroom. I would
2 expect a surrender self-type scenario where he would
3 present himself for medical care.
4 BY MR. CONLEY:
5     **Q.  At the point that the officers understood that**
6 **Mr. White may be attempting to swallow a baggy of drugs,**
7 **did that increase the urgency of the need to get control**
8 **over Mr. White?**
9         MR. NISENBAUM:  Objection; misstates the
10 evidence, misstates testimony, again asserts a fact
11 that's in dispute.
12        THE WITNESS:  Do you want me to assume that he
13 swallowed drugs and they're aware of it and answer the
14 question?
15 BY MR. CONLEY:
16     **Q.  I want you to assume that the officer perceived**
17 **that, as what was going on, and announced it to the**
18 **other officers.**
19        **Would the understanding that that event is**
20 **going on increase the urgency of the officers' need to**
21 **gain control of Mr. White?**
22     A.  If they thought he had swallowed something that
23 might harm him -- and I took that as your question --
24 then they would want to make sure that he was okay, and
25 that would require medical care.  So it would factor

Page 30

1 into time, talking, and tactics.
2     **Q.  All right.  You talk at one point about TASER**
3 **use, and I want to know, How many attempts to use a**
4 **TASER on Mr. White were there, to your understanding?**
5     A.  Well, it's -- that's confusing.  However, I --
6 my review of the record, as far as statements made to
7 the police, were at least six.  The physical evidence --
8 the photographs -- indicate two weapons.  The TASER
9 readout provided documents only one cycle by one weapon.
10     **Q.  So at this point you don't know how many times**
11 **a TASER was actually applied to Mr. White; correct?**
12     A.  Well, there are three fundamental locations
13 where you find that commentary, and so it's six, one, or
14 two, depending on what you look at, and that's a
15 concern.
16     **Q.  But you're not able to determine from the**
17 **information that you have right now how many times**
18 **Mr. White was -- actually experienced a TASER**
19 **application; is that right?**
20     A.  You're correct.  It's -- and it was never
21 adequately documented or investigated.
22     **Q.  And the description by the officers of the**
23 **application of the TASERS -- did they generally report**
24 **that the TASERS were not apparently effective when**
25 **applied?**

Page 31

1     A.  To the contrary.  I saw in their statements to
2 investigators that the -- he was incapacitated during
3 the cycle and then apparently, according to them,
4 recovered quickly.  So they ignored the window of --
5 what we call and what's in the training -- the "window
6 of opportunity."
7     **Q.  And -- okay.  What did you understand to be the**
8 **number of times that the officers reported an**
9 **application of a TASER that actually affected Mr. White?**
10        MR. NISENBAUM:  I object to the term "actually
11 affected him."  That seems to call for, again, the
12 witness to testify as to the truth of what actually
13 occurred.
14 BY MR. CONLEY:
15     **Q.  I am not asking you to talk about what you**
16 **think actually occurred, but what you understood and**
17 **were basing your opinions upon.**
18     A.  Well, the high end is taken from Munoz, who --
19 that he stated two to three times; Cunningham, three
20 times.  Boersma tried the TASER.  He said it didn't
21 work.  That's a bit problematic.  So that could have
22 been four or five times.
23        The sergeant, Robinson, appears to recognize a
24 minimum of three or more in his statement.
25        So it -- it's a -- it's a -- it's a problem.

Page 32

1 And it's easily resolved by the examination of the
2 recording of the -- each one of the weapons, which
3 appears to be nonexistent.
4     **Q.  Are you saying that the TASER information was**
5 **not downloaded?**
6     A.  Yes, I am.  And I can explain why.
7     **Q.  Why it was not downloaded?**
8     A.  Oh, I can't explain why it wasn't, but the fact
9 it wasn't should have been the result -- should have
10 resulted in a separate investigation, clearly.
11     **Q.  Well, some information was downloaded; correct?**
12     A.  There are -- there -- oops, sorry.  I'll wait
13 for the -- are you ready?
14     **Q.  Some information about the use of TAS- -- these**
15 **TASERS was downloaded; correct?**
16     A.  There is a -- in the material given to me -- a
17 receipt for each one of the TASERS allegedly involved,
18 and there are three documents that are offered as
19 downloaded material, one for Robinson, one for
20 Cunningham, and one for Munoz.
21     **Q.  Okay.  And is there a problem with those three**
22 **documents?**
23     A.  Yes.
24     **Q.  What's the problem?**
25     A.  Robinson shows no TASER use.  Cunningham shows

Page 33

9 (Pages 30 to 33)

1  one TASER use for five seconds.  And Munoz shows no
2  TASER use.  There are two TASER cartridges expended.
3  It's a physical impossibility to get this kind of
4  readout and have two expended cartridges.  That's the
5  first issue.
6         The second is, taking their own testimony, the
7  number of cycles is not reflected in the readout -- or
8  the download.
9         There are other issues.
10   Q.  All right.  Your Opinion 4 uses the phrase
11  "Prolonged, and multiple uses of taser[s]."
12       What -- what's the duration -- constitutes
13  "prolonged"?  Your opinion.
14   A.  Anything beyond three cycles is prolonged with
15  certainty.  Two cycles are the accepted standard, and
16  then you would reassess and not deploy the TASER again
17  unless there's something exceptional.
18       (Reporter interruption)
19  BY MR. CONLEY:
20   Q.  When you're talking about cycles, so
21  "prolonged" and "multiple" are just different words for
22  the same thing?  The number of applications?
23       (Reporter interruption)
24       MR. NISENBAUM:  Objection; argumentative,
25  misstates the witness's testimony.

Page 34

1  three-cycles-per-use limit?
2   A.  Well, the TASER company itself.  But what I am
3  relying on is the federal guidelines -- and it's
4  Item No. 6 -- that -- that is the first federal
5  guidelines published.  There's been a subsequent, but it
6  came in after this incident.  So I quoted the 2006
7  guidelines, and it's -- the commentary starts on page 11
8  of my report, as you know, and then I give -- I quote a
9  number of their findings.
10   Q.  And that is Item 6 of your documents?
11   A.  That's right.
12   Q.  Page 2?
13       And the TASER documents -- that would be
14  Item 7?
15   A.  Yes, it would be.  And that's -- and it's in
16  the training.
17   Q.  You say, "it's in the training."
18   A.  Well, it's in their training.  It's in their --
19  what I am going to provide is the PowerPoint that will
20  cover that issue.
21       As I said -- and I need to put it in the record
22  again -- the TASER training module for these officers
23  was not provided, nor the TASER policy manual sections.
24   Q.  Okay.  And then you indicate that only one
25  TASER should be used.

Page 36

1       MR. CONLEY:  It's a question.
2       THE WITNESS:  No.  In this case, there were two
3  TASERS deployed and used.  There are two cartridges
4  expended.  There are photographs of them.  And you would
5  not use more than one TASER in any event whatsoever.
6  BY MR. CONLEY:
7   Q.  So "multiple" is referring to the number of
8  TASERS, and "prolonged" relates to the number of cycles?
9   A.  No.  It's for both.  "Multiple" meaning more
10  than one weapon and multiple cycles as well and
11  "prolonged" in terms of what the cycles would mean.
12       Maybe in five minutes a break?  Is that
13  possible?
14       MR. CONLEY:  Sounds fine.  You can do it now,
15  if you would like.
16       THE WITNESS:  Oh, that would be wonderful.
17  Thank you so much.
18       (Recess)
19       MR. CONLEY:  All right.  Back on the record,
20  then.
21  BY MR. CONLEY:
22   Q.  All right.  You've just described a limit of
23  three cycles per use.
24       And can you describe for me what published
25  authority you have for that three -- or

Page 35

1       And what was the published authority for that
2  number?
3   A.  It's in 6.
4   Q.  Okay.  All right.  Going back to Item No. 4,
5  the full sentence of the context there is "Prolonged,
6  and multiple uses of taser weapons can result in death."
7       And what is your authority for that?
8   A.  It is in No. 6, and it's quoted on page 12,
9  paragraph No. -- listed No. 4.
10   Q.  Okay.  And as of 2006, did POST certified
11  courses involving TASER use instruct officers that
12  TASERS could result in death?
13   A.  I don't know.  It's been known.  It was known
14  and published since 2006 certainly by the federal
15  government.
16   Q.  You also, in Opinion 4, talk about application
17  of TASERS to mentally ill persons.
18       And by "mentally ill," are you including people
19  who are intoxicated on drugs?
20   A.  It could include that, but this is the --
21  whether or not they determined that his behavior was
22  drug induced or mental illness I think would be -- and
23  the timing would -- they would have to favor mental
24  illness or at least consider it as a real possibility,
25  likely possibility.

Page 37

10 (Pages 34 to 37)

1    Q.  Do you have any records from Mr. White
2 indicating that he was ever diagnosed as having mental
3 illness?
4    A.  Well, there are records, but it wasn't
5 available to the officers.  His behavior is certainly
6 extremely bizarre, et cetera.  They have to consider
7 mental illness.  But, as you know, the investigative
8 reports connect him with services for mental illness
9 provided to him and medications.
10    Q.  I'm sorry.  I'm not quite sure what you're
11 referring to.
12       What records are you talking about?
13    A.  I am talking about the -- it's the first
14 report, Bates stamped -- let me get it for you -- Bates
15 stamped 11.  He had -- there is this -- "doctors
16 prescribed medications provided through the contact with
17 the social worker by the name of Fleischman," et cetera.
18 It's on Bates stamped 11.
19    Q.  That's a conversation with Agent Thomas?  Okay.
20 I see where you're talking about.  All right.
21    A.  Right.  The officers didn't know any of that.
22 They had to consider "This is very bizarre behavior,"
23 and mental illness is -- would be a consideration
24 certainly.
25    Q.  And what is the basis for your opinion that

Page 38

1 TASER use and mental illness provides some special
2 concern?
3    A.  Well, they're extremely fragile healthwise, and
4 they're -- and they're -- in the material I cited in the
5 2006, it does discuss mental illness, but it's more
6 defined in the 2011 guidelines.  But it is included in
7 the 2006 that -- and it cited delirium, is mentioned by
8 name.
9    Q.  Okay.  And again we're talking about Item 6,
10 the 2006 report; is that right?
11    A.  That's correct.  That's correct.
12    Q.  Again, is the issue of mental illness raised in
13 training on TASER use in POST certified courses as of
14 2010?
15    A.  No.  TA- -- the mental illness is addressed and
16 discussed in Learning Domain No. 37, which I cited on
17 page 2.
18    Q.  And does Learning Domain No. 37 deal with TASER
19 use and the mentally ill?
20    A.  No.  It deals with use of force and the
21 mentally ill but not TASERS particularly.
22    Q.  Do you know whether POST training as of 2010
23 raised any specific issues about TASER use on mentally
24 ill individuals?
25    A.  No.

Page 39

1    Q.  Let's turn to Opinion No. 5, which deals with
2 the carotid restraint.
3       All right.  Are you offering any medical
4 opinions about causation in this particular case?
5    A.  No.
6    Q.  Okay.  Is the carotid restraint still a tactic
7 which is taught at POST academies?
8    A.  Yes.
9    Q.  Now, you identified some opinions about carotid
10 restraint dangers if not properly applied.
11       Leaving aside the question of whether you
12 believe it should have been applied or not here, are you
13 expressing some opinion about whether the manner in
14 which it was applied was proper or improper?
15    A.  I need to correct.  I not only said it's
16 dangerous if improperly applied, but it's dangerous when
17 even properly applied.  And I comment on that in my --
18 in my report.  It's extremely dangerous, period.
19    Q.  And so you're saying it's dangerous even if
20 it's done correctly; correct?
21    A.  Yes.  And it's trained as such.  Even if done
22 correctly, it's extremely dangerous.
23    Q.  Okay.  And as of 2010, where was -- what part
24 of the POST training involved carotid restraints?
25    A.  Learning Domain No. 33.  And there's a

Page 40

1 chapter -- a specific chapter on the carotid, and
2 it's -- it's an entire chapter devoted to that
3 technique.
4    Q.  Okay.  Now, there's some discussion in your
5 papers here about carotid restraint becoming dangerous
6 if it's misapplied and turns into an arm bar or choke
7 hold.
8       Are you expressing an opinion that an arm bar
9 or choke hold was actually applied in this case?
10    A.  No, I'm not.  Only if it was misapplied, it
11 could easily become that.  I hope my report indicates it
12 should never have been used, period.
13    Q.  No, I understand that's a question of whether
14 it should be applied or not.
15       I am actually asking, at this point, about
16 whether the -- essentially the manner in which it was
17 applied was proper or improper, in your view.  So --
18    A.  Oh, thank you for that, because it was
19 improperly applied per se.  Having said that, the --
20 could it have degraded into something significantly
21 worse?  The answer is it could easily.  That's part of
22 the training.  Whether it did or not, that's Dr. Spitz's
23 work, I think.
24    Q.  So you don't have an opinion of whether the
25 officer applied it improperly as a matter of -- of

Page 41

11 (Pages 38 to 41)

1  tactics.
2        MR. NISENBAUM:  Object to that.
3  BY MR. CONLEY:
4     Q.  You're opinion is about whether it was applied
5  at all; correct?
6     A.  No.  It was -- it was -- should never have been
7  applied as an issue of tactics, and it should never have
8  been applied at all, period.
9        Whether it was misapplied in terms of the
10 precision of how this hold is inflicted, I have no
11 opinion because I was not there to see it.  I know if I
12 was a sergeant, I would forbid it.  Actually, if I were
13 an officer, I would have stepped in and stopped it.
14    Q.  Okay.  So this -- that -- we're sort of
15 rounding the distinction I am trying to make.  So I want
16 to make sure I'm clear on this.
17       Your opinion is about whether it should have
18 been used at all, but you're not offering an opinion on
19 whether he used the proper technique; is that right?
20    A.  No.  That it should never have been used at
21 all.  And whether the technique was done with precision
22 or not is not -- makes no difference, in my opinion.  It
23 should never have been done at all.  But whether it was
24 misapplied in terms of precision -- and I could be
25 more -- the compression of the three parts of the neck
Page 42

1  on each side -- whether that was done with finesse or
2  grace or precision -- these are all my terms -- I -- I
3  don't know.
4        I -- I would imagine, with Mr. White being laid
5  prone, that it would be extremely difficult to apply it
6  properly.
7     Q.  Is it your understanding Mr. White was prone
8  when this was applied?
9     A.  Yes.
10    Q.  Would it matter to you if the facts were that
11 he was actually in a seated position?
12    A.  No, it wouldn't matter.  But it would be easier
13 in a seated position as far as the technicalities of the
14 application.
15    Q.  Right.  Okay.  So -- so you're -- you don't
16 have an opinion about whether it was applied correctly
17 in a tactic -- a tactical -- not tactical -- in -- in
18 the sense of the technical manner in which it's applied
19 as opposed to whether it was a proper strategy to go to
20 that; is that right?
21    A.  I think you're getting close, yeah.  The
22 technicalities of the hold and how it really occurred --
23 I was not there, and there's nothing in the record to
24 indicate one way or the other.
25    Q.  All right.  Now, there is some discussion that
Page 43

1  you have in your report -- I think it begins on page 9
2  and goes to the top of page 11 -- about positional
3  asphyxia, and I don't see that specifically mentioned in
4  one of the opinions, but let me ask you about that.
5        What -- you cite a number of bullet point
6  outlines of categories and so forth and so on.
7        What is the origin of this material?  Is there
8  a publication that you're referring to?
9     A.  Yes.  It comes from three sources:  The -- in
10 particular, the LAPD in-custody deaths, the -- and the
11 training videos --
12    Q.  Okay.
13    A.  -- and then it's in Learning Domain No. 42, I
14 believe -- let me make sure -- 34, "First Aid and CPR,"
15 which is breathing emergencies or -- yeah, breathing
16 emergencies.
17    Q.  Okay.  Just so I have these right, the material
18 on positional asphyxia are the documents 8, 9, and 10?
19 Are those the ones you're referring to?
20    A.  Just one second.
21       It's --
22    Q.  Too?
23    A.  It's 8, 9, 10, and 5I.
24    Q.  Okay.  Let me ask you, On Item 5, these Basic
25 Learning Domains, are -- you have electronic copies of
Page 44

1  those?
2     A.  I do.
3     Q.  Well, I would like to have those also made part
4  of the -- well, let's make them Exhibit 2.
5     A.  May I make a suggestion?
6     Q.  Sure.
7     A.  That we include it in 1?  Because I envision,
8  this is going to be more than just a disk.  It will have
9  to go on a thumb drive or flash drive, and that I would
10 provide that to you, and there would be enough space on
11 that for that -- all of that.  Is that all right?
12    Q.  That would be perfect.  Thank you.
13       And what was your understanding of how long
14 Mr. White was on his stomach?
15    A.  I don't know.  Only that he was at one point.
16 Actually, two points, I think.  At least two points, two
17 times.
18    Q.  And one of those when he was being handcuffed?
19    A.  One of those was the handcuffing.  And then,
20 apparently, brought to a seated position and then the
21 struggle started up again.
22    Q.  Okay.  And the second time?
23    A.  The second time he was put in a, like -- he was
24 put in a hobble and, before that, a Figure 4 restraint,
25 et cetera.
Page 45

12 (Pages 42 to 45)

1   Q.  So, again, I'm not sure I see it in any of your
2   specific opinions, but are you expressing a criticism
3   about how long he was on his stomach?
4   A.  Oh, certainly.  He should not have -- they --
5   they should have been able to handcuff him straightaway,
6   get him up, and never put him on his stomach again.
7   Q.  Do you have some understanding for the total
8   amount of time that Mr. White was on his stomach?
9   A.  No, I have no understanding.
10  Q.  And as far as whether Mr. White being on his
11  stomach caused him any injury, that's a medical question
12  for someone else; correct?
13  A.  That would be a medical question, I believe.
14  Q.  So that's not something you are going to give
15  an opinion on?
16  A.  Well, we don't do it.  And my -- my opinion was
17  he's alive when they encounter him and he's dead when
18  they leave him.  So that would be the extent of my
19  opinion as far as medical, I think, as a -- as a
20  detective.
21  Q.  Well, my question to you is, Are you intending
22  to offer some opinion in this case on whether
23  Mr. White's positioning caused his death?
24      MR. NISENBAUM:  I would say simply that that is
25  a -- you're asking for a medical opinion.  It's an

Page 46

1   improper opinion from this expert.  We haven't offered
2   that opinion from him.
3   BY MR. CONLEY:
4   Q.  Okay.  On that basis, I am not going to ask you
5   anything further, because counsel has said you're not
6   offering an opinion on that.
7   A.  A blessing.
8       MR. NISENBAUM:  With my demure response.
9   BY MR. CONLEY:
10  Q.  Are you expressing a criticism of the
11  application of the hobble?
12  A.  Only if it -- and it appears in the record that
13  it's a possibility -- and it's -- and it's in the
14  training, incidentally, in the videos, that if his --
15  the hobble, which I understand was connected to his
16  ankles, was connected -- and -- and apparently
17  uncontested -- connected to his handcuffs, was connected
18  in such a way that it caused his legs to bend, then,
19  yes, that would be a -- that would equate to hogtied,
20  which is specifically forbidden in -- even in the
21  Vallejo policy.
22  Q.  And if it was not the hogtied system and the
23  hobble was not connected to his handcuffs, then you are
24  not critical of the application of the hobble?
25  A.  Well, yes, I am.  Because the training for

Page 47

1   hobble is that the leash end is held by the officer and
2   not attached to the handcuffs.  And there are
3   specific -- there are departments, very large
4   departments, that absolutely forbid connecting to the
5   handcuffs.  LAPD is one of them.  So -- because of that
6   possibility or likelihood that it becomes a hogtie.
7       And in this case, it was connected to the
8   handcuffs.  So I am -- the leash end was connected to
9   the handcuffs.  So I am critical of that.
10  Q.  And why do you believe that the leash was
11  connected to the handcuffs?
12  A.  It's in the record and so stated specifically
13  by one of the paramedic's statements that I read.
14  Q.  I want you to assume that in this case the
15  hobble was applied but not attached to the handcuffs.
16      If that were the facts here, would you still
17  have a criticism of the application of the hobble?
18  A.  No.
19  Q.  All right.  All right.  And after Mr. White was
20  placed in a hobble, he was brought out to a gurney, and
21  the paramedics took over; right?
22  A.  Yes, that's my understanding.
23  Q.  Okay.  So at that point, no further force was
24  used against him by the -- any of the defendants;
25  correct?

Page 48

1   A.  Well, I don't know.  But it's not in the
2   record.
3   Q.  Not that you're aware of?
4   A.  That's right.
5   Q.  Okay.  Fine.  All right.  So have we talked
6   about all of the uses of force that you are critical of
7   in this case?
8   A.  Well, I -- I think if we -- I'm content, but we
9   didn't talk too much about weight and the calculus on
10  how much muscle versus his 216 pounds of muscle equated,
11  but I think, in my estimate -- my memory of the
12  deposition, I think we covered it.
13  Q.  Okay.  Bear with me for a second --
14  A.  Sure.
15  Q.  -- while I look at my papers here.
16      MR. NISENBAUM:  Thank you for the verbal
17  update.
18  BY MR. CONLEY:
19  Q.  All right.  You offer in Item 9 an opinion that
20  the Vallejo Police Department didn't provide necessary
21  training and administrative enforcement, and that is, as
22  I understand it, based upon the fact that these officers
23  did what they did and -- well, okay.  Let's start with
24  that.
25      Part of your reason for criticizing the police

Page 49

13 (Pages 46 to 49)

1 department's training and enforcement was that the
2 officers did what they did?
3   A.  Well, yes.  That's -- it is -- I think that's
4 the essence.  They did what they did, and that was done
5 in front of a sergeant and with a sergeant.  And that
6 speaks volumes, I think, as to the department's
7 administrative enforcement.
8   Q.  Okay.  You have not received any -- or have you
9 received any training records for the involved officers?
10   A.  Yes.  There are training records that are
11 included in the package.
12       Do you want the Bates-stamped numbers?
13   Q.  No.  That's fine.
14       And did you review those training records?
15   A.  Yes.
16   Q.  Did they -- all of the defendant -- defendants
17 receive all of the required POST certified training?
18   A.  On paper, yes.
19   Q.  Okay.  Do you have information other than these
20 training records with respect to these officers
21 indicating anything about their individual histories?
22   A.  No.  Only that they came from other
23 departments, some of them.
24   Q.  So you have no personnel files or prior
25 complaint records?  Anything like that?
Page 50

1   A.  No.
2   Q.  And do you have any Vallejo Police Department
3 records concerning prior complaints involving department
4 officers?
5   A.  Well, I've had cases involving Vallejo over the
6 years.
7   Q.  But those documents were not produced in this
8 case; right?
9   A.  That's right.
10   Q.  All right.  Attached to your report is your CV,
11 or resume.
12       Is that your current one?
13   A.  Yes.
14   Q.  So you retired as a police officer in 1993; is
15 that correct?
16   A.  Yes.  Deputy sheriff.
17   Q.  Have you taken any coursework on the use of
18 force since you retired?
19   A.  No, I have not taken any coursework.
20   Q.  Have you taught any classes in any POST
21 certified program on the use of force since retirement?
22   A.  No.
23   Q.  Have you written any POST Learning Domains or
24 workbooks for any POST classes since retirement?
25   A.  No.
Page 51

1   Q.  Have you created any testing or training
2 specifications for POST certified courses since
3 retirement?
4   A.  No.
5   Q.  Have you ever been a member of any association
6 of law enforcement trainers on police procedures?
7   A.  No.
8   Q.  Have you published any articles on use of
9 force?
10   A.  No.
11   Q.  Have you participated in any use of force
12 studies?
13   A.  I've done a number of studies of departments,
14 some ongoing still, and they have been used for court
15 cases.
16   Q.  And this was in your role as an expert witness?
17   A.  Yes.
18   Q.  Okay.  Have you conducted any studies in
19 circumstances where you were not serving as an expert
20 witness?
21   A.  No.  Even the pro bono cases would be expert.
22 So you're correct, no.
23   Q.  Have you taught physical skills training in any
24 POST certified course?
25   A.  Well, when I was on the department, I did.
Page 52

1   Q.  Okay.  But since retirement?
2   A.  No.
3   Q.  Have you reviewed any of the City of Vallejo
4 Police Department policies?
5   A.  Yes.
6   Q.  Okay.  Which ones have you reviewed?
7   A.  Well, in this case, there were -- their use of
8 force and the use of the hobble provided for the
9 material to be reviewed.  It's included in the
10 Bates-stamped material.  I can give you the numbers if
11 you like.  And then in other cases, I've had opportunity
12 to review their manual.
13   Q.  Okay.  Are you offering any opinions about the
14 adequacy of the Vallejo-published policies?
15   A.  I'm critical of their -- that their policy
16 regarding the carotid straight -- restraint does not
17 emphasize its dangers or restrict its use more
18 definitively such as in Richmond.
19   Q.  Okay.  Any other criticism of any of the
20 Vallejo-published policies?
21   A.  That's all that comes to mind.
22       Well, the -- let me amend that.  The -- whether
23 or not the policy regarding the examination of TASERS
24 when they're used and the evaluation of the TASER
25 usage -- I don't know.  It's not provided.  I would have
Page 53

14 (Pages 50 to 53)

1  expected something akin to the 2006 guidelines.
2  **Q.  And you're critical of the published policy on**
3  **that?**
4      A.  I don't -- haven't seen a published policy.  So
5  I don't know.  I would not know.
6      **Q.  Okay.**
7      A.  I only know what was offered in the report is
8  totally inadequate.
9      **Q.  Okay.  But you don't know whether that was done**
10  **according to policy or not because you haven't seen the**
11  **policy; correct?**
12      A.  That's right.  So there's some problems there,
13  and that would be, Then how did such a report pass
14  muster in the first place?
15      **Q.  Have you been involved in the development of**
16  **any of the Learning Domains for POST?**
17      A.  No.  Only the curriculum in -- back in the '70s
18  when I worked on -- for reserves.
19      **Q.  Okay.  Were you a patrol officer with the**
20  **sheriff's department?**
21      A.  Yes.
22      **Q.  And for what period of time?**
23      A.  It's in the CV.  Let me give you the dates.
24      **Q.  Okay.**
25      A.  I was a patrol officer from '78 to '70 -- '68

Page 54

1  to '70.
2      **Q.  And that would be Item No. 11 on your CV,**
3  **patrol division, San Dimas --**
4      A.  Yes.  Yes.
5      **Q.  When is the last time you arrested someone by**
6  **use of force?**
7      A.  Personally?
8      **Q.  Yes.**
9      A.  1984.
10      **Q.  And that's while you hold the position**
11  **identified as No. 3 in your CV?**
12      A.  Correct.
13      **Q.  Field operations?**
14      A.  Yes.
15      **Q.  And were you a sworn officer right up until**
16  **March of 1993?**
17      A.  Yes.
18      **Q.  Are you POST certified in the use of TASERS?**
19      A.  No.
20      **Q.  Were you at any time?**
21      A.  No.
22      **Q.  Did you ever deploy a TASER in the field as a**
23  **sworn officer?**
24      A.  No.
25      **Q.  While you were a sworn officer, did you carry a**

Page 55

1  TASER?
2      A.  No.
3      **Q.  Have you conducted any POST certified training**
4  **in TASER use?**
5      A.  No.
6      **Q.  Does POST offer any training in the field of**
7  **excited delirium?**
8      A.  Not in POST basic, they don't.
9      **Q.  Are there any POST certified courses that deal**
10  **with excited delirium, to your knowledge?**
11      A.  Not to my knowledge.  I would imagine there
12  are.
13      **Q.  And that training, though, would not be at the**
14  **basic academy?  It would have to be some kind of**
15  **in-service training?**
16      A.  On the specific topic of "excited delirium,"
17  yes.
18      **Q.  Have you ever taught a course on excited**
19  **delirium?**
20      A.  I gave training in the -- when I was at the
21  jail, yes, and commanded -- in the men's central jail, I
22  gave -- I saw that training occur.
23      **Q.  And since your retirement, have you given any**
24  **training in excited delirium?**
25      A.  No.

Page 56

1      **Q.  Have you ever authored any publications on**
2  **excited delirium?**
3      A.  No.
4      **Q.  While you were a sworn officer, was there**
5  **training of some sort on excited delirium?**
6      A.  Certainly, yes.
7      **Q.  And did that area develop while you were an**
8  **officer, or did it already exist when you became an**
9  **officer?**
10      A.  Well, the -- it's nothing new in terms of -- I
11  am taking the excited delirium as the person's
12  delirious; they're out of their head; they're agitated;
13  physically hard to -- unre-- -- they have to be
14  physically restrained sometimes -- that's always been
15  understood -- and that they are fragile -- that's my
16  term -- in terms of their health and what can happen to
17  them if they're not handled properly.  That's always
18  been taught, ever -- since '65 when I came on the
19  department.  The term "excited delirium" appears in the
20  literature, I think, after I retired out in terms of a
21  subject study and significant publications for law
22  enforcement.
23      **Q.  Can you recall when you first saw the term**
24  **"excited delirium" appearing in the -- in any training**
25  **literature?**

Page 57

15 (Pages 54 to 57)

1    A.  No, I can't.  But I can -- I remember
2  discussing it with doctors and nurses at the jail.  We
3  had a five-story hospital attached to the central jail,
4  and that was when I came on the department in '65.  And
5  then when I became a -- returned as a lieutenant, I
6  also -- it was always a topic of training and
7  discussion.
8    Q.  Okay.  I -- we may have gotten a little
9  confused on that.  I was specifically asking about the
10  term "excited delirium."
11    Do you recall when you first saw that in any
12  training literature?
13    A.  No, I don't recall.
14    Q.  Okay.  You've included within your report your
15  rates that you charge.
16    And can you tell me how much to date you've
17  charged on the present case?
18    A.  $3,000.  The retainer.
19    Q.  Okay.  And do you know how many hours you've
20  put into this case so far?
21    A.  In terms of hours, probably 20 hours, something
22  like 20, 15 to 20 hours.
23    Q.  Now, you have also enclosed a list of sworn
24  testimony for the last -- what is it? -- four years; is
25  that right?

Page 58

1    A.  Sure.
2    Q.  Do you have some estimate as to how many
3  different cases are shown on this list of sworn
4  testimony?
5    A.  No.
6    Q.  No estimate?
7    A.  No.
8    Q.  Are they mostly civil rights claims?
9    A.  Yes.  And the list is precise.
10    Q.  Precise in what sense?
11    A.  That they're exact in terms of every single
12  date of testimony and deposition.
13    Q.  Okay.  Are they all civil rights cases?
14    A.  No.
15    Q.  Can you tell me how many are not?
16    A.  No.  But there are civil service cases.
17  There's criminal matters.  And there are civil cases.
18    Q.  Can you give me an estimate of what percentage
19  are civil rights cases as opposed to some other kind?
20    A.  I would estimate at least 85 percent, maybe
21  more.
22    Q.  And of the civil rights cases, about what
23  percentage are you retained by the plaintiff or
24  claimant?
25    A.  Well, I accept the case on their merits, and I

Page 60

1    A.  Correct.
2    Q.  Okay.  And that's your most current, updated
3  list?
4    A.  No.  There's been subsequent testimony since I
5  submitted that one.
6    Q.  Okay.  So there have been additional matters as
7  between January 13th and today?  February 10th?
8    A.  Yes, there have been.
9    Q.  How many more?
10    A.  Let me check the record.
11    So from January 13th?
12    Q.  Yes.
13    A.  Okay.  Seven.  There have been seven.
14    Q.  Do you have an updated list?
15    A.  Yes.
16    Q.  Could you provide that with the other exhibits?
17    A.  I will.
18    THE REPORTER:  Would you like to mark that as
19  an exhibit, Counsel?
20    THE WITNESS:  Put it into 1?
21    MR. CONLEY:  Put it in Exhibit 1.
22    THE WITNESS:  I'll add it in 1.
23    Okay.  Sounds good.
24  BY MR. CONLEY:
25    Q.  Is that all right?

Page 59

1  think in that list there's one that is for the defense
2  that I accepted.
3    Q.  And the remainder are for the plaintiff?
4    A.  That's my recollection.
5    Q.  Have you been retained by Mr. Burris's office
6  before?
7    A.  Yes.
8    Q.  How many times?
9    A.  I'm not sure.  I'm sure -- but I'm -- it's over
10  a dozen times over the years.
11    Q.  So that's over a dozen times but not
12  necessarily all reflected in this list of the last four
13  years; correct?
14    A.  That's right.
15    Q.  Are you retained by Burris's office in any
16  other cases currently?
17    A.  Yes.
18    Q.  How many?
19    A.  One that comes to mind right now.
20    Q.  All right.  As the last question, let me ask,
21  Are there -- can you think of any other areas of
22  criticism you have of any of these defendants which we
23  haven't yet touched upon?
24    A.  No.
25    MR. CONLEY:  In that case, I believe I'm done.

Page 61

16 (Pages 58 to 61)

1       MR. NISENBAUM:  Great.
2       Can we get a copy of the deposition?
3       THE REPORTER:  Yes.
4       THE WITNESS:  Do I provide a bill to you?  How
5  does this work?
6       MR. CONLEY:  Are you -- are you speaking to me
7  or to Mr. Clark [sic]?
8       THE WITNESS:  I am speaking to you, sir.
9       MR. CONLEY:  Okay.  We can go off the record,
10  then.
11       THE WITNESS:  All right.  That's fine.
12       MR. CONLEY:  Send the original to Mr. Clark to
13  review, and then when he's signed off on it, you will
14  give me the original.
15       MR. NISENBAUM:  I don't think that's very --
16  I've never actually -- my view is that simply make the
17  transcript available for him to review.  Don't send him
18  the original to review.
19       MR. CONLEY:  Well, all right.  Fine.  You can
20  make it available to him.
21       THE REPORTER:  Great.  So we'll go according to
22  code, then.
23       (The deposition concluded at 3:13 p.m.)
24            * * *
25

Page 62

---

1       DECLARATION UNDER PENALTY OF PERJURY
2
3       I, Roger A. Clark, do hereby certify under
4  penalty of perjury under the laws of the State of
5  California that the foregoing is true and correct.
6       Executed this _____ day of _____,
7  2016, at _____, California.
8
9
10      _____
11         ROGER A. CLARK
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 63

---

1       REPORTER'S CERTIFICATE
2       I, Gina Marie De Luca , RMR, CRR, CSR No. 6973,
3  Certified Shorthand Reporter, certify:
4       That the foregoing proceedings were taken
5  before me at the time and place therein set forth, at
6  which time the witness was put under oath by me;
7       That the testimony of the witness, the
8  questions propounded, and all objections and statements
9  made at the time of the examination were recorded
10  stenographically by me and were thereafter transcribed;
11       That the foregoing is a true and correct
12  transcript of my shorthand notes so taken.
13       I further certify that I am not a relative or
14  employee of any attorney of the parties, nor financially
15  interested in the action.
16       I declare under penalty of perjury under the
17  laws of California that the foregoing is true and
18  correct.
19       Dated this 16th day of February 2016.
20
21         Gina Marie De Luca
           RMR, CRR, CSR No. 6973
22
23
24
25

Page 64

17 (Pages 62 to 64)

REPORTER'S CERTIFICATE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I, Gina Marie De Luca , RMR, CRR, CSR No. 6973,
Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken
before me at the time and place therein set forth, at
which time the witness was put under oath by me;

That the testimony of the witness, the
questions propounded, and all objections and statements
made at the time of the examination were recorded
stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct
transcript of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under the
laws of California that the foregoing is true and
correct.

Dated this 16th day of February 2016.

(signature requested)

Gina Marie De Luca
RMR, CRR, CSR No. 6973

64

**A**

AA0135E 1:25
able 31:16 46:5
about 5:13 6:21 9:13
12:14 13:20 14:5 16:16
27:9,9 29:17 31:2
32:15 33:14 34:20
37:16 38:12,13,20 39:9
39:23 40:4,9,13 41:5
41:15 42:4,17 43:16
44:2,4 46:3 49:6,9
50:21 53:13 58:9 60:22
absolutely 48:4
academies 40:7
academy 60:25
accept 60:25
accepted 34:15 61:2
according 32:3 54:10
62:21
accurate 9:13
acting 19:22 27:25
action 64:15
active 11:20
actually 6:14 7:3 9:9 13:6
24:11,12 31:11,18 32:9
32:10,12,16 41:9,15
42:12 43:11 45:16
62:16
Ad 1:4 2:4
add 28:12 59:22
addition 6:18
additional 11:21 12:13
59:6
addressed 25:1 39:15
adequacy 53:14
adequately 31:21
administrative 49:21
50:7
affected 32:9,11
after 9:22 22:17 26:2,6
36:6 48:19 57:20
again 13:5 14:5,19 22:24
23:22 28:9 30:10 32:11
34:16 36:22 39:9,12
45:21 46:1,6
against 48:24
Agent 38:19
agitated 57:12
agree 22:9
Ah 9:25
Aid 44:14
airway 25:8
akin 54:1
al 5:17
alive 46:17
alleged 24:10
allegedly 33:17
already 57:8
although 14:9
always 17:13 57:14,17
58:6
ambulance 18:2
amend 53:22
amended 6:7,9
amount 46:8
and/or 25:24
Angeles 13:18
ankles 47:16
announced 18:2 23:16
24:5,24 25:19 30:17
announcement 18:7

another 19:8
answer 30:13 41:21
answered 28:23
anybody 22:4 27:13
anyone 28:24
anything 16:19 22:2,3
34:14 47:5 50:21,25
anywhere 23:1
apartment 18:4
apparently 27:25 31:24
32:3 45:20 47:16
appear 20:22
appeared 18:18 19:1,22
23:15 24:4,24 29:5
appearing 57:24
appears 17:5 20:24
32:23 33:3 47:12 57:19
application 31:19,23
32:9 37:16 43:14 47:11
47:24 48:17
applications 34:22
applied 31:11,25 40:10
40:12,14,16,17 41:9,14
41:17,19,25 42:4,7,8
43:8,16,18 48:15
apply 43:5
appreciate 29:12
approached 18:17
area 8:14 57:7
areas 61:21
argument 28:2,18,21
29:10,23
argumentative 34:24
arm 41:6,8
arrest 22:11,13 23:4,5
26:20 28:9,12
arrested 22:5 27:13
28:11 55:5
arrived 18:16 19:5
articles 52:8
articulation 23:8
aside 40:11
asked 20:13,13 21:16,19
21:24
asking 23:25 24:13,16
32:15 41:15 46:25 58:9
asphyxia 44:3,18
assailant 28:4
assault 28:13
assaulted 19:23
asserted 21:2
asserting 20:24
asserts 20:24 30:10
association 52:5
assume 23:25 30:12,16
48:14
assumes 23:22
assuming 21:11
assumption 28:8
ATKINSON-BAKER 1:21
attached 48:2,15 51:10
58:3
attacked 18:18,25 22:7
22:11 28:20,24,24 29:5
attacks 28:1
attempting 25:23 30:6
attempts 31:3
attorney 64:14
authored 57:1
authority 35:25 37:1,7
autopsy 7:24 25:8

**B**

B 4:7 22:11
back 10:14,21 11:19
12:12 21:8 22:20 23:10
23:11 26:8,13 35:19
37:4 54:17
baggy 30:6
bar 41:6,8
Barber 1:4 2:4
Barry 2:18 3:8
base 17:2
based 49:22
basic 4:11 14:14 15:12
44:24 56:8,14
basically 21:11
basing 32:17
basis 24:20 38:25 47:4
Bate 7:25
Bates 7:3 8:2 9:2,16,17
38:14,14,18
Bates-stamped 6:15,19
8:1,16 50:12 53:10
bathroom 7:7,19,21 20:7
20:8 21:16,21 22:19
26:10,13 29:1,6,15,18
30:1
Bear 49:13
became 57:8 58:5
become 41:11
becomes 48:6
becoming 41:5
bed 7:6,10
bedroom 7:7 20:8
before 2:21 5:9 27:4
45:24 61:6 64:5
beginning 15:6
begins 8:6 44:1
behalf 2:17
behavior 11:6 37:21 38:5
38:22
behind 26:8,10
being 18:8,14 21:1,1
26:7 43:4 45:18 46:10
belief 25:25
believe 6:9 21:9 28:6
40:12 44:14 46:13
48:10 61:25
believed 25:23
bend 47:18
BENJAMIN 3:4
between 5:18 59:7
beyond 34:14
bill 62:4
bit 8:20 13:10,12 17:7
32:21
bizarre 38:6,22
blessing 47:7
body 25:16 26:1
Boersma 2:18 3:8 32:20
bono 52:21
both 27:13 35:9
bother 8:19 16:19
bottom 25:21
Boulevard 3:11
break 35:12
breathing 44:15,15
brief 25:2

brought 27:4 45:20
48:20
bullet 44:5
bulletin 13:19,22,24
bulletins 12:10
Bureau 14:4
burn 15:24
BURRIS 3:3
Burris's 61:5,15

**C**

C 3:1,10
CA 5:1
calculus 49:9
California 1:2,18 2:2,20
3:5,11,12 63:5,7 64:17
call 6:17 9:17,21 11:7,18
26:17 27:14,16 28:7
32:5,11
called 11:19 26:15
calls/dispatch 6:11
came 18:10 36:6 50:22
57:18 58:4
capacity 1:10 2:10
care 27:10,25 28:14,16
29:1 30:3,25
careful 9:15
carotid 40:2,6,9,24 41:1
41:5 53:16
carry 55:25
cartridges 7:8,13,15,21
34:2,4 35:3
case 1:4 2:4 5:16 24:20
35:2 40:4 41:9 46:22
48:7,14 49:7 51:8 53:7
58:17,20 60:25 61:25
cases 51:15 52:15,21
53:11 60:3,13,16,17,19
60:22 61:16
catchall 17:8
categories 44:6
category 4:9 10:24
causation 40:4
caused 46:11,23 47:18
central 56:21 58:3
certainly 20:17 21:5
22:14 26:23 37:14 38:5
38:24 46:4 57:6
certainty 34:15
CERTIFICATE 64:1
certification 13:3
certified 12:23,24 14:13
15:11 37:10 39:13
50:17 51:21 52:2,24
55:18 56:3,9 64:3
certify 63:3 64:3,13
cetera 8:8 38:6,17 45:25
change 10:17
changed 11:2,6
changes 10:19 11:4,8,13
chapter 41:1,1,2
charge 58:15
charged 58:17
check 59:10
Chief 1:11 2:11
choke 41:6,9
choked 18:4
Circling 12:12
circumstances 52:19
cite 44:5
cited 39:4,7,16

City 1:9  2:9 53:3
civil 60:8,13,16,17,19,22
claimant 60:24
claims 60:8
Clark 1:17 2:17 4:3,10,12
5:2,8 21:10 24:15 62:7
62:12 63:3,11
Claros 18:18,22 19:5
classes 51:20,24
clear 24:15 42:16
clearly 21:2 33:10
close 27:19 43:21
close-up 7:8
code 62:22
color 6:20
come 18:4 21:16,19,21
21:24 22:2,18 23:2
comes 44:9 53:21 61:19
commanded 56:21
commencing 2:20
comment 40:17
commentary 31:13 36:7
company 13:1 36:2
complaint 6:6,7,8,9
50:25
complaints 51:3
complete 9:1
compound 29:10,23
compression 42:25
computer 15:25
concepts 14:1
concern 31:15 39:2
concerned 29:16
concerning 5:22 51:3
conclude 27:3
concluded 62:23
conduct 28:8
conducted 52:18 56:3
confused 58:9
confusing 31:5
Conley 3:10,10 4:5 5:7
15:22 16:1,6,11,13
17:17 21:14 23:24
24:14 26:5 27:20 28:3
28:15,19 29:3,11,13,21
30:4,15 32:14 34:19
35:1,6,14,19,21 42:3
47:3,9 49:18 59:21,24
61:25 62:6,9,12,19
connect 38:8
connected 47:15,16,17
47:17,23 48:7,8,11
connecting 48:4
consider 27:24 37:24
38:6,22
consideration 38:23
considered 17:2 25:5,6
constitutes 34:12
contact 22:4,6 38:16
contain 6:16
containing 4:9
contend 24:10
content 49:8
contest 20:4
context 37:5
contraband 25:5,7
contrary 32:1
control 27:4 28:17 29:6
30:7,21
conversation 38:19
convey 26:23

conveyed 25:7 28:7
cooperate 29:7
cooperating 29:15
copies 15:13 44:25
copy 15:18 62:2
Coroner 7:23
corporation 1:9 2:9
correct 5:9,20,23 7:24
    10:6,18,25 16:23 17:12
    17:20,21,24 18:11
    19:24 23:20,21 24:6,17
    24:25 31:11,20 33:11
    33:15 39:11,11 40:15
    40:20 42:5 46:12 48:25
    51:15 52:22 54:11
    55:12 59:1 61:13 63:5
    64:11,18
correctly 40:20,22 43:16
counsel 47:5 59:19
couple 28:20 29:5
course 52:24 56:18
courses 12:23,24 13:6
    15:11 37:11 39:13 52:2
    56:9
coursework 51:17,19
court 1:1,21 2:1 15:17
    16:4 52:14
cover 36:20
covered 17:11 49:12
CPR 44:14
crazy 19:22 27:25
created 52:1
Creek 3:12
criminal 28:8 60:17
critical 21:22 22:22
    47:24 48:9 49:6 53:15
    54:2
criticism 18:13 19:4,13
    21:20 46:2 47:10 48:17
    53:19 61:22
criticizing 49:25
CRR 1:24 2:22 64:2,21
CSR 1:24 2:22 64:2,21
Cunningham 2:18 3:8
    32:19 33:20,25
current 51:12 59:2
currently 61:16
curriculum 54:17
CV 51:10 54:23 55:2,11
cycle 31:9 32:3
cycles 34:7,14,15,20
    35:8,10,11,23

D

D 4:1
Damages 6:6
dangerous 40:16,16,18
    40:19,22 41:5
dangers 40:10 53:17
date 10:12 14:22 15:1
    58:16 60:12
dated 4:10 5:25 10:10
    64:19
dates 54:23
day 63:6 64:19
days 11:19
De 1:24 2:22 64:2,21
dead 46:17
deal 39:18 56:9
deals 39:20 40:1
death 37:6,12 46:23

deaths 44:10
decades 10:14,21
Decedent 1:6 2:6
DECLARATION 63:1
declare 64:16
defendant 25:21 50:16
defendants 1:13 2:13,18
    3:8 48:24 50:16 61:22
defense 9:3 61:1
defined 39:6
definitively 53:18
degraded 41:20
delirious 57:12
delirium 39:7 56:7,10,16
    56:19,24 57:2,5,11,19
    57:24 58:10
demure 47:8
department 5:19 13:2,19
    13:21 14:6,16,18 15:10
    49:20 51:2,3 52:25
    53:4 54:20 57:19 58:4
departments 12:7 48:3,4
    50:23 52:13
department's 50:1,6
depending 31:14
deploy 34:16 55:22
deployed 7:11 35:3
deposed 5:8 21:5,8,10
deposition 1:16 2:17
    21:9 49:12 60:12 62:2
    62:23
depositions 5:14 10:4,5
Deputy 51:16
describe 35:24
described 35:22
description 4:8 31:22
detective 46:20
detention 22:25
determine 31:16
determined 37:21
develop 57:7
development 54:15
devoted 41:2
diagnosed 38:2
Diego 1:18 2:20 5:1
difference 42:22
different 7:17 11:24
    13:12 34:21 60:3
difficult 43:5
Dimas 55:3
directly 16:4
discuss 39:5
discussed 39:16
discussing 58:2
discussion 22:17 41:4
    43:25 58:7
disk 6:18 8:21 9:6,12,12
    9:15 15:20,24 16:4
    45:8
disks 6:16
dispatch 6:16 9:16,16,19
    9:21 17:23
dispatcher 18:1
displays 7:5
dispute 30:11
distinction 42:15
DISTRICT 1:1,2 2:1,2
division 55:3
doctors 38:15 58:2
document 13:16,17 14:2
documented 31:21

documents 6:12 7:11,16
    8:12,16,24 9:2,22 31:9
    33:18,22 36:10,13
    44:18 51:7
domain 10:12,14 39:16
    39:18 40:25 44:13
domains 4:11 10:9,15,17
    10:21,24 11:2 44:25
    51:23 54:16
done 29:20 40:20,21
    42:21,23 43:1 50:4
    52:13 54:9 61:25
door 12:9,20,23 23:4,10
    23:14 25:22 26:9,11,14
    26:25 27:1
download 34:8
downloaded 33:5,7,11
    33:15,19
dozen 61:10,11
Dr 41:22
drive 4:9 45:9,9
drug 25:5 37:22
drugged 18:18
drugs 4:9 1,22 23:15 24:4
    24:24 25:8,24 26:8
    28:1 29:6 30:6,13
    37:19
duly 5:3
duplicate 15:20
duration 34:12
during 32:2

E

E 3:1,1 4:1,7
each 33:2,17 43:1
earlier 16:17
easier 43:12
easily 33:1 41:11,21
EASTERN 1:2 2:2
effect 19:3,24
effective 31:24
either 27:1
electronic 15:13 44:25
electronic-only 15:18
embraces 12:24
emergencies 44:15,16
emphasize 43:17
employee 64:14
enclosed 5:18 46:17
encounter 5:18 46:17
encountered 28:25
end 8:9 10:1 32:18 48:1
    48:8
ending 9:25
ends 8:13 9:10
enforcement 49:21 50:1
    50:7 52:6 57:22
enough 20:17 23:3 45:10
entire 9:8 41:2
entitled 5:16
entry 23:11
envision 45:7
episode 27:9,10
equate 47:19
equated 49:10
esophagus 25:9
ESQ 3:4,10
essence 50:4
essentially 41:16
estimate 49:11 60:2,6,18
    60:20

et 5:17 8:8 38:6,17 45:25
evaluation 53:24
even 40:17,19,21 47:20
    52:21
event 25:17 30:19 35:5
ever 38:2 52:5 55:22
    56:18 57:1,18
every 60:11
everything 10:13,20 12:2
evidence 25:15,24 28:22
    29:24 30:10 31:7
exact 60:11
exactly 8:24 27:22
examination 4:4 5:6 33:1
    53:23 64:9
examined 5:4 26:1
example 11:5
Excellent 16:10
exceptional 34:17
excited 56:7,10,16,18,24
    57:2,5,11,19,24 58:10
excuse 13:10
Executed 63:6
exhibit 4:9 15:17 16:12
    45:4 59:19,21
exhibits 59:16
exist 57:8
existed 11:15
exit 23:12
expect 12:2 25:14 27:18
    29:25 30:2
expected 23:1 27:15
    54:1
expended 34:2,4 35:4
experienced 31:18
expert 47:1 52:16,19,21
explain 33:6,8
expressing 40:13 41:8
    46:2 47:10
extent 46:18
extremely 38:6 39:3
    40:18,22 43:5
eyewitness 24:17

F

F 2:19
fact 17:12 24:6,10,25
    30:10 33:8 49:22
factor 30:25
facts 17:1,2 20:24 24:2
    24:19 27:6 29:14 43:10
    48:16
far 4:11 6:5 31:6 43:13
    46:10,19 58:20
favor 37:23
Fax 3:6,13
fear 20:1
February 1:19 2:21 5:1
    59:7 64:19
federal 36:3,4 37:14
feel 5:13
few 6:20 8:21 11:4 26:3
field 55:13,22 56:6
Figure 45:24
FILE 1:25
files 50:24
financially 64:14
find 31:13
findings 36:9
fine 15:22 16:6 35:14
    49:5 50:13 62:11,19

finesse 43:1
finished 29:11
fire 9:17,21 18:8,13
first 5:3 6:4,6,7,9 27:8
    34:5 36:4 38:13 44:14
    54:14 57:23 58:11
five 32:22 34:1 35:12
five-story 58:3
flash 45:9
Fleischman 38:17
floor 2:20 7:8
follow 17:9
following 17:11
follows 5:4
forbid 42:12 48:4
forbidden 47:20
force 11:5,12,15 22:25
    39:20 48:23 49:6 51:18
    51:21 52:9,11 53:8
    56:5
foregoing 63:5 64:4,11
    64:17
forth 9:23 13:8 26:14
    44:6 64:5
forward 21:15
foundation 28:22 29:24
four 32:22 58:24 61:12
Fourth 2:20
fragile 39:3 57:15
from 4:10,11 7:7,7,12
    12:2 13:8,11,14 15:9
    23:19 31:16 32:18 38:1
    44:9 47:1,2 50:22
    54:25 59:11
front 50:5
full 37:5
fundamental 31:12
further 22:14 47:5 48:23
    64:13

G

gain 30:21
gave 56:20,22
generally 31:23
Georgia 14:3
getting 23:3 43:21
GIBBONS 3:10
Gina 1:24 2:21 64:2,21
give 20:9 36:8 46:14
    53:10 54:23 60:18
    62:14
given 12:1 21:10 27:2
    33:16 56:23
giving 8:6
global 17:13
go 8:9 17:18 20:9,19
    22:19 25:20 43:19 45:9
    62:19,21
goes 8:19,20 9:4,18
    10:14,21 44:2
going 15:4 16:25 19:13
    21:15 23:1 24:2 26:25
    27:16,17 28:14 29:18
    30:17,20 36:19 37:4
    45:8 46:14 47:4
gone 19:8
good 59:23
Google 7:5 16:16,18
gotten 10:5 58:8
government 37:15
grace 43:2

Great 6:4 62:1,21
group 15:17
Guardian 1:4 2:4
guess 16:3 18:20 19:8
27:1
guest 19:17
guidelines 36:3,5,7 39:6
54:1
gurney 27:23 48:20

**H**

H 4:7
hand 27:19
handcuff 46:5
handcuffed 45:18
handcuffing 45:19
handcuffs 47:17,23 48:2
48:5,8,9,11,15
handled 57:17
happen 57:16
happened 24:11,12,16
25:14
happening 25:15
hard 14:9,19 57:13
harm 30:23
having 5:3 38:2 41:19
head 14:24 57:12
health 57:16
healthwise 39:3
hearsay 21:3,11 23:23
24:1
held 48:1
her 1:4 2:4 18:4 19:1
20:1,1,2,10
Herman 2:18 3:8
herself 19:10
high 19:1,22 32:18
him 18:3 22:2,5,18 23:2
25:4 27:13,17 28:10,25
30:23 32:11 38:8,9
46:5,6,6,11,17,18 47:2
48:24 62:17,17,20
himself 30:3
histories 50:21
history 27:2,9
hobble 45:24 47:11,15
47:23,24 48:1,15,17,20
53:8
hogtie 48:6
hogtied 47:19,22
hold 8:4 9:10 24:8 29:12
41:7,9 42:10 43:22
55:10
hope 41:11
hospital 26:2 58:3
hours 58:19,21,21,22
house 20:10
hurt 22:11
hypothetical 29:10,23

**I**

ideas 13:8,14
identified 13:18 19:10
40:9 55:11
identify 7:1
ignored 32:4
ill 37:17,18 39:19,21,24
illegal 25:24
illness 37:22,24 38:3,7,8
38:23 39:1,5,12,15
imagine 14:9,19 43:4

56:11
immediately 26:23
impossibility 34:3
improper 40:14 41:17
47:1
improperly 40:16 41:19
41:25
inadequate 54:8
INC 1:21
incapacitated 32:2
incident 16:15 26:2 36:6
incidentally 47:14
include 37:20 45:7
included 7:25 39:6 50:11
58:14
including 37:18
incomplete 29:9,22
incorporating 13:8
increase 30:7,20
indicate 25:3 31:8 36:24
43:24
indicated 18:25 20:16
22:10
indicates 6:10 25:8
41:11
indicating 27:13 38:2
50:21
individual 1:10 2:10
50:21
individually 1:5,11 2:5
2:11
individuals 39:24
induced 37:22
inflicted 42:10
information 13:20 14:5,8
23:3,6 31:17 33:4,11
33:14 50:19
injury 46:11
inquired 20:17
inquiries 23:7
inquiry 22:15 23:3
inserting 30:1
inside 20:19 21:16
insofar 12:19
instruct 37:11
instruction 14:13
instructions 29:7
intended 17:13
intending 46:21
Interest 1:5 2:5
interested 64:15
International 11:22
12:14
interruption 16:2 17:16
21:6,13 26:4 34:18,23
intoxicated 37:19
investigated 31:21
investigation 14:4 22:14
33:10
investigative 38:7
investigator 25:13
investigators 32:2
involved 33:17 40:24
50:9 54:15
involves 5:18
involving 37:11 51:3,5
in-custody 44:10
in-service 16:15
isolated 28:25
issue 27:24 28:7,7,14,23
29:1 34:5 36:20 39:12

42:7
issues 17:14 28:13 34:9
39:23
item 4:11 6:6,10 7:23
10:3,8 11:21 13:18
16:14 36:4,10,14 37:4
39:9 44:24 49:19 55:2
Items 4:9 15:13

**J**

jail 56:21,21 58:2,3
January 5:25 59:7,11
John 2:18 3:3,8
jointly 1:12 2:12
just 7:2,4,20 9:6 10:14
10:20,22 11:5,12 15:4
15:5,20 16:18 19:23
21:10 24:19 27:1,11
28:20,24 29:4 34:21
35:22 44:17,20 45:8

**K**

keep 10:19
Kenneth 18:20
key 8:21 14:23,25
kind 17:7 23:7 34:3
56:14 60:19
knew 8:24 27:8,9
know 5:11 11:17 12:22
13:2,6,24 14:12,17,22
14:23 15:10 25:1,7
27:21,22,23 31:3,10
36:8 37:13 38:7,21
39:22 42:11 43:3 45:15
49:1 53:25 54:5,5,7,9
58:19
knowledge 14:18 56:10
56:11
known 37:13,13
Koutnik 2:19 3:8

**L**

L 3:3
lab 8:8
laid 43:4
language 23:9
LAPD 44:10 48:5
large 48:3
last 55:5 58:24 61:12,20
law 3:3 52:6 57:21
laws 63:4 64:17
learning 4:11 10:9,12,14
10:15,17,21,24 11:2
39:16,18 40:25 44:13
44:25 51:23 54:16
leash 48:1,8,10
least 37:17 37:24 45:16
60:20
leave 20:1,20 46:18
Leaving 40:11
legs 47:18
let 6:14 8:6 9:24 24:15
25:20,20 28:12 38:14
44:4,14,24 53:22 54:23
59:10 61:20
let's 6:4 17:5 40:1 45:4
49:23
lieutenant 58:5
like 8:22 9:7 10:13 14:25
15:16 17:7 35:15 45:3

45:23 50:25 53:11
58:22 59:18
likelihood 48:6
likely 37:25
limit 35:22 36:1
Linda 19:10
line 20:23
list 4:11 10:3,8 58:23
59:3,14 60:3,9 61:1,12
listed 10:24 37:9
listened 17:23
Litem 1:4 2:4
literature 57:20,25 58:12
little 13:12 17:7 58:8
living 27:18
location 7:4
locations 31:12
long 45:13 46:3
look 6:4 17:5 31:14
49:15
looks 17:7
Los 13:18
lot 16:20
Luca 1:24 2:22 64:2,21

**M**

M 2:21
made 18:7 20:25 25:13
25:18 31:6 45:3 64:9
major 17:2,22
make 8:6,23 15:17 30:24
42:15,16 44:14 45:4,5
62:16,20
makes 42:22
making 28:9
male 18:2
man 5:19
manner 40:13 41:16
43:18
manual 13:13,15,16
36:23 53:12
many 5:8,8 31:3,10,17
58:19 59:9 60:2,15
61:8,18
map 7:5 16:16,18
March 55:16
Marie 1:24 64:2,21
mark 59:18
marked 8:15 15:16 16:12
material 4:10 6:5,15,19
8:1 12:14 13:11 15:19
16:22 26:7 33:16,19
39:4 44:7,17 53:9,10
materials 11:22 12:13,23
mathematician 5:13 21:2 41:25
43:10,12
matters 59:6 60:17
may 30:6 45:5 58:8
maybe 9:5 35:12 60:20
mean 35:11
meaning 35:9
medical 18:8,13 25:10
27:10,16,24 28:11,13
28:14,16 29:1,1,2,17
30:1,3,25 40:3 46:11
46:13,19,25
medications 38:9,16
medics 26:15,18 27:5,15
member 52:5
memory 49:11

mental 37:22,23 38:2,7,8
38:23 39:1,5,12,15
mentally 37:17,18 39:19
39:21,23
mention 13:1
mentioned 8:1 10:13,20
12:1,19 39:7 44:3
men's 56:21
merits 60:25
met 19:10
Michael 1:6 2:6 5:19
25:22
Michael's 26:1
might 30:23
Mike 2:19 3:8
mind 10:20 53:21 61:19
minimum 7:16 32:24
minor 1:3 2:3
minutes 35:12
misapplied 41:6,10 42:9
42:24
misstates 27:6 28:22,22
29:10,23,24 30:9,10
34:25
mode 7:12
model 12:25 13:1
module 12:7 13:10,11
36:22
more 6:14 9:22 32:24
35:5,9 39:5 42:25 45:8
53:17 59:9 60:21
most 22:6,16 59:2
mostly 60:8
mouth 23:15 24:5,24
25:6 26:8
moved 26:8
much 12:7 35:17 49:9,10
58:16
multiple 34:11,21 35:7,9
35:10 37:6
municipal 1:9 2:9
Munoz 2:19 3:8 32:18
33:20 34:1
muscle 49:10,10
muster 54:14

**N**

N 3:1 4:1
name 38:17 39:8
named 5:19
necessarily 61:12
necessary 12:21 49:20
neck 42:25
need 5:13 15:19 27:10
29:2,2 30:7,20 36:21
40:15
needed 18:2 27:3
neighbor 18:17 19:23
net 17:13
never 31:20 41:12 42:6,7
42:20,23 46:6 62:16
new 14:16 15:10 17:20
57:10
Next 14:15
Nichelini 1:10 2:10,19
3:9 5:17
NISENBAUM 3:4 15:20
15:23 16:3,7,10 21:7
23:19,22 24:8 27:6
28:2,5,18,21 29:9,19
29:22 30:9 32:10 34:24

42:2 46:24 47:8 49:16
62:1,15
**NISSENBAUM** 20:23
nomenclature 11:12,15
nonexistent 33:3
non-compliant 11:18
North 3:11
notes 64:12
noth 22:9
nothing 14:10,20 17:20
22:10 27:8,11,12 28:10
43:23 57:10
notice 27:15
number 4:8 6:19 8:8 9:4
10:4 32:8 34:7,22 35:7
35:8 36:9 37:2 44:5
52:13
numbers 50:12 53:10
nurses 58:2

**O**

Oakland 3:5
Oakport 3:4
oath 64:6
object 20:23 23:15 24:4
24:23 25:8 32:10 42:2
objection 24:9 27:6 28:2
28:5,18,21 29:9,19,22
30:9 34:24
objections 64:8
observed 25:4
obviously 12:20
occur 56:22
occurred 32:13,16 43:22
62:9,13
off 14:23 15:4,25 29:12
62:9,13
offer 46:22 49:19 56:6
offered 21:1 33:18 47:1
54:7
offering 25:10 40:3
42:18 47:6 53:13
office 61:5,15
officer 22:22 23:13 24:3
24:22 25:3,4,18 26:6
30:16 41:25 42:13 48:1
51:14 54:19,25 55:15
55:23,25 57:4,8,9
officers 1:11 2:11 12:3
13:21 17:8 18:10,16,22
19:4,7,21 20:5,9,13,20
21:15,18,20,24 22:12
22:19 23:16 24:6,10,25
25:19,21 26:12,14,24
27:3,14 28:9,25 29:4
29:16 30:5,18,20 31:22
32:8 36:22 37:11 38:5
38:21 49:22 50:2,9,20
51:4
**OFFICES** 3:3
official 1:10 2:10
Oh 33:8 35:16 41:18 46:4
okay 6:10,22,24 7:18 8:2
9:4,10,14,19 10:2,8,15
11:11,21 12:12,17 13:5
13:12,18 14:3,12 15:3
15:5,8,16,23 16:1,7,21
17:23 21:15,23 25:10
25:17 27:24 30:24 32:7
33:21 36:24 37:4,10
38:19 39:9 40:6,23
41:4 42:14 43:15 44:12

**P**

P 3:1,1
package 50:11
page 4:4,8 6:4 11:17
16:25,25 17:6 25:21
36:7,12 37:8 39:17
44:1,2
paid 20:18
paper 50:18

papers 41:5 49:15
paragraph 25:21 37:9
paramedics 9:20 26:20
48:21
paramedic's 48:13
paraphrasing 27:12
parenthetically 25:25
park 16:20
parole 19:19
parsed 17:14
part 14:13 40:23 41:21
45:3 49:25
participated 52:11
particular 10:12 40:4
44:10
particularly 39:21
parties 64:14
parts 42:25
party 18:23
party's 18:4
pass 54:13
passive 11:19
patrol 54:19,25 55:3
penalty 63:1,4 64:16
people 22:8 28:1,20 29:5
30:1 37:18
per 35:23 41:19
perceived 25:18 30:16
percent 60:20
percentage 60:18,23
perfect 45:12
perfectly 24:15
period 21:23 40:18 41:12
42:8 54:22
periodically 12:15
perjury 63:1,4 64:16
permission 20:9
Personally 55:7
personnel 50:24
persons 37:17
person's 57:11
photograph 7:10,14
photographing 7:19
photographs 6:11,12,19
6:20 8:19 31:8 35:4
phrase 34:10
physical 25:15 31:7 34:3
52:23
physically 7:16 57:13,14
pieces 17:21
place 54:14 64:5
placed 48:20
plaintiff 60:23 61:3
Plaintiffs 1:7 2:7 3:2
point 8:9 12:20 21:18
22:16,18 26:18,24 29:8
30:5 31:2,10 41:15
44:5 45:15 48:23
pointed 20:6
points 45:16,16
police 1:11 2:11 5:19
6:10 13:19,21 14:6,16
14:17 15:10 20:3,15,22
21:1 22:3 25:2 31:7
49:20,25 51:2,14 52:6
53:5
policies 53:4,14,20
policy 36:23 47:21 53:15
53:23 54:2,4,10,11
position 43:11,13 45:20
55:10

positional 44:2,18
positioning 46:23
possession 25:4
possibility 37:24,25
47:13 48:6
possible 35:13
POST 10:8 12:23,24 13:2
13:6,10,15,16,25 14:13
14:14 15:11,12 37:10
39:13,22 40:7,24 50:17
51:20,23,24 52:2,24
54:16 55:18 56:3,6,8,9
pounds 49:10
PowerPoint 36:19
precise 6:14 25:20 60:9
60:10
precision 42:10,21,24
43:2
premature 26:17
prescribed 38:16
present 3:2,9 23:16
27:14 28:8 30:3 58:17
pretty 7:22
prevent 23:11
primary 28:14
print 16:19
printed 6:21 7:1
printing 7:9
printout 15:19
prior 50:24 51:3
pro 52:21
probably 12:3 58:21
probe 7:12
problem 32:25 33:21,24
problematic 32:21
problems 54:12
procedure 5:11
procedures 52:6
proceedings 64:4
produced 51:7
produces 13:1
professionals 29:18
program 51:21
prolonged 34:11,13,14
34:21 35:8,11 37:5
prone 43:5,7
pronounce 18:21
proper 40:14 41:17
42:19 43:19
properly 40:10,17 43:6
57:17
propounded 64:8
provide 10:12 17:1 36:19
45:10 49:20 59:16 62:4
provided 9:2,2 28:16
31:9 36:23 38:9,16
53:8,25
provides 39:1
publication 44:8
publications 57:1,21
published 35:24 36:5
37:1,14 52:8 54:2,4
pulling 26:25
purpose 7:9,18 22:25
23:4
purposes 15:18 16:22
28:9
push 23:4,11
pushed 22:20 23:10,11
23:13
pushing 22:22 26:13,25

27:1
put 9:6 10:11 12:10
25:24 29:2 36:21 45:23
45:24 46:6 58:20 59:20
59:21 64:6
puts 12:6
putting 23:14 24:5,23
25:5,5 26:7
p.m 2:21 5:1 62:23

**Q**

question 13:12 16:3 22:1
26:21 29:11,20 30:14
30:23 35:1 40:11 41:13
46:11,13,21 61:20
questioning 20:24
questions 64:8
quickly 32:4
quite 6:20 8:20,21 13:9
38:10
quote 36:8
quoted 11:17 14:2 36:6
37:8

**R**

R 3:1
radio 6:16
raised 39:12,23
range 8:2,11,20 9:5,9,18
rates 58:15
rather 20:25
Raul 2:19 3:8
read 20:15 23:10 48:13
readout 31:9 34:4,7
ready 33:13
real 37:24
really 43:22
reason 49:25
reasonable 22:5,15,24
27:3 29:16
reasonably 22:13
reasses 34:16
recall 18:19 19:20 20:12
20:16 21:4,7 23:9
57:23 58:11,13
receipt 33:17
receive 50:17
received 50:8,9
recent 27:2
Recess 35:18
recognize 32:23
recollection 20:6 61:4
referred 11:25 12:8 14:11
14:20 27:12 28:10 31:6
35:19 36:21 43:23
47:12 48:12 49:2 59:10
62:9
recorded 64:9
recording 17:24 33:2
recordings 6:13,16 9:19
records 38:1,4,12 50:9
50:10,14,20,25 51:3
recovered 32:4
referred 10:21
referring 35:7 38:11 44:8
44:19
reflected 34:7 61:12
refused 21:25
regarding 53:16,23
relates 35:8
relation 7:21

relative 64:13
relying 36:3
remainder 17:19 61:3
remember 8:20 20:21,22
23:17 25:3 58:1
reminders 5:13
remove 20:5,14
rent 20:18
report 4:10 5:22,25 8:8
11:14 19:25 23:19
31:23 36:8 38:14 39:10
40:18 41:11 44:1 51:10
54:7,13 58:14
reported 1:24 18:17
23:14 24:23 26:6 32:8
reportedly 18:1
reporter 15:17 16:2,5
17:16 21:6,13 26:4
34:18,23 59:18 62:3,21
64:3
REPORTERS 1:21
REPORTER'S 64:1
reporting 18:4,23
reports 6:10 7:23 17:13
19:16 20:3,16,22 21:1
22:3 25:2 38:8
request 22:18
require 30:25
required 50:17
reserves 54:18
resisted 11:6
resistive 11:18,19
resolved 33:1
respect 50:20
respond 18:11
responding 23:7
response 47:8
rest 8:18
restrained 57:14
restraint 40:2,6,10 41:5
45:24 53:16
restraints 40:24
restrict 53:17
result 33:9 37:6,12
resulted 33:10
resume 51:11
retained 60:23 61:5,15
retainer 58:18
retired 51:14,18 57:20
retirement 51:21,24 52:3
53:1 56:23
returned 18:5 58:5
revealed 26:1
review 31:6 50:14 53:12
62:13,17,18
reviewed 4:10 6:5 16:22
53:3,6,9
Richmond 53:18
right 5:16 7:18 8:13,14
10:2,3 12:17 13:5
16:10,14,21 17:3,18
18:3,7,23 19:2,11,16
21:25 22:8,9,16,17
23:13 24:18 25:19 26:9
28:4 29:14 31:2,17,19
34:10 35:19,22 36:11
37:4 38:20,21 39:10
40:3 42:19 43:15,20,25
44:17 45:11 48:19,19
48:21 49:4,5,19 51:8,9
51:10 54:12 55:15

58:25 59:25 61:14,19
61:20 62:11,19
rights 20:18 60:8,13,19
60:22
RMR 1:24 2:22 64:2,21
Robert 1:9 2:9,19 3:8
5:17
Robinson 2:18 3:8 32:23
33:19,25
Roger 1:17 2:17 4:3,10
4:12 5:2 16:8 24:8 63:3
63:11
role 52:16
room 27:18
rounding 42:15
Rucho 18:20,20

**S**

S 3:1 4:7
safety 20:2 29:17
same 28:5 34:22
San 1:18 2:20,5 1 55:3
saw 14:20 23:14 24:4,23
26:6 28:10 32:1 56:22
57:23 58:11
saying 10:23 33:4 40:19
says 9:12,15,16 11:21
scenario 30:2
scene 6:11 16:15 18:10
se 41:19
SEAN 3:10
seated 43:11,13 45:20
second 6:10 7:2 8:4 9:11
12:12 15:4,5 34:6
44:20 45:22,23 49:13
seconds 34:1
sections 36:23
see 9:24 20:3,17 22:3
38:20 42:11 44:3 46:1
seems 24:12 32:11
seen 54:4,10
segmented 13:17
self-type 30:2
send 16:4 62:12,17
sense 43:18 60:10
sentence 37:5
separate 33:10
sergeant 32:23 42:12
50:5,5
service 60:16
services 18:14 38:8
serving 52:19
set 9:1 11:5 64:5
seven 59:13,13
several 18:10
severally 1:12 2:12
sheriff 51:16
sheriff's 54:20
shorthand 64:3,12
shortly 26:2
shoved 19:25
show 6:25
shown 60:3
shows 16:19 33:25,25
34:1
sic 62:7
side 27:1 43:1
sign 7:4
signed 62:13
significant 13:11 57:21
significantly 41:20

simply 46:24 62:16
since 11:3 37:14 51:18
51:21,24 52:2 53:1
56:23 57:18 59:4
single 60:11
sir 62:8
six 31:7,13
size 7:22
skills 52:23
Skype 3:9 15:4
small 7:22
social 38:17
some 10:19 11:4 12:24
21:23 22:18,18 33:11
33:14 39:1 40:9,13
41:4 43:25 46:7,22
50:23 52:14 54:12
56:14 57:5 60:2,19
someone 27:25 28:16,24
29:17 46:12 55:5
something 17:10 18:3
19:3,24 25:23 26:22,22
30:22 34:17 41:20
46:14 54:1 58:21
sometimes 10:17 57:14
sorry 29:20 33:12 38:10
sort 27:11 42:14 57:5
Sounds 35:14 59:23
sources 44:9
space 45:10
speaking 19:4 62:6,8
speaks 50:6
special 39:1
specific 23:9 39:23 41:1
46:2 48:3 56:16
specifically 20:12,13
44:3 47:20 48:12 58:9
specifications 52:2
Spitz's 41:22
stage 27:18
staged 18:8,14 27:21,22
stamped 7:3 9:2,16,17
38:14,15,18
Stand 27:16
standalone 13:16,17
standard 34:15
start 17:19 49:23
started 12:9 45:21
starts 8:5 36:7
State 63:4
stated 32:19 48:12
statement 21:12 23:23
24:1 25:13,17 32:24
statements 20:25 31:6
32:1 48:13 64:8
STATES 1:1 2:1
stenographically 64:10
stepped 21:18 42:13
still 26:10,13 40:6 48:16
52:14
stomach 45:14 46:3,6,8
46:11
stop 12:20
stopped 42:13
straight 53:16
straightaway 46:5
strategy 43:19
Street 2:20 3:4
strike 10:16
struggle 45:21
studies 52:12,13,18

study 57:21
subject 18:2 23:3 57:21
submitted 59:5
subsequent 17:15 36:5
59:4
substance 25:6
Successor 1:5 2:5
suggestion 45:5
Suite 3:5,11
summary 17:1
sure 8:6,23 15:2 30:24
30:10 42:16 44:14 45:6
46:1 49:14 60:1 61:9,9
surrender 30:2
suspected 26:7
suspicion 22:5,15,24
swallow 25:23 30:6
swallowed 26:22 30:13
30:22
sworn 4:11 5:3 55:15,23
55:25 57:4 58:23 60:3
system 47:22

**T**

T 4:7
TA 39:15
tactic 40:6 43:17
tactical 43:17,17
tactics 31:1 42:1,7
taken 2:17 26:22 32:18
51:17,19 64:4,12
takes 13:10
taking 13:14 26:19 34:6
57:11
talk 18:22 21:21 31:2
32:15 37:16 49:9
talked 49:5
talking 12:14 19:14 31:1
34:20 38:12,13,20 39:9
TAS 33:14
taser 7:6,11,17,20 11:21
11:24,25 12:6,6,6,13
12:14,15,25 13:3,4,9
13:11 31:2,4,8,11,18
32:9,20 33:4,25 34:1,2
34:2,16 35:5 36:2,13
36:22,23,25 37:6,11
39:1,13,18,23 53:24
55:22 56:1,4
TASERS 7:17 31:23,24
33:15,17 35:3 38:12
37:17 39:21 53:23
55:18
taser's 34:11
taught 40:7 51:20 52:23
56:18 57:18
technical 43:18
technicalities 43:13,22
technique 41:3 42:19,21
tel 6:17
telephonically 3:2,9
tell 8:2,11,21 9:8 19:21
24:16 58:16 60:15
tenant 20:18
Tenaya 1:4 2:4
term 32:10 57:16,19,23
58:10
terms 11:5,6 35:11 42:9
42:24 43:2 57:10,16,20
58:21 60:11
testified 5:4 16:16 25:22

testify 24:11 32:12
testimony 4:12 27:7
28:22 29:10,23 30:10
34:6,25 58:24 59:4
60:4,12 64:7
testing 52:1
thank 10:2 15:8 16:11
35:17 41:18 45:12
49:16
their 19:13 23:11 32:1
34:6 36:9,18,18 50:21
17:2,12,15,15 57:12,16
60:25
themselves 13:7
thing 7:5 34:22
think 8:5,13 9:13,17,18
9:25 11:9 17:21 20:15
21:4 22:13 28:23 32:16
37:22 41:23 43:21 44:1
45:16 46:19 49:8,11,12
50:3,6 57:20 61:1,21
62:15
Thomas 38:19
though 56:13
thought 30:22
thoughts 23:8
three 6:21 7:1 31:12
32:19,19,24 33:18,21
34:14 35:23,25 42:25
44:9
three-cycles-per-use
36:1
threshold 7:6,19
throat 25:9
through 1:4 2:4 4:9 6:15
8:16 9:14 15:14 17:22
38:16
thumb 4:9 45:9
time 10:17 21:23 26:15
31:1 45:22,23 46:8
54:22 55:5,20 64:5,6,9
times 5:9 31:10,17 32:8
32:19,20,22 45:17 61:8
61:10,11
timing 37:23
today 59:7
told 19:7,19 22:4,7 29:4
top 14:24 44:2
topic 56:16 58:6
topics 11:9
total 8:11 46:7
totally 54:8
touched 61:23
toxicology 7:24 8:13
trailer 7:22 16:20 19:8,9
20:1 21:19 27:23
trailers 16:20
trained 12:3,21 14:1
40:21
trainers 52:6
training 11:22,25 12:7,13
12:14,25 13:3,7,10,14
13:19,22,24,25 14:3,7
14:12,15 15:9 17:9
32:5 36:16,17,18,22
39:13,22 40:24 41:22
44:11 47:14,25 49:21
50:1,9,10,14,17,20
52:1,23 56:3,6,13,15
56:20,22,24 57:5,24
58:6,12

transcribed 64:10
transcript 62:17 64:12
transmissions 6:17
tried 22:19 32:20
true 63:5 64:11,17
truth 21:2,11 23:22,25
   32:12
try 22:23
trying 24:1,19 26:19
   42:15
turn 40:1
turning 13:15
turns 41:6
two 7:8,16,17 22:8 28:1
   31:8,14 32:19 34:2,4
   34:15 35:2,3 45:16,16
   45:16
type 22:6

**U**

uncontested 47:17
under 6:4 10:24 27:4
   63:1,3,4 64:6,16,16
understand 24:1,19,20
   32:7 41:13 47:15 49:22
understanding 9:1 13:9
   18:1,21 24:22 30:19
   31:4 43:7 45:13 46:7,9
   48:22
understood 24:3 30:5
   32:16 57:15
unit 18:5
UNITED 1:1 2:1
unless 34:17
unre 57:13
until 55:15
untrue 26:1
update 49:17
updated 4:11 12:15 59:2
   59:14
urgency 30:7,20
usage 53:25
use 11:5,12,14,14,15
   13:6,9 31:3,3 33:14,25
   34:1,2 35:5,23 37:11
   39:1,13,19,20,23 51:17
   51:21 52:8,11 53:7,8
   53:17 55:6,18 56:4
used 7:17 10:11 12:7,23
   13:1,2,13,25 14:13
   15:11 35:3 36:25 41:12
   42:18,19,20 48:24
   52:14 53:24
uses 7:17 34:10,11 37:6
   49:6
using 10:16 12:17 23:7

**V**

vague 28:2,18,21
Vallejo 1:9 2:9 5:19 13:2
   13:21 14:6,17 47:21
   49:20 51:2,5 53:3
Vallejo-published 53:14
   53:20
verbal 29:7 49:16
verified 26:25
version 11:25 12:3,5,5,6
   12:9,10
versions 11:24 12:15
versus 49:10
very 38:22 48:3 62:15

video 14:3,7,12,15,18,22
   15:9
videos 44:11 47:14
view 17:13 22:12 29:16
   41:17 62:16
Villasenor 19:10,14
   20:19 21:4,7
violence 27:2
volumes 50:6
voluntarily 23:2
vs 1:8 2:8 5:17
V.W 1:3 2:3 5:17

**W**

wait 33:12
Walnut 3:12
want 8:9 17:18 22:11
   30:12,16,24 31:3 42:15
   48:14 50:12
wanted 6:25 8:23 22:5
   27:13 28:10
warning 12:10
wasn't 20:17 33:8,9 38:4
way 11:5 12:1 14:20
   18:20 26:20,21 29:2
   43:24 47:18
weapon 31:9 35:10
weapons 31:8 33:2 37:6
Wednesday 2:21 5:1
weight 49:9
well 8:1,23 9:8,10,15
   10:16 11:24 12:11,19
   15:24 22:1,7,10,24
   23:25 24:15 25:17
   26:19 27:8 28:6 31:5
   31:12 32:18 33:11
   35:10 36:2,18 38:4
   39:3 45:3,4 46:16,21
   47:25 49:1,8,23 50:3
   51:5 52:25 53:7,22
   57:10 60:25 62:19
went 18:22 19:9
were 6:13,14 8:18,24
   10:25 12:3,20,23 13:21
   14:9 18:8 19:7 21:24
   22:4 26:12,19,21,24
   27:21,22 31:4,7,24
   32:17 35:2 42:12 43:10
   48:16 51:7 52:19 53:7
   54:19 55:15,20,25 57:4
   57:7 64:4,9,10
West 2:19
we'll 17:19 62:21
we're 8:16 27:16,17 39:9
   42:14
whatsoever 35:5
while 21:8 26:12 28:7
   49:15 55:10,25 57:4,7
White 1:6 2:6 5:19 18:17
   18:25 19:7,16,19,21,25
   20:5,6,14,20 21:16,19
   21:24 22:13,20 23:14
   24:5,23 26:7,8,10,20
   27:4 29:15 30:6,8,21
   31:4,11,18 32:9 38:1
   43:4,7 45:14 46:8,10
   48:19
White's 27:2 46:23
window 32:4,5
wires 7:5,6,10,12
wise 9:6

witness 4:3 15:24 16:4,9
   23:21 27:8 28:6,23
   29:25 30:12 32:12 35:2
   35:16 52:16,20 59:20
   59:22 62:4,8,11 64:6,7
witness's 34:25
wonderful 35:16
words 23:8 34:21
work 5:14 32:21 41:23
   62:5
workbooks 51:24
worked 54:18
worker 38:17
works 5:11
worse 41:21
wouldn't 14:10 20:4 29:6
   43:12
written 5:22 51:23
wrong 8:7
www.depo.com 1:22

**X**

X 4:1,7

**Y**

yeah 8:4,7,14,23 9:10,17
   10:19 43:21 44:15
years 51:6 58:24 61:10
   61:13
York 14:16 15:10

**$**

$3,000 58:18

**1**

1 4:9 6:15 8:16 9:14 12:2
   12:9 15:17 16:12 17:5
   17:10,12,20 45:7 59:20
   59:21,22
1-25 1:11 2:11
1/19/16 4:11
1:04 2:21 5:1
10 1:19 2:21 4:9 5:1
   15:14 44:18,23
10th 59:7
105 2:19
11 16:14 36:7 38:15,18
   44:2 55:2
1120 3:5
12 37:8
13th 59:7,11
14 12:3
142 8:5,16
15 58:22
16 4:9
16th 64:19
162 8:13,17
19 5:25 12:2,10
1984 55:9
1993 51:14 55:16

**2**

2 17:22 36:12 39:17 45:4
2:12-cv-01629-LKK-G...
   1:4 2:4
20 58:21,22,22
2002 15:7
2006 36:6 37:10,14 39:5
   39:7,10 54:1
2010 10:14,22,25 11:3,16

12:4,22 13:6,22 14:7
   14:18 39:14,22 40:23
2011 39:6
2016 1:19 2:21 5:1,25
   63:7 64:19
216 49:10
2185 3:11
285 3:11
288-3376 1:22
298 6:15 8:16

**3**

3 7:23 16:25 25:21 55:11
3:13 62:23
33 40:25
34 44:14
360 7:7
363 7:6
37 39:16,18
387 7:5

**4**

4 10:3 16:25 17:6 34:10
   37:4,9,16 45:24
42 44:13

**5**

5 4:5,11 10:8,24 40:1
   44:24
5l 44:23
500 8:19 9:5
510.839.3882 3:6
510.839.5200 3:6
515 7:3
518 9:12,13,14,16,19
   10:1
519 9:17,19 10:1,1
520 9:18,22

**6**

6 4:9 15:13 36:4,10 37:3
   37:8 39:9
65 57:18 58:4
68 54:25
6973 1:24 2:22 64:2,21

**7**

7 11:21 36:14
70 54:25 55:1
70s 54:17
7677 3:4
78 54:25

**8**

8 11:17 13:18 44:18,23
800 1:22
85 60:20

**9**

9 14:3 17:22 44:1,18,23
   49:19
911 6:11,17 27:14
92101 2:20
925.932.1623 3:13
925.932.3600 3:12
94596 3:12
94621 3:5