# EXHIBIT H

1           UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                - - -

4   V.W., a minor, by and through
     her Guardian Ad Litem, Tanaya
5   Barber, Individually and as
     Successor in Interest of Decedent
6   MICHAEL WHITE,
                           Case No.
7          Plaintiffs.      2:12-cv-01629-MCE-AC

8        vs.

9   ROBERT NICHELINI, et al,

10       Defendants.
      _____/
11

12

13

14

15

16            DEPOSITION OF

17        WERNER U. SPITZ,M.D.

18     ST. CLAIR SHORES, MICHIGAN

19       FEBRUARY 8, 2016

20
   ATKINSON-BAKER, INC.
21  COURT REPORTERS
    500 North Brand Boulevard, Third Floor
22  Glendale, California   91203
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  SHARON GARDZINSKI, CSR NO. 3915

25  FILE NO.:  AA0135D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

- - -

V.W., a minor, by and through
her Guardian Ad Litem, Tanaya
Barber, Individually and as
Successor in Interest of Decedent
MICHAEL WHITE,

                   Case No.
    Plaintiffs,    2:12-cv-01629-MCE-AC
    vs.

ROBERT NICHELINI, et al,
    Defendants.
_____/

Deposition of WERNER U. SPITZ, M.D., taken on behalf of Defendants, at 23001 Greater Mack Avenue, St. Clair Shores, Michigan, commencing at 1:18 p.m., Monday, February 8, 2016, before Sharon Gardzinski, CSR No. 3915.

Page 2

A P P E A R A N C E S :
FOR PLAINTIFF:
LAW OFFICES OF JOHN BURRIS
BY:  BENJAMIN NISENBAUM, ESQ.
7677 Oakport Street
Suite 1120
Oakland, CA  94621
(510)839-5200
bnisenbaum@hotmail.com

FOR DEFENDANTS:

GIBBONS & CONLEY
BY:  SEAN C. CONLEY, ESQ. SBN 130814
2185 North California Boulevard
Suite 285
Walnut Creek, CA  94596
(925)932-3600
scc@gibbons-conley.com

Page 3

I N D E X
WITNESS:  WERNER U. SPITZ, M.D.
EXAMINATION                          PAGE

   Examination By Mr. Conley            5
   Examination By Mr. Nisenbaum         75

EXHIBITS

             DEFENDANT'S
NUMBER       DESCRIPTION      PAGE

1    Excerpt of Publication - Three Pages   26

Page 4

WERNER U. SPITZ, M.D.,
an Expert Witness herein, having been first
duly sworn, testified as follows:
EXAMINATION
BY MR. CONLEY:
Q.  Dr. Spitz --
A.  Yes.
Q.  -- my name is Sean Conley.  I represent the defendants in this case designated as V.W. versus Nichelini, et al.
    And you've submitted a report under Rule 26 in this case; correct?
A.  Yes.
Q.  And do you have that with you?
A.  Yes.  Yes, I do.
Q.  Thank you.
    Now, if you look at your report on page 3 --
A.  Yes, sir.
Q.  -- the central paragraph there reports a number of uses of force by police officers on Mr. White, who's the decedent in this case.
A.  Yes.
Q.  And these include, among other things, your report, your physical alteration -- I'm sorry --

Page 5

2 (Pages 2 to 5)

1     altercation, Taser, corotid restraint, knee in the back,
2     and punching on the right side and hobbling.
3          Now, you've come to the conclusion, am I
4     correct, that these various uses of force caused
5     Mr. White's death?
6       A. Yes.
7       Q. Okay.
8       A. Actually, the death was caused by
9 asphyxiation, primarily. I mean, if I wish to include
10 other ways which may have contributed to death, the main
11 cause of death is asphyxiation.
12       Q. Okay. And your opinion is that the use of
13 force identified in this paragraph on page 3 caused that
14 asphyxiation?
15       A. Yes. There is -- when I say "use of force,"
16 or you say "use of force," what I understand is that
17 there was a corotid hold. There was a pressure applied
18 to the back. There was punching of the right side of the
19 body; of the torso, of the chest. And there was an
20 altercation, as well, that may have played some role.
21 But the primary role is the former; the various ways in
22 which he was in prone position.
23       At one time he was subjected to a corotid hold
24 and he was punched and pressed upon the back.
25       Q. All right.

Page 6

1       So the primary triggering mechanisms for the
2     asphyxiation were the corotid restraint, pressure on the
3     back, punching on the right side of the torso and chest,
4     and prone position at some point?
5       A. Well, the "prone position" is a method in
6 which police place individuals who are in a -- who are
7 being restrained.
8       So, yes, he was in prone position. But if he
9 would have been left alone in prone position, I don't
10 think much would have happened to him.
11       But coupled with the other ways, namely
12 compression, namely punching, namely applying, as I said,
13 pressure on the back, and on top of that a corotid hold,
14 that is what complimented the prone position.
15       The prone position alone is not as significant
16 as the others, but all together they played a role.
17       Q. All right.
18     So by itself, having him in the prone position
19     did not cause the asphyxia; correct?
20       A. I never said it did, no. I don't believe that
21 the prone position in and of itself would have
22 asphyxiated him. But prone position -- prone position
23 with compression, with a corotid hold, those things are
24 not so good.
25       Q. Okay. So the corotid hold by itself did not

Page 7

1     cause the asphyxia; correct?
2       A. No, I'm not saying that either. I don't know
3 how long he was held in a corotid hold.
4       A corotid hold means that the -- well, in this
5 case there's testimony that the neck was held by an arm,
6 with the biceps on the right side and the forearm on the
7 other side with the airway able to breathe. But by
8 compressing the neck, by pulling --
9       What I didn't say, that in a corotid hold if
10 your right arm, as it was in this case, is used to
11 compress the neck, the left hand will hold the right hand
12 and pull back such that the major vessels on both sides
13 of the neck, namely the corotid artery and the jugular
14 vein on both sides, are compressed, depriving the brain
15 of blood flow. Or 80 percent of blood flow to the brain
16 is eliminated by that process.
17       And, therefore, if it is held even only a
18 little bit too long, consciousness is lost and maybe
19 death occurs.
20       The brain receives blood flow from the corotid
21 arteries, approximately 80 percent, and the other
22 20 percent through the vertebral arteries in the back of
23 the neck. The 20 percent is insufficient. As you may
24 imagine, that 80 percent is the major -- Lion's share
25 of the blood flow to the brain.

Page 8

1       Q. Doctor, you're going well beyond my question.
2     I just wanted to know whether the corotid
3     restraint, as described in this case, was the cause of
4     the asphyxia?
5     My understanding is your answer -- no, that's
6     not the opinion you're offering here; is that correct?
7       A. Well, alone, in view of everything else that I
8 know about this case, in view of that, I would say
9 probably it contributed to --
10       Q. As alone? Okay?
11       A. "Alone," no, probably not. But I cannot --
12       Q. Let me ask you this.
13     The pressure on the back that you believe was
14     applied in this instance, did that alone cause the
15     asphyxia?
16     MR. NISENBAUM: Objection to this entire line of
17 questioning. It's inappropriate. It's taking the entire
18 case out of context of -- and it's also argumentative in
19 the sense that Dr. Spitz has explained -- he's answered.
20     I think he's explained his answer, which is
21 very clear that he's not -- he's not answering that these
22 events happened alone, or not in conjunction with the
23 other events. All the events happened to a single person
24 during the same incident.
25     So the entire line of questioning is

Page 9

3 (Pages 6 to 9)

1 argumentative. It's improper. And I object to it.
2     MR. CONLEY: And I object to the objection as not
3 an objection, but coaching the witness and arguing the
4 case.
5     MR. NISENBAUM: Well, I haven't coached him at all.
6 I've just restated what he said.
7         I mean, you're not listening to what he's
8 telling you.
9     MR. CONLEY: I'm listening perfectly clearly.
10 BY MR. CONLEY:
11     Q. Now, I want --
12     MR. NISENBAUM: Then you're arguing with him.
13 BY MR. CONLEY:
14     Q. My question --
15     MR. NISENBAUM: Objection. Argumentative.
16 BY MR. CONLEY:
17     Q. Doctor, do you remember what the question was?
18     A. Whether the pressure on the back alone caused
19 the death?
20     Q. Yes.
21     A. I can really not answer that because a corotid
22 hold, by the testimony of the officers, was applied. A
23 knee applied pressure to the back of the chest, was
24 applied. A punching to the side of the torso was applied
25 causing him -- causing interference with breathing, as

Page 10

1 these kind of punches do, where he sustained three
2 punches to the right side of his chest.
3         All these things work on the same person. And
4 all of them together caused the death, yes. Caused
5 asphyxiation and caused the death.
6         And when I say "caused asphyxiation" --
7     MR. CONLEY: The remainder of that answer is
8 nonresponsive.
9     MR. NISENBAUM: I object to that request.
10 BY MR. CONLEY:
11     Q. You say that there were punches to the chest?
12     A. Yes.
13     Q. And your opinion is based upon these punches
14 to the chest, not to the arm or shoulder; correct?
15     A. No. The arm is not even mentioned. Not the
16 arm, not the shoulder, no. The --
17     Q. In your opinion --
18     A. The right side of the torso. And that is
19 where these three punches were applied. And that is
20 usually --
21     Q. Doctor --
22     A. That is usually the chest. Because if you go
23 down below the chest, very soon you encounter the pelvis.
24         So that is not where these punches are
25 applied. So these punches are applied higher up. The --

Page 11

1     Q. Are you assuming where the punches were
2 applied?
3     A. I'm sorry?
4     Q. To the torso and not to the arm or the
5 shoulder?
6     A. Yes. Because that's what the officer said.
7         The officer who applied that, Munoz, said that
8 he applied the punches to the right side of the body.
9         But I can tell you that when that statement is
10 rendered as it was, I take it that that is to the chest
11 area. But in and of itself it would not have caused the
12 death. I do not believe that.
13         But when it is applied to the chest, the
14 individual may even stop breathing as there are such
15 punches. Because they are heavy-duty punches.
16     Q. And that's the basis for your opinion, that
17 the punches had an affect, that they were heavy-duty
18 punches to the torso; correct?
19     MR. NISENBAUM: Objection. Argumentative.
20 Incomplete hypothetical.
21     A. I'm suggesting to you that this man died of
22 all the trauma he was subjected to. And that includes
23 the corotid hold, the pressure on the chest and the
24 punches, as well.
25

Page 12

1 BY MR. CONLEY:
2     Q. Okay. And in your report you discuss the
3 corotid restraint.
4         Do you assume, for purposes of your opinion,
5 that Mr. White was rendered unconscious by the corotid
6 restraint?
7     A. I don't know if he was just by the corotid
8 restraint alone. He may have. Because the testimony is
9 that he may have held the corotid restraint in place for
10 an entire minute. An entire minute is a long time for a
11 corotid restraint. Lots of people lose consciousness in
12 less time than one minute.
13     Q. Okay. How long was it applied in this case?
14     A. The testimony here is that it may have been
15 applied for as long as one entire minute, or maybe a
16 little less.
17     Q. If it's applied substantially less than a
18 minute, does that affect your opinion?
19     A. It affects my opinion insofar as it may have
20 caused him to go unconscious. And, in other words, what
21 that would mean, that a blood flow to the brain was
22 substantially reduced, otherwise he would not have lost
23 consciousness.
24     Q. Did anyone justify that he lost consciousness
25 during the corotid restraint process?

Page 13

4 (Pages 10 to 13)

1       A.  I'm not aware of that specifically.  I'm only
2   aware that he was restrained for a duration of 24
3   minutes.  And when he -- when the restraint was finished,
4   he was taken out -- out of the trailer to be taken on a
5   gurney to the hospital.  At that time he was dead.
6       **Q.  My question is about the corotid restraint.**
7   **And the testimony at any point, did you read as saying**
8   **that he lost consciousness during the process of the**
9   **corotid restraint?  Is that your understanding of what**
10  **happened?**
11      A.  I'm sorry, would you tell me that again,
12  please?
13      **Q.  For purposes of forming your opinion, were you**
14  **assuming that Mr. White lost consciousness during the**
15  **course of the corotid restraint?**
16      A.  I cannot really do that because there were
17  other forces applied to him.  And it is the -- you have
18  to -- you cannot omit one or the other force.  That is
19  medically improper and scientifically unfounded to do
20  that.  So I have to consider all the manifestations.
21          Therefore, he started off healthy.  Or more or
22  less healthy.  He was under the influence of
23  cocaine, but he was active, agitated, fighting with the
24  officers.  But --
25      **Q.  Okay.  He was agitated and fighting with the**

Page 14

1           MR. NISENBAUM:  Objection.
2       A.  He had -- probably had a state of at least
3   reduced consciousness.  Because when you deprive the
4   brain of oxygen, being that the brain is only two percent
5   of body weight but requires 20 percent of total oxygen, I
6   have to conclude that reducing or eliminating oxygen
7   supply to the brain is not very good for maintaining
8   consciousness for very long.
9   BY MR. CONLEY:
10      **Q.  Okay.  Let's talk about the statement about**
11  **the prone position.**
12          **And let me ask you, how long do you believe**
13  **that Mr. White was in a prone position?**
14      A.  He was in a prone position from when he was --
15          The interaction with the police started
16  sometime around -- what was it -- 4:24, and then it
17  terminated at 4:48.  That would mean 24 minutes.
18          He was placed in prone position as soon as
19  they could put him in prone position.  I don't know how
20  long that may have taken.
21          I do know that when the officers went -- two
22  officers went into the trailer to take him out to put him
23  on a gurney, he was already dead.
24      **Q.  Let me ask you then, again, because I didn't**
25  **get an answer.  How long --**

Page 16

1   officers after the corotid restraint and --
2       A.  For a while -- for a while he was probably
3   with a state -- in a state of reduced consciousness.  But
4   subsequently he recovered from that and he continued to
5   be agitated.
6           But --
7       **Q.  What is your basis for --**
8       A.  But at the same time there were other forces
9   also applied to him.  And he did -- he suffered the
10  adverse effect of those forms of restraint, also.
11  Subsequently, he -- or as a result of which he went into
12  cardiac arrest and died when he was wheeled out.
13          Actually, he died probably before he was even
14  taken out.  Because when he was taken out, when he was --
15  the two officers took him out, he was already in a --
16  unresponsive.  And when he was actually taken out, then
17  he was -- an electrocardiogram was taken and he showed a
18  flatline.
19          MR. CONLEY:  Move to strike as argumentative and
20  nonresponsive.
21          MR. NISENBAUM:  I oppose that motion.
22  BY MR. CONLEY:
23      **Q.  Doctor, do you have a factual basis to say**
24  **that he had reduced consciousness as a consequence of the**
25  **corotid restraint?**

Page 15

1           MR. NISENBAUM:  Objection.  Argumentative.
2   BY MR. CONLEY:
3       **Q.  How long was he in prone position?**
4       A.  I don't know.  Somewhere between point A and
5   point B.
6           But I must tell you that he was not placed in
7   prone position right at point A, and he was not taken out
8   of prone position at point B, but sometime before that.
9   Because otherwise he, unlikely, would have been in a
10  state of flatlining and electrocardiograph, just by
11  coincidence, as he was hitting the outside at the
12  trailer.
13          Because when the EMTs took the
14  electrocardiogram, he was already flatlining, and any
15  effort to maintain his life, to preserve his life, failed
16  at that point.  Because they tried CPR and they tried all
17  kind of things in the ambulance when they took him to the
18  hospital, but he did not respond.  And he was in a
19  similar condition when they brought him out of the -- the
20  police brought him out of the trailer.
21          So he was dead before he was taken out.  And
22  he was in prone position after he -- after the -- well,
23  sometime after the police put him in prone position.  But
24  I don't have a specific time for that.
25      **Q.  Okay.  So you don't know how long he was in**

Page 17

5 (Pages 14 to 17)

1  prone position; correct?
2      A.  Right.  I can tell you that he was in prone
3  position less than 24 minutes.
4      Q.  And how much less?
5      A.  I don't know.  No time is given for when.
6      Q.  Any minimum amount of time that he was in
7  prone position?
8      A.  No.  I would have to guess, and I don't think
9  I should do that.
10     Q.  Okay.  All right.
11       You also refer to "pressure on his back."  And
12  I believe you were referring to a report of someone
13  putting a knee into his back; correct?
14     A.  Yeah.  Pressing -- using a knee to press him
15  down, yes.
16     Q.  And --
17     A.  To press him down and to pin him to the
18  ground.
19     Q.  And how long was that pressure applied?
20     A.  I don't know that I have a time for that,
21  also, but during the 24 minutes.  And I did say the
22  interaction with the police was less than 24 minutes.  It
23  could have been substantially less than 24 minutes.  It
24  could have been 24 minutes.  But I think that's unlikely.
25      But during that time he was provided with a

Page 18

1  corotid hold.  And with the pressure on his back and the
2  hits, or punches on the left side of his body, on the
3  left side of his chest.
4      So how long these things happened, I don't
5  know that I can tell you.  But they all occurred within
6  that window from 4:24 to 4:48 p.m.
7     Q.  And how much pressure was put on his back?
8     A.  When pressure is put on his back, judging from
9  my experience, be as much pressure as an individual can
10  muster; can provide.
11      He doesn't just skimp on pressure.  He applies
12  the maximum that he can pin him to the ground with,
13  because that's the idea in restraining somebody.  And
14  that's what caused this man's death.
15     Q.  Okay.
16      And so your opinion is based upon the
17  assumption that the officer put as much pressure as he
18  could with his knee?
19     A.  To pin him down.  Because that's what he said
20  he did.
21     Q.  Your testimony, though, is that your
22  assumption, for purposes of your opinion, was that the
23  officer put maximum amount of pressure he could into
24  Mr. White's back?
25      MR. NISENBAUM:  Objection.  Argument.  Misstates

Page 19

1  testimony.
2     A.  He put as much pressure that -- as he could
3  provide to pin him to the ground.
4      I'm sorry?
5     Q.  And that's based upon your assumption of how
6  the officer performed that task of trying to hold him
7  down with his knee; correct?
8      MR. NISENBAUM:  Objection.  Misstates testimony.
9     A.  My opinion is that he pinned him to the
10  ground.  And I'm quoting an officer to -- on that issue.
11  BY MR. CONLEY:
12     Q.  And what part of the torso was the knee
13  applied to?
14     A.  The knee is described as being on the back.
15  So on the back on -- maybe more on the right side.  More
16  so, as I say, on the right side.  But it was applied to
17  the back of the right side.
18     Q.  Okay.
19      Can you describe more particularly where on
20  the back it was applied?
21     A.  It was not given.
22     Q.  How long after he was -- he had the corotid
23  restraint applied was he determined to be flatlined?
24     A.  How long?
25     Q.  Yes.

Page 20

1     A.  I told you.  He was held in the corotid hold
2  and he became limp.  That's what the record indicates.
3     Q.  Okay.
4      My question is, you've observed that he was
5  determined to be in cardiac arrest, and I want to know if
6  you are -- if you have an opinion about how long a period
7  passed between the corotid restraint and his going into
8  cardiac arrest?
9     A.  I don't know.  There's nobody who told me,
10  other than one minute for the corotid hold.  In fact, I'm
11  not sure, but I think they -- it was said that he was
12  held in a corotid hold for just less than one minute.  Or
13  he may have been.  That's somebody's estimate.
14      It may have been -- the way I read it, it may
15  have been somewhat more than a minute, and it may have
16  been somewhat less than a minute.
17      But the fact is that during that time he
18  sustained a much reduced oxygen flow to the brain from
19  the corotid hold such that he went limp.  He didn't go
20  limp because he just felt like going to sleep now.  But
21  he went limp because the corotid hold was being applied
22  and he was getting less oxygen than needed to the body.
23      The brain controls --
24     Q.  Rendering a psychiatric opinion?
25     A.  No, no, no, that's not a psychiatric opinion.

Page 21

6 (Pages 18 to 21)

1      Come on.  This is not a psychiatric opinion.
2      Q.  The officers, because of a corotid restraint,
3   but rather was a cause to, what, pass out?
4      A.  Sir, if you don't get enough oxygen to the
5   brain -- you don't need to be a psychiatrist.  I'm a
6   physician.  So I went to school for a long time to learn
7   about that.
8      And my opinion is based on my studies, my
9   education, training and experience that this man
10  sustained a much reduced oxygen availability to the
11  brain, which requires that the entire body gets less oxygen than
12  considering that the entire body gets less oxygen than
13  what the brain needs just by its little self.
14      So he went limp as a consequence to the
15  application of the corotid hold and perhaps the remaining
16  activities that were done with him, as well.  Or maybe
17  just from the corotid hold by itself.
18      I cannot -- I don't know that.  Because the
19  description in the records does not allow me to separate
20  between the corotid hold and the compression and the
21  punching.
22      But it is evident that the corotid hold by
23  itself, it seems is -- because it was -- if it was one
24  minute, or around there, that the corotid hold got him to
25  go limp for lack of oxygen.

Page 22

1   So I'm not a psychiatrist, no, by any stretch.
2      Q.  All right.
3      And so you don't have any way of determining
4   whether or not the corotid didn't have an effect and that
5   Mr. White simply decided at some point along the line to
6   stop fighting for a little while?
7      MR. NISENBAUM:  Objection.  Argument.
8      A.  Well, if that's your question, then I'd like
9   to tell you that he also did not --
10      First of all, he did not do that.  Because it
11  is to be expected that if somebody is held by their neck
12  to provide for an inadequate amount of blood to the
13  brain, that he will go limp.
14      But if you ask me that -- I don't mean to be
15  facetious, but then I would have to also tell you that he
16  didn't mean to die when he was taken out of the trailer.
17  BY MR. CONLEY:
18      Q.  And you don't know that the corotid restraint
19  was effective, though?
20      A.  The limpness --
21      MR. NISENBAUM:  Argument.  Vague.
22      A.  The limpness indicates that.
23      (Deposition interrupted.)
24
25

Page 23

1   BY MR. CONLEY:
2      Q.  All right.  Let's turn to your observation
3   that Mr. White had an enlarged heart.  How pronounced was
4   the enlargement?
5      A.  The heart is only enlarged -- because I didn't
6   want to necessarily contradict the pathologist who did
7   the autopsy.
8      The heart was not really enlarged.  And if it
9   was enlarged -- because I'm giving her the benefit of the
10  doubt on that because she didn't do microscopic
11  examination.  I do not know how she would know whether
12  the heart was pathologically enlarged, or whether it
13  looked to her like it may have been enlarged.
14      She never measured the valve -- sorry.  The
15  thickness of the wall of the left ventricle of the heart.
16  She ventured an opinion that the heart was enlarged to
17  the tune of 450 grams, which according to the literature,
18  is not an enlargement at all.  But if it is enlarged, it
19  is minimal.
20      Q.  Okay.  All right.
21      And you attribute that enlargement to
22  hypertension?
23      A.  If it is enlarged, most enlargements of the
24  heart, by virtue of the hypertrophy, or thickness, excess
25  thickness of the left ventricular wall are due to

Page 24

1   hypertension.  Some are due to valve problems.  Mitral
2   valve problems.  Some are due to other conditions.  But
3   hypertension is probably the main cause of heart
4   enlargement.
5      He being -- Mr. White is African-American.  A
6   large number -- a large percentage of African-American
7   males, and to a lesser extent, but also females, suffer
8   of hypertension to cause an enlargement of the heart.
9      But I would like to emphasize the fact that if
10  the enlargement of the heart really existed, it's
11  minimal.
12      Q.  Okay.
13      A.  Because I have literature on the table to
14  provide as a support for my statement.  If you want to
15  have the literature, I'll give it to you.
16      Q.  The literature on minimal enlargement?
17      A.  No.  Minimal of what 450 grams of heart weight
18  would be considered as an enlarged heart.
19      Q.  Okay.  And how many pages are we talking
20  about?
21      A.  Well, I have two books here.  And I didn't
22  even have to look very far because I have them right here
23  in my library.  One is one page and the other one is
24  another page.
25      Q.  Can you have copies of those pages made?

Page 25

7 (Pages 22 to 25)

1  A.  I will -- the court reporter will then see to
2  it.
3  Q.  All right.
4  MR. CONLEY:  We'll have that marked as Exhibit 1;
5  the two pages that you're talking about.
6  THE WITNESS:  Okay.
7  MR. CONLEY:  Thank you.
8  (Exhibit 1 was marked for identification.)
9  BY MR. CONLEY:
10  Q.  Now, did you review any of Mr. White's
11  pre-mortem medical records?
12  A.  No, I did not.  I'm aware of the autopsy
13  having been done.  And I am aware of his -- the condition
14  of his body.  But I do not -- I did not go through prior
15  medical records.
16  Q.  Did you speak to any of his treating doctors?
17  A.  No.  I don't -- I don't have any information
18  from treating doctors.
19  Q.  Okay.
20  A.  Unless you consider the pathologist also a
21  treating doctor?  But that's postmortem.
22  Q.  Right.  Can chronic drug use cause enlargement
23  of the heart?
24  A.  It may, yes.  It may.
25  Q.  And did you eliminate that as a possible cause

Page 26

1  of whatever enlargement of the heart was found on
2  Mr. White?
3  A.  I don't know how to do that, other than to
4  testify that addiction to stimulants may cause
5  enlargement of the heart.  So can genetic factors.
6  Q.  Do you have information from any source that
7  Mr. White was treated for any enlarged heart at any time
8  prior to his death?
9  A.  I do not have such information.  But that
10  doesn't tell me which -- what caused his cardiac
11  enlargement; whether it was cocaine or whether it was
12  because he inherited the gene that prevails in the
13  African-American race.
14  Q.  Are you aware, from any source, of whether he
15  treated at any time for hypertension?
16  A.  No, I'm not aware of that.
17  Q.  Okay.
18  You're aware that the toxicology report in
19  this case indicates that Mr. White had cocaine in his
20  blood?
21  A.  Yes, I'm aware that he had a low level, or a
22  recreational level of cocaine in his system.  However,
23  the report provided by Dr. Wang and by the pathologist
24  who did the autopsy is wrong, where they testify -- or
25  where Dr. Wang, or Mr. Wang, sorry -- where Mr. Wang

Page 27

1  maintains that Benzoylecgonine, known as BE, is an active
2  metabolite.  I think he doesn't know what he's talking
3  about.
4  And the pathologist who did the autopsy also
5  made that determination, that Benzoylecgonine, where he
6  had an amount of 1.34 milligrams per liter, had -- in the
7  blood -- had a toxic effect on him.  Because
8  Benzoylecgonine is not an active metabolite.
9  It's time that they -- if they do coroners'
10  autopsies, they should know that.
11  Q.  Okay.
12  Based upon the information contained in the
13  blood test, can you express any opinion about when
14  Mr. White took this cocaine?
15  A.  Well, he probably took it -- considering the
16  relatively short half-life time of cocaine, which is
17  about somewhere between an hour -- somewhere between 45
18  minutes to an hour and a half, maybe, or an hour and a
19  quarter -- he probably took that either the evening
20  before, or maybe on the same day.  Or maybe both, you
21  know.  Maybe he took some on the evening before and then
22  the rest on the same day.
23  Q.  Okay.  And how much did he take?
24  A.  I don't know.  I don't know how much he has
25  taken.  He didn't take a whole lot.  But he had in his

Page 28

1  blood, he had point 5 milligrams per liter of cocaine.
2  And the rest is the one point -- 1.34 milligram per liter
3  is the metabolite.
4  Q.  And do you know how he took it?
5  A.  Well, he probably took it by mouth.  Or by
6  mouth or snorted it.  I have no idea.  I do know that he
7  is alleged to have swallowed something out of a packet.
8  But I don't know how much he took.
9  Q.  Okay.  Can cocaine cause cardiac arrest?
10  A.  Well, that depends on the circumstances.
11  Different people have different susceptibility to the
12  effects of cocaine when it comes to causing cardiac
13  arrest at certain amounts.
14  But this individual didn't have any reason to
15  suspect that he had cardiac arrest when he died.  Well,
16  he had cardiac arrest, of course, because every dead
17  person has cardiac arrest.  But I don't think that that
18  is due to the cocaine, when, in fact, there was
19  interference with his ability to breathe.
20  Q.  Okay.
21  What is -- what level does cocaine become
22  potentially toxic?
23  A.  Cocaine can be toxic at even low levels.  The
24  fact that he was agitated and was in a state of acute
25  psychosis when he resisted the police in affecting their

Page 29

8 (Pages 26 to 29)

1  restraint, I think that that indicates that there was a
2  toxic effect. But it wasn't a fatal toxic effect. He's
3  active and, obviously, alive when all this happened.
4      But when it stopped being funny is when the
5  corotid hold was applied and the pressure on the back and
6  the punches to the chest. Those things are not -- are
7  medically not good for you.
8      Q.  Well, taking cocaine is not good for you
9  either; is it?
10     A.  Well, there are millions of people who take
11 cocaine, and probably some of these people don't fair
12 very well, maybe.
13     This guy was 47 years old and he was doing
14 pretty well until then. So to assume that he died of
15 cocaine intoxication, I think, is uncalled for and
16 misleading and not jiving with the facts.
17     Q.  Cocaine can be fatal at point 54 milligrams
18 per liter; can't it?
19     A.  Well, it depends on the individual. It
20 depends on whether this is his usual dose. It depends on
21 a lot of factors.
22     And it depends specifically on the
23 circumstances of the event. And the circumstances here
24 do not call for cocaine as the cause of death, but rather
25 the more likely -- by far the more likely interference

Page 30

1  with his ability to breathe.
2      If you cannot breathe, or you have some other
3  method applied to you that interferes with oxygen's
4  availability to the brain, those are far more -- in this
5  case, far more significant than shoving it off on
6  cocaine.
7      Cocaine may have been the reason why there was
8  a cocaine psychosis in this individual, but not in the --
9  not causing the death.
10     When somebody is compressed like he was, and
11 somebody has pressure applied to the corotid arteries,
12 that is, in this case, by far, far more likely as the
13 cause of death.
14     We all know that when -- when the cause of
15 death is asphyxia, any type of asphyxia, the cause of
16 death must be -- must be determined by the circumstantial
17 evidence. And that's exactly what I'm doing here, to --
18 as I said before --
19     Q.  What are the circumstances?
20     A.  The circumstances of the events. The event
21 calls for asphyxiation, not for any cocaine intoxication.
22     Q.  Did cocaine have any contribution to the cause
23 of Mr. White's death?
24     A.  Cocaine -- the contribution that cocaine
25 afforded this case is that it brought the police. If the

Page 31

1  police would have not arrived -- let's say they got lost
2  on the way there -- he would not have died. And I'm
3  telling you that to a reasonable degree of medical
4  certainty.
5      Q.  You've been talking about asphyxiation here.
6  And let me ask you about that.
7      On autopsy, is it difficult for a forensic
8  pathologist to tell when a person has died from
9  asphyxiation?
10     A.  Asphyxiation, by and large, is a respiratory
11 manifestation, which leaves no markings. When somebody
12 dies of lack of oxygen, whether it's local or focal, like
13 in the case of obstruction of blood flow to the brain by
14 a corotid hold, or when it is due to somebody applying
15 pressure on the chest, you would not know that pressure
16 on the chest has necessarily been applied just by the
17 outcome.
18     Now, if I'm told pressure was applied to the
19 chest, yeah, I'm going to go and look for a broken rib,
20 maybe. Sometimes a rib gets broken. But sometimes -- or
21 most times it doesn't get broken.
22     So, in any way, if I'm told there was pressure
23 applied to the chest, I will have to consider that as
24 something that's interfering with the ability to breathe.
25     So in this case you have the one -- you have

Page 32

1  the punches to the right side of the chest and you have a
2  corotid hold that caused him to go limp. So what am I
3  going to do, divert from there to cocaine? No. That's
4  unfair and unjust and incorrect medically.
5      Q.  I understand that that's your opinion. I'm
6  asking about something different.
7      Which is, on a hypothetical basis, if you have
8  a body come in for autopsy, are there any apparent signs
9  that indicate to you asphyxiation on examination,
10 forensically?
11     A.  There may not be.
12     MR. NISENBAUM: Improper hypothetical.
13 BY MR. CONLEY:
14     Q.  Typical or prominent size indicating --
15     MR. NISENBAUM: Improper hypothetical.
16     A.  No, there may not be.
17     Now, if you -- let me say this.
18     If somebody gets asphyxiated, or caused to be
19 asphyxiated, by pressure on the chest, or by application
20 of a corotid hold, or both, remember that this is a
21 vascular -- this is a vascular phenomenon, not a
22 respiratory phenomenon.
23     You don't -- you -- if you -- what I'm
24 suggesting to you, if you believe that petechial
25 hemorrhages, or a broken iliac bone, or a broken thyroid

Page 33

9 (Pages 30 to 33)

cartilage was evident, or has to be evident, you are
mistaken.  Because these skeletal structures indicate
that there was interference with the airway, and if they
are not broken, therefore, there was no interference with
the airway.

That is wrong.  Because in the vast majority
of strangulations, or holds of the neck, these things do
not break.  And they do break sometimes, but they don't
always break.

And petechial hemorrhages sometimes are there
and sometimes they are not there.

If, for example, the corotid hold is such that
it compresses the arteries, the end -- or the corotid
artery and the jugular vein in one, and a corotid hold
where the arm is used to compress and pressure is applied
such that there are no petechial, that doesn't mean a
thing.  Because as I said, it is a -- to have petechial,
which are pinpoint hemorrhages, usually in the eyelids,
in the lining of the eyelids, and in the -- on the face;
on the skin of the face.  But they may not be there.  And
he may just -- may be asphyxiated just, as well, whether
they are there or they are not there.

When they are there, that means the veins were
compressed and the arteries were not compressed.  That's
what that means.

Page 34

---

Q.  In this case there's no indication of observed
petechial hemorrhaging, is there?
A.  No, there is not.
Q.  And is there typically a change in skin color
associated with asphyxia?
A.  Well, there may be.  There may be -- may be a
blue discoloration.  There may be a dusky, or grayish
coloration of the skin of the face.

But you really cannot base an opinion of -- or
a diagnosis of asphyxia or no asphyxia based on whether
the face was blue.

Yes, if it's -- if the face is blue, it may be
due to all kind of causes.  It may be due to cardiac
arrest just by itself.

So, yes, you have to -- any way you twist and
turn this, you have to base a diagnosis -- a medical
diagnosis of asphyxiation on the circumstantial
happenings in a case.  Only that will lead you in the
right direction.  To deviate off and try and push the
cause of death on something else, renders a fictitious
diagnosis.
Q.  I understand the opinion you're trying to
express.  My job is to get information for my purposes.
And as you understand, having been a witness many, many
times before, it's your job to answer my questions.

Page 35

---

A.  I understand that.
MR. NISENBAUM:  Again, I'm going to object to that.
Argumentative.

He is answering your questions.  You're asking
questions which require explanation, and he's offering
those.
BY MR. CONLEY:
Q.  Now, in asphyxia cases, do you typically see
signs of brain swelling?  Or discoloration?  Or ischemic
asphyxiation?
MR. NISENBAUM:  Objection.  Vague.
A.  You want to know whether he had brain
swelling?  Is that what I understand you to -- what I
understand you to -- understand what you want me to
answer?
BY MR. CONLEY:
Q.  Yes.
A.  Let me check that.  (Witness reviewing
documents.)

He has a brain weight of 1,400 grams.  That is
within the spread of a normal brain.  However, you have
to also understand that I do not know what his brain
weighed before he died.

So I cannot really tell you whether this
400-gram brain was moderately swollen, or was not swollen

Page 36

---

at all, or was, indeed, swollen.  Because I don't know --
maybe his normal brain weight was 1,200 grams.  In which
case he had 200 grams of edema fluid in the brain.

So I cannot really answer that.  But let me
check some other thing.

The unfortunate thing is that there is no
microscopic examination.  That would have answered some
of the questions.
Q.  Was there any discoloration of the brain --
A.  No.
Q.  -- indicated?
A.  No.
Q.  Is that something you would expect to see in
asphyxia?
A.  If the asphyxia is long enough in being there,
then you find changes that are visible on microscopic
examination.  But otherwise you really don't see much of
anything.

You may see -- if the brain swelling goes on
for a while, for a significant time, then you may see
swelling, as well.  But you may not see swelling if the
brain is only swollen for a small length of time and only
very little swollen, then you don't see anything at all.
Q.  Okay.

How long is long enough to show discoloration

Page 37

10 (Pages 34 to 37)

| | |
|---|---|
| 1 | in the brain? |
| 2 | A.  Well, "to show discoloration in the brain," |
| 3 | you mean when the brain looks dusky, or -- you need |
| 4 | hours.  You need a long time for that for the -- |
| 5 | Q.  "Hours"? |
| 6 | A.  The brain is profused with low level -- low |
| 7 | level -- with blood that is -- with reduced amount of |
| 8 | oxygen.  Then the brain becomes dusky looking.  But for |
| 9 | that you need hours.  That doesn't happen in a few |
| 10 | minutes, like in this case.  Remember that the whole |
| 11 | episode here -- |
| 12 | MR. NISENBAUM:  Objection.  I'm -- |
| 13 | A.  I'm sorry? |
| 14 | BY MR. CONLEY: |
| 15 | Q.  I'm trying to clarify. |
| 16 | Are you saying you would need hours of oxygen |
| 17 | deprivation in order to see discoloration? |
| 18 | A.  I would say at least an hour or two hours. |
| 19 | But normally in people who have conditions where they |
| 20 | breathe low -- blood low -- I'm sorry -- air with |
| 21 | low oxygen concentration, that goes on for a while.  That |
| 22 | doesn't just occur from minute to minute. |
| 23 | Q.  Does the autopsy report indicate any |
| 24 | hemorrhaging? |
| 25 | A.  No. |

Page 38

| | |
|---|---|
| 1 | Q.  Anywhere? |
| 2 | A.  No. |
| 3 | Q.  Does the autopsy report indicate any focal |
| 4 | bruising? |
| 5 | A.  Not that I know of. |
| 6 | Q.  Okay.  Can you identify any peer-reviewed |
| 7 | medical studies that demonstrate that a transient |
| 8 | application of a knee to someone's back can cause |
| 9 | asphyxia? |
| 10 | A.  Well, I don't know that there is literature |
| 11 | where people did experiments where they applied a knee on |
| 12 | the chest to cause asphyxia and then turn around and |
| 13 | wrote an article about it.  Because the police is going |
| 14 | to knock on their door. |
| 15 | There have been experiments by a colleague of |
| 16 | Dr. Velke, your witness, where maybe a few rooms away |
| 17 | from Dr. Velke's room there at the emergency department |
| 18 | of -- in San Diego in the hospital where they work |
| 19 | there's a Dr. Chan.  And he did experiments.  And I think |
| 20 | some of these experiments even involved Dr. Velke. |
| 21 | But -- and they both -- and Dr. Newman, also |
| 22 | in that department, wrote articles about those |
| 23 | experiments.  And then Dr. Velke went to Wyoming and |
| 24 | testified in Federal Court at the Daubert hearing that |
| 25 | all these experiments that they did are not applicable to |

Page 39

| | |
|---|---|
| 1 | what goes on in the field. |
| 2 | So what should we do without that information |
| 3 | that Dr. Chan, Dr. Velke and Dr. Newman published in a |
| 4 | magazine, which I've read, and determined at the end of |
| 5 | the day that in Dr. Chan going to Wyoming and testifying |
| 6 | in the Daubert hearing, that the experiments that they |
| 7 | conducted have absolutely no significance, no meaning. |
| 8 | Should not be applied to what happens when the police |
| 9 | restrain an individual, no matter where; outside, or |
| 10 | inside, or somewhere. |
| 11 | That's the only article that existed. |
| 12 | And now they -- Dr. Velke proposes that, based |
| 13 | on his report and on his subsequent report, as well, |
| 14 | that -- that is a -- those experiments indicate that you |
| 15 | can compress somebody up to a weight -- with a weight up |
| 16 | to 225 pounds and nothing happens.  And, therefore, you |
| 17 | can do that all the time.  Well, you will kill a lot of |
| 18 | people that way. |
| 19 | Q.  So you're saying the medical literature that |
| 20 | you're aware of says that compression by up to 225 pounds |
| 21 | will not cause asphyxia? |
| 22 | A.  No, I'm not saying that.  I'm saying the |
| 23 | opposite. |
| 24 | I'm saying that Dr. Velke wrote articles where |
| 25 | he says that these compressions with weights up to |

Page 40

| | |
|---|---|
| 1 | 225 pounds are -- cause no harm. |
| 2 | And I'm telling you, if they -- if they read |
| 3 | their own -- Dr. Chan's own report, or testimony in front |
| 4 | of Judge Alan B. Johnson in Laramie, Wyoming, they'll |
| 5 | think differently. |
| 6 | Because what my suggestion would have been, |
| 7 | that Dr. Velke go into the room where Dr. Chan has his |
| 8 | office and discuss his -- Dr. Velke's testimony in this |
| 9 | case before he actually wrote his report. |
| 10 | Q.  All right. |
| 11 | So you're asserting that the report by |
| 12 | Dr. Chan states that asphyxia can be caused by |
| 13 | application of some amount of weight less than |
| 14 | 225 pounds; is that what you're saying? |
| 15 | A.  No.  He's saying -- no, he's not saying that. |
| 16 | He is saying that the experiments that he and |
| 17 | his group conducted are not to be construed as applicable |
| 18 | to what goes on when the police effect a restraint.  That |
| 19 | the two are not the same.  What goes on in the laboratory |
| 20 | is not to be understood as what goes on during police |
| 21 | restraint. |
| 22 | Q.  You're saying that's what Dr. Chan's article |
| 23 | says? |
| 24 | A.  And Dr. Velke.  And Dr. Newman. |
| 25 | Dr. Chan went to Wyoming and testified to |

Page 41

11 (Pages 38 to 41)

1   that. I was in the courtroom when that happened.
2       And I have the decision of -- and the
3   testimony of Dr. Chan as rendered by Judge Johnson in
4   Federal Court in Laramie. I have that here. If you want
5   to, I'll give you a copy of it.
6     Q.  Sure.
7     MR. NISENBAUM: You want to mark that as Exhibit B?
8     A.  And there's also -- I just -- I just lost a
9   deposition that Dr. Chan gave in a case in Miami where he
10  states exactly that.
11     That there's no applicability. We should not
12  even believe that what goes on in a restraint is
13  applicable to what they did in the laboratory.
14     So the question came up, "Well, why do you do
15  those experiments in the laboratory?"
16     Well, it's interesting physiologically. Well,
17  it's very interesting, but no applicability to what goes
18  on in police restraint.
19  BY MR. CONLEY:
20     **Q.  All right. So you're saying those articles**
21  **are not applicable.**
22     **My question is, what articles do you have that**
23  **say that weight over a certain amount of compression on**
24  **the back will cause asphyxiation?**
25     A.  There are no experimental reports of -- to

Page 42

1   answer that question that you posed. The articles that
2  were published by this group in San Diego, being that
3  they are not applicable -- these articles and the
4  experiments that they conducted on volunteers are not
5  applicable to what goes on when police make an arrest.
6  Those are the only articles that exist.
7     And, of course, the testimony of Dr. Chan in
8  Federal Court in Wyoming stands for what he testified.
9     **Q.  All right.**
10     A.  And I said -- I didn't finish the sentence
11  earlier.
12     He testified in a case called "Colindres," a
13  Miami case, where -- that is not -- well, that was an
14  experiment down there where -- in Miami -- where police
15  retrained an 18-year-old autistic boy and he died from
16  compression during the arrest.
17     And the medical examiner said she didn't know,
18  or she -- before she would sign the Death Certificate,
19  she would want the case reenacted.
20     And they took the same officer that effected
21  the -- that did the restraint on the boy, and two of
22  them -- of the officers, compressed a third one just the
23  same way they did with the boy. And after less than one
24  minute of that compression the guy that was being
25  compressed panicked because he couldn't breathe, and he

Page 43

1   asked to be released. And the officers on top thought
2  that he was kidding them. But then they got wise and
3  then they got off of him.
4     So that is not a scientific experiment, but it
5  was done and it stands for what it was.
6    Q.  Okay.
7     A.  And so that is why I'm bringing this for your
8  consideration.
9    Q.  Okay.
10     **Was there any other compression, besides the**
11  **knee on the back, that is the basis of your opinion?**
12     A.  No. There is -- there are three individual
13  mechanisms here all yielding the same thing; the neck
14  hold, the compression with the knee, and the three
15  punches in the right side of his body.
16    **Q.  Okay. And so the fact that he was in a prone**
17  **position at some point is not one of the mechanisms then;**
18  **correct?**
19     A.  Well, it may be a mechanism, too. But in view
20  of the other three, maybe it plays some role, but it's
21  not a major -- the major role. It's not the only role.
22  Maybe it has some low percentage to be considered, but
23  alone I don't believe it would have caused the death, but
24  only in view of the other three.
25    Q.  All right.

Page 44

1     **And how did -- how do you believe that being**
2  **in the prone position contributed?**
3     A.  Well, if you apply pressure to the back, you
4  push down on the body, you -- if your pressure is -- if
5  the pressure is --
6    **Q.  Is the issue of being in prone position only**
7  **the fact that pressure was applied to the back? Or is it**
8  **simply being in a prone position?**
9     A.  No. The prone position has nothing to do with
10  the punches, nor is it to do with the carotid hold.
11     The pressure on the back only comes into play
12  with pressure below the diaphragm. Because by pressure
13  on the back, the organs are pushed upward, contrary to
14  what Dr. Velke suggests, that the organs go sideways.
15     Well, I have news for Dr. Velke, that the
16  organs don't go sideways. That is in plain English,
17  nonsense, because they don't go sideways. They go up and
18  down. They go -- they would go down further but there's
19  a bony pelvis, so they don't go down all the way into the
20  legs.
21    **Q.  Let me ask you this, because I'm trying to get**
22  **the record clear on this.**
23     **You're not complaining about Mr. White being**
24  **in a prone position, except for the fact that he was in a**
25  **prone position -- happened to be in a prone position when**

Page 45

12 (Pages 42 to 45)

1    he had pressure applied to his back.  So anytime he
2    was --
3        A.  Well, I mean, since he was in prone position,
4    and he was in --
5        Q.  He was in prone position when he got a knee on
6    his back.  So --
7        A.  Yeah, he was in prone position when he had
8    this knee on his back.  He had to have been because
9    otherwise you wouldn't be able to put the knee on his
10   back.
11       Q.  Well, he could be on the -- or whatever.  But
12   that's not really my question.
13           My question is, are you expressing some
14   concern about him being in a prone position at any other
15   time, other than when a knee was on his back?
16       A.  No.  He was dead then.  Because he was turned
17   over when the body was carried out by the police because
18   the gurney would not go into the trailer because of
19   dimensions.  So they brought -- they carried Mr. White
20   out and placed him face down on the gurney, and then the
21   EMTs turned him over.
22       Q.  Okay.
23           And do you have a basis, in the medical
24   literature, to support the idea that obese people being
25   placed in a prone position will have their diaphragm

Page 46

1    interfered with in a way that will cause them to suffer
2    impaired breathing?
3        A.  No.
4        MR. NISENBAUM:  Objection.  Vague.  Incomplete
5    hypothetical.
6        A.  No.  Mr. White was overweight and had
7    protuberant abdomen.
8            If you apply pressure below the diaphragm,
9    you're going to push the organs against the diaphram.
10           You know, I should tell you, I have observed
11   in my lifetime over 60,000, and probably around 62,000
12   autopsies, because I've been director of training of
13   pathologists to be forensic pathologists in all the -- or
14   the -- yeah, in all the offices where I have worked over
15   the last 62 years.
16           So organs -- and I've made a -- I made it my
17   business to find out which way the organs go when you put
18   pressure on the back.
19           The essence is the pressure, not the prone
20   position.  They don't -- the organs don't go sideways,
21   like Dr. Velke suggests.  I think that's funny.
22   BY MR. CONLEY:
23       Q.  Okay.
24           So, the discussion about the prone position
25   and asphyxia in your report is only concerned with the

Page 47

1    period of time where pressure was being applied to his
2    back?
3        A.  Yes, that's correct.  But Dr. Velke says that
4    he doesn't agree with me.  He agrees with his version.
5            And he says that I am of the opinion that the
6    prone position is what killed Mr. White.
7            No, no, no.  In my report the word "pressure
8    on the back" features on every page of the report, with
9    the exception of the first two pages where it talks about
10   my education, training and experience, my Curriculum
11   Vitae.
12           The position is not the major element.  The
13   pressure on the back is a major element.
14           The paralysis of the diaphragm is a major
15   element.  The diaphragm is the major respiratory muscle.
16   When that's paralyzed, you don't breathe.
17       Q.  Now, there's also a discussion in your report
18   about the hobble restraint.  Are you offering an opinion
19   that the hobble restraint caused or contributed to the
20   asphyxia?
21       A.  No, I'm not.
22       Q.  Okay.  So the mechanisms causing the asphyxia
23   were the corotid restraint, compression by the knee, and
24   three punches to the right side; correct?
25       A.  Yes.

Page 48

1        Q.  Okay.  And you're not criticizing any other of
2    the activities?  Those are the activities that caused
3    the -- that, basically, caused the heart attack?
4        A.  There was no "heart attack."
5        MR. NISENBAUM:  Objection.
6    BY MR. CONLEY:
7        Q.  Fine.  Let me rephrase it then.
8            So those three mechanisms, the corotid
9    restraint, compression by the knee, and three punches to
10   the right side were the cause of Mr. White's death and
11   not other activities by the police; right?
12       A.  Those are the three mechanisms that caused him
13   to provide the manifestations that he exhibited which
14   culminated in the death.
15       Q.  Okay.
16           Are those the three mechanisms which caused
17   the asphyxia which you opined caused his death?
18       A.  Yes.
19       Q.  Okay.  And are you attributing the asphyxia to
20   any other activities by the police, besides these three?
21       A.  Well, the compression, the corotid hold, and
22   the punches were the ones that were abundantly accounted
23   for by the officers who exercised these mechanisms; who
24   did the restraint.
25           And as part of the restraint, there was a

Page 49

13 (Pages 46 to 49)

**Page 50**

1  carotid hold.  There was neck compression.  The back
2  compression.  Compression of the back and the punches.
3  Other than that, they didn't talk about anything, that I
4  could see.
5       There was an interaction where -- fight for
6  the door where the door was ripped off the hinges in the
7  bathroom.  But he didn't die from that.
8       So they put him face down, compressed him, and
9  provided a carotid hold.  So if that's not enough, I
10 don't -- he has no other cause of death.  There's nothing
11 else.  The cocaine didn't kill him.
12      **Q.  All I'm trying to do is make sure I understand**
13 **the scope of --**
14      A.  Well, I'm trying to help you.
15      **Q.  As I understand them, you are saying that the**
16 **officers who performed them by applying a carotid**
17 **restraint, compression to his torso by a knee in the**
18 **back, and the three punches to his side, those are the**
19 **activities by the police which caused the asphyxia?  And**
20 **you're not saying it's caused by any of the other**
21 **activities by the police?**
22      A.  I don't know what other activities there were.
23 I'm unaware of any other activities.
24      **Q.  Okay.  All right.  Fine.**
25      **Now, let's go to the issue of excited**

**Page 51**

1  **delirium.  Is the excited delirium diagnosis recognized**
2  **by the American College of Emergency Physicians?**
3       A.  I think that that is -- to my knowledge, that
4  is correct.  But what is -- that the American College of
5  Emergency Physicians recognizes excited delirium.
6       But I have never understood what they see in
7  excited delirium that is different.  A different
8  diagnosis, or a different finding, or something that I
9  can call by a different name and convert an accidental
10 death or a traumatic cause of death.
11      **Q.  All right.**
12      A.  Hold on.
13      A traumatic cause of death over and above so
14 that there would be a natural cause of death, a natural
15 fictitious cause of death, because that's not a --
16 excited delirium is not really a diagnosis.  There's
17 nothing different.
18      **Q.  Does the National Association of Medical**
19 **Examiners recognize excited delirium?**
20      A.  Yeah, I understand that, too.
21      Do you know that Dr. Demayo, who plays with
22 this excited delirium nonsense, is the editor of the
23 journal where Dr. Chan publishes his papers.  Dr. Chan
24 and Dr. Velke.
25      So are you telling me that he doesn't have

**Page 52**

1  enough pull to get that -- as the association where he's
2  an officer on the board of directors, being that he's the
3  editor of the journal, don't you think that he has enough
4  pull to get that as a -- recognition by the National
5  Association of Medical Examiners?
6       The reason I'm telling you all that is because
7  there's nothing that distinguishes excited delirium from
8  cocaine intoxication.
9       So do I need another term?
10      Do I need a natural cause of death so that now
11 I call the -- these death by a harmless name to divert
12 attention from the trauma?
13      Also, I do not understand, and need some
14 understanding, why the coroner called this "an accident,"
15 when the pathologist called this "excited delirium"?
16      How does that make sense?
17      The natural cause of death "excited delirium,"
18 but the coroner doesn't agree.  The coroner signs it out
19 as "accident."  How does that make sense?
20      Is excited delirium an accidental cause of
21 death?
22      **Q.  All right.**
23      **You make reference to an article on page 6 by**
24 **someone named Ronald O'Halloran?**
25      A.  Yes.

**Page 53**

1       **Q.  And in the American Journal of Forensic**
2  **Medical -- I'm sorry -- Medicine and Pathology; is that**
3  **right?**
4       A.  Yes.  We call it the orange journal.
5       **Q.  Okay.  Is that article you're talking about,**
6  **is that a republication?**
7       A.  You mean is it peer reviewed?
8       **Q.  Yes.**
9       A.  Well, all the articles in that journal are
10 peer reviewed.
11      **Q.  Okay.  So was this particular article peer**
12 **reviewed?**
13      A.  I don't know.  But I would think so.  Because
14 I don't think that there are -- there is one article in
15 any of these -- in any -- in this journal -- in any of
16 the publications that appear in this journal that would
17 not be peer reviewed.
18      In fact, I think in the beginning of that
19 journal, in the first -- in one or two of the first pages
20 is a list of the editors.
21      Just one second.
22      Yes, there's a long list of people who review
23 articles in that journal.  Or, for that journal.
24      **Q.  This was an article, not a comment?**
25      A.  No.  Dr. O'Halloran wrote an article with

14 (Pages 50 to 53)

1 another co-author called, I think Joyce -- let me see.
2 Janice. Janice Frank.
3        And Dr. O'Halloran and this lady wrote this
4 article. This is an article of reporting 21 cases of
5 death during restraint.
6        And the article is -- starts -- how many pages
7 are there? The article has several pages. I don't know,
8 ten or twelve pages.
9        Q. All right.
10        Have you ever published a peer-reviewed
11 article that excited delirium does not exist?
12        A. No, I don't think so. But I'm in the process
13 to, because I'm -- I don't know if you're aware, I
14 published a textbook. A big textbook. Like, I don't
15 know, nine-pound textbook. So if weight has some meaning
16 with regards to quality, must be a good textbook.
17        But I'm doing -- that book came out in 1972,
18 and now it's in the Fourth Edition. So I'm doing the
19 Fifth Edition right now as we speak.
20        Q. Okay.
21        A. And there will be an article about restraint
22 and death during restraint and probably about excited
23 delirium, as well.
24        Q. Okay. That has not been published yet?
25        A. No, it has not been submitted.

                                                Page 54

1        Q. Okay.
2        In the course of your opinion, you indicate an
3 opinion that Mr. White was experiencing pain, fear and
4 dread. Would any of those emotions be affected by his
5 cocaine intoxication?
6        A. No. It would be affected by the fact that
7 when a person cannot breathe, they go crazy. They go
8 wild. They go panicky. They go to any length to get
9 weight off their bodies, to the point where police often
10 believe that he's trying to rise because -- when in prone
11 position, he's trying to rise because he wants to run
12 away.
13        No, he doesn't want to run away. He wants to
14 be able to breathe. And that's why he's rising.
15        The fear --
16        Q. He was acting wild and crazy before the police
17 even arrived; didn't he?
18        A. Well, he was in a state of acute psychosis.
19 But during the restraint was interference with his
20 airway; with his ability to breathe.
21        These people panic. And when you put your arm
22 around somebody that is being restrained for the purpose
23 of compression of the corotid artery to make him -- to
24 get him to be subdued, these people, just from the
25 feeling of the arm around the neck in a hostile way,

                                                Page 55

1 sure, putting somebody's arm around my neck out of love
2 is one thing, but not out of hate.
3        And people like that go berserk when the
4 compression is exercised, because that is called air
5 hunger and fear of impending doom. And that's what
6 Mr. White experienced.
7        Q. Okay. Was Mr. White experiencing delusions
8 during this encounter?
9        A. He may have. He may have experienced
10 delusions.
11        But he certainly did not feel delusional when
12 there was interference with his airway. At that time he
13 felt very, very threatened, such that he was of the
14 opinion that he is going to die unless the hold is going
15 to be released.
16        Q. And you're not a psychiatrist; correct?
17        A. No, I'm not a psychiatrist. However, I use
18 the tools of the trade of a forensic pathologist of the
19 body. The understanding how the body works. The
20 medicine of it. And the knowledge of what happens when
21 certain events occur.
22        Like, for example, somebody is found in a
23 house on fire with a rope around her arm when the house
24 is on fire and the fire is coming towards her and she's
25 now got confronted with the possibility of jumping from a

                                                Page 56

1 three-story balcony or being consumed by the flames.
2        And she never had the courage to jump. Or she
3 had the fear of impending doom if she jumped or if she
4 was burned to death. And she burned to death.
5        You don't think that this woman had fear of
6 impending doom?
7        Q. Have you, in your medical practice, treated
8 drug users and addicts?
9        A. No.
10        Q. Have you conducted any studies on the effect
11 on cognition of drug use and addiction?
12        A. No, I have not. Although I've written some
13 articles. I think I have. I have to look.
14        I've written 96 scientific articles and
15 several chapters in different books. In my own book, of
16 course. And I don't recall if there were articles
17 specifically related to drugs. I don't recall. I may
18 have.
19        There's a long chapter in my book on drugs.
20 There is -- I did not write that chapter. But there's a
21 chapter on alcohol that I wrote. And there will be -- in
22 the next edition there will be marijuana included in the
23 book.
24        But other than that, no, I did not.
25        Q. Have you ever worked in an emergency room?

                                                Page 57

                                    15 (Pages 54 to 57)

1   A.   No.
2   Q.   **Have you ever worked in a drug rehab facility?**
3   A.   No.
4   Q.   **Have you written any articles on the pain, or**
5   **emotional or psychological responses of intoxicated**
6   **people?**
7   A.   No.  But there will be -- in my new book there
8   will be a chapter on conscious pain and suffering, which
9   will include drugs, as well, in that context.
10   Q.   **At any point was there any report that**
11   **Mr. White stated that he was feeling pain, fear, or**
12   **dread?**
13   A.   He could not talk.  He could not talk.  While
14   a person is compressed, they do not talk.  They don't --
15   they're not able to pass air over the vocal cords, so
16   they don't talk.  Or sometimes they do talk.  Because I
17   don't know -- there's not any information here of whether
18   he tried to talk or he -- during the compression I'm not
19   aware what he did.
20       There's no -- I don't have any information
21   about whether he even tried to talk.  That information is
22   lacking.
23   Q.   **Okay.**
24       **And, in fact, Mr. White continued to fight**
25   **with the police, despite the various kinds of force they**

Page 58

1   **used on him; correct?**
2   MR. NISENBAUM:  Objection.  Argument.
3   A.   He -- from during that 24 minutes -- and you
4   remember I said earlier that it had to have been less
5   than 24 minutes because when he was first tackled he --
6   time went by.  And when he died, we don't know when that
7   was.  So probably before he was taken out.  We don't know
8   how much before.
9       So during that relatively short period, there
10   may have been things happening that I'm not aware of.
11   BY MR. CONLEY:
12   Q.   **Well, was there some point that he stopped**
13   **fighting before they were able to get the hobble**
14   **restraint on him?**
15   A.   There was a time when he went limp and still
16   held -- then he suddenly regained his demeanor and became
17   active again.  But then when -- towards the end he may
18   have gotten quiet as he was dying.  But I don't know that
19   that happened.  He may not have had that episode.
20       So I can only say that which is in the
21   records.  But I do not know anything else.  So --
22   Q.   **All right.**
23   A.   -- all I know is that when he was out, he was
24   taken out, right there and then the EMTs tried to see
25   what condition his body was in, and he was found to be in

Page 59

1   cardiac arrest.
2       So after that they tried to resuscitate him,
3   and it didn't work.  He was pronounced dead at 5:22.  He
4   was only, like, eleven minutes in the hospital.  But they
5   tried, but they didn't achieve any success either.
6   Q.   **You also have an opinion expressed here about**
7   **his life span.**
8       **And let me first ask.  Are you an actuary?**
9   A.   No.  No.  But I am able to evaluate an autopsy
10   report.  And that autopsy report, that does not tell me
11   anything that I can see and agree with that that is a
12   manifestation that would tell me that he had a limited
13   life expectancy.  He had a life expectancy no different
14   than any other healthy person.
15   Q.   **And you don't have any particular expertise in**
16   **gaging expected life span beyond simply reading what**
17   **this -- what this actuarial chart says; correct?**
18   A.   Well, the actuarial chart for -- valid for
19   Mr. White is no different for him than it is for any
20   other 47-year-old healthy individual.
21       So, yes, he has -- maybe -- I'm not sure that
22   he does, but maybe he has some enlargement of the heart;
23   minimal.  That is not something that is not treatable.
24       He has a cocaine addiction.  I can only wish
25   and hope and suggest to him, had he been alive and asked

Page 60

1   me, what can I do to get rid of his addiction.
2       And I would have sent him to a specialist.
3   And if he would have abided by and remained under
4   supervision, there's no question in my mind that he would
5   have lived to at least age 80.  And that is some 30
6   years, or 33 years from the time that he died.
7       And in that 33 years miracles happen in
8   medicine.  So who knows.  He might have lived to be a
9   hundred.  He might have lived to be -- a lot longer than
10   a hundred.
11   Q.   **I'm asking whether you have specific expertise**
12   **in creating actuarial tables, as opposed to simply**
13   **reading the table and saying what it says, and saying,**
14   **"It says 80 years"?**
15   A.   No.  I'm offering an opinion as a forensic
16   pathologist.
17       I am not an insurance agent.  I am not a
18   actuarial agent.  I am strictly going by the facts of the
19   condition of his body.
20       If I saw some kind of cancer in his body, I
21   would consider that as well.  But he doesn't have that.
22   In fact, he doesn't have anything wrong with him except,
23   as I said, maybe some enlargement of the heart.  But
24   maybe not.
25       And he does have a cocaine addiction.  The

Page 61

16 (Pages 58 to 61)

cocaine addiction may be treated. And under supervision
he would probably, at some point, relinquish that habit.
        But there are millions of people around the
world who take cocaine, and have been taking cocaine for
many, many years. And meaning not the same people, but
cocaine addiction has been known for a long, long time.
And people don't keel over on Main Street all the time
from cocaine addiction. Some people die, yes. But maybe
not Mr. White.
    Q.   Was there any evidence that he has
historically treated for hypertension?
    A.   I don't know that. I have no documents to
tell me that.
        But as I said, hypertension with a heart that
weighs 450 grams may be due to other causes than cocaine
addiction. May not be. But it's treatable.
        And there's no indication for a reduced life
expectancy.
    Q.   If it's treated?
    A.   Yes.
    Q.   And you have no basis to assume that he would
treat it --
    A.   I --
    Q.   -- correct?
    A.   I have -- as a physician, I try to shy away

Page 62

from my patients all eventually will die. Instead, I
look at this as maybe they'll all get better. They'll
all be treated. They will have a happy and wonderful
life ahead of them. And that goes for Mr. White, as
well. That is what doctors -- doctors don't like to
admit that patients ever die.
        So maybe Mr. White eventually would come to
his senses. And I have plenty of hope that with the
right medical supervision, he will come to his senses and
with treatment, and live a happy life ahead.
    Q.   If Mr. White had, and continued to have
untreated hypertension, that would reduce his expected
life span; correct?
    A.   You know what happens in cases like that, is
that he develops -- a person, not necessarily Mr. White,
but a person, let's say, who is in Mr. White's shoes, and
he's 47 years old, he's got 33 years to be at age 80, and
maybe by then you take a pill and you don't have the
craving for cocaine anymore. So maybe that is something
to think about.
        But even if you didn't have that --
    Q.   Hypertension?
    A.   Yeah, hypertension. Maybe you take a pill and
all the hypertension goes away. Lots of things have
happened in the last --

Page 63

    Q.   Hypertension reduces lifespan?
    A.   Yeah, I understand that. But if there is a
pill between now and 33 years from now, maybe Mr. White
will benefit from such events. From progression --
healthy progression by patients who have hypertension who
eventually will outlive their life expectancy.
        So you have to consider all the facts, not
just some of the facts. And Mister --
    Q.   Being a drug user is also something that would
also reduce his expected longevity; correct?
    A.   If it continues this way, maybe it would. But
also maybe not. You see, because if he's under
supervision by a physician and he starts to develop
swollen legs and he starts to develop little infarcts in
his brain, and he starts to develop this and that and the
other complications, and he now suddenly realizes, "Boy,
if I don't go and do what the doctor tells me, I'm really
going to die," maybe at that time he will stop being a
cocaine addict, for Mr. White's sake. For Mr. White's
sake.
    Q.   Do you have any information that Mr. White
ever treated for his addiction?
    A.   I don't know.
    Q.   Do you have any basis for gaging his life
expectancy based upon his history of criminal activity?

Page 64

        MR. NISENBAUM:  Objection.
    A.   You know, now you make him to be a criminal.
I don't know anything about that. I don't know. To me
he's a patient.
BY MR. CONLEY:
    Q.   So if you were to learn that he had a history
of violence, you wouldn't be able to say whether that
would affect the expected life span based upon the
actuarial tables; correct?
    A.   You know, I cannot answer these questions
because I don't know anything about Mr. White's home
life; if he has one. I don't know if he's married. I
don't know if he has kids. I don't know if he likes it
in his home. Maybe he doesn't like it and that's why he
takes cocaine. Who knows.
        I do not know that I can answer these
questions. I don't know enough about the man.
    Q.   Okay.
        MR. NISENBAUM:  Further objection. Improper that
it calls for an improper opinion.
BY MR. CONLEY:
    Q.   In looking at your report I didn't see a
statement of what rates you charge. Although that's
supposed to be in the report.
        Can you tell me what rates you charge for

Page 65

17 (Pages 62 to 65)

expert work?

    A.  Well, I charge $2,500 for a deposition in my office. I charge a $4,000 retainer applicable towards ten hours of work at a fee of $400 per hour. I charge $5,000 a day if I have to go to testify in court, plus, of course, hotel and airline tickets, and whatever expenses I have along the way.

    Q.  **All right.**

    **And how much have you charged to date in this case?**

    A.  I charged your office for the deposition and I charged Mr. Nisenbaum's office a retainer, which I received, and which will be applied when the final bill comes for ten hours of work. Any additional hours of work will be billed separately.

    Q.  **Have you yet -- how many hours have you spent on this case so far, leaving aside the deposition?**

    A.  I don't really know. Somewhere around -- somewhere between twelve and 15 hours.

    Q.  **Okay. And that's hourly?**

    **There's no contingency involved?**

    A.  What does that mean?

    Q.  **It's -- you're not paid, depending upon the results of the case? You're paid no matter what happens?**

    A.  There's no contingency. I get paid for what I

Page 66

do. And what I do is paid at the rate of $400 an hour for work I do in my office. And for other work, I gave you those fees, as well.

    Q.  **Okay.**

    **Have you worked on other cases for Mr. Nisenbaum or his office?**

    A.  Yes, I did. I worked for that office with Mr. Burris, I think even before Mr. Nisenbaum was there.

    But the total number of cases I worked in that office, I don't know. Maybe five, six. Something like that. Maybe seven.

    Q.  **Okay.**

    **Right now are you working for Mr. Burris' office on any other cases, in addition to this one?**

    A.  If I am, I'm not aware of it. I don't think so.

    Q.  **Okay.**

    **How many cases have you testified on involving civil rights claims?**

    A.  I don't know. But I have had in my office to be worked on, that means I did work on, probably over 150 such cases.

    Q.  **Okay. And what percentage of those were you acting as an expert for the plaintiff, or claimant, who said their civil rights were violated?**

Page 67

    A.  Oh, you're talking about -- civil rights?

    Q.  **Which side retained you?**

    A.  Yeah. Probably the -- most of them were plaintiff cases.

    But then you have to also understand that when I retired from government work, when I worked for the government, at that time I never testified against the police because I was prohibited to do that.

    Q.  **Okay.**

    A.  So then at that time I testified only for the defense. Now I testify mostly for the plaintiff. But not a hundred percent, because they have their own medical examiner, so they don't need me.

    Q.  **Okay.**

    **How many times have you, since your retirement, been retained by the defense side on a civil rights case?**

    A.  Well, all these cases are retained cases.

    Q.  **I understand that. How many times was it on the defense side since your retirement?**

    A.  Oh, I don't know. Maybe ten percent. Maybe 15 percent.

    Q.  **Now, as far as the autopsy report, you indicated that you would like to have seen some slides of certain parts of the body.**

Page 68

    **Other than that, do you have any criticism of the autopsy report?**

    A.  Well, there are some mistakes in the autopsy report, and that is one of them, that they did not do microscopy.

    I don't like these reports that -- I don't know if they skimp the money that it costs, but I don't know why they don't do microscopy to give you a complete picture.

    But there are some mistakes in the -- in the -- there's a mistake there in the toxicology that I said.

    Q.  **Can you tell me exactly what you would want to see in the microscopy?**

    A.  What I would like to see?

    Well, I can tell you. What I would like to see -- well, first of all, since there isn't microscopy, you never know what you find in a microscope because you enlarge the material that you look at up to 400 times. So you can see things that you never dreamt about.

    But in this case specifically, I would have liked to know whether the heart muscle fibers are, indeed, enlarged. In other words, medically that would be referred to as myocyte hypertrophy. And that would tell me whether the heart is, indeed, enlarged or not.

Page 69

18 (Pages 66 to 69)

1    Because you are talking about a heart that is
2  almost to be considered as borderline enlarged. It's not
3  really definitively established that this heart is
4  enlarged. Because I got literature that tells you: No,
5  it is not.
6    And there's a book that came out a couple of
7  years ago, I think, and that book is called "Academic
8  Forensic Pathology." And, actually, this book was
9  published in 2011. And there's an article in here by a
10  well-known pathologist called Dr. Fishbein. And he is in
11  Los Angeles. And he is a -- works at -- if I'm not
12  mistaken, at the University of California in Los Angeles.
13    And he wrote a nice article about enlargement
14  of the heart. I think that's the name of the article.
15    On page 188 of this book, that contains
16  various articles. And he has one article, one such
17  article. And the name of the article I will tell you,
18  "When is having a big heart a problem?" Published by
19  Gregory Fishbein, M.D., and Michael Fishbein, M.D.
20    The first is his son, who is also a -- I think
21  he's a pathologist. But his son and he published this
22  article together. It's a worthwhile reading.
23  Q.  All right.
24    My understanding is that you don't care
25  whether his heart is enlarged or not? You don't believe

Page 70

1  that contributed to it?
2  A.  With 450 grams, you are dealing with a
3  borderline situation. And --
4  Q.  In any event, you don't believe that that
5  enlarged heart, even if it exists, contributed to
6  Mr. White's death; correct?
7  A.  No. Of course, not. Of course not. It did
8  not -- it did not create a problem.
9  Q.  That examination wouldn't change your opinion;
10  correct?
11  A.  No, no. I cannot -- I wish I could, but I
12  cannot. I cannot change my opinion because that would be
13  wrong. That would be cheating the patient and cheating
14  my sworn obligation to the patient as a doctor.
15    I have to call things for what they are, not
16  for what they may be, or what they are construed to be.
17  I have to call it what it is, regardless where the chips
18  fall.
19  Q.  My question is not what you just answered.
20    My question is, since you don't believe that
21  the enlarged heart, even if it exists, contributed to the
22  death, then whether or not this particular microscopic
23  examination was done or not is not going to affect your
24  opinion; correct?
25  A.  Well, if --

Page 71

1  Q.  The criticism -- it wouldn't affect your
2  opinion no matter what the result was --
3  A.  Well, I don't know.
4  Q.  -- right?
5  A.  I don't know. If she made a mistake, I don't
6  know.
7    Is that a measured weight? Is that heart
8  really weighing 450 grams?
9    That's not -- according to the literature,
10  that is not a markedly enlarged heart that would cause
11  somebody to die or contribute to their death.
12    And not -- Fishbein's article doesn't allow
13  for that. And two books, one called "Geigy Scientific
14  Tables." Geigy is a large pharmaceutical company. And
15  that book is the Eighth Revised and Enlarged Edition
16  published by Ciba-Geigy. That's G-e-i-g-y.
17    And that -- I have a book here that talks only
18  about heart weights. And it's a thick --
19  Q.  We seem to be going off on a branch that's not
20  fruitful here.
21    My question is, whether this criticism you
22  have actually makes any difference in your opinion?
23    If that microscopic examination was done and
24  it was determined "Yes" or "No" there's some mildly
25  enlargement of the heart, would not that determination

Page 72

1  affect your opinion in this case that the cause of death
2  was asphyxia?
3  A.  No, it wouldn't.
4  Q.  Okay. So that's a criticism, but not one that
5  would affect your opinion regardless of the outcome?
6  A.  No, I can't -- there's no way for any
7  self-respecting pathologist to call a 450-gram heart
8  enlarged to the point of causing death. And especially
9  when there's no microscopic examination available to
10  support or dismiss this kind of notion.
11  Q.  Okay. Fine.
12    So, we talked about the microscopic exam of
13  the heart.
14    What other criticisms do you have of the
15  autopsy?
16  A.  Well, the autopsy would do well if they had a
17  little more knowledge, both Mr. Wang and Doctor-- what's
18  her name? Hogan. Both Mr. Wang and Dr. Hogan with
19  regards to cocaine.
20    I mean, you'd expect your pathologist to know
21  that the metabolites, the BE in the -- in this case,
22  present in the blood, is not pharmacologically active.
23    I mean, if they don't know that, what else
24  don't they know?
25    So that's my complaints at face value. I

Page 73

19 (Pages 70 to 73)

1  don't know. I didn't go through it for the purpose of
2  criticizing them. I just came across these observations
3  when I read their reports.
4      Q. So those are your two criticisms that you're
5  prepared to say today; that they didn't do a microscopy
6  exam of the heart, and they were incorrect on whether the
7  BE was an active metabolite?
8      A. Yeah. They call it "the toxic effect of BE."
9  I've never heard that. BE doesn't have "toxic effect."
10     Q. Okay. All right.
11         And then let me ask you this. One other
12  question.
13         Is it your opinion that if Mr. White had not
14  gotten into an altercation with the police that he would
15  not have died?
16     A. Yeah. I said that.
17         I said if the police for some reason, for some
18  unknown reason would not have made it to the scene,
19  Mr. White would not have died at that time.
20     Q. Okay. All right.
21     MR. CONLEY: I believe those are all of my
22  questions at this point. Thank you.
23     THE WITNESS: I thank you very much.
24     MR. NISENBAUM: One question.
25

Page 74

---

1      EXAMINATION
2  BY MR. NISENBAUM:
3      Q. Doctor, with respect to the question you were
4  just asked, isn't it also your opinion that if the police
5  had arrested Mr. White without asphyxiating him, that
6  Mr. White would have lived?
7      A. Yes, that would be my opinion. Absolutely.
8      MR. CONLEY: Objection. Argumentative. Lacks
9  foundation.
10         Go ahead.
11     THE WITNESS: What happened? Hello?
12     MR. NISENBAUM: Yes, I'm here.
13     THE WITNESS: Okay. I was afraid you just
14  vanished.
15     MR. NISENBAUM: No. No.
16  BY MR. NISENBAUM:
17     Q. Do you want me to repeat the question?
18     A. No. I got the question.
19         The question that you asked me is, had he not
20  been asphyxiated, would he be alive?
21         Yes, he would have been alive.
22     Q. Okay.
23     MR. NISENBAUM: Thank you. No other questions.
24     MR. CONLEY: So I'd like to definitely, obviously,
25  order.

Page 75

---

1      (Ending time:  3:40 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 76

---

1      REPORTER'S CERTIFICATE
2
3
4      I, SHARON GARDZINSKI, CSR No. 3915, Certified
5  Shorthand Reporter, certify;
6      That the foregoing proceedings were taken before me
7  at the time and place therein set forth, at which time
8  the witness was put under oath by me;
9      That the testimony of the witness, the questions
10  propounded, and all objections and statements made at the
11  time of the examination were recorded stenographically by
12  me and were thereafter transcribed;
13      That the foregoing is a true and correct transcript
14  of my shorthand notes so taken.
15      I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
17  interested in the action.
18      I declare under penalty of perjury under the laws of
19  Michigan that the foregoing is true and correct.
20      Dated this 18th day of February, 2016.
21
22
23      SHARON GARDZINSKI, C.S.R. No. 3915
24
25

Page 77

20 (Pages 74 to 77)

REPORTER'S CERTIFICATION OF CERTIFIED COPY

1
2
3
4
5
6
7      I, SHARON GARDZINSKI, CSR No. 3915, a Certified
8   Shorthand Reporter in the State of Michigan, certify that
9   the foregoing pages 1 through 76, constitute a true and
10  correct copy of the original deposition of WERNER U.
11  SPITZ, M.D. taken on Monday, February 8, 2016.
12      I declare under penalty of perjury under the laws of
13  the State of Michigan that the foregoing is true and
14  correct.
15      Dated this 18th day of February, 2016.
16
17

18  SHARON GARDZINSKI, C.S.R. No. 3915
19
20
21
22
23
24
25

Page 78

Atkinson-Baker Court Reporters
www.depo.com

REPORTER'S CERTIFICATE

1

2

3

4      I, SHARON GARDZINSKI, CSR No. 3915, Certified

5   Shorthand Reporter, certify;

6      That the foregoing proceedings were taken before me

7   at the time and place therein set forth, at which time

8   the witness was put under oath by me;

9      That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by

12  me and were thereafter transcribed;

13     That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15     I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18     I declare under penalty of perjury under the laws of

19  Michigan that the foregoing is true and correct.

20     Dated this 18th day of February, 2016.

21

22

23  SHARON GARDZINSKI, C.S.R. No. 3

24

25



**A**

AA0135D 1:25
abdomen 47:7
abided 61:3
ability 29:19 31:1 32:24
  55:20
able 8:7 46:9 55:14 58:15
  59:13 60:9 65:7
absolutely 40:7 75:7
abundantly 49:22
Academic 70:7
accident 52:14,19
accidental 51:9 52:20
accounted 49:22
achieve 60:5
acting 55:16 67:24
action 77:17
active 14:23 28:1,8 30:3
  59:17 73:22 74:7
activities 22:16 49:2,2
  49:11,20 50:19,21,22
  50:23
activity 64:25
actuarial 60:17,18 61:12
  61:18 65:9
actuary 60:8
acute 29:24 55:18
Ad 1:4 2:4
addict 64:19
addiction 27:4 57:11
  60:24 61:1,25 62:1,6,8
  62:16 64:22
addicts 57:8
addition 67:14
additional 66:14
admit 63:6
adverse 15:10
affect 12:17 13:18 65:8
  71:23 72:1 73:1,5
afforded 31:25
afraid 75:13
African-American 25:5,6
  27:13
age 61:5 63:17
agent 61:17,18
agitated 14:23,25 15:5
  29:24
ago 70:7
agree 48:4 52:18 60:11
agrees 48:4
ahead 63:4,10 75:10
air 38:20 56:4 58:15
airline 66:6
airway 8:7 34:3,5 55:20
  56:12
al 1:9 2:9 5:11
Alan 41:4
alcohol 57:21
alive 30:3 60:25 75:20,21
alleged 29:7
allow 22:19 72:12
alteration 5:25
altercation 6:1,20 74:14
ambulance 17:17
American 51:2,4 53:1
amount 18:6 19:23 23:12
  28:6 38:7 41:13 42:23
amounts 29:13
Angeles 70:11,12
answer 9:5,20 10:21
  11:7 16:25 35:25 36:15
  37:4 43:1 65:10,16

answered 9:19 37:7
  71:19
answering 9:21 36:4
anymore 63:19
anytime 46:1
apparent 33:8
appear 53:16
applicability 42:11,17
applicable 39:25 41:17
  42:13,21 43:3,5 66:3
application 22:15 33:19
  39:8 41:13
applied 6:17 9:14 10:22
  10:23,24,24 11:19,25
  11:25 12:2,7,8,13
  13:13,15,17 14:17 15:9
  18:19 20:13,16,20,23
  21:21 30:5 31:3,11
  32:16,18,23 34:15
  39:11 40:8 45:7 46:1
  48:1 66:13
applies 19:11
apply 45:3 47:8
applying 7:12 32:14
  50:16
approximately 8:21
area 12:11
arguing 10:3,12
Argument 19:25 23:7,21
  59:2
argumentative 9:18 10:1
  10:15 12:19 15:19 17:1
  36:3 75:8
arm 8:5,10 11:14,15,16
  12:4 34:15 55:21,25
  56:1,23
arrest 15:12 21:5,8 29:9
  29:13,15,16,17 35:14
  43:5,16 60:1
arrested 75:5
arrived 32:1 55:17
arteries 8:21,22 31:11
  34:13,24
artery 8:13 34:14 55:23
article 39:13 40:11 41:22
  52:23 53:5,11,14,24,25
  54:4,4,6,7,11,21 70:9
  70:13,14,16,17,17,22
  72:12
articles 39:22 40:24
  42:20,22 43:1,3,6 53:9
  53:23 57:13,14,16 58:4
  70:16
aside 66:17
asked 44:1 60:25 75:4,19
asking 33:6 36:4 61:11
asphyxia 7:19 8:1 9:4,15
  31:15,15 35:5,10,10
  36:8 37:14,15 39:9,12
  40:21 41:12 47:25
  48:20,22 48:17,19
  50:19 73:2
asphyxiated 7:22 33:18
  33:19 34:21 75:20
asphyxiating 75:5
asphyxiation 6:9,11,14
  7:2 11:5,6 31:21 32:5,9
  32:10 33:9 35:17 36:10
  42:24
asserting 41:11
associated 35:5
association 51:18 52:1,5
assume 13:4 30:14

62:21
assuming 12:1 14:14
assumption 19:17,22
  20:5
ATKINSON-BAKER 1:20
attack 49:3,4
attention 32:12
attorney 77:16
attribute 24:21
attributing 49:19
autistic 43:15
autopsies 28:10 47:12
autopsy 24:7 26:12
  27:24 28:4 32:7 33:8
  38:23 39:3 60:9,10
  68:23 69:2,3 73:15,16
availability 22:10 31:4
available 73:9
Avenue 2:18
aware 14:1,2 26:12,13
  27:14,16,18,21 40:20
  54:13 58:19 59:10
  67:15

**B**

B 17:5,8 41:4 42:7
back 6:1,18,24 7:3,13
  8:12,22 9:13 10:18,23
  18:11,13 19:1,7,8,24
  20:14,15,17,20 30:5
  39:8 42:24 44:11 45:3
  45:7,11,13 46:1,6,8,10
  46:15 47:18 48:2,8,13
  50:1,2,18
balcony 57:1
Barber 1:5 2:5
base 35:9,16
based 11:13 19:16 20:5
  22:8 28:12 35:10 40:12
  64:25 65:8
basically 49:3
basis 12:16 15:7,23 33:7
  44:11 46:23 62:21
  64:24
bathroom 50:7
beginning 53:18
behalf 2:17
believe 7:20 9:13 12:12
  16:12 18:12 33:24
  42:12 44:23 45:1 55:10
  70:25 71:4,20 74:21
benefit 24:9 64:4
BENJAMIN 3:3
Benzoylecgonine 28:1,5
  28:8
berserk 56:3
better 63:2
beyond 9:1 60:16
biceps 8:6
big 54:14 70:18
bill 66:13
billed 66:15
bit 8:18
blood 8:15,15,20,25
  23:1 23:12 27:20 28:7
  28:13 29:1 32:13 38:7
  38:20 73:22
blue 35:7,11,12
bnisenbaum@hotmail....
  3:6
board 52:2
bodies 55:9

body 6:19 12:8 16:5 19:2
  21:22 22:12 26:14 33:8
  44:15 45:4 46:17 56:19
  56:19 59:25 61:19,20
  68:25
bone 33:25
bony 45:19
book 54:17 57:15,19,23
  58:7 70:6,7,8,15 72:15
  72:17
books 25:21 57:15 72:13
borderline 70:2 71:3
Boulevard 1:21 3:9
boy 43:15,21,23 64:16
brain 8:14,15,20,25
  13:21 16:4,4,7 21:18
  21:23 22:5,11,13 23:13
  31:4 32:13 36:9,12,20
  36:21,22,25 37:2,3,9
  37:19,22 38:1,2,3,6,8
  64:15
branch 72:19
Brand 1:21
break 34:8,8,9
breathe 8:7 29:19 31:1,2
  32:24 38:20 43:25
  48:16 55:7,14,20
breathing 10:25 12:14
  47:2
bringing 44:7
broken 32:19,20,21
  33:25,25 34:4
brought 17:19,20 31:25
  46:19
bruising 39:4
burned 57:4,4
Burris 3:3 67:8
Burris' 67:13
business 47:17

**C**

C 3:1,9
C.S.R 77:23 78:18
CA 3:5,10
California 1:2,22 2:2 3:9
  70:12
call 30:24 51:9 52:11
  53:4 71:15,17 73:7
  74:8
called 43:12 52:14,15
  54:1 56:4 70:7,10
  72:13
calls 31:21 65:20
cancer 61:20
cardiac 15:12 21:5,8
  27:10 29:9,12,15,16,17
  35:13 60:1
care 70:24
carried 46:17,19
cartilage 34:1
case 1:8 2:6 5:10,13,22
  8:5,10 9:3,8,18 10:4
  13:13 27:19 31:5,12,25
  32:13,25 35:1,18 37:3
  38:10 41:9 42:9 43:12
  43:13,19 66:10,17,24
  68:17 69:21 73:1,21
cases 36:8 54:4 63:14
  67:5,9,14,18,22 68:4
  68:18,18
cause 6:11 7:19 8:1 9:3
  9:14 22:3 25:3,8 26:22

26:25 27:4 29:9 30:24
  31:13,14,15,22 35:20
  39:8,12 40:21 41:1
  42:24 47:1 49:10 50:10
  51:10,13,14,15 52:10
  52:17,20 72:10 73:1
caused 6:4,8,13 10:18
  11:4,4,5,6 12:11 13:20
  19:14 27:10 33:2,18
  41:12 44:23 48:19 49:2
  49:3,12,16,17 50:19,20
causes 35:13 62:15
causing 10:25,25 29:12
  31:9 48:22 73:8
central 5:20
certain 29:13 42:23
  56:21 68:25
certainly 56:11
certainty 32:4
Certificate 43:18 77:1
CERTIFICATION 78:1
Certified 77:4 78:1,7
certify 77:5,15 78:8
Chan 39:19 40:3,5 41:7
  41:12,25 42:3,9 43:7
  51:23,23
Chan's 41:3,22
change 35:4 71:9,12
changes 37:16
chapter 57:19,20,21 58:8
chapters 57:15
charge 65:23,25 66:2,3,4
charged 66:9,11,12
chart 60:17,18
cheating 71:13,13
check 36:18 37:5
chest 6:19 7:3 10:23
  11:2,11,14,22,23 12:10
  12:13,23 19:3 30:6
  32:15,16,19,23 33:1,19
  39:12
chips 71:17
chronic 26:22
Ciba-Geigy 72:16
circumstances 29:10
  30:23,23 31:19,20
circumstantial 31:16
  35:17
civil 67:19,25 68:1,16
claimant 67:24
claims 67:19
Clair 1:18 2:18
clarify 38:15
clear 9:21 45:22
clearly 10:9
co-author 54:1
coached 10:5
coaching 10:3
cocaine 13:24 27:11,19
  27:22 28:14,16 29:1,9
  29:12,18,21,23 30:8,11
  30:15,17,24 31:6,7,8
  31:21,22,24,24 33:3
  50:11 52:8 55:5 60:24
  61:25 62:1,4,4,6,8,15
  63:19 64:19 65:15
  73:19
cognition 57:11
coincidence 17:11
Colindres 43:12
colleague 39:15
College 51:2,4
color 35:4

coloration 35:8
come 6:3 22:1 33:8 63:7 63:9
comes 29:12 45:11 66:14
coming 56:24
commencing 2:19
comment 53:24
company 72:14
complaining 45:23
complaints 73:25
complete 69:8
complications 64:16
complimented 7:14
compress 8:11 34:15 40:15
compressed 8:14 31:10 34:24,24 43:22,25 50:8 58:14
compresses 34:13
compressing 8:8
compression 7:12,23 22:20 40:20 42:23 43:16,24 44:10,14 48:23 49:9,21 50:1,2,2 50:17 55:23 56:4 58:18
compressions 40:25
concentration 38:21
concern 46:14
concerned 47:25
conclude 16:6
conclusion 6:3
condition 17:19 26:13 59:25 61:19
conditions 25:2 38:19
conducted 40:7 41:17 43:4 57:10
confronted 56:25
conjunction 9:22
Conley 3:8,9 4:5 5:6,9 10:2,9,10,13,16 11:7 11:10 13:1 15:19,22 16:9 17:2 20:11 23:17 24:1 26:4,7,9 33:13 36:7,16 38:14 42:19 47:22 49:6 59:11 65:5 65:21 74:21 75:8,24
conscious 58:8
consciousness 8:18 13:11,23,24 14:8,14 15:3,24 16:3,8
consequence 15:24 22:14
consider 14:20 26:20 32:23 61:21 64:7
consideration 44:8
considered 25:18 44:22 70:2
considering 22:12 28:15
constitute 78:9
construed 41:17 71:16
consumed 57:1
contained 28:12
contains 70:15
context 9:18 58:9
contingency 66:21,25
continued 15:4 58:24 63:11
continues 64:11
contradict 24:6
contrary 45:13
contribute 72:11
contributed 6:10 9:9

45:2 48:19 71:1,5,21
contribution 31:22,24
controls 21:23
convert 51:9
copies 25:25
copy 42:5 78:1,10
cords 58:15
coroner 52:14,18,18
coroners' 28:9
corot;d 6:1,17,23 7:2,13 7:23,25 8:3,4,9,13,20 9:2 10:21 12:23 13:3,5 13:7,9,11,25 14:6,9,15 15:1,25 19:1 20:22 21:1,7,10,12,19,21 22:2,15,17,20,22,24 23:4,18 30:5 31:11 32:14 33:2,20 34:12,13 34:14 45:10 48:23 49:8 49:21 50:1,9,16 55:23
correct 5:13 6:4 7:19 8:1 9:6 11:14 12:18 18:1 18:13 20:7 44:18 48:3 48:24 51:4 56:16 59:1 60:17 62:24 63:13 64:10 65:9 71:6,10,24 77:13,19 78:10,14
costs 69:7
couple 70:6
coupled 7:11
courage 57:2
course 14:15 29:16 43:7 55:2 57:16 66:6 71:7,7
court 1:1,21 2:1 26:1 39:24 42:4 43:8 66:5
courtroom 42:1
CPR 17:16
craving 63:19
crazy 55:7,16
create 71:8
creating 61:12
Creek 3:10
criminal 64:25 65:2
criticism 69:1 72:1,21 73:4
criticisms 73:14 74:4
criticizing 49:1 74:2
CSR 1:24 2:20 77:4 78:7
culminated 49:14
Curriculum 48:10

**D**

D 4:1
date 66:9
Dated 77:20 78:15
Daubert 39:24 40:6
day 28:20,22 40:5 66:5 77:20 78:15
dead 14:5 16:23 17:21 29:16 46:16 60:3
dealing 71:2
death 6:5,8,10,11 8:19 10:19 11:4,5 12:12 19:14 27:8 30:24 31:9 31:13,15,16,23 35:20 43:18 44:23 49:10,14 49:17 50:10 51:10,10 51:13,14,15 52:10,11 52:17,21 54:5,22 57:4 57:4 71:6,22 72:11 73:1,8
decedent 1:5 2:5 5:22

decided 23:5
decision 42:2
declare 77:18 78:12
DEFENDANT'S 4:9
defendants 1:10 2:10,18 3:7 5:10
defense 68:11,16,20
definitely 75:24
definitively 70:3
degree 32:3
delirium 51:1,1,5,7,16,19 51:22 52:7,15,17,20 54:11,23
delusional 56:11
delusions 56:7,10
Demayo 51:21
demeanor 59:16
demonstrate 39:7
department 39:17,22
depending 66:23
depends 29:10 30:19,20 30:20,22
deposition 1:16 2:17 23:23 42:9 66:2,11,17 78:10
deprivation 38:17
deprive 16:3
depriving 8:14
describe 20:19
described 9:3 20:14
description 4:9 22:19
designated 5:10
despite 58:25
determination 28:5 72:25
determined 20:23 21:5 31:16 40:4 72:24
determining 23:3
develop 64:13,14,15
develops 63:15
deviate 35:19
diagnosis 15:10,16,17 35:21 51:1,8,16
diaphragm 45:12 46:25 47:8 48:14,15
diaphram 47:9
die 23:16 50:7 56:14 62:8 63:1,6 64:18 72:11
died 12:21 15:12,13 29:15 30:14 32:2,8 36:23 43:15 59:6 61:6 74:15,19
Diego 39:18 43:2
dies 32:12
difference 72:22
different 29:11,11 33:6 51:7,7,8,9,17 57:15 60:13,19
differently 41:5
difficult 32:7
dimensions 46:19
direction 35:19
director 47:12
directors 52:2
discoloration 35:7 36:9 37:9,25 38:2,17
discuss 13:2 41:8
discussion 47:24 48:17
dismiss 73:10
distinguishes 42:5
DISTRICT 1:1,2 2:1,2
divert 33:3 52:11
doctor 9:10 17:11:21

15:23 26:21 64:17 71:14 75:3
Doctor-- 73:17
doctors 26:16,18 63:5,5
documents 36:19 62:12
doing 30:13 31:17 54:17 54:18
doon 56:5 57:3,6
door 39:14 50:6,6
dose 30:20
doubt 24:10
Dr 5:7 9:19 27:23,25 39:16,17,19,20,21,23 40:3,3,3,5,12,24 41:3,7 41:7,8,12,22,24,24,25 42:3,9 43:7 45:14,15 47:21 48:3 51:21,23,23 51:24 53:25 54:3 70:10 73:18
dread 55:4 58:12
dreamt 69:20
drug 26:22 57:8,11 58:2 64:9
drugs 57:17,19 58:9
due 24:25 25:1,2 29:18 32:14 35:13,13 62:15
duly 5:4
duration 14:2
dusky 35:7 38:3,8
dying 59:18

**E**

E 3:1,1 4:1
earlier 43:11 59:4
EASTERN 1:2 2:2
edema 37:3
edition 54:18,19 57:22 72:15
editor 51:22 52:3
editors 53:20
education 22:9 48:10
effect 15:10 23:4 28:7 30:2,2 41:18 57:10 74:8,9
effected 43:20
effective 23:19
effects 29:12
effort 17:15
Eighth 72:15
either 8:2 28:19 30:9 60:5
electrocardiogram 15:17 17:14
electrocardiograph 17:10
element 48:12,13,15
eleven 60:4
eliminate 26:25
eliminated 8:16
eliminating 16:6
emergency 39:17 51:2,5 57:25
emotional 58:5
emotions 55:4
emphasize 25:9
employee 77:16
EMTs 17:13 46:21 59:24
encounter 11:23 56:8
English 45:16
enlarge 69:19
enlarged 24:3,5,8,9,12 24:13,16,18,23 25:18

27:7 69:23,25 70:2,4
70:25 71:5,21 72:10,15
73:8
enlargement 24:4,18,21
25:4,8,10,16 26:22
27:1,5,11 60:22 61:23
70:13 72:25
enlargements 24:23
entire 9:16,17,25 13:10
13:10,15 22:12
episode 38:11 59:19
especially 73:8
ESQ 3:3,9
essence 47:19
established 70:3
estimate 21:13
et 1:9 2:9 5:11
evaluate 60:9
evening 28:19,21
event 30:23 31:20 71:4
events 9:22,23,23 31:20
56:21 64:4
eventually 63:1,7 64:6
evidence 31:17 62:10
evident 22:22 34:1,1
exactly 31:17 42:10
68:13
exam 73:12 74:6
examination 4:3,5,6 5:5
24:11 33:9 37:7,17
71:9,23 72:23 73:9
75:1 77:11
examiner 43:17 68:13
Examiners 51:19 52:5
example 34:12 56:22
exception 48:9
Excerpt 4:11
excess 24:24
excited 50:25 51:1,5,7
51:16,19,22 52:7,15,17
52:20 54:11,22
exercised 49:23 56:4
Exhibit 26:4,8 42:7
exhibited 49:13
EXHIBITS 4:8
exist 43:6 54:11
existed 25:10 40:11
exists 71:5,21
expect 37:13 73:20
expectancy 60:13,13
62:18 64:6,25
expected 23:11 60:16
63:12 64:10 65:8
expenses 66:7
experience 19:9 22:9
48:10
experienced 56:6,9
experiencing 55:3 56:7
experiment 43:14 44:4
experimental 42:25
experiments 39:11,15,19
39:20,23,25 40:6,14
41:16 42:15 43:4
expert 5:3 66:1 67:24
expertise 60:15 61:11
explained 9:19,20
explanation 36:5
express 28:13 35:23
expressed 60:6
expressing 46:13
extent 25:7
eyelids 34:18,19

**F**

face 34:19,20 35:8,11,12
46:20 50:8 73:25
facetious 23:15
facility 58:2
fact 21:10,17 25:9 29:18
29:24 44:16 45:7,24
53:18 55:6 58:24 61:22
factors 27:5 30:21
facts 30:16 61:18 64:7,8
factual 15:23
failed 17:15
fair 30:11
fall 71:18
far 25:22 30:25 31:4,5,12
31:12 66:17 68:23
fatal 30:2,17
fear 55:3,15 56:5 57:3,5
58:11
features 48:8
February 1:19 2:20 77:20
78:11,15
Federal 39:24 42:4 43:8
fee 66:4
feel 56:11
feeling 55:25 58:11
fees 67:3
felt 21:20 56:13
females 25:7
fibers 69:22
fictitious 35:20 51:15
field 40:1
Fifth 54:19
fight 50:5 58:24
fighting 14:23,25 23:6
59:13
FILE 1:25
final 66:13
financially 77:16
find 37:16 47:17 69:18
finding 51:8
Fine 49:7 50:24 73:11
finish 43:10
finished 14:3
fire 56:23,24,24
first 5:3 23:10 48:9 53:19
53:19 59:5 60:8 69:17
70:20
Fishbein 70:10,19,19
Fishbein's 72:12
five 67:10
flames 57:1
flatline 15:18
flatlined 20:23
flatlining 17:10,14
Floor 1:21
flow 5:15,15,20,25 13:21
21:18 32:13
fluid 37:3
focal 32:12 39:3
follows 5:4
force 5:21 6:4,13,15,16
14:18 58:25
forces 14:17 15:8
forearm 8:6
foregoing 77:6,13,19
78:9,13
forensic 32:7 47:13 53:1
56:18 61:15 70:8
forensically 33:10
former 6:21
forming 14:13

forms 15:10
forth 77:7
found 27:1 56:22 59:25
foundation 75:9
Fourth 54:18
Frank 54:2
front 41:3
fruitful 72:20
funny 30:4 47:21
further 45:18 65:19
77:15

**G**

G-e-i-g-y 72:16
gaging 60:16 64:24
Gardzinski 1:24 2:20
77:4,23 78:7,18
Geigy 72:13,14
gene 27:12
genetic 27:5
getting 21:22
GIBBONS 3:8
give 25:15 42:5 69:8
given 18:5 20:21
giving 24:9
Glendale 1:22
go 11:22 13:20 21:19
22:25 23:13 26:14
32:19 33:2 41:7 45:14
45:16,17,17,18,18,19
45:19 47:17,20 50:25
55:7,7,8,8 56:3 64:17
66:5 74:1 75:10
goes 37:19 38:21 40:1
41:18,19,20 42:12,17
43:5 63:4,24
going 9:1 21:7,20 32:19
33:3 36:2 39:13 40:5
47:9 56:14,14 61:18
64:18 71:23 72:19
good 7:24 16:7 30:7,8
54:16
gotten 59:18 74:14
government 68:6,7
grams 24:17 25:17 36:20
37:2,3 62:15 71:2 72:8
grayish 35:7
Greater 2:18
Gregory 70:19
ground 18:18 19:12 20:3
20:10
group 41:17 43:2
Guardian 1:4 2:4
guess 18:8
gurney 14:5 16:23 46:18
46:20
guy 30:13 43:24

**H**

habit 62:2
half 28:18
half-life 28:16
hand 8:11,11
happen 38:9 61:7
happened 7:10 9:22,23
14:10 19:4 30:3 42:1
45:25 59:19 63:25
75:11
happening 59:10
happenings 35:18
happens 40:8,16 50:20
63:14 66:24

happy 63:3,10
harm 41:1
harmless 52:11
hate 56:2
healthy 14:21,22 60:14
60:20 64:5
heard 74:9
hearing 39:24 40:6
heart 24:3,5,8,12,15,16
24:24 25:3,8,10,17,18
26:23 27:1,5,7 49:3,4
60:22 61:23 62:14
69:22,25 70:1,3,14,18
70:25 71:5,21 72:7,10
72:18,25 73:7,13 74:6
heavy-duty 12:15,17
held 8:3,5,17 13:9 21:1
21:12 23:11 59:16
Hello 75:11
help 50:14
hemorrhages 33:25
34:10,18
hemorrhaging 35:2
38:24
higher 11:25
hinges 50:6
historically 62:11
history 64:25 65:6
hits 19:2
hitting 17:11
hobble 48:18,19 59:13
hobbling 6:2
Hogan 73:18,18
hold 6:17,23 7:13,23,25
8:3,4,8,9,11 10:22
12:23 19:1 20:6 21:1
21:10,12,19,21 22:15
22:17,20,22,24 30:5
32:14 33:2,20 34:12,14
44:14 45:10 49:21 50:1
50:9 51:12 56:14
holds 34:7
home 65:11,14
hope 60:25 63:8
hospital 14:5 17:18
39:18 60:4
hostile 55:25
hotel 66:6
hour 28:17,18,18 38:18
66:4 67:1
hourly 66:20
hours 38:4,5,9,16,18
66:4,14,14,16,19
house 56:23,23
hundred 61:9,10 68:12
hunger 56:5
hypertension 24:22 25:1
25:3,8 27:15 62:11,14
63:12,22,23,24 64:1,5
hypertrophy 24:24 69:24
hypothetical 12:20 33:7
33:12,15 47:5

**I**

idea 11:13 29:6 46:24
identification 26:8
identified 6:13
identify 39:6
iliac 33:25
imagine 8:24
impaired 47:2
impending 56:5 57:3,6

improper 10:1 14:19
33:12,15 65:19,20
inadequate 23:12
inappropriate 9:17
incident 9:24
include 5:24 6:9 58:9
included 57:22
includes 12:22
Incomplete 12:20 47:4
incorrect 33:4 74:6
indicate 33:9 34:2 38:23
39:3 40:14 55:2
indicated 37:11 68:24
indicates 21:2 23:22
27:19 30:1
indicating 33:14
indication 35:1 62:17
individual 12:14 19:9
29:14 30:19 31:8 40:9
44:12 60:20
Individually 1:5 2:5
individuals 7:6
infarcts 64:14
influence 14:22
information 26:17 27:6,9
28:12 35:23 40:2 58:17
58:20,21 64:21
inherited 27:12
inside 40:10
insofar 13:19
instance 9:14
insufficient 8:23
insurance 61:17
interaction 16:15 18:22
50:5
Interest 1:5 2:5
interested 77:17
interesting 42:16,17
interfered 47:1
interference 10:25 29:19
30:25 34:3,4 55:19
56:12
interferes 31:3
interfering 32:24
interrupted 23:23
intoxicated 58:5
intoxication 30:15 31:21
52:8 55:5
involved 39:20 66:21
involving 67:18
Ischemic 36:9
issue 20:10 45:6 50:25

**J**

Janice 54:2,2
jiving 30:16
job 35:23,25
JOHN 3:3
Johnson 41:4 42:3
journal 51:23 52:3 53:1,4
53:9,15,16,19,23,23
Joyce 54:1
Judge 41:4 42:3
judging 19:8
jugular 8:13 34:14
jump 57:2
jumped 57:3
jumping 56:25
justify 13:24

**K**

keel 62:7

kidding 44:2
kids 65:13
kill 40:17 50:11
killed 48:6
kind 11:1 17:17 35:13
61:20 73:10
kinds 58:25
knee 6:1 10:23 18:13,14
19:18 20:7,12,14 39:8
39:11 44:11,14 46:5,8
46:9,15 48:23 49:9
50:17
knock 39:14
know 8:2 9:2,8 13:7
16:19,21 17:4,25 18:5
18:20 19:5 21:5,9
22:18 23:18 24:11,11
27:3 28:2,10,21,24,24
29:4,6,8 31:14 32:15
36:12,22 37:1 39:5,10
43:17 47:10 50:22
51:21 53:13 54:7,13,15
58:17 59:6,7,18,21,23
62:12 63:14 64:23 65:2
65:3,3,10,11,12,13,13
65:16,17 66:18 67:10
67:20 68:21 69:7,8,18
69:22 72:3,5,6 73:20
73:23,24 74:1
knowledge 51:3 56:20
73:17
known 28:1 62:6
knows 61:8 65:15

**L**

laboratory 41:19 42:13
42:15
lack 22:25 32:12
lacking 58:22
Lacks 75:9
lady 54:3
Laramie 41:4 42:4
large 25:6,6 32:10 72:14
LAW 3:3
laws 77:18 78:12
lead 35:18
learn 22:6 65:6
leaves 32:11
leaving 66:17
left 7:9 8:11 19:2,3 24:15
24:25
legs 45:20 64:14
length 37:22 55:8
lesser 25:7
let's 16:10 24:2 32:1
50:25 63:16
level 27:21,22 29:21 38:6
38:7
levels 29:23
library 25:23
life 17:15,15 60:7,13,13
60:16 62:17 63:4,10,13
64:6,24 65:8,12
lifespan 64:1
lifetime 47:11
liked 69:22
likes 65:13
limited 60:12
limp 21:2,19,20,21 22:14
22:25 23:13 33:2 59:15
limpness 23:20,22
line 9:16,25 23:5

lining 34:19
Lion's 8:24 22:11
list 53:20,22
listening 10:7,9
Litem 1:4 2:4
liter 28:6 29:1,2 30:18
literature 24:17 25:13,15
    25:16 39:10 40:19
    46:24 70:4 72:9
little 8:18 13:16 22:13
    23:6 37:23 64:14 73:17
live 63:10
lived 61:5,8,9 75:6
local 32:12
long 8:3,18 13:10,13,15
    16:8,12,20,25 17:3,25
    18:19 19:4 20:22,24
    21:6 22:6 37:15,25,25
    38:4 53:22 57:19 62:6
    62:6
longer 61:9
longevity 64:10
look 5:18 25:22 32:19
    57:13 63:2 69:19
looked 24:13
looking 38:8 65:22
looks 38:3
Los 70:11,12
lose 13:11
lost 8:18 13:22,24 14:8
    14:14 32:1 42:8
lot 28:25 30:21 40:17
    61:9
Lots 13:11 63:24
love 56:1
low 27:21 29:23 38:6,6
    38:20,20,21 44:22

___ M ___

M.D 2:17 4:2 5:2 70:19
    70:19 78:11
Mack 2:18
magazine 40:4
main 6:10 25:3 62:7
maintain 17:15
maintaining 16:7
maintains 28:1
major 8:12,24 44:21,21
    48:12,13,14,15
majority 34:6
males 25:7
man 12:21 22:9 65:17
man's 19:14
manifestation 32:11
    60:12
manifestations 14:20
    49:13
marijuana 57:22
mark 42:7
marked 26:4,8
markedly 72:10
markings 32:11
married 65:12
material 69:19
matter 40:9 66:24 72:2
maximum 19:12,23
mean 6:9 10:7 13:21
    16:17 23:14,16 34:16
    38:3 46:3 53:7 66:22
    73:20,23
meaning 40:7 54:15 62:5
means 8:4 34:23,25

67:21
measured 24:14 72:7
mechanism 44:19
mechanisms 7:1 44:13
    44:17 48:22 49:8,12,16
    49:23
medical 26:11,15 32:3
    35:16 39:7 40:19 43:17
    46:23 51:18 52:5 53:2
    57:7 63:9 68:13
medically 14:19 30:7
    33:4 69:23
medicine 53:2 56:20
    61:8
mentioned 11:15
metabolite 28:2,8 29:3
    74:7
metabolites 73:21
method 7:5 31:3
Miami 42:9 43:13,14
Michael 1:6 2:6 70:19
Michigan 1:18 2:19
    77:19 78:8,13
microscope 69:18
microscopic 24:10 37:7
    37:16 71:22 72:23 73:9
    73:12
microscopy 69:5,8,14,17
    74:5
mildly 72:24
milligram 29:2
milligrams 28:6 29:1
    30:17
millions 30:10 62:3
mind 61:4
minimal 24:19 25:11,16
    25:17 60:23
minimum 18:6
minor 1:4 2:4
minute 13:10,10,12,15
    13:18 21:10,12,15,16
    22:24 38:22,22 43:24
minutes 14:3 16:17 18:3
    18:21,22,23,24 28:18
    38:10 59:5,5 60:4
miracles 61:7
misleading 30:16
Misstates 19:25 20:8
mistake 69:11 72:5
mistaken 34:2 70:12
mistakes 69:3,10
Mister 64:8
Mitral 25:1
moderately 36:25
Monday 2:19 78:11
money 69:7
motion 15:21
mouth 29:5,6
Move 15:19
Munoz 12:7
muscle 48:15 69:22
muster 19:10
myocyte 69:24

___ N ___

N 3:1 4:1
name 9:8 51:9 52:11
    70:14,17 73:18
named 52:24
National 51:18 52:4
natural 51:14,14 52:10
    52:17

necessarily 24:6 32:16
    63:15
neck 8:5,11,13,23 23:11
    34:7 44:13 50:1 55:25
    56:1
need 22:5 38:3,4,9,16
    52:9,10,13 68:13
needed 21:22
needs 22:13
never 7:20 24:14 51:6
    57:2 68:7 69:18,20
    74:9
new 58:7
Newman 39:21 40:3
    41:24
news 45:15
nice 70:13
Nichelini 1:9 2:9 5:11
nine-pound 54:15
Nisenbaum 3:3 4:6 9:16
    10:5,12,15 11:9 12:19
    15:21 16:1 17:1 19:25
    20:8 23:7,21 33:12,15
    36:2,11 38:12 42:7
    47:4 49:5 59:2 65:11,19
    67:6,8 74:24 75:2,12
    75:15,16,23
Nisenbaum's 66:12
nonresponsive 11:8
    15:20
nonsense 45:17 51:22
normal 36:21 37:2
normally 38:19
North 1:21 3:9
notes 77:14
notion 73:10
number 4:9 5:21 25:6
    67:9

___ O ___

O'Halloran 52:24 53:25
    54:3
Oakland 3:5
Oakport 3:4
oath 77:8
obese 46:24
object 10:1,2 11:9 36:2
objection 9:16 10:2,3,15
    12:19 16:1 17:1 19:25
    20:8 23:7 36:11 38:12
    47:4 49:5 59:2 65:1,19
    75:8
objections 77:10
obligation 71:14
observation 24:2
observations 74:2
observed 21:4 35:1
    47:10
obstruction 32:13
obviously 30:3 75:24
occur 38:22 56:21
occurred 19:5
occurs 8:19
offering 9:6 36:5 48:18
    61:15
office 41:8 66:3,11,12
    67:2,6,7,10,14,20
officer 12:6,7 19:17,23
    20:6,10 43:20 52:2
officers 5:21 10:22 14:24
    15:1,15 16:21,22 22:2
    43:22 44:1 49:23 50:16

offices 3:3 47:14
Oh 68:1,21
Okay 6:7,12 7:25 9:10
    13:2,13 14:25 16:10
    17:25 18:10 19:15
    20:18 21:3 24:20 25:12
    25:19 26:6,19 27:17
    28:11,23 29:8,20 37:24
    39:6 44:8,9,16 46:22
    47:23 48:22 49:1,15,19
    50:24 53:5,11 54:20,24
    55:1 56:7 58:23 65:18
    66:20 67:4,12,17,23
    68:9,14 73:4,11 74:10
    74:20 75:13,22
old 30:13 63:17
omit 14:18
ones 49:22
opined 49:17
opinion 6:12 9:6 11:13
    11:17 12:16 13:4,18,19
    14:13 19:16,22 20:9
    21:6,24,25 22:1,8
    24:16 28:13 33:5 35:9
    35:22 44:11 48:5,18
    55:2,3 56:14 60:6
    61:15 65:20 71:9,12,24
    72:2,22 73:1,5 74:13
    75:4,7
oppose 15:21
opposed 61:12
opposite 40:23
orange 53:4
order 38:17 75:25
organs 45:13,14,16 47:9
    47:16,17,20
original 78:10
outcome 32:17 73:5
outlive 64:6
outside 17:11 40:9
overweight 47:6
oxygen 16:4,5,6 21:18
    21:22 22:4,10,11,12,25
    32:12 38:8,16,21
oxygen's 31:3

___ P ___

P 3:1,1
p.m 2:19 19:6 76:1
packet 29:7
page 4:3,9 5:18 6:13
    25:23,24 48:8 52:23
    70:15
pages 4:11 25:19,25
    26:5 48:9 53:19 54:6,7
    54:8 78:9
paid 66:23,24,25 67:1
pain 55:3 58:4,8,11
panic 55:21
panicked 43:25
panicky 55:8
papers 51:23
paragraph 5:20 6:13
paralysis 48:14
paralyzed 48:14
part 20:12 49:25
particular 53:11 60:15
    71:22
particularly 20:19
parties 77:16
parts 68:25
pass 22:3 58:15

passed 21:7
pathologically 24:12
pathologist 24:6 26:20
    27:23 28:4 32:8 52:15
    56:18 61:16 70:10,21
    73:7,20
pathologists 47:13,13
Pathology 53:2 70:8
patient 65:4 71:13,14
patients 63:1,6 64:5
peer 53:7,10,11,17
peer-reviewed 39:6
    54:10
pelvis 11:23 45:19
penalty 77:18 78:12
people 13:11 29:11
    30:10,11 38:19 39:11
    40:18 46:24 53:22
    55:21,24 56:3 58:6
    62:3,5,7,8
percent 8:15,21,22,23,24
    16:4,5 68:12,21,22
percentage 25:6 44:22
    67:23
perfectly 10:9
performed 20:6 50:16
period 21:6 48:1 59:9
perjury 77:18 78:12
person 9:23 11:3 29:17
    32:8 55:7 58:14 60:14
    63:15,16
petechial 33:24 34:10,16
    34:17 35:2
pharmaceutical 72:14
pharmacologically
    73:22
phenomenon 33:21,22
physical 5:25
physician 22:6 62:25
    64:13
Physicians 51:2,5
physiologically 42:16
picture 69:9
pill 63:18,23 64:3
pin 18:17 19:12,19 20:3
pinned 20:9
pinpoint 34:18
place 7:6 13:9 77:7
placed 16:18 17:6 46:20
    46:25
plain 45:16
plaintiff 3:2 67:24 68:4
    68:11
Plaintiffs 1:7 2:7
play 45:11
played 6:20 7:16
plays 44:20 51:21
please 14:12
plenty 63:8
plus 66:5
point 7:4 14:7 17:4,5,7,8
    17:16 23:5 29:1,2
    30:17 44:17 55:9 58:10
    59:12 62:2 73:8 74:22
police 5:21 7:6 16:15
    17:20,23 18:22 29:25
    31:25 32:1 39:13 40:8
    41:18,20 42:18 43:5,14
    46:17 49:11,20 50:19
    50:21 55:9,16 58:25
    68:8 74:14,17 75:4
posed 43:1
position 6:22 7:4,5,8,9

7:14,15,18,21,22,22
16:11,13,14,18,19 17:3
17:7,8,22,23 18:1,3,7
44:17 45:2,6,8,9,24,25
45:25 46:3,5,7,14,25
47:20,24 48:6,12 55:11
**possibility** 56:25
**possible** 26:25
**postmortem** 26:21
**potentially** 29:22
**pounds** 40:16,20 41:1,14
**practice** 57:7
**pre-mortem** 26:11
**prepared** 74:5
**present** 73:22
**preserve** 17:15
**press** 18:14,17
**pressed** 6:24
**Pressing** 18:14
**pressure** 6:17 7:2,13
9:13 10:18,23 12:23
18:11,19 19:1,7,8,9,11
19:17,23 20:2 30:5
31:11 32:15,15,18,22
33:19 34:15 45:3,4,5,7
45:11,12,12 46:1 47:8
47:18,19 48:1,7,13
**pretty** 30:14
**prevails** 27:12
**primarily** 6:9
**primary** 6:21 7:1
**prior** 26:14 27:8
**probably** 9:9,11 15:2,13
16:2 25:3 28:15,19
29:5 30:11 47:11 54:22
59:7 62:2 67:21 68:3
**problem** 70:18 71:8
**problems** 25:1,2
**proceedings** 77:6
**process** 8:16 13:25 14:8
54:12
**profused** 38:6
**progression** 64:4,5
**prohibited** 68:8
**prominent** 33:14
**prone** 6:22 7:4,5,8,9,14
7:15,18,21,22,22 16:11
16:13,14,18,19 17:3,7
17:8,22,23 18:1,2,7
44:16 45:2,6,8,9,24,25
45:25 46:3,5,7,14,25
47:19,24 48:6 55:10
**pronounced** 24:3 60:3
**proposes** 40:12
**propounded** 77:10
**protuberant** 47:7
**provide** 19:10 20:3 23:12
25:14 49:13
**provided** 18:25 27:23
50:9
**psychiatric** 21:24,25
22:1
**psychiatrist** 22:5 23:1
56:16,17
**psychological** 58:5
**psychosis** 29:25 31:8
55:18
**Publication** 41:7
**publications** 53:16
**published** 40:3 43:2
54:10,14,24 70:9,18,21
72:16
**publishes** 51:23

**pull** 8:12 52:1,4
**pulling** 8:8
**punched** 6:24
**punches** 11:1,2,11,13,19
11:24,25 12:1,8,15,15
12:17,18,24 19:2 30:6
33:1 44:15 45:10 48:24
49:9,22 50:2,18
**punching** 6:2,18 7:3,12
10:24 22:21
**purpose** 55:22 74:1
**purposes** 13:4 14:13
19:22 35:23
**push** 35:19 45:4 47:9
**pushed** 45:13
**put** 16:19,22 17:23 19:7
19:8,17,23 20:2 46:9
47:17 50:8 55:21 77:8
**putting** 18:13 56:1

**Q**

**quality** 54:16
**quarter** 28:19
**question** 9:1 10:14,17
14:6 21:4 23:8 42:14
42:22 43:1 46:12,13
61:4 71:19,20 72:21
74:12,24 75:3,17,18,19
**questioning** 9:17,25
**questions** 35:25 36:4,5
37:8 65:10,17 74:22
75:23 77:9
**quiet** 59:18
**quoting** 20:10

**R**

**R** 3:1
**race** 27:13
**rate** 67:1
**rates** 65:23,25
**read** 14:7 21:14 40:4
41:2 74:3
**reading** 60:16 61:13
70:22
**realizes** 64:16
**really** 10:21 14:16 24:8
51:10 35:9 36:24 37:4
37:17 46:12 51:16
64:17 66:18 70:3 72:8
**reason** 29:14 31:7 52:6
74:17,18
**reasonable** 32:3
**recall** 57:16,17
**received** 66:13
**receives** 8:20
**recognition** 52:4
**recognize** 51:19
**recognized** 51:1
**recognizes** 51:5
**record** 21:2 45:22
**recorded** 77:11
**records** 22:19 26:11,15
59:21
**recovered** 15:4
**recreational** 27:22
**reduce** 63:12 64:10
**reduced** 13:22 15:3,24
16:3 21:18 22:10 38:7
62:17
**reduces** 64:1
**reducing** 16:6
**reenacted** 43:19

**refer** 18:11
**reference** 52:23
**referred** 69:24
**referring** 18:12
**regained** 59:16
**regardless** 71:17 73:5
**regards** 54:16 73:19
**rehab** 58:2
**related** 57:17
**relative** 77:15
**relatively** 28:16 59:9
**released** 44:1 56:15
**relinquish** 62:2
**remainder** 11:7
**remained** 61:3
**remaining** 22:15
**remember** 10:17 33:20
38:10 59:4
**rendered** 12:10 13:5
42:3
**Rendering** 21:24
**renders** 35:20
**repeat** 75:17
**rephrase** 49:7
**report** 5:12,18,25 13:2
18:12 27:18,23 38:23
39:3 40:13,13 41:3,9
41:11 47:25 48:7,8,17
58:10 60:10,10 65:22
65:24 68:23 69:2,4
**REPORTED** 1:24
**reporter** 26:1 77:5 78:8
**REPORTER'S** 77:1 78:1
**REPORTERS** 1:21
**reporting** 54:4
**reports** 5:20 42:25 69:6
74:3
**represent** 5:9
**republication** 53:6
**request** 11:9
**require** 36:5
**requires** 16:5 22:11
**resisted** 29:25
**respect** 75:3
**respiratory** 32:10 33:22
48:15
**respond** 17:18
**responses** 58:5
**rest** 28:22 29:2
**restated** 10:6
**restrain** 40:9
**restrained** 7:7 14:2
55:22
**restraining** 19:13
**restraint** 6:1 7:2 9:3 13:3
13:6,8,9,11,25 14:3,6,9
14:15 15:1,10,25 20:23
21:7 22:2 23:18 30:1
41:18,21 42:12,18
43:21 48:18,19,23 49:9
49:24,25 50:17 54:5,21
54:22 55:19 59:14
**result** 15:11 72:2
**results** 66:24
**resuscitate** 60:2
**retained** 68:2,16,18
**retainer** 66:3,12
**retired** 68:6
**retirement** 68:16,20
**retrained** 43:15
**review** 26:10 53:22
**reviewed** 53:7,10,12,17
**reviewing** 36:18

**Revised** 72:15
**rib** 32:19,20
**rid** 61:1
**right** 6:2,18,25 7:3,17 8:6
8:10,11 11:2,18 12:8
17:7 18:2,10 20:15,16
20:17 23:2 24:22 25:2
25:22 26:3,22 33:1
35:19 41:10 42:20 43:9
44:15,25 48:24 49:10
49:11 50:24 51:11
52:22 53:3 54:9,19
59:22,24 63:9 66:8
67:13 70:23 72:4 74:10
74:20
**rights** 67:19,25 68:1,17
**ripped** 50:6
**rise** 55:10,11
**rising** 55:14
**ROBERT** 1:9 2:9
**role** 6:20,21 7:16 44:20
44:21,21
**Ronald** 52:24
**room** 39:17 41:7 57:25
**rooms** 39:16
**rope** 56:23
**Rule** 5:12
**run** 55:11,13

**S**

**S** 3:1
**sake** 64:19,20
**San** 39:18 43:2
**saw** 61:20
**saying** 8:2 14:7 38:16
40:19,22,22,24 41:14
41:15,15,16,22 42:20
50:15,20 61:13,13
**says** 40:20,25 41:23 48:3
48:5 60:17 61:13,14
**SBN** 3:9
**scc@gibbons-conley....**
3:11
**scene** 74:18
**school** 22:6
**scientific** 44:4 57:14
72:13
**scientifically** 14:19
**scope** 50:13
**Sean** 3:9 5:9
**second** 53:21
**see** 26:1 36:8 37:13,17
37:19,20,21,23 38:17
50:4 51:6 54:1 59:24
60:11 64:12 65:22
69:14,15,17,20
**seen** 68:24
**self** 22:13
**self-respecting** 73:7
**sense** 9:19 52:16,19
**senses** 63:8,9
**sent** 61:2
**sentence** 43:10
**separate** 22:19
**separately** 66:15
**set** 77:7
**seven** 67:11
**share** 8:24 22:11
**Sharon** 1:24 2:20 77:4
77:23 78:7,18
**shoes** 63:16
**Shores** 1:18 2:19

**short** 28:16 59:9
**shorthand** 77:5,14 78:8
**shoulder** 11:14,16 12:5
**shoving** 31:5
**show** 37:25 38:2
**showed** 15:17
**shy** 62:25
**side** 6:2,18 7:3 8:6,7
10:24 11:2,18 12:8
19:2,3 20:15,16,17
33:1 44:15 48:24 49:10
50:18 68:2,16,20
**sides** 8:12,14
**sideways** 45:14,16,17
47:20
**sign** 43:18
**significance** 40:7
**significant** 7:15 31:5
37:20
**signs** 33:8 36:9 52:18
**similar** 17:19
**simply** 23:5 45:8 60:16
61:12
**single** 9:23
**sir** 5:19 22:4
**situation** 71:3
**six** 67:10
**size** 33:14
**skeletal** 34:2
**skimp** 19:11 69:7
**skin** 34:20 35:4,8
**sleep** 21:20
**slides** 68:24
**small** 37:22
**snorted** 29:6
**somebody** 19:13 23:11
31:10,11 32:11,14
33:18 40:15 55:22
56:22 72:11
**somebody's** 21:13 56:1
**someone's** 39:8
**somewhat** 21:15,16
**son** 70:20,21
**soon** 11:23 16:18
**sorry** 5:25 12:3 14:11
20:4 24:14 27:25 38:13
38:20 53:2
**source** 27:6,14
**span** 60:7,16 63:13 65:8
**speak** 26:16 54:19
**specialist** 61:2
**specific** 17:24 61:11
**specifically** 14:1 30:22
57:17 69:21
**spent** 66:16
**Spitz** 2:17 4:2 5:2,7 9:19
78:11
**SPITZ,M.D** 1:17
**spread** 36:21
**St** 1:18 2:18
**stands** 43:8 44:5
**started** 14:21 16:15
**starts** 54:6 64:13,14,15
**state** 15:3,16:2 17:10
29:24 55:18 78:8,13
**stated** 58:11
**statement** 12:9 16:10
25:14 65:23
**statements** 77:10
**states** 1:1 2:1 41:12
42:10
**stenographically** 77:11
**stimulants** 27:4

stop 12:14 23:6 64:18
stopped 30:4 59:12
strangulations 34:7
Street 3:4 62:7
stretch 23:1
strictly 61:18
strike 15:19
structures 34:2
studies 22:8 39:7 57:10
subdued 55:24
subjected 6:23 12:22
submitted 5:12 54:25
subsequent 40:13
subsequently 15:4,11
substantially 13:17,22
  18:23
success 60:5
Successor 1:5 2:5
suddenly 59:16 64:16
suffer 25:7 47:1
suffered 15:9
suffering 58:8
suggest 60:25
suggesting 12:21 33:24
suggestion 41:6
suggests 45:14 47:21
Suite 3:4,10
supervision 61:4 62:1
  63:9 64:13
supply 16:7
support 25:14 46:24
  73:10
supposed 65:24
sure 21:11 42:6 50:12
  56:1 60:21
susceptibility 29:11
suspect 29:15
sustained 11:1 21:18
  22:10
swallowed 29:7
swelling 36:9,13 37:19
  37:21,21
swollen 36:25,25 37:1,22
  37:23 64:14
sworn 5:4 71:14
system 27:22

**T**
table 25:13 61:13
tables 61:12 65:9 72:14
tackled 59:5
take 12:10 16:22 28:23
  28:25 30:10 62:4 63:18
  63:23
taken 2:17 14:4,4 15:14
  15:14,16,17 16:20 17:7
  17:21 23:16 28:25 59:7
  59:24 77:6,14 78:11
takes 65:15
talk 16:10 50:3 58:13,13
  58:14,16,16,18,21
talked 73:12
talking 25:19 26:5 28:2
  32:5 53:5 68:1 70:1
talks 48:9 72:17
Tanaya 1:4 2:4
Taser 6:1
task 20:6
tell 12:9 14:11 17:6 18:2
  19:5 23:9,15 27:10
  32:8 36:24 47:10 60:10
  60:12 62:13 65:25

69:13,16,25 70:17
telling 10:8 32:3 41:2
  51:25 52:6
tells 64:17 70:4
ten 54:8 66:4,14 68:21
term 52:9
terminated 16:17
test 28:13
testified 5:4 39:24 41:25
  43:8,12 67:18 68:7,10
testify 27:4,24 66:5
  68:11
testifying 40:5
testimony 8:5 10:22 13:8
  13:14 14:7 19:21 20:1
  20:8 41:3,8 42:3 43:7
  77:9
textbook 54:14,14,15,16
thank 5:17 26:7 74:22,23
  75:23
thick 72:18
thickness 24:15,24,25
thing 34:17 37:5,6 44:13
  56:2
things 5:24 7:23 11:3
  17:17 19:4 30:6 34:7
  59:10 63:24 69:20
  71:15
think 7:10 9:20 18:8,24
  21:11 28:2 29:17 30:1
  30:15 39:19 41:5 47:21
  51:3 52:3 53:13,14,18
  54:1,12 57:5,13 63:20
  67:8,15 70:7,14,20
third 1:21 43:22
thought 44:1
threatened 56:13
three 4:11 11:1,19 44:12
  44:14,20,24 48:24 49:8
  49:9,12,16,20 50:18
three-story 57:1
thyroid 33:25
tickets 66:6
time 6:23 13:10,12 14:5
  15:8 17:24 18:5,6,20
  18:25 21:17 22:6 27:7
  27:15 28:9,16 37:20,22
  38:4 40:17 46:15 48:1
  56:12 59:6,15 61:6
  62:6,7 64:18 68:7,10
  74:19 76:1 77:7,7,11
times 32:21 35:25 68:15
  68:19 69:19
today 74:5
told 21:1,9 32:18,22
tools 56:18
top 7:13 44:1
torso 6:19 7:3 10:24
  11:18 12:4,18 20:12
  50:17
total 16:5 67:9
toxic 28:7 29:22,23 30:2
  30:2 74:8,9
toxicology 27:18 69:11
trade 56:18
trailer 14:4 16:22 17:12
  17:20 23:16 46:18
training 22:9 47:12 48:10
transcribed 77:12
transcript 77:13
transient 39:7
trauma 12:22 52:12
traumatic 51:10,13

treat 62:22
treatable 60:23 62:16
treated 27:7,15 57:7 62:1
  62:11,19 63:3 64:22
treating 26:16,18,21
treatment 63:10
tried 17:16,16 58:18,21
  59:24 60:2,5
triggering 7:1
true 77:13,19 78:9,13
try 35:19 62:25
trying 20:6 35:22 38:15
  45:21 50:12,14 55:10
  55:11
tune 24:17
turn 24:2 35:16 39:12
turned 46:16,21
twelve 54:8 66:19
two 15:15 16:4,21 25:21
  26:5 38:18 41:19 43:21
  48:9 53:19 72:13 74:4
type 31:15
Typical 33:14
typically 35:4 36:8

**U**
U 1:17 2:17 4:2 5:2 78:10
unaware 50:23
uncalled 30:15
unconscious 13:5,20
understand 6:16 33:5
  35:22,24 36:1,13,14,14
  36:22 50:12,15 51:20
  52:13 64:2 68:5,19
understanding 9:5 14:9
  52:14 56:19 70:24
understood 41:20 51:6
unfair 33:4
unfortunate 37:6
unfounded 14:19
UNITED 1:1 2:1
University 70:12
unjust 33:4
unknown 74:18
unresponsive 15:16
untreated 63:12
upward 45:13
use 6:12,15,16 26:22
  56:17 57:11
user 64:9
users 57:8
uses 5:21 6:4
usual 30:20
usually 11:20,22 34:18

**V**
V.W 1:4 2:4 5:10
Vague 23:21 36:11 47:4
valid 60:18
value 73:25
valve 24:14 25:1,2
vanished 75:14
various 6:4,21 58:25
  70:16
vascular 33:21,21
vast 34:6
vein 8:14 34:14
veins 34:23
Velke 39:16,20,23 40:3
  40:12,24 41:7,24 45:14
  45:15 47:21 48:3 51:24

Velke's 39:17 41:8
ventricle 24:15
ventricular 24:25
ventured 24:16
version 48:4
versus 5:10
vertebral 8:22
vessels 8:12
view 8:7,8 44:19,24
violated 67:25
violence 65:7
virtue 24:24
visible 37:16
Vitae 48:11
vocal 58:15
volunteers 43:4
vs 1:8 2:8

**W**
wall 24:15,25
Walnut 3:10
Wang 27:23,25,25,25
  73:17,18
want 10:11 21:5 24:6
  25:14 36:12,14 42:4,7
  43:19 55:13 69:13
  75:17
wanted 9:2
wants 55:11,13
wasn't 30:2
way 21:14 23:3 32:2,22
  35:15 40:18 43:23
  45:19 47:1,17 55:25
  64:11 66:7 73:6
ways 6:10,21 7:11
We'll 26:4
weighed 36:23
weighing 72:8
weighs 62:15
weight 16:5 25:17 36:20
  37:2 40:15,15 41:13
  42:23 54:15 55:9 72:7
weights 40:25 72:18
well-known 70:10
went 15:11 16:21,22
  21:19,21 22:6,14 39:23
  41:25 59:6,15
WERNER 1:17 2:17 4:2
  5:2 78:10
wheeled 15:12
White 1:6 2:6 5:21 13:5
  14:14 16:13 23:5 24:3
  25:5 27:2,7,19 28:14
  45:23 46:19 47:6 48:6
  55:3 56:6,7 58:11,24
  60:19 62:9 63:4,7,11
  63:15 64:3,21 74:13,19
  75:5,6
White's 6:5 19:24 26:10
  31:23 49:10 63:16
  64:19,19 65:11 71:6
wild 55:8,16
window 19:6
wise 44:2
wish 6:9 60:24 71:11
witness 4:2 5:3 10:3 26:6
  36:24 36:18 39:16
  74:23 75:11,13 77:8,9
woman 57:5
wonderful 63:3
word 48:7
words 13:20 69:23

work 11:3 39:18 60:3
  66:1,4,14,15 67:2,2,21
  68:6
worked 47:14 57:25 58:2
  67:5,7,9,21 68:6
working 67:13
works 56:19 70:11
world 62:4
worthwhile 70:22
wouldn't 46:9 65:7 71:9
  72:1 73:3
write 57:20
written 57:12,14 58:4
wrong 27:24 34:6 61:22
  71:13
wrote 39:13,22 40:24
  41:9 53:25 54:3 57:21
  70:13
www.depo.com 1:23
Wyoming 39:23 40:5
  41:4,25 43:8

**X**
X 4:1

**Y**
yeah 18:14 32:19 46:7
  47:14 51:20 63:23 64:2
  68:3 74:8,16
years 30:13 47:15 61:6,6
  61:7,14 62:5 63:17,17
  64:3 70:7
yielding 44:13

**Z**

**0**

**1**
1 4:11 26:4,8 78:9
1,200 37:2
1,400 36:20
1.34 28:6 29:2
1:18 2:19
1120 3:4
130814 3:9
15 66:19 68:22
150 67:21
18-year-old 43:15
188 70:15
18th 77:20 78:15
1972 54:17

**2**
2,500 66:2
2:12-cv-01629-MCE-AC
  1:7 2:7
20 8:22,23 16:5
200 37:3
2011 70:9
2016 1:19 2:20 77:20
  78:11,15
21 54:4
2185 3:9
225 40:16,20 41:1,14
23001 2:18
24 14:2 16:17 18:3,21,22
  18:23,24 59:3,5
26 4:11 5:12
285 3:10
288-3376 1:22

**3**
3 5:18 6:13
3:40 76:1
30 61:5
33 61:6,7 63:17 64:3
3915 1:24 2:20 77:4,23
    78:7,18

**4**
4,000 66:3
4:24 16:16 19:6
4:48 16:17 19:6
400 66:4 67:1 69:19
400-gram 36:25
45 28:17
450 24:17 25:17 62:15
    71:2 72:8
450-gram 73:7
47 30:13 63:17
47-year-old 60:20

**5**
5 4:5 29:1
5,000 66:5
5:22 60:3
500 1:21
510)839-5200 3:5
54 30:17

**6**
6 52:23
60,000 47:11
62 47:15
62,000 47:11

**7**
75 4:6
76 78:9
7677 3:4

**8**
8 1:19 2:20 78:11
80 8:15,21,24 61:5,14
    63:17
800 1:22

**9**
91203 1:22
925)932-3600 3:11
94596 3:10
94621 3:5
96 57:14



**FP**

**Editor-In-Chief** J. Keith Pinckard MD PhD

**Publisher** Emma O. Lew MD

**Founder and Director** Evan W. Matshes MD FRCPC

**Chief Administrative Officer** Kathy Downey LIT(Hon)

**Production Manager** Don Downey BA PMT

**Manager** Melissa Power

**Research Associate** Cecilia Wu MD

**Anatomic Illustrator-In-Residence** Carrie Allen

**Editorial Board Members**
Andrew M. Baker MD
Nicholas I. Batalis MD
Michael D. Bell MD
Stephen J. Cina MD
Gregory G. Davis MD MSPH
Gregory J. Davis MD
J.C. Upshaw Downs MD
Michael A. Graham MD
Randy Hanzlick MD
John C. Hunsaker III MD JD
Craig T. Mallak MD
Marcus Nashelsky MD
Kurt B. Nolte MD
William R. Oliver MD MS MPA
Jacqueline L. Parai MD
R. Ross Reichard MD
Barbara A. Sampson MD PhD
Marianna Sandomirsky MD
Gregory A. Schmunk MD
Victor W. Weedn MD JD

**Executive Offices**
Suite 240, 600 Crowfoot Crescent
Calgary, Alberta, Canada
T3G 0B4
403-374-3848

**email** publisher@academicfp.com

www.academicfp.com

www.afpjournal.com

Academic Forensic Pathology: The Official Publication of the National Association of Medical Examiners • Copyright © 2011 Academic Forensic Pathology Incorporated. (ISBN 978-0-9879053-0-7) Printed in Canada.

INVITED REVIEW



**Image 2:** Isolated right ventricular hypertrophy from a patient with idiopathic pulmonary arterial hypertension.

usually preserved with some segments of great vessels still attached. In addition, the cardiac chambers usually contain post-mortem clots that are often difficult and labor-intensive to remove. Since different chambers may hypertrophy to different degrees, total heart weight does not provide information regarding which chamber has increased the most. In fact, the majority of heart weight is left ventricle, so left ventricular hypertrophy will usually increase heart weight the most. In practice, the one time wall thickness measurements may be more useful than heart weight is in the case of pure right ventricular hypertrophy as occurs in idiopathic pulmonary hypertension, since there will be substantial thickening of the right ventricular wall with little impact on overall heart weight (Image 2). There are methods described to separate the cardiac chambers before weighing. The Fulton method (6) is one, but this method is used primarily for research studies.

How then does one go about obtaining an accurate heart weight? First the heart must be opened before weighing to remove post-mortem clots. The great vessels should be transected 1-2 cm above the semilunar valves. The inferior and superior vena cavae and the pulmonary veins should be cut within 1 cm of their entry into the atria. For routine purposes, epicardial adipose tissue with coronary arteries in place is weighed as part of the heart.

What is normal heart weight? In most mammalian species, including human beings, normal heart weight is 0.45% of body weight for males, and 0.40% of body weight for females, if and only if, body weight is normal (7). Unfortunately, obesity is currently epidemic in industrialized

societies, limiting the use of body weight to calculate normal heart weight. For example, in a 400 lb obese individual, 0.45% of body weight would equal 810 gm. This would not be a normal sized heart. In obesity, the heart is enlarged pathologically for a number of reasons. First, adipose tissue is very vascular so cardiac output is increased to supply blood to the fat. Second, in obese individuals, "lean" body mass is increased as muscle is added to carry the excess fat. The increase in skeletal muscle also increases cardiac workload. And third, obesity is associated with diseases that also are associated with hypertrophy of the heart, such as hypertension and diabetes mellitus. Clearly there are serious limitations in using body weight to normalize heart weight. One popular table (8) used by pathologists lists "normal" heart weight for a 5'8" man as 224-446 gm. This may be the "average" heart weight for this height, but certainly "normal" could not have such a wide range. The articles justifying the use of body weight to normalize heart weight cite a linear relationship between increasing body weight and heart weight. This is precisely the problem. Heart weight does increase with body weight, but this is pathologic; the heart in overweight individuals is not normal.

How then is normal heart weight best estimated? In our opinion, it makes much more sense to normalize heart weight to body height. Zeek, in 1942 (9), did a study of heart size in men and women without heart disease, and came up with formulae based on body height that can readily be used to calculate normal heart weight for adult men and women (Table 1). Table 1 lists information on cardiac dimensions taken from the medical literature, and summarize normal dimensions for adult hearts. Many of these data have serious limitations.

## CAUSES OF HYPERTROPHY

When the heart is enlarged, regardless of whether it can be designated eccentric or concentric, the hypertrophy is invariably attributed to growth at the cellular level. The heart is an organ with exceptionally low regenerative capacity; the principle mechanism by which the heart responds to increased workload and increased stress is by cardiomyocyte hypertrophy. Protein expression is up-regulated, and sarcomeres, the cell's force-generating machinery, increase in size, resulting in cellular enlargement. Furthermore, the sarcomeres become more organized, arranging themselves in a manner that cumulatively results in either wall thickening (concentric hypertrophy) or chamber dilatation (eccentric hypertrophy). We tend to consider the former a result of pressure overload, and the latter a result of volume

The structural abnormalities that predispose to arrhythmias are hypertrophy and/or fibrosis. Fibrosis can result in conduction block and re-entry arrhythmias (23). The mechanism by which hypertrophy predisposes to arrhythmia is a complex subject, the discussion of which is beyond the scope of this paper. However, proposed mechanisms include changes in membrane channels, ion pumps, cell receptor abnormalities, and other derangements of the cellular level. Whatever the cellular event, there is no question that hypertrophy of the heart increases the risk of sudden death. The classical Framingham Study (24) found that, in men, hypertrophy of any cause increases the risk of sudden death four fold. Interestingly, in women, hypertrophy only doubles the risk of sudden death. Other studies (25) have confirmed the increased risk of fatal arrhythmia in the presence of cardiac hypertrophy. So finally, having a big heart in life, despite its positive connotations, is likely problematic. However, to the autopsy pathologist, the finding of a big heart is less a problem than a solution. It provides a basis for determination of the mechanisms of death -- heart failure or arrhythmia -- in what may be an otherwise negative autopsy.

## REFERENCES

1) Laflamme M a, Murry CE. Heart regeneration. Nature. 2011;473(7347):326-335. Available at: http://www.nature.com/doifinder/10.1038/nature10147 [Accessed May 19, 2011].

2) Anversa P, Nadal-Ginard B. Myocyte renewal and ventricular remodelling. Nature 2002; 415(6868):240-3.

3) Hutchins GM, Anaya OA. Measurements of cardiac size, chamber volumes and valve orifices at autopsy. The Johns Hopkins medical journal 1973; 133(2):96-106.

4) Zipes DP, Wellens HJJ. Sudden cardiac death. Circulation. 1998;98(21):2334-51. Available at: http://circ.ahajournals.org/cgi/content/extract/98/21/2334 [Accessed June 17, 2011].

5) Opie LH, Commerford PJ, Gersh BJ, Pfeffer MA. Controversies in ventricular remodelling. Lancet 2006; 367(9507):356-67.

6) Fulton R, Hutchinson E. Ventricular weight in cardiac hypertrophy. British Heart Journal 1952; 14(3):413-420.

7) Hudson R. Cardiovascular Pathology. 1st ed. Baltimore: Williams & Wilkins; 1965:34-38.

8) Kitzman DW, Scholz DG, Hagen PT, Ilstrup DM, Edwards WD. Age-related changes in normal human hearts during the first 10 decades of life. Part II (Maturity): A quantitative anatomic study of 765 specimens from subjects 20 to 99 years old. Mayo Clinic proceedings 1988; 63(2):137-46.

9) Zeek P. Heart weight. I. The weight of the normal human heart. Arch Pathol 1942; 34:820-32.

10) Dorn GW. The fuzzy logic of physiological cardiac hypertrophy. Hypertension. 2007;49(5):962-70.

11) Dickerman RD, Schaller F, McConathy WJ. Left ventricular wall thickening does occur in elite power athletes with or without anabolic steroid use. Cardiology 1998; 90(2):145-8.

12) Toischer K, Rokita AG, Unsöld B, et al. Differential Cardiac Remodeling in Preload Versus Afterload Circulation. 2010:410-528.

13) Spirito P, Pelliccia A, Proschan MA, et al. Morphology of the" athlete's heart" assessed by echocardiography in 947 elite athletes representing 27 sports. The American journal of cardiology 1994;74(8):802-806.

14) Pelliccia a. Remodeling of Left Ventricular Hypertrophy in Elite Athletes After Long-Term Deconditioning. Circulation 2002; 105(8):944-949.

15) Carabello BA. The relationship of left ventricular geometry and hypertrophy to left ventricular function in valvular heart disease. The Journal of heart valve disease 1995; 4 Suppl 2:S132-8; discussion S138-9.

16) Hill J a, Olson EN. Cardiac plasticity. The New England journal of medicine 2008; 358(13):1370-80.

17) Ganau a, Devereux RB, Roman MJ, et al. Patterns of left ventricular hypertrophy and geometric remodeling in essential hypertension. Journal of the American College of Cardiology 1992; 19(7):1550-8.

18) Drazner MH. The progression of hypertensive heart disease. Circulation 2011; 123(3):327-34.

19) Fishbein MC. Cardiac disease and risk of sudden death in the young: the burden of the phenomenon. Cardiovascular pathology : the official journal of the Society for Cardiovascular Pathology. 2010; 19(6):326-8.

20) Watkins H, Ashrafian H, Redwood C. Inherited cardiomyopathies. The New England journal of medicine 2011; 364(17):1643-56.

21) Hershberger RE, Siegfried JD. Update 2011: clinical and genetic issues in familial dilated cardiomyopathy. Journal of the American College of Cardiology 2011; 57(16):1641-9.

22) Seward JB, Casaclang-Verzosa G. Infiltrative cardiovascular diseases: cardiomyopathies that look alike. Journal of the American College of Cardiology 2010; 55(17):1769-79.

23) Myerburg RJ, Kessler KM, Castellanos A. Pathophysiology of sudden cardiac death. Pacing and clinical electrophysiology : PACE 1991; 14(5 Pt 2):935-43.

24) Haider a W, Larson MG, Benjamin EJ, Levy D. Increased left ventricular mass and hypertrophy are associated with increased risk for sudden death. Journal of the American College of Cardiology 1998; 32(5):1454-9.

25) Verdecchia P, Carini G, Circo A, et al. Left ventricular mass and cardiovascular morbidity in essential hypertension: the MAVI study. Journal of the American College of Cardiology. 2001; 38(7):1829-35.

26) Silver M, Gotlieb A, Schoen F. Cardiovascular pathology. 3rd ed. New York: Churchill Livingstone; 2001:7-9.

