JOHN L. BURRIS, Esq./ State Bar #69888
BENJAMIN NISENBAUM, Esq./ State Bar #222173
LAW OFFICES OF JOHN L. BURRIS
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:     (510) 839-5200
Facsimile:     (510) 839-3882

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.W., a minor, by and through her Guardian Ad Litem, Tenaya Barber, Individually and as Successor in Interest of Decedent MICHAEL WHITE,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT NICHELINI, et al.,<br><br>Defendants. | Case No. 2:12-CV-1629-MCE-AC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 19, 2016<br>Time: 2:00 p.m.<br>Location: Courtroom 7<br><br>Honorable Morrison C. England |

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

**Introduction** ........................................................................................................**1**

Statement of Facts ..................................................................................................1

**Argument** ............................................................................................................**4**

A. Legal Standard on Summary Judgment ...............................................................4

B. The Claims Against the Defendant Officers Can Not be Dismissed by Virtue of Defendant
City's Bankruptcy Protection ...................................................................................6

C. The Defendant Officers Used Improper and Excessive Force on Mr. White for Which They
are not Entitled to Qualified Immunity .....................................................................8

    *1. The Defendant Officers Use of Force was Excessive and Unreasonable* .......................8

    *2. All Involved Officers Were Integral Participants in the Harm Mr. White Suffered* ......13

    *3. The Defendant Officers are not Entitled to Qualified Immunity* ...................................14

    *4. Chief Nichelini is Personally Liable Pursuant to Monell* ..............................................15

D. The Defendant Officers' Conduct Shocks the Conscience In Violation of the Fourteenth
Amendment ..........................................................................................................16

E. Plaintiff's State Law Claims Must go Forward ..................................................17

    *1. Civil Code § 52.1* .............................................................................................................17

    *2. Negligence* ......................................................................................................................18

    *3. Assault and Battery* ........................................................................................................19

*F. Plaintiff is Entitled to Punitive Damages* ......................................................19

**Conclusion** .........................................................................................................**20**

# TABLE OF AUTHORITIES

**Statutes**

Fed.R.Civ.P. 56(a) ..................................................................................................... 5

Federal Rule of Civil Procedure 56(e) ....................................................................... 5

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 5

*Arce v. Blackwell*, 294 Fed.Appx. 259 (9th Cir. 2008)................................................ 10

*Ashcroft v. al-Kidd*, 563 U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ......................... 14

*Ashker v. California Dep't of Corrections*, 112 F.3d 392 (9th Cir. 1997).................................... 7

*Atkinson v. County of Tulare*, 790 F.Supp.2d 1188 (ED Cal. 2011) ........................................ 15

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ......................................... 9

*Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004)........................................................... 13

*Brosseau, v. Hagan*, 534 U.S. 194 (2004) ..................................................................... 14

*Brown v. Ransweiler,* 171 Cal.App.4th 516 (2009)........................................................... 18

*Bryan v. MacPherson,* 630 F.3d 805 (9th Cir. 2010) ......................................... 9, 10, 15

*City of Canton v. Harris,* 489 U.S. 378 (1989)................................................................. 15

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................................ 15

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084 (ND Cal.
2005) ........................................................................................................................ 18

*Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945 (9th Cir. 2010)............................. 8

*Connick v. Thompson,* 563 U.S. 51 (2011) .................................................................... 15

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005). ............................................................... 19

*Demery v. Kupperman*, 735 F.2d 1139 (9th Cir. 1984) ...................................................... 8

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ......................................... 10, 12

*Drummond ex rel. Drummond v. City of Anahein*, 343 F.3d 1052 (9th Cir. 2013) .............. 10, 15

*Edson v. City of Anaheim*, 63 Cal.App.4th 1269 (1998)..................................................... 19

*Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528 (9th Cir. 2010) .................................... 8

*Flores v. Cty. of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014) ..................................... 16

*Franklin v. Foxworth,* 31 F.3d 873 (9th Cir. 1994) ......................................................... 9

*Freeman v. Arpaio*, 125 F.3d 723 (9th Cir. 1997) ........................................................... 5

*Garlick v. Cty. of Kern*, 2016 WL 880785 (E.D. Cal. 2016) ........................................ 12

*George v. Morris,* 736 F.3d 829 (9th Cir. 2013) ............................................................. 9

*Glenn v. Washington*, 673 F.3d 842 (9th Cir. 2011) ....................................................... 9

*Graham v. Connor,* 490 U.S. 386 (1989) ............................................................. 7, 9, 10

*Gregory v. Cnty. of Maui*, 523 F.3d 1103 (9th Cir. 2008) .............................................. 6

*Grudt v. City of Los Angeles,* 2 Cal.3d 575 (1970) ...................................................... 18

*Haynes v. City and County of San Francisco*, 2010 WL 2991732 (ND Cal. 2010) ..................... 18

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009) .................................................... 13

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ........................................ 5

*Jones v. Kmart Corp.*, 17 Cal.4th 329 (1998) .............................................................. 18

*Jones v. Williams*, 297 F.3d 930 (9th  Cir. 2002) .................................................... 6, 14

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) ............................................................. 5

*Kentucky v. Graham*, 473 U.S. 159 (1985) ...................................................................... 7

*LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) ...................................... 10

*Marsall v. City of Portland*, 2004 WL 1048127 (D. Or. 2004) ...................................... 12

*Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 5

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) .......................................................... 9

*Miller v. Clark Cty.,* 340 F.3d 959 (9th Cir. 2003) ....................................................... 9

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ........................ 7, 15

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365 (9th Cir. 1998) .............................. 17

*Munoz v. Olin*, 24 Cal.3d 629 (1979) ........................................................................... 18

*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) ........................................................ 10

*Patel v. Kent School Dist.*, 648 F.3d 965 (9th Cir. 2011) ............................................ 17

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................. 14

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) ................................ 17

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ................................................... 16, 17

*Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256 (2006) .................................... 18

*Santos v. Gates*, 287 F.3d 846 (9th Cir.2002)................................................................. 6, 9

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................ 14

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................. 7

*Scott v. Henrich*, 39 F.3d 912 (9th Cir.1994)........................................................... 6

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ........................................ 11, 12

*Tolan v. Cotton*, —— U.S. ——, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014)................................. 14

*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011)........................................ 14, 15

**California Statutes**

Civil Code section 52.1................................................................................... 17

Government Code section 825............................................................................. 8

Government Code section 995............................................................................. 7

**INTRODUCTION**

This action arises out of the death of Decedent Michael White who was pronounced dead after being subjected to the multiple and unreasonable uses of force, including excessive tasing, carotid hold, and unreasonable manual restraints by several City of Vallejo Police Officers. Defendants argue that Defendant City's bankruptcy status requires dismissal of Plaintiff's claims against all individually named Defendants. Defendants renew this argument, despite this Court's previous rejection of it. Defendants otherwise claim that they are entitled to qualified immunity for their conduct. .

Plaintiff reiterates that the City's bankruptcy protection cannot have a preclusive effect on Plaintiff's claims against the individually named defendants who are sued in their personal capacities and who are not, themselves, bankrupt. Otherwise, the Defendant Officers were on notice that their conduct against Mr. White amounted to constitutional violations.

Plaintiff's Opposition to Defendants' Motion for Summary Judgment is based on the arguments made below, on the Declaration of Benjamin Nisenbaum, filed herewith and all exhibits attached thereto, on the court's file in this matter, and on such oral and/or documentary evidence presented at the hearing of this motion.

**STATEMENT OF FACTS**

On June 15, 2011, Elizabeth Claros was entering her mobile home when her neighbor Linda Villasenor's house guest, Michael White who was experiencing a medical emergency, choked her from behind. (Deposition of Elizabeth Claros at p. 18, attached to the Nisenbaum Declaration as Exhibit A.) Claros got free from White, and he fled into Villasenor's mobile home. (Claros 18-20.) Claros told Villasenor to keep White away from her and although she was upset, determined to leave the situation alone and not report it. (Claros 20-21.) No one else saw Mr. White attack Claros. (Claros 27-28.) Several minutes later Villasenor's young son came and asked her to call the police. (Claros 21, 41.)

Claros called 911 and reported that a man had choked her and he needed an ambulance because something was wrong with him. The dispatch broadcast of the call informed as follows: "I have a call for you. Respond with fire. Originally an elderly neighbor stating that a male

subject needed an ambulance. Something's not right with him. She stated that he came inside her unit, and choked her, and then went back into his unit. This is going to be at 395 San Marcos for the original victim X and the responsible inside of 392. And we're going to have fire and ambulance staged." (Deposition of Officer Barry Boersma at 20, attached to the Nisenbaum Declaration as Exhibit B.) Despite this clear dispatch call that something was wrong with the suspect and that he needed medical attention, all of the involved police officers misheard the call to wrongly assumed that Claros was in need of the ambulance. (Depositions of Sergeant Herman Robinson 38-41, 51-52; Raul Munoz 43, 48, 53-54; John Cunningham 24-25, attached to the Nisenbaum Declaration as Exhibits C, D, and E.) For example, Boersma testified that he was informed that White strangled Claros and pushed her up against a wall causing her to bump her head, when this information was never actually conveyed. (Boersma 25.)

Boersma arrived on scene interviewed Ms. Claros, observed that she had no visible injuries and was not in physical distress and learned that White acted unprovoked and crazy. (Claros 34, 46-47; Boersma 16-17, 28.) Boersma then contacted White's girlfriend, Ms. Villasenor who informed him that White was acting crazy and was high on drugs, perhaps cocaine. (Boersma 29, 31.) A third civilian also reported Mr. White was high on drugs and acting crazy. (Boersma 30-31; Robinson 56.) At this point the officers were informed that White was highly intoxicated and was really disturbed. (Boersma 34; Robinson 70.)

Boersma then entered Villasenor's trailer, Sergeant Robinson and Officers Cunningham and Munoz were already inside trying to make contact with White. (Boersma 32-33; Munoz 58.) White was inside the bathroom and the door was slightly ajar. (Boersma 38, 40.) Boersma testified that no sound was coming from the bathroom; however, other officers testified that White was mumbling loudly and unintelligibly. (Munoz 60-61.) Boersma knocked on the bathroom door and asked White to come out; White did not respond. (Boersma 41.) Boersma and Munoz pushed against the bathroom door and felt White pushing back but he did not close the door. (Boersma 42; Munoz 66-67.) Boersma pushed again harder and observed White biting down on a plastic bag containing a golf ball size chunk of drugs, and informed the other officers that White was eating drugs. (Boersma 47, 52.) A tugging match over the door ensued resulting in the door breaking off the hinges. (Boersma 47, 49; Cunningham 72-73.) Boersma deployed his

taser in dart mode on White, but it did not appear to be functioning properly. (Boersma 58.) Officer Cunningham reached around the broken door and tased White in dart mode, hitting his upper torso chest area; he deployed three consecutive five-second cycles. (Cunningham 78-81.) Cunningham's third cycle appeared to have an effect on White. (Cunningham 81; Boersma 58.) Munoz then tased White in deployment mode and made four five-second applications. (Munoz 70-71.) Officer Boesma testified that Munoz's taser applications caused White to scream and back up. (Boersma 57.) Boersma was able to push the door which causing White to crumple to the ground, first to his knee and then in a seated position on the floor. (Boersma 59-60.) Boersma placed White in a carotid hold from behind. (Boersma 62-63.) Boersma applied pressure to White's carotid arteries for approximately 30 seconds. (Boersma 66-67.) Munoz punched White three times to his right side while he was on the ground causing him to go limp and allowing him to be handcuffed behind his back. (Munoz 71-73; Boersma 50, 71.) The officers then dragged White into the hallway and had him in seated position and White went completely limp and appeared to go unconscious for several seconds. (Robinson 87.) Boersma was worried about White's breathing and requested a CPR mask. (Boersma 72; Robinson 86-87; Munoz 77.) Cunningham massaged White's jaw to ensure that he was still breathing, during this time. (Munoz 78; Cunningham 99-100.)

When White regained consciousness, he started kicking and thrashing. (Robinson 88.) The officers described that White was kicking his legs at them and they just let him kick for a few minutes. (Boersma 73-74.) Officer Melville then turned White on to his stomach. Officer Munoz put pressure on White's back with his knee so that other officers could get him in leg restraints, this lasted for no more than a minute. (Munoz 80-81, 83.)  Officers Melville and Keutnik placed pressure on White's legs and put him in a figure four leg hold which allowed the officers to place White in hobble restraints. (Boersma 74; Cunningham 92; Deposition of Michael Keutnik 22-23, 26, attached to the Nisenbaum Declaration as Exhibit F.) Robinson kneeled on White's legs to restrain him from kicking out and getting up to his feet. (Robinson 84-85.) Officers Melville and Keutnik carried White face down out of the trailer on to the paramedics' gurney. (Munoz 84; Keutnik 30.)

In total, White was restrained and combated with for 24 minutes. (Deposition of Dr. Werner Spitz 14, 16, attached to the Nisenbaum Declaration as Exhibit G.)  Plaintiff's medical expert opined that the combination of White being placed in prone position, being compressed, struck/punched in the side and placed in a carotid hold all contributed to him being asphyxiated and ultimately dying. (Spitz 6-7, 12.) Dr. Spitz opined that White was likely in cardiac arrest as he was taken out of the trailer, particularly because he flatlined on the electrogram taken in the ambulance. (Spitz 14-15, 17.) Dr. Spitz opined that contrary to the pathologist's finding, White's heart was only minimally enlarged, if at all given the limits of the measurements that she performed. (Spitz 24.) Dr. Spitz also determined that the pathologist and coroner were incorrect in their assessment that White had a toxic amount of cocaine in his system, when indeed, he had a low (recreational at best) level of cocaine in his system and the form of it was a non-active metabolite not an active form of the drug. (Spitz 27-28.) Importantly, Dr. Spitz determined that, given the metabolism rate of cocaine, White likely took the cocaine the night before or earlier in the day. (Spitz 28-29.) White did not die from ingesting cocaine, but rather his lack of oxygen. (Spitz 30-31.) Dr. Spitz opined that excited delirium is not a real diagnosis, it's another name for a traumatic death, pointing out that the coroner deemed White's death as an accident, which is inconsistent with the pathologist's opinion of excited delirium death. (Spitz 51-52.)

Plaintiff's Police Practices Expert Roger Clark opined the Defendant Officers response to and use of force on Mr. White was grossly unjustified, excessive and unnecessary. (Roger Clark Rule 26 Report p. 4, attached to the Nisenbaum Declaration as Exhibit H.) Clark opined that the Defendant Officers' utter failure to pay accurate attention to the contents of the dispatch broadcast is a violation of their training and department policies and basic common sense. (Clark 5.) And as a result, they responded to Mr. White as if he was a violent criminal who was trying to avoid being arrest and not a mentally impaired person who needed medical help. (Clark 5-6.) Clark opined that the tasers should never have been used because Mr. White was not an active combatant—the defendant Officers brought the fight to him. (Clark 11-13.) The carotid restraint is an extremely dangerous use of force and the instant circumstances did not call for its use. (Clark 13-14.)

# ARGUMENT

## A. Legal Standard on Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those that may affect the outcome of the case. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted").  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. (citing Fed.R.Civ.P., Rule 56(e)). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. See *Anderson*, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. See *Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the nonmoving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

The Ninth Circuit has explained, "[c]ases in which the victim of alleged excessive force

has died 'pose a particularly difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story... is unable to testify.'" *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)). Because of the danger posed by self-serving testimony in such situations, a district court "may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Henrich*, 39 F.3d at 915. Following from these precepts, courts "have denied summary judgment to defendant police officers in cases where 'a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.'" *Gregory*, at 1107 (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

Here, Defendants rely on the interpretations of and inferences drawn from the evidence that favor their theory of the case and that impermissibly require unfettered belief in the only living percipient witness's testimony in asserting that they are entitled to summary judgment.

**B. The Claims Against the Defendant Officers Can Not be Dismissed by Virtue of Defendant City's Bankruptcy Protection**

Once again, Defendants request that Plaintiff's entire action be dismissed as to all Defendants because only one of the Defendants successfully filed for bankruptcy. Plaintiff again maintains that the bankruptcy protections conferred on Defendant City cannot extend to the individually named Defendant Officers who are sued in their personal capacities and have not themselves petitioned for any bankruptcy protection. Moreover, this Court's previous determination on this issue of law should foreclose reconsideration of this issue now.

Liability under section 1983 is premised on a showing of personal participation in the alleged civil rights violation, and there is no *respondeat superior* liability under section 1983 for the conduct of the officers of the municipal entity. See *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Defendant City is simply not liable for the section 1983 violations of the Defendant Officers in this litigation.

The United States Supreme Court has repeatedly explained the difference between a suit against a government official in an official capacity, and a suit against a government official in an individual capacity. Specifically, the Supreme Court has explained:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, e.g., *Scheuer v. Rhodes*, 416 U.S. 232, 237–238 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978).  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. (Citation omitted).  It is not a suit against the official personally, for the real party in interest is the entity. Thus, *while an award of damages against an official in his personal capacity can be executed only against the official's personal assets*, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. . . . On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."

*Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (emphasis added).

Defendants assert that because California has enacted laws requiring the state to pay (out of the City's treasury) the cost of litigation and damage awards levied against California officials for acts performed in the course of their official duties, these costs are the "debt" of the City and these laws have commuted the nature of Plaintiff's claims to "in reality" be against the City and have made the City the real party in interest. This argument flies in the face of section 1983 jurisprudence. California Government Code sections 995 and 825 codifies the state's attorney's fees and indemnification programs for its employees. However, the Ninth Circuit has held that state statutes requiring states to indemnify state officials, even in cases where they are sued in their individual capacities, are "purely intramural arrangements" between the state and its officials. *Ashker v. California Dep't of Corrections*, 112 F.3d 392, 395 (9th Cir.1997) ("[W]e hold California's indemnification of [the defendants] does not render California the real party in interest.").

California's cost of litigation and indemnification programs are "purely intramural arrangement[s] with its officers" which "derive from an entirely collateral and voluntary undertaking on the part of the state" and "do[] not, and cannot, change the nature of the federal

claim" and cannot divest Plaintiff of her right to seek redress from the individually named Defendants. *Demery v. Kupperman*, 735 F.2d 1139, 1148-49 (9th Cir. 1984), cert. denied, 469 U.S. 1127 (1985); *Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967-68 (9th Cir. 2010). Section 1983 makes clear that claims against government officials in their individual capacity makes them individually liable to Plaintiff.

Defendants' dissection of this Court's Order on Judgment on the Pleadings (Document 24), is fruitless.[1] In that Order, this Court determined the issue central to the instant motion, "[t]he issue presented here is whether a claim against a city officer in his individual or personal capacity is discharged in the city's bankruptcy because of Cal. Gov't Code §§ 825(a) and 995." (Document 24 10:3-5.) And this Court determined that it "will not make the leap over the facts and the law that defendant requests. It will not find that a claim (and lawsuit) against a City officer in his individual capacity is the legal equivalent of a claim (and lawsuit) against the City, when any judgment against defendant can only be executed against defendant's assets (not the City's)...." (Document 24 16:18-23.) To the extent that this Court has already determined the issue central to defendant's tortured reiteration of this argument that the City's bankruptcy status disposes of all legal claims against the individual defendants this argument must fail.

**C. The Defendant Officers Used Improper and Excessive Force on Mr. White for Which They are not Entitled to Qualified Immunity**

Defendants argue that the Defendant Officers used reasonable force that was necessary to overcome White's resistance. In so arguing, Defendants usurp the role of the finder of fact.

***1. The Defendant Officers Use of Force was Excessive and Unreasonable***

This Court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir.2003)). "[E]ven where some force is justified, the amount actually used may be

---

[1] Defendants also assert that this Court mistakenly based its JNOP decision on sovereign immunity grounds. Not so. This Court was imminently clear, that the individually named Defendants did not assert sovereign immunity and that it found the reasoning of Ninth Circuit sovereign immunity cases useful and instructive in analyzing the indemnity question presented in this matter. (Document 24, fn. 10, 15:6-17:11.)

excessive." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002). Second, a court must evaluate the government's interest in the use of force. *Glenn v. Washington*, 673 F.3d 842, 871 (9th Cir. 2011) (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)). "Relevant factors to this inquiry include, but are not limited to, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Graham,* 490 U.S. at 396). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Id.* The *Graham* factors, however, are not exhaustive. *George v. Morris,* 736 F.3d 829, 837–38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir.1994)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn,* 673 F.3d at 872 (citations omitted). Finally, a district court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller,* 340 F.3d at 964.

### Nature and Quality of the Intrusion

The evidence reveals that several officers acting in concert with one another physically engaged in an altercation with Mr. White, who they were informed was and observed to be acting erratic and irrational, by pushing a door against him, striking him about the ribs, tasing him several times for several consecutive deployment cycles, carotid restraint, handcuffing, compressive force as he laid prone and handcuffed, and further compressive force as he was hogtied while handcuffed and laying prone.

Generally, impact blows by punching or kicking are considered "significant force." *See, e.g., Blankenhorn,* 485 F.3d at 480. Punching or kicking are "broadly characterized as [a] non-lethal levels of force," but could in some circumstances "be employed in a manner that creates a

substantial risk of death or serious bodily injury." *Bryan*, 630 F.3d at 825 n. 7. Handcuffing, even without hogtying, is nontrivial and may in some circumstances constitute excessive force. *See, e.g.*, *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000). Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a "prone and handcuffed individual [ ] in an agitated state" can cause suffocation "under the weight of restraining officers," therefore, such conduct may be considered deadly force. *Drummond ex rel. Drummond v. City of Anahein*, 343 F.3d 1052, 1056–67 (9th Cir. 2013); *see also Arce v. Blackwell*, 294 Fed.Appx. 259, 260–62 (9th Cir. 2008). "Known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* (collecting cases).

Contrary to Defendants' representation, courts have long repeated Taser applications can be deadly and are thus unreasonable. See *Bryan* v, 630 F.3d at 825, n. 7 (citing *Oliver v. Fiorino*, 586 F.3d 898, 906-907 (11th Cir. 2009) (holding that while the initial use of a single Taser shock may have been justified, the repeated uses of the Taser—eight additional taser shocks—which caused the suspect's death were unreasonable)).

### Government Interest in the Use of Force and Balancing

This Court must examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*" in order to "determine objectively 'the amount of force that is necessary in a particular situation.'" *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (quoting *Graham*, 490 U.S. at 396–97). Even though the "most important" *Graham* factor is whether the suspect posed an "immediate threat to the safety of the officers or others," "[a] simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.

Viewing the facts in the light most favorable to Plaintiff, the totality of the circumstances here did not justify the amount of force heaped on Mr. White, and the Defendant Officers unnecessarily escalated the encounter. Mr. White inexplicably choked his elderly neighbor; confoundingly, he did not flee the scene rather he retreated back into the neighboring trailer. Although she was upset, Ms. Claros had determined to let situation go; indeed, she only called

911 several minutes after the incident at a young boy's insistence. Moreover, when Ms. Claros called 911, she requested an ambulance for Mr. White because something was clearly wrong with him. All of the Defendant Officers' testimony reveals that none of them paid attention to the substance of the dispatch call, because they all approached the scene believing that Ms. Claros was injured and requesting an ambulance for herself. Similarly, the Defendant Officers' contact with Ms. Claros should have put them on notice that Mr. White was a disturbed, mentally impaired, medically at-risk individual who required help, as Ms. Claros had no visible injuries[2] and she refused medical care even though an ambulance was staged nearby. Their contact with Ms. Villasenor only confirms this as she was not injured either, only concerned about his erratic behavior and as a result no longer wanted Mr. White to be her houseguest.

The circumstances of the Defendant Officers' contact with Mr. White also do not support the severity of force they used. Mr. White was inside a trailer by himself. Even within the trailer he was inside a bathroom with no other means of escape. The Defendant Officers had no reason to believe he was armed, and he was unable to access anyone without first encountering the Defendant Officers. Some of the officers claim that Mr. White was mumbling loudly and unintelligibly; however, he never uttered any threats to the officers. Court's have recognized that unintelligible and loud utterances are not factors justifying force. See *Smith v. City of Hemet*, 394 F.3d 689, 702–03 (9th Cir. 2005) (recognizing that although the victim was shouting expletives, there was no threat leveled against the officer). Indeed, Mr. White's mumbling only underscores the fact that he needed the officers' help, not a factor supporting their uses of force.

Defendants also justify their uses of force because of Mr. White's noncompliance with orders and later his resistance. It is undisputed that Mr. White needed medical attention for his erratic behavior. The Ninth Circuit has held that "the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense," because increasing the use of force on

---

[2] Plaintiff maintains that Sergeant Robinson's testimony that he observed Ms. Claros face bloodied is an outright falsehood and is emblematic of the exaggeration that the Defendant Officers engaged in making this situation appear worse than it actually was.

an emotionally distraught individual may exacerbate the situation rather than bring it to a swift resolve. *Deorle*, 272 F.3d at 1282-83. The Defendant Officers were required to factor Mr. White's obvious mental infirmity into their use of force on him notwithstanding his intoxication level. See e.g. *Marsall v. City of Portland*, 2004 WL 1048127 (D. Or. 2004) (holding that the *Deorle* requirement to consider a subject's mental infirmity in the calculus of reasonableness applies even to a suspect who was under the influence of hallucinogenic mushrooms).

The Defendant Officers then began an altercation with White by pushing against the bathroom door. White's reaction of pushing back is consistent with his erratic behavior. The Defendant Officers claim that they observed White ingesting drugs during this struggle which made the situation even more perilous for them. However, this factor is wrought with factual questions. The paramedics did not find any drugs or obstructions in White's mouth or throat, and his blood test was not consistent with him ingesting drugs during the fracas. In addition, the golf ball sized rocks of cocaine, as described by Officer Boersma, were never recovered from White or from the scene. There simply was no real reason for the Defendant Officers to force their contact with White. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle,* 272 F.3d at 1273. Once the bathroom door broke off the hinges, White had both of his hands gripped to the door and was pushing it against the officers, meanwhile the Defendant Officers' collective hands were free to deploy three different tasers and cycle them several times, to strike White about the rib cage area, place him in a carotid hold and handcuff him. According to Dr. Spitz, these actions caused Plaintiff to be unable to breathe, and essentially began the asphyxiation process. Certainly, post-handcuffing Mr. White was not an actual immediate threat. See e.g., *Smith*, 394 F.3d at 702-03. However, the Defendant Officers persisted by placing White in prone position, variously applying downward pressure to his body, including to his back and legs, and ultimately hogtying him. Defendants claim that White continued to resist by kicking and thrashing; however, these movements could also be consistent with him struggling to breathe. See e.g., *Garlick v. Cty. of Kern*, 2016 WL 880785, at *29 (E.D. Cal. 2016) (finding material questions regarding the nature of decedent's resistance precluded

summary judgment when he was kicking and thrashing while laying prone after being

handcuffed and officer's collective weight was pressing down on him).

Based on the foregoing a jury can determine that the Defendant Officers' use of force

was completely out of proportion to what was called for in this case.  A jury would likely believe

the Defendants' obvious overreaction was triggered by their failure to actually listen to the report

to which they responded.  Decedent was not armed, and never was legitimately suspected of

being armed. Under the facts of this case, Defendants use of force was unreasonable.

### 2. All Involved Officers Were Integral Participants in the Harm Mr. White Suffered

Defendants urge this Court to grant summary judgment as to Sergeant Robinson because

he did not go hands on with Mr. White. This argument is not supported by the record or the law.

Sergeant Robinson, himself, testified that he kneeled on Mr. White's legs as he laid prone

to allow for even more restraints to be applied to White. (Robinson 84-85.) Given that Sergeant

Robinson added his body weight on Mr. White after he had been handcuffed and already

substantially asphyxiated, this only served to further encumber his ability to breathe and makes

Robinson a meaningful participant in the harm Mr. White suffered. *Boyd v. Benton Cty*., 374

F.3d 773, 781 (9th Cir. 2004) (an officer is an "integral participant" where he or she

"participated in some meaningful way" in the actions which gave rise to the constitutional

violation.) Importantly, Sergeant Robinson is one of the primary instigators and creators of the

overwrought nature of the Defendant Officers' response to Mr. White. As the Sergeant he was

the highest ranking officer on the scene, he admits that he did not even pay attention to the

dispatch call and was thereby ignorant that the thrust of the call was for medical help for Mr.

White. And Robinson was the only officer to purportedly observe Ms. Claros bloodied and

injured from her encounter with Mr. White, which of course was completely false.  She was

uninjured and unbloodied.

Even crediting Defendants' version of the facts (which is not permissible on summary

judgment) that Sergeant Robinson did not go hands on, the doctrine of integral participation

"extends liability to those actors who were integral participants in the constitutional violation,

even if they [did] not engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*,

573 F.3d 752, 770 (9th Cir. 2009); see also *Boyd*, 374 F.3d at 773 ("[I]ntegral participation does

not require that each officer's actions themselves rise to the level of a constitutional violation.") (internal quotation marks omitted).

Plaintiff urges that each of the Defendant Officers acted unconstitutionally and, although individual officers did not necessarily participate in every application of excessive force, they were fundamentally involved in the altercation with Mr. White and thus are liable under the integral participation doctrine. See *Jones v. Williams*, 297 F.3d at 936  (integral participation requires some fundamental involvement in the conduct that allegedly caused the violation) (emphasis in original). Defendants' suggestion that any involved officer be dismissed from the action is without merit.

### 3. The Defendant Officers are not Entitled to Qualified Immunity

The doctrine of qualified immunity protects a government official from liability for civil damages except where the official violates a constitutional right that "was "clearly established" at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)). The qualified immunity inquiry has two prongs: (1) whether the officer's conduct violated a constitutional right and (2) whether "the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in the situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). The court has discretion to consider the two factors in either order. See *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). At summary judgment, resolution of the qualified immunity defense turns whether the undisputed facts and the inferences to be drawn therefrom, viewed in the light most favorable to the non-moving party, show a violation of clearly established federal constitutional rights. See *Tolan v. Cotton*, —— U.S. ——, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014). In cases alleging unreasonable searches or seizures, courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier, supra*, at 201. Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. See *Brosseau, v. Hagan*, 534 U.S. 194, 195, 198 (2004) (inquiring as to whether conduct violated clearly established law ""in light of the specific context of the case"" and construing "facts...in a light most favorable to" the nonmovant). The question of whether a

1  defendant is entitled to qualified immunity is a question of law for the court. *Torres*, 548 F.3d at

2  1210. However, the court only resolves that question of law if all material facts are undisputed

3  and, taken in the light most favorable to the plaintiff, the facts show the defendant did not violate

4  clearly established federal constitutional rights. *Id.*

5       At the time of the subject incident it was clearly established that all of the Defendant

6  Officers' uses of force were constitutional violations. *Drummond*, made plain that multiple

7  officers' use of prolonged body-weight pressure to a suspect's back is known to be capable of

8  causing serious injury or death. *See* 343 F.3d at 1056. This Court denied qualified immunity to

9  an officer that used a carotid hold on a suspect based on a long-held-industry-wide understanding

10  of the dangers inherent therein. *Atkinson v. County of Tulare*, 790 F.Supp.2d 1188, 1203 (ED

11  Cal. 2011) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 116-117 (1983) (dissent) ("It has

12  undisputed that chokeholds pose a high and unpredictable risk of serious injury or death.

13  Chokeholds are intended to bring a subject under control by causing pain and rendering him

14  unconscious. Depending on the position of the officer's arm and the force applied, the victim's

15  voluntary or involuntary reaction, and his state of health, an officer may inadvertently crush the

16  victim's larynx, trachea, or thyroid. The result may be death caused by either cardiac arrest or

17  asphyxiation."). Even though, the Ninth Circuit determined the use of a Taser in deployment

18  mode to be an intermediate use of force a few months after the subject incident, it was long

19  recognized by the courts that repeated uses of the Taser can cause death and is thereby

20  unreasonable. See Bryan, 630 F.3d at 825, n. 7.

21       As such, the Defendant Officers are not entitled to qualified immunity for their violative

22  conduct.

23  *4. Chief Nichelini is Personally Liable Pursuant to Monell*

24       "[T]he inadequacy of police training may serve as the basis for § 1983 liability only

25  where the failure to train amounts to deliberate indifference to the rights of persons with whom

26  the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989).  This same

27  standard applies to an official in his individual capacity—Nichelini was deliberately indifferent

28  to the need to train subordinates, and the lack of training actually caused the constitutional harm

or deprivation of rights. *Connick v. Thompson,* 563 U.S. 51, 61 (2011); *Flores v. Cty. of Los*

*Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014). To satisfy the statute, a supervisor's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton,* 489 U.S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.,* at 389. Here, the lack of training is abundantly clear, in that every involved officer, regardless of rank and years of service, committed the same errors. Each officer admitted to not actually listening to the dispatch call as none of them realized that the call was for medical help for Mr. White[3]. None of the involved officers considered Mr. White's obvious mental infirmity into their use of force on him, despite the fact they all recognized that his capacity was diminished. The officers engaged in multiple and taser deployments, including to Mr. White's chest, which was a clear violation of industry-wide practices at the time, and none of the officers were aware of it. Importantly, the Defendant Officers appeared to be unaware that all of the force used on Mr White, including strikes to the ribs, carotid hold, and downward pressure on a restrained and resisting subject could cause him to asphyxiate and die, almost as if each use of force was against a separate individual, without recognizing that all of the force was inflicted on Mr. White himself, who suffered the cumulative effect of all of the force in its totality. The Defendant Officers lack of training on this issues resulted in Mr. White's death. Clearly, Defendant Nichelini's deliberate indifference to the Defendant Officer's training needs caused Plaintiff's harm.  Defendant's argument on this point must fail.

**D. The Defendant Officers' Conduct Shocks the Conscience In Violation of the Fourteenth Amendment**

　　"[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citation omitted). In determining whether excessive force shocks the conscience, the court must first ask "whether the

---

[3] The failure to do the simple act of paying attention to the police radio, which one expects transmits important information (as opposed to listening to music on the radio, for example), is plainly reckless and would seem to be well below the minimum level of competency of police officers entrusted with the responsibility to use force, including deadly force, and to respond to emergency circumstances with some sense of responsibility.  This recklessness is evident throughout the other areas of the defendants' response to Mr. White as described herein, raising a real question of what acceptable standards of policing the defendants and other Vallejo police officers have been permitted to fall beyond.

circumstances are such that actual deliberation [by the officer] is practical." *Id*. at 1137(quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id*. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Porter v. Osborn,* 546 F.3d at 1140. "Deliberate indifference is 'a stringent standard of fault; requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' [Citation.]" *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state. *Patel v. Kent School Dist*., 648 F.3d 965, 974 (9th Cir. 2011).

Again, the Defendant Officers had time to deliberate and develop an appropriate approach to the obviously mentally disturbed Mr. White. Mr. White was alone and confined to the bathroom of the trailer from which he had no means of escape. While confined to the bathroom, Mr. White had no access to people without first encountering the police officers, thus any innocents and the police officers themselves, were safe from any encounter with him. Mr. White pushed against the bathroom door clearly indicating his attention to remain where he was. Clearly, the Defendant Officers had time and the ability to keep the situation static and attempt means of contact that would not necessarily have resulted in Mr. White's death. Instead, consistent with ignoring the contents of the dispatch report, defendants ignored the opportunity to use lesser force, and instead opted to use repeated, extensive force against a person who the defendants knew already was suffering a medical emergency.

**E. Plaintiff's State Law Claims Must go Forward**

Plaintiff properly brings state law claims against the Defendants.

***1. Civil Code § 52.1***

California Civil Code section 52.1, also known as the Bane Act, gives rise to a claim where "a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the

exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ.Code § 52.1(a). To prevail on a Bane Act claim, a plaintiff must demonstrate: 1) an act of interference with a legal right by 2) intimidation, threats or coercion. *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998). Defendants urge that Plaintiffs' Section 52.1 claim fails because there is no violation separate and apart from the conduct supporting the Fourth Amendment violation.

Plaintiff has proven that the Defendant Officers interfered with Mr. White's rights by use of threats, intimidation and violence. "[C]ases involving Fourth Amendment violations that include allegations of excessive force, the excessive force is enough to meet the intimidation, threats, or coercion requirement." See *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084, 1102 (ND Cal. 2005). *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015), which discusses California cases involving detentions alone. The instant matter involves excessive force, and courts in California are still split on whether a Fourth Amendment excessive force violations alone qualifies for the element of interference with a legal right under § 52.1. See e.g., *Haynes v. City and County of San Francisco*, 2010 WL 2991732, at *6 (ND Cal. 2010).

### 2. Negligence

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256, 1264 (2006). The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin,* 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles,* 2 Cal.3d 575, 587 (1970)). In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler,* 171 Cal.App.4th 516, 526, fn.10 (2009). The same questions of fact that preclude summary judgment on Plaintiff's excessive force claim precludes summary judgment on the negligence claim. While pain compliance techniques necessarily result in pain, when heaped on concurrently they can result in death.

Defendants' argument on this point must fail.

*3. Assault and Battery*

It has been long held that an assault and battery claim against a police officer requires that unreasonable force be established. *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272 (1998). Indeed, the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force. *Nelson v. City of Davis*, 709 F.Supp.2d at 992 (2010). Here again, Defendants assert that based on their version of the facts, the Defendant Officers' actions were reasonable and thus do not amount to a violation of assault. Plaintiff has already established that material questions of fact preclude summary judgment on the issue of reasonableness in the constitutional context. These same questions of fact also preclude summary judgment on Plaintiff's assault and battery claims. *Id*. As such, Defendants' argument on this point must also fail.

**F. Plaintiff is Entitled to Punitive Damages[4]**

Punitive damages may be awarded in a § 1983 claim if the defendant's conduct was malicious, wanton, or oppressive. *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). Plaintiff has presented evidence that Mr. White likely asphyxiated after the carotid hold was successfully placed on him and that any kicking and thrashing he did thereafter resulted from his inability to breathe—not out of active resistance. Therefore, all of the force used on him after that (i.e., handcuffing, prone position, knee to his back, leg control holds, hog-tied) was heaped onto a man that was in the process of dying. And Officers Melville and Keutnik carried a dead man out of the trailer, while claiming that he was still living and breathing as a cover up for their collective egregious acts. A reasonable finder of fact could determine these facts necessarily reveal conduct motivated by evil motive or intent or that involving reckless and callous indifference to the federally protected rights of others.

---

[4] Defendants assert that they are entitled to summary judgment on Plaintiff's prayer for declaratory and injunctive relief because Defendant City is not a party to this action. Plaintiff maintains that this fundamental admission is internally inconsistent with their primary claim that Plaintiff's suit "in reality" is a claim against the City of Vallejo making it the real party interest and renders their entire discharge argument disingenuous poppycock.

**CONCLUSION**

This case is fraught with material questions of fact, particularly, whether the Defendant Officers' actions and decisions created a false urgency and situation that caused them to use the amount of force they did and ignore the true nature of the call that Mr. White was a mentally impaired person who needed medical help. This Court may not properly decide these factual questions on summary judgment and should deny Defendants' motion.

**Dated:  April 14, 2016**                              **THE LAW OFFICES OF JOHN L. BURRIS**


/s/ Benjamin Nisenbaum
Benjamin Nisenbaum
Attorney for Plaintiff
**V.W.**