1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.W., a minor, by and through her Guardian Ad Litem, ) Tenaya Barber, Individually and as Successor in Interest of Decedent MICHAEL WHITE, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBERT NICHELINI, et al., <br><br> Defendants. | Case No. 2:12-CV-1629-MCE-AC <br><br> **DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: May 19, 2016 <br> Time: 2:00 p.m. <br> Location: Courtroom 7 <br><br> Honorable Morrison C. England |

# EXHIBIT A

Declaration of Benjamin Nisenbaum in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment
Case No: 2:12-CV-1629-MCE-AC

1

1                     UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
2                     CASE NO. 2:12-CV-01629-LKK-AC

3   V.W., a minor, by and through her      )
    Guardian Ad Litem, Tenaya Barber,      )
4   Individually and as a Successor in     )
    Interest of Decedent MICHAEL WHITE,    )
5                                          )
              Plaintiffs,                  )
6                                          )
    vs.                                    )
7                                          )
    ROBERT NICHELINI, individually;        )
8   BARRY BOERSMA, individually; RAUL      )
    MUNOZ, individually; HERMAN ROBINSON,)
9   individually; JOHN CUNNINGHAM,         )
    individually; MIKE KOUTNIK,            )
10  individually; and DOES 6-25,           )
    individually,                          )
11                                         )
              Defendants.                  )
12  _____)

13

14

15

16              DEPOSITION OF ELIZABETH DARLENE CLAROS

17                    RALEIGH, NORTH CAROLINA

18                      NOVEMBER 6, 2015

19

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376

23  REPORTED BY:   SUZANNE R. WADE, CVR NO. 3870

24  FILE NO.:      A90C042

25

1                  UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
                 CASE NO. 2:12-CV-01629-LKK-AC
3
V.W., a minor, by and through her      )
4  Guardian Ad Litem, Tenaya Barber,    )
   Individually and as a Successor in   )
5  Interest of Decedent MICHAEL WHITE,  )
                                         )
6           Plaintiffs,                  )
                                         )
7  vs.                                   )
                                         )
8  ROBERT NICHELINI, individually;      )
   BARRY BOERSMA, individually; RAUL    )
9  MUNOZ, individually; HERMAN ROBINSON,)
   individually; JOHN CUNNINGHAM,       )
10 individually; MIKE KOUTNIK,          )
   individually; and DOES 6-25,         )
11 individually,                        )
                                         )
12          Defendants.                  )
   --------------------------------------)

13

14

15          Deposition of ELIZABETH DARLENE CLAROS, taken on

16 behalf of the Defendants, Robert Nichelini, Barry Boersma,

17 Raul Munoz, Herman Robinson, John Cunningham, and Mike

18 Koutnik, at Regus Business Center located at 4208 Six Forks

19 Road, Suite 1000, in Raleigh, North Carolina, commencing

20 at 12:12 p.m. on Friday, November 6, 2015, before Suzanne R.

21 Wade, CVR No. 3870.

22

23

24

25

                                                              2

```
 1              RALEIGH, NC; FRIDAY, NOVEMBER 6, 2015; 12:12 P.M.

 2                      ELIZABETH DARLENE CLAROS

 3              having been duly sworn, was examined and

 4              testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MS. FARUQUI:

 7      Q.   Good afternoon, Ms. Claros.  We're obviously in

 8   the morning here because we're in the West Coast.

 9           I didn't hear you spell your last name.  Can you

10   spell that again for me?

11      A.   C-l-a-r-o-s, Claros.

12      Q.   All right.  Thank you.  Ms. Claros, have you

13   ever had your deposition taken before?

14      A.   No.

15      Q.   All right.

16      A.   Well --

17      Q.   What is your --

18      A.   -- when all this happened just with the

19   detective or whatever.  That was it.

20      Q.   Oh, okay.  All right.  So you were interviewed,

21   but it wasn't a formal proceeding like we're here today

22   for.  Is that correct?

23      A.   Correct.

24      Q.   All right.  What is your date of birth?

25      A.   5/14/57.
```

1        Q.   Is that correct?

2        A.   Yes.

3        Q.   Okay.  So you went to -- what time did you

4   approximately go to Ms. Bland's home?

5        A.   I -- I'd say about 12:00 or 1:00.

6        Q.   Was anyone else at Ms. Bland's home other than

7   you?

8        A.   Yes.  Her mother.

9        Q.   What's her mother's name?

10       A.   At that time we called her Mammie, but she's

11  passed away now.

12       Q.   Okay.  And how long were you at Ms. Bland's

13  home?

14       A.   A couple of hours.

15       Q.   And -- and then what did you do next?

16       A.   I went home.

17       Q.   And what did you do when you were at home?  Or

18  tell me what led up to the incident.

19       A.   I -- I made it up on my porch and I went to put

20  the key in my door when all of a sudden I had an arm

21  around my neck.  I did not know at that time what was

22  going on.

23            So I guess God give me strength to overcome it

24  and I -- I got out of the hold.  The man run off the

25  porch.  I came off the porch.  I never got my door

1    unlocked at that time.  I came off the porch.

2            And the lady was on the street there.  She

3    had -- she -- I don't know what she was doing, but I

4    came -- when I came on the street I told her, "You better

5    get that nigger off of me or away from me."

6            I'm sorry.  I'm not prejudiced.  I have no

7    prejudiced bone in my body.  But at that moment I felt

8    like my life was in danger.

9        Q.   And so just as some follow-up questions,

10   you -- were you walking home from Ms. Bland's house and

11   you were on the way to your residence?

12       A.   Yes.

13       Q.   Is that correct?

14       A.   Yes.  That is correct.

15       Q.   And as you were approaching your home, were you

16   on the porch or were about to walk to your front door?

17       A.   I was on my porch fixing to unlock my door.

18       Q.   All right.  And then you felt a man -- do you

19   know who it was at the time who -- who put his arm around

20   your neck?

21       A.   Not at that time.

22       Q.   Did you say anything when this happened?

23       A.   Excuse me?

24       Q.   Did you say anything as this happened to the

25   man?

1          A.   What I just told you.  At the time that he put

2     his arm around my neck, I didn't say anything.

3          Q.   Okay.  So you mentioned you were fearful for

4     your life.  Can you elaborate on that?

5          A.   Well, I thought he was going to choke me.  I

6     didn't know --

7          Q.   So you got -- so you thought that he was trying

8     to kill you?

9          A.   Yes.

10         Q.   Were you scared?

11         A.   Yes.

12              MR. NISENBAUM:  Objection.  Leading.

13    BY MS. FARUQUI:

14         Q.   Then after -- so you said that you were able to

15    get him off of you somehow?

16         A.   Yes.

17         Q.   How did you accomplish that?

18         A.   I guess from God up above.

19         Q.   And after you were able to get him off of you,

20    what happened next?

21         A.   He -- he run off my porch and I run in the

22    street.  And I told Linda Valli -- Villasenor that --

23         Q.   Ms. Villasenor?  Is that --

24         A.   Yes.

25         Q.   What did you tell her?

1        A.    "Get that nigger away from me."

2        Q.    And -- and then what happened?

3        A.    I went inside.  Linda's son came and opened my

4    door, come running inside with a stick, and climbed under

5    my table telling me to call the police because I wasn't

6    going to call the police.

7        Q.    Why were you not going to call the police?

8        A.    I was going to let it go.  There's -- there's so

9    much problems in the world, so I was just going to let it

10   go.

11       Q.    All right.  So what is Linda's son's name?

12       A.    Kenneth Rucho (phonetic).

13       Q.    And how old was he at the time if you know?

14       A.    He's 13 now.  Five years ago he was about nine,

15   ten.

16       Q.    So you -- at this time you're in Linda's home.

17   Is that correct?

18       A.    I was -- no, ma'am.  That's not correct.  I run

19   on the street.  I wasn't in her home.  I was --

20       Q.    And so you're on -- you're on the street.

21       A.    Yes.

22       Q.    Is that correct?

23       A.    Yes.

24       Q.    And you're having this conversation with Linda

25   and her son.  Is that correct?

21

1    15th, 2010, and you said that you don't specifically

2    recall what you said to the police at the time --

3         A.    Does --

4         Q.    -- or to 911?

5         A.    I told them what happened.

6         Q.    All right.  And do you know how much after you

7    called that they showed up to San Marcus Drive?

8         A.    Approximately ten minutes.

9         Q.    Now, you -- you stated that you were interviewed

10   by detectives.  Is that correct?

11        A.    It was a man.  That's all I know.  And I took it

12   to be a detective.

13        Q.    Do you remember what he asked you?  Do you

14   remember the conversation?

15        A.    No, I do not.

16        Q.    Okay.  Do you remember generally what he -- and

17   did he ask you what happened?  Do you remember that?

18        A.    Yes.

19        Q.    And -- and you relayed your answer to him.  Is

20   that correct?

21        A.    Yes.

22        Q.    What time did the incident happen, if you

23   remember, or what time of day?

24        A.    Approximately 4:00 or 5:00.

25        Q.    Did anyone else see Mr. White attack you?

27

1      A.    No.

2      Q.    Do you recall if anybody else was on the street

3  at the time of the incident?

4      A.    No.   Only Linda.

5      Q.    So -- but did Linda witness the incident?

6      A.    No.   I told her.   I -- I told her.

7      Q.    So after you were interviewed by the detective,

8  what happened next?

9      A.    We stayed there three or four hours and then he

10  come -- he brung (sic) us home.   And at that time we did

11  not know what happened.   He interviewed -- he -- when he

12  brung (sic) us home, he took Linda inside and told her

13  what happened.

14      Q.    Okay.   So just to clarify, when you were

15  interviewed by the detective, did he take you to the

16  police station to be interviewed or you were interviewed

17  on your porch?

18      A.    No.   At downtown Vallejo.

19      Q.    Where?   At the police station?   No?

20      A.    It was some building.   I -- I'm not positively

21  sure about that.   It was a building.

22      Q.    Okay.   What I want to clarify, in terms of the

23  event, when the police arrived to the scene, one of the

24  detectives approached you and interviewed you.   Is that

25  correct?

28

```
 1    a little bit?  Is there a gate?  Was there a gate at the
 2    time?
 3         A.   Yes.
 4         Q.   So how would you describe where the gate was in
 5    reference to your property?
 6         A.   The gate was coming up to the porch.  And a lot
 7    of times when I opened the gate, I did not close that gate
 8    back.
 9         Q.   So do you remember if Mr. White opened the gate
10    or if the gate was open at the time?
11         A.   To my knowledge I -- I -- it probably was open.
12         Q.   Did -- do you remember -- after Mr. White
13    attempted to choke you, did he ever shove you against the
14    wall?
15              MR. NISENBAUM:  Objection.  Leading.
16         A.   I do not recall.
17    BY MS. FARUQUI:
18         Q.   Were you ever -- did you have any -- after --
19    did you have any type of visible injuries on your body
20    after the attack?
21         A.   No.
22         Q.   After the incident, did you ever have problems
23    sleeping or any type of anxiety or anything like that?
24         A.   I -- I watched my back.  Yes.
25         Q.   And -- and why did you watch your back?  Were
```

1    Mr. White had choked you did you call them --

2         A.   They came out --

3         Q.   -- if you know?

4         A.   -- they came out there ten -- about ten minutes

5    after I called.

6         Q.   I'm asking you in the time frame between when

7    Mr. White choked you to when you called for the ambulance,

8    how long was that?

9         A.   I -- I didn't call the ambulance.

10        Q.   I'm sorry.  When you called 911, how long was

11   that?

12        A.   Approximately 15 -- ten, 15 minutes.

13        Q.   Ten or 15 minutes from the time when Mr. White

14   choked you until when you called 911?

15        A.   Approximately.

16        Q.   And let me ask you this.  Have you -- have you

17   noticed whether or not you've been experiencing any

18   disturbances in your memory?

19        A.   No, sir.  My memory is doing good as far as I

20   know.

21        Q.   Okay.  And you've never been to a doctor

22   regarding any memory problems then.  Is that correct?

23        A.   That is correct.

24        Q.   Okay.  Do you -- do you recall -- after Mr.

25   White choked you, did you follow him?

41

1    out from under him.

2        Q.   Again, my question is was your air cut off.  Yes

3    or no?

4        A.   No, sir.

5        Q.   Okay.  And then he choked you -- in what -- in

6    what manner did he choke you?  It was from behind,

7    correct?

8        A.   Yes, sir.

9        Q.   And his arm -- one of his arms came around under

10   your neck?

11       A.   Yes, sir.

12       Q.   I'm sorry.  Yes or no?  I didn't hear.

13       A.   Yes.

14       Q.   Okay.  Which arm came around?  His right arm or

15   his left arm?

16       A.   Left.

17       Q.   Okay.  But his left arm would have come around

18   the left side of your neck and then moved around the right

19   side?

20       A.   I would say so.

21       Q.   Okay.  And, of course, you were able to get out

22   of it, correct?

23       A.   That is correct.

24       Q.   And then he did not continue the attack after

25   that, correct?

Atkinson-Baker Court Reporters
www.depo.com

1      A.   That is correct.

2      Q.   But he ran away and then you called 911,

3   correct?

4      A.   When Linda's son come in I called 911, yes.

5      Q.   Right.  And you indicated that you were going to

6   let it go, correct?

7      A.   Yes.

8      Q.   And the reason you were going to let it go is

9   because you didn't suffer any significant injuries,

10   correct?

11      A.   Right.

12      Q.   Okay.  Now, let me ask you this.  You indicate

13   that you're not prejudiced.  Why did you call him a

14   nigger?

15      A.   Well --

16           MS. FARUQUI:  Objection.  Irrelevant.

17      A.   -- you would have probably done the same thing

18   if it had of been vice-a-versa.

19   BY MR. NISENBAUM:

20      Q.   Well, I can tell you that I would have not done

21   the same thing because I am not prejudiced.

22           So my question to you is, if you used the term

23   "nigger," is it a term that you use frequently?  How often

24   do you use that term?

25      A.   That was the first time.

```
 1                    REPORTER'S CERTIFICATE

 2            I, Suzanne R. Wade, CVR No. 3870, Certified

 3   Verbatim Court Reporter, certify:

 4            That the foregoing proceedings were taken before

 5   me at the time and place therein set forth;

 6            That the witness produced to me satisfactory

 7   evidence of identification and was duly sworn by me prior

 8   to the taking of the foregoing deposition;

 9            That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by

12   me and were thereafter transcribed;

13            That the foregoing is a true and correct

14   transcript of my stenomask notes so taken;

15            That the witness waived the right to review her

16   testimony.

17            I further certify that I am not a relative or

18   employee of any attorney of the parties, nor financially

19   interested in the action.

20            I declare under penalty of perjury under the laws

21   of North Carolina that the foregoing is true and correct.

22            Dated this 12th day of November, 2015.

23

24                      _____
                        Suzanne R. Wade, CVR No. 3870
25
```

55

Atkinson-Baker Court Reporters
www.depo.com