1
2
3                    UNITED STATES DISTRICT COURT
4            FOR THE EASTERN DISTRICT OF CALIFORNIA
5
6   V.W., a minor, by and through her Guardian Ad Litem, )   Case No. 2:12-CV-1629-MCE-AC
7   Tenaya Barber, Individually and as Successor in    )
    Interest of Decedent MICHAEL WHITE,                )
8                                                       )   **DECLARATION OF BENJAMIN**
                         Plaintiffs,                    )   **NISENBAUM IN SUPPORT OF**
9                                                       )   **PLAINTIFF'S OPPOSITION TO**
              vs.                                       )   **DEFENDANTS' MOTION FOR**
10                                                      )   **SUMMARY JUDGMENT**
    ROBERT NICHELINI, et al.,                          )
11                                                      )
                         Defendants.                    )   Date: May 19, 2016
12                                                      )   Time: 2:00 p.m.
                                                        )   Location: Courtroom 7
13                                                      )
                                                        )
14                                                      )   Honorable Morrison C. England
                                                        )
15  _____)
16
17
18
19
20
21
22
23
# EXHIBIT B
24
25
26
27
28

DEPOSITION OF OFFICER BARRY BOERSMA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

---oOo---

V.W., a minor, by and through          )
her Guardian Ad Litem, Tenaya          )
Barber, Individually and as a          )
Successor in Interest of               )
Decedent MICHAEL WHITE,                )
                                       )
                Plaintiffs,            )
                                       )
        vs.                            ) Case No.:
                                       ) 2:12-CV-01629-LKK-AC
CITY OF VALLEJO, a municipal           )
corporation; ROBERT NICHELINI,         )
in his individual and official         )
capacity as Chief of Police;           )
Officer Does 1-25, individually,       )
jointly and severally,                 )
                                       ) CERTIFIED COPY
                Defendants.            )
_____)

DEPOSITION OF OFFICER BARRY BOERSMA

WEDNESDAY, AUGUST 27, 2014

REPORTED BY:   ANGELICA R. GUTIERREZ, CSR NO. 13292

DEPOSITION OF OFFICER BARRY BOERSMA

1                          I N D E X

2

3      EXAMINATION BY:                                PAGE

4      MR. NISENBAUM                                      6

5

6

7                          ---o0o---

8

9      Appearance Page                                    3

10     Exhibit Page                                       4

11     Location                                           5

12     Reporter's Certificate                            83

13     Deponent Signature Page                           84

14     Deponent Signature Waiver                         85

15     Witness Letter                                    86

16     Changes and/or Corrections                        87

17     Attorney's Notes                                  88

18

19

20                         --o0o--

21

22

23

24

25

                                                         2

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1                         APPEARANCES

 2

 3      FOR THE PLAINTIFFS:

 4          LAW OFFICES OF JOHN L. BURRIS
            Airport Corporate Centre
 5          7677 Oakport Street, Suite 1120
            Oakland, California 94621
 6          (510) 839-5200

 7          BY:  BENJAMIN NISENBAUM, ATTORNEY AT LAW

 8

 9      FOR THE DEFENDANTS:

10          VALLEJO CITY ATTORNEY'S OFFICE
            555 Santa Clara Street
11          P.O. Box 3068
            Vallejo, California 94590
12          (707) 648-4545

13          BY:  FURAH Z. FARUQUI, ATTORNEY AT LAW

14

15

16

17

18

19

20

21

22

23

24

25

                                                          3
```

DEPOSITION OF OFFICER BARRY BOERSMA

1          Pursuant to Notice of Taking Deposition and on

2     Wednesday, August 27, 2014, commencing at the hour of 3:04

3     p.m., thereof, at the Law Offices of John L. Burris, 7677

4     Oakport Street, Suite 1120, Oakland, California, before

5     me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified

6     Shorthand Reporter and Deposition Officer of the State of

7     California, there personally appeared:

8

9               OFFICER BARRY BOERSMA

10

11    called as a witness by the Plaintiffs, who having been

12    duly sworn by me, to tell the truth, the whole truth and

13    nothing but the truth, testified as hereinafter set forth:

14

15                    ---oOo---

16

17

18

19

20

21

22

23

24

25

                                                            5

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1     who was strangled?
 2         A.   I have to look at her name.  Clarous.
 3         Q.   C-L-A-R-O-U-S?
 4         A.   Yes.
 5         Q.   And when you say that she was strangled, what
 6     do you mean by strangled?
 7         A.   She said that he had -- I don't remember if it
 8     was hands or arm around her neck and squeezed against
 9     her neck and then slamming her into the side of the
10     mobile home.
11         Q.   Okay.  You spoke to her personally?
12         A.   Yes.
13         Q.   And that's what she told you?
14         A.   Yeah.
15         Q.   And was this before or after you interacted
16     with Mr. White?
17         A.   Before.
18         Q.   Okay.  Did she have physical injuries?
19         A.   I didn't see any on her.
20         Q.   Was she breathing okay?
21         A.   Yes.
22         Q.   Okay.  Did she -- did you look for visible
23     injuries?
24         A.   I'm sorry?
25         Q.   Did you look for any visible injuries?
```

16

DEPOSITION OF OFFICER BARRY BOERSMA

1     A.   I did.  I was looking at her neck.

2     Q.   Did you see any marks?

3     A.   I didn't see any, no.

4     Q.   And she was not in medical distress when you

5   saw her, correct?

6     A.   No, she was not.  She said she did not need an

7   ambulance.

8     Q.   Now, you responded to a call to arrive to the

9   scene, correct?

10    A.   I'm sorry?

11    Q.   You responded to a call when you arrived at

12  the scene?

13    A.   Yes.

14    Q.   Were you dispatched personally?

15    A.   Yes.

16    Q.   Meaning dispatch sent you on it, correct?

17    A.   Yes.

18    Q.   Did you hear the dispatch call?

19    A.   Yes.

20    Q.   Okay.  Were you wearing an earpiece?

21    A.   I don't remember.

22    Q.   Okay.  Were you in your car at the time?

23    A.   I think so.

24    Q.   Have you reviewed any documents in preparation

25  for today's deposition?

17

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1    dispatch still staged medical.
 2         Q.   It did?
 3         A.   Yeah.
 4         Q.   So I'm going to play the recording --
 5         A.   Okay.
 6         Q.   -- just a little bit and I would like for you
 7    to transcribe.  I'm going start the recording at 2:01.
 8    It will come up in maybe about ten seconds.
 9         A.   Okay.
10         Q.   But the main transmission will come up shortly
11    and then I'll pause it after the transmission is
12    completed.
13         A.   Okay.
14              "DISPATCHER:  I have a call for you.  Respond
15    with fire.  Originally an elderly neighbor stating that
16    a male subject needed an ambulance.  Something's not
17    right with him.  She stated he came inside her unit,
18    choked her, and then went back into his unit.  This is
19    going to be at 395 San Marcos for the original victim X
20    and the responsible inside of 392.  And we're going to
21    have fire and ambulance staged."
22              MR. NISENBAUM:  Q.  Okay.  So I stopped it at
23    2:36.  Does that refresh your recollection as to the
24    dispatch call that you heard?
25         A.   Yes.
```

20

DEPOSITION OF OFFICER BARRY BOERSMA

1    time when you talked to the woman, all the information

2    she gave you, you've already told me that she told you

3    that he had strangled her; is that right?

4         A.    Yes.

5         Q.    And that he pushed her against the wall,

6    causing her to bump her head, correct?

7         A.    Yes.

8         Q.    Okay.  Anything else that she told you about

9    what he had done?

10        A.    That he had done, no.

11        Q.    Okay.  I guess you learned from her that he

12   had gone back into a residence?

13        A.    Yes.

14        Q.    That he was inside a particular residence?

15        A.    Yes.

16        Q.    Was it his own residence, to your knowledge?

17        A.    His girlfriend told me it's where he had been

18   staying for two weeks.

19        Q.    Okay.  Did you know the man?

20        A.    I don't think so.

21        Q.    And in terms of whether or not the man was in

22   possession of any weapons, did anyone tell you that he

23   had had any weapons?

24        A.    No.

25        Q.    Did you see any weapons?

25

DEPOSITION OF OFFICER BARRY BOERSMA

1      Q.    Yes.

2            MS. FARUQUI:  Why don't you refer to her by

3      name.

4            MR. NISENBAUM:  I'm not sure how to pronounce

5      it.

6            MS. FARUQUI:  Darlene.

7            THE WITNESS:  Darlene.

8            MR. NISENBAUM:  And her last name is Clarous?

9            MS. FARUQUI:  Yeah.

10           MR. NISENBAUM:  C-L-A-R-O-U-S.  Could be

11     Clarous, I'm not certain.

12           THE WITNESS:  C-L-A-R-O-U-S.

13           MR. NISENBAUM:  Q.  And how long do you think

14     you talked to her?

15     A.    Well, not very long.

16     Q.    Did you ask her any questions about what's

17     wrong with him, meaning Mr. White?

18     A.    I asked why did he do it.

19     Q.    And what did she say?

20     A.    She said she has no idea.  She says there was

21     no reason at all.

22     Q.    Did she indicate that he was acting in a

23     bizarre manner?

24     A.    She said he was acting crazy and she said she

25     doesn't know if he's high on something or what his

                                                        28

DEPOSITION OF OFFICER BARRY BOERSMA

1    problem is, something like that.

2        Q.    Okay.  Did you ask his name?

3        A.    I think I did.

4        Q.    Did she give it to you?

5        A.    I can't remember.

6        Q.    Do you know whether or not you knew anything

7    about whether he was on probation or parole?

8        A.    I did, but that was from Ms. Villasenor.

9        Q.    When did you learn that from her?

10       A.    So after speaking with Ms. Clarous, I walked

11   over and Ms. Villasenor was out front and I spoke with

12   her and I asked her what happened.  And she said that

13   he's crazy, that he's high, that he's high on dope.

14   And that he pushed her.  That he was on parole.  That

15   she let him stay with her for two weeks and she wanted

16   him out.

17       Q.    Did you have an understanding that he was

18   living there for two weeks?

19       A.    Yes, that's what she told me.

20       Q.    Okay.  And so did she tell you any offenses

21   for which she was on parole for?

22       A.    That he was on parole for?

23       Q.    Correct.

24       A.    No.

25       Q.    Did you run his name at all?

                                                         29

DEPOSITION OF OFFICER BARRY BOERSMA

1       A.   I don't think so.

2       Q.   But she did give it to you, correct,

3   Ms. Villasenor?

4       A.   Yes, I think she did.

5       Q.   Okay.  According to this report there was a

6   white man in his late 40s with a lot of tattoos who

7   flagged you down.  Do you recall that?

8       A.   Yes.

9       Q.   Do you know who that was?

10      A.   I don't know his name.

11      Q.   All right.  What did he tell you?

12      A.   He said -- you know, for best recollection I

13   should probably look at this.

14      Q.   If you don't remember, use that.  But what I

15   want you to do --

16      A.   I remember generally what he was telling me.

17      Q.   Why don't we do it this way.  Tell me

18   generally what you recall and then look at that.  If

19   that refreshes your recollection further, then tell me

20   how so.  And if it doesn't, but it's different, then

21   you can read that and just say that's what's in the

22   report.

23      A.   Okay.

24      Q.   Go ahead.

25      A.   I remember him saying that the guy was high on

30

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1    dope.  That he looked crazy.  He said you better do
 2    something or something is going to happen.
 3         Q.   Okay.
 4         A.   Yeah, something like that.
 5         Q.   All right.
 6         A.   That's pretty close.  That's about what I
 7    remember too.
 8         Q.   Okay.  And as I understand it, it was after
 9    that that you spoke with Ms. Villasenor?
10         A.   You know, yes, it was after that.  I forget if
11    he flagged me down, if I spoke to him first, or if he
12    said that as I pulled up and then I spoke to Clarous,
13    or -- I don't remember the order, to be honest with
14    you.
15         Q.   In any event, you spoke to at least three
16    different civilians?
17         A.   Yes.
18         Q.   Is there any other information that you recall
19    being told that you haven't told me yet from any of
20    these three?
21         A.   I think I asked Villasenor about the -- what
22    kind of dope he was on and she said crack.
23         Q.   Okay.
24         A.   She said but it could be anything.  Crack, but
25    it could be anything.
```

31

DEPOSITION OF OFFICER BARRY BOERSMA

```
1         Q.    She said that Mr. White used crack but it
2    could be anything?
3         A.    Yeah.
4         Q.    At some point in time you entered the trailer
5    where he was located?
6         A.    Yes.
7         Q.    And the two other officers, Officers
8    Cunningham and Robinson, were already in there,
9    correct?
10        A.    Yes.
11        Q.    Had you talk to them at all at the scene prior
12   to going into the trailer?
13        A.    No.
14        Q.    Okay.  Do you know who they spoke to, if
15   anyone?
16        A.    I believe -- I'd be guessing.  I really don't
17   know.
18        Q.    Okay.  When you went in the trailer -- strike
19   that.
20              Had you heard any sounds from the trailer
21   prior to going in?
22        A.    No.
23        Q.    You didn't hear the sound of anyone yelling or
24   making nonsensical sounds?
25        A.    No.
```

                                                                    32

DEPOSITION OF OFFICER BARRY BOERSMA

1    Q.   When you went in the trailer, did you talk to
2    the two officers?
3    A.   Yes.
4    Q.   And what did you guys talk about?
5    A.   I asked if they had contacted him already.
6    They said they were trying to, that he was in this
7    bathroom and he wasn't coming out.  That he was really
8    agitated.  And they had a bad feeling about it.  And
9    the sergeant, that's when he called for another unit.
10   Q.   So they told you specifically that they had a
11   really bad feeling about it?
12   A.   Yeah.
13   Q.   Did you tell that to investigators when you
14   were being interviewed?
15   A.   I think so.
16   Q.   I don't know.  I'm looking at the interview
17   here and I'll just read it.  This is Bates stamp 19, at
18   the last paragraph.  "Boersma stated that he contacted
19   Sergeant Robinson and Officer Cunningham in the
20   trailer.  Boersma stated that the officers told him
21   that White had barricaded himself in the bathroom, was
22   refusing to come out, and that they had been attempting
23   to talk to White.  Boersma said that he, sergeant
24   Robinson and Cunningham then attempted to recontact
25   White."

33

DEPOSITION OF OFFICER BARRY BOERSMA

1      MS. FARUQUI:  Can you just say the number

2    because his isn't Bates stamped.

3      MR. NISENBAUM:  At the top it's page 7.

4      THE WITNESS:  Yeah.  I was following you.

5      MR. NISENBAUM:  Q.  Okay.

6   A.   Yeah, I mean, I'm just telling you what I

7    remember.

8      MR. NISENBAUM:  One moment.

9      (Off the record.)

10      MR. NISENBAUM:  Q.  And did they elaborate

11    what they meant by "bad feeling"?

12   A.   Just because he was really agitated when they

13    were trying to contact him.  That's what they said.

14   Q.   They had a sense that he was pretty disturbed?

15   A.   Yes.

16   Q.   That this was a man who really needed help?

17   A.   There was something wrong with this guy.

18   Q.   Something psychiatrically possibly wrong,

19    correct?

20   A.   I don't know.

21   Q.   Could be medical, could be psychiatric?

22   A.   Could be the drugs, yeah.

23   Q.   Something perhaps past your skill level,

24    correct?

25   A.   Well, to diagnose it as psychiatric, yes.

34

DEPOSITION OF OFFICER BARRY BOERSMA

1      A.    Well, I can -- for me would it be, you know,

2   locking the doors, stacking things against the door,

3   that sort of thing would be barricaded.

4      Q.    You indicated for you.  But with respect to

5   being a police officer, is there a term called

6   "barricaded subject"?

7      A.    Yes.  But, I mean, for me that's what it

8   means, that's he's locked himself up in the room.

9      Q.    That's your understanding of what it means?

10     A.    Yes.

11     Q.    A person who's enclosed with no place to go,

12  no means of egress or access?

13     A.    Taking steps to prevent people from coming in,

14  to me that's barricaded.

15     Q.    You said the door was open a crack.

16     A.    Yes.

17     Q.    So you didn't see it as a barricaded

18  subject --

19     A.    Not really, no.

20     Q.    Let me finish the question.

21     A.    Okay.

22     Q.    You did not see it barricaded subject

23  situation?

24     A.    No.

25     Q.    Okay.  Did you ask either of the two officers

38

DEPOSITION OF OFFICER BARRY BOERSMA

1      if there were any weapons they found and secured?

2          A.   No.

3          Q.   Were you talking to them in the bathroom --

4      not the bathroom, the bedroom?

5          A.   I think the hallway just outside the bedroom.

6          Q.   Okay.  And did you develop any type of plan of

7      action?

8          A.   Just we were going to try to talk him out.

9          Q.   Okay.  How long did you guys talk before you

10     decided what to do?

11         A.   I asked him to come out several times.

12         Q.   Hold on.

13         A.   How long?

14         Q.   How long did you and the other two officers

15     talk before deciding on the plan of action?

16         A.   Oh, I'm sorry.  I don't know, maybe a minute.

17         Q.   Okay.  And the decision was that you were

18     going to try to talk him out of the bathroom?

19         A.   Yes.

20         Q.   And was any officer designated to be the lead

21     person to do it or not?

22         A.   No, I don't think it was really brought up,

23     but I think I was the lead guy.

24         Q.   You were the most senior; is that right?

25         A.   No, I wasn't.

                                                        39

DEPOSITION OF OFFICER BARRY BOERSMA

1        Q.    Who was?

2        A.    Robinson.

3        Q.    Okay.

4        A.    He's got me by over ten years.

5        Q.    Had you heard any sounds from the bathroom?

6        A.    Before going up to it, no.

7        Q.    Okay.  And when you were talking in the

8    hallway for about that minute deciding on what you were

9    going to do, had you heard any sounds from the bathroom

10   then?

11       A.    No.

12       Q.    So you walked up to the bathroom?

13       A.    Yes.

14       Q.    So I assume you walked up to the door?

15       A.    Yes.

16       Q.    And the door was cracked slightly?

17       A.    Yes.

18       Q.    Was the light on inside?

19       A.    I don't remember.

20       Q.    Inside the bathroom?

21       A.    I don't remember.

22       Q.    Was it daytime or nighttime?

23       A.    Daytime.

24       Q.    And was it a sunny day?

25       A.    Yes.

                                                        40

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1        Q.   How was visibilty inside the house?
 2        A.   Good, because I remember there was a window in
 3   the bedroom, but I don't think there was a window in
 4   the bathroom.
 5        Q.   How did you know?
 6        A.   I'm just -- that's what I remember.
 7        Q.   Okay.  So you walked up to the bathroom door?
 8        A.   Yes.
 9        Q.   And what did you say?  What did you do?
10        A.   I knocked at the door, asked for Mr. White to
11   come on out, said we need to talk to him.  And I waited
12   for him to come out.
13        Q.   Did you use his name?
14        A.   I believe so.
15        Q.   Did you say Mr. White or did you say Michael,
16   if you remember?
17        A.   I don't remember.
18        Q.   Did you say --
19        A.   We try to use people's last names unless I
20   really know them.
21        Q.   So you tried to talk to him and ask him to
22   come out?
23        A.   Yes.
24        Q.   And was there any response?
25        A.   It was quiet and I couldn't see into the
```

41

DEPOSITION OF OFFICER BARRY BOERSMA

1    bathroom.  And I pushed at the door and he pushed back.

2    And he didn't close it all the way, but he just pushed

3    back.  And I heard like okay, okay, okay.  So I gave

4    him a little more time.  And he still wasn't coming

5    out.

6         Q.   Let me stop you there.

7         A.   Okay.

8         Q.   When you say he didn't close it all the way, I

9    assume you didn't have your foot in there blocking it,

10   preventing it from closing all the way?

11        A.   No, not at that point.

12        Q.   When he pushed the door back, he just didn't

13   push it back hard enough for it to close all the way?

14        A.   Yeah.  We were trying to really be low key to

15   not get him agitated.  I wanted it to be on his terms

16   coming out.

17        Q.   You recognized that he was in distress and you

18   wanted to be very mellow with him?

19        A.   I knew there was something going on with him,

20   yes.

21        Q.   Right.

22        A.   Okay.  From what everybody was saying.

23        Q.   Okay.

24        A.   So I gave him more time to come out and he

25   still wouldn't come out.

                                                          42

DEPOSITION OF OFFICER BARRY BOERSMA

1          Q.   How much more time did you give him?

2          A.   It was seconds, but I don't know how many

3     really, maybe ten, 15 seconds.  You know, you'd expect

4     him to just come out, but now I knew at least he wasn't

5     on the toilet or anything because he was right there by

6     the door to push back.  So I was expecting him to come

7     out quickly and I was getting concerned about what he

8     was doing inside.  You know, I just didn't know what he

9     was doing in there.

10         Q.   You couldn't see any actions that he was

11    doing, correct?

12         A.   At that point, no.

13         Q.   Now, the way the bathroom is situated, if

14    you're standing at the door and the door is cracked,

15    were you able to look somewhat inside at least through

16    the crack?

17         A.   A little bit.

18         Q.   And what -- from there, what would you be

19    looking at, like a vanity, a wall?

20         A.   It was -- I don't remember.  I really don't.

21    It was -- I really don't remember.  I know it wasn't

22    him, that's what I know.

23         Q.   And he responded to you in English, right?  He

24    said okay, okay?

25         A.   I think so, but it was faint.  It was like

                                                         43

DEPOSITION OF OFFICER BARRY BOERSMA

1    mumbling.

2        Q.   Okay.  So after the ten to 15 seconds that you

3    gave him, what happened next -- oh, let me ask you

4    this, during that time period, did you talk to the

5    other two officers?

6        A.   While we're standing there?

7        Q.   Yeah.

8        A.   No.

9        Q.   Okay.  Anything in your hand?

10       A.   Oh, we might have gotten our tasers out

11   because we were getting concerned --

12       Q.   You in particular --

13       A.   -- about what he was doing inside there.

14       Q.   You in particular, did you have your taser

15   out?

16       A.   I did.

17       Q.   Okay.  Do you know if the other two officers

18   had their tasers out?

19       A.   At that time, I don't remember.

20       Q.   Did you hear the sound of movement inside that

21   bathroom during that ten to 15 seconds?

22       A.   Yes, I did hear some movement.

23       Q.   What type of movement, what sound?

24       A.   Just sounded like footsteps, shuffling.

25       Q.   So it sounded like he was walking away from

                                                        44

DEPOSITION OF OFFICER BARRY BOERSMA

```
1    the door?
2         A.   No.  It sounded very close to the door.
3         Q.   Okay.  All right.  And then so after the ten
4    to 15 seconds pass, what happened next?
5         A.   Okay.  So I pushed on the door again and he
6    might have said something more.  I can't remember.  And
7    then he pushed back really fast to close it.  And I was
8    getting concerned of what he was doing in there because
9    he wasn't coming out and he was right by the door.  I
10   was -- and I was trying to see what he was doing.  And
11   so I pushed harder on the door after he had pushed it
12   back, and that's when I saw him with what looked like a
13   bag of dope in his hand.
14        Q.   Let me ask you this, you said you indicated
15   that you were very concerned about what he was doing.
16        A.   Yes.
17        Q.   Were you concerned that he might be gaining
18   possession of a weapon in some way?
19        A.   I was certainly concerned about that.
20        Q.   With respect to the other people who were
21   available, there was at least one person who lived in
22   that residence, correct?
23        A.   Yes.
24        Q.   Okay.  And at no time was she ever consulted
25   as to whether or not there was any weapons inside the
```

45

DEPOSITION OF OFFICER BARRY BOERSMA

1    suggested he needed medical help, right?

2        A.   That something was wrong with him, yes.

3        Q.   Okay.  So he pushed on the door?

4        A.   Yes.

5        Q.   How many times did it happen that you pushed

6    and he pushed back?

7        A.   Before I saw the dope, probably I think it was

8    on the third push.

9        Q.   And the dope you saw, what did you see?

10       A.   I saw it looked like about a golf ball size,

11   maybe smaller, white, chalky yellowy-looking substance.

12   I thought it was meth is what I thought.  And it was in

13   a plastic bag.  And he was putting it up to his mouth.

14       Q.   And what's the next thing that happened?

15       A.   I told the other officers he's eating dope and

16   that changes the whole thing.  You know, now it's

17   urgent.  We need to stop him from eating the dope.  I'm

18   yelling, saying, I don't care about the dope, we're not

19   here about the dope.  Throw the dope down.  Come out.

20   And I'm pushing on the door and he's pushing back.

21   And, I mean, it gets into this huge tugging match with

22   this door back and forth.  And, you know, I'm yelling

23   just come out, throw down the dope.  I don't care about

24   that.  Just throw it down because -- yeah, I mean, sure

25   I'm thinking destruction of evidence, but I'm thinking

47

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1        A.    Yes.

 2        Q.    And how did that happen?

 3        A.    Between us pushing and him pushing on the

 4   door, the door completely broke off the hinges.

 5        Q.    Was he gripping one part of the door, one side

 6   of the door?

 7        A.    Well, he was pushing it.  And once it broke

 8   off he was like pushing it on top of us and we were

 9   pushing it back on him.  And it was kind of ridiculous,

10   we had this door in between us for a while and it

11   wasn't even attached.  And I think it was at that point

12   around the door somehow that one of the officers

13   managed to tase him.  And I tried to tasing him once we

14   got this door partially opened and my taser didn't

15   work.

16        Q.    What do you mean it didn't work?

17        A.    I don't know, it didn't work.  Nothing fired,

18   nothing happened.

19        Q.    You tried to tase him in dart mode?

20        A.    Yes.

21        Q.    And the darts did not fly out?

22        A.    No.

23        Q.    Like it was out of battery or something?

24        A.    Maybe.  I saw lights on it.

25        Q.    Okay.
```

49

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1        A.   So I don't know.
 2        Q.   Did you hear any clicking sounds associated
 3   with it?
 4        A.   No.
 5        Q.   Okay.  Were you injured at all in this
 6   incident?
 7        A.   My hand was sore.  And my ribs on one side.
 8        Q.   Which side?
 9        A.   This side.
10        Q.   By this side, you mean your left side?
11        A.   My left side, I'm sorry, yes.
12        Q.   And do you know how those injuries happened?
13        A.   The hand, I'm not sure if it was -- looking
14   back on it now, I'm not sure if was from punches or
15   from when he was elbowing me.
16        Q.   He punched you at some point?
17        A.   Well, he punched at us around the door.  He
18   was actually taking a boxer stance at some point and
19   would back us up away from the door, some of the guys
20   when they'd get around the door.
21        Q.   Was this when the door was off its hinges?
22        A.   Yeah.
23        Q.   Okay.  And was he pushing the door with one
24   hand, holding the door up with one hand and punching
25   with the other?
```

50

DEPOSITION OF OFFICER BARRY BOERSMA

1   seeing what he's doing, right?

2       A.   This was not that kind of situation.  This was

3   a violent engagement.  We were already engaging with

4   him.  He was very strong.  He was pushing on that door.

5   He would strike out at us.  We had to -- I was

6   concerned about the dope and him eating more dope.  I

7   was -- I wanted to make sure that he wasn't -- yeah,

8   no, I wouldn't have thought of that.

9       Q.   Did you actually see him eat dope?

10      A.   I saw him biting at the bag and chomping down.

11  To say that he actually -- I saw that white powder in

12  his mouth, no.

13      Q.   And you didn't see it around his face either,

14  correct?

15      A.   No.

16      Q.   You don't know that the bag ever opened,

17  correct?

18      A.   I don't know.

19      Q.   Okay.  And so you don't know that any of the

20  biting pierced the bag, correct?

21      A.   I don't know.  I was certainly concerned about

22  that.

23      Q.   So if I understand correctly, he was in the

24  bathroom, you were trying to get into the bathroom.  He

25  didn't want you in the bathroom.  And you kept trying

52

DEPOSITION OF OFFICER BARRY BOERSMA

1     you know, it was different.

2          Q.    You saw Officer Cunningham taser Mr. White?

3          A.    I know at some point my taser wasn't working

4     and I put it away and somebody else got theirs to work.

5     I don't remember who tasered him first.

6          Q.    If I told you Officer Munoz tasered him first,

7     would you disagree with that?

8          A.    I couldn't argue one way or the other.

9          Q.    From your report, my Bates stamp 20, page 8,

10    supplemental report, and starting with the

11    second-to-last paragraph, "Boersma stated that Officer

12    Munoz was then able to deploy his taser and that he

13    believed that the taser dart then struck White.

14    Boersma stated that White screamed after being struck

15    by the taser, backed up, and was still able to push

16    back on the door even after being struck with the

17    taser."

18          A.    Yeah.

19          Q.    "Boersma stated that he had deployed his taser

20    in the past on suspect and that White's reaction to the

21    taser was not the typical reaction.  Boersma stated

22    that White was able to fight through the taser and was

23    not immobilized by it.  Boersma did not know if the

24    taser stopped cycling and did not know how many times

25    the taser had been activated."

                                                          57

DEPOSITION OF OFFICER BARRY BOERSMA

1       A.   Right.

2       Q.   "But observed that the taser appeared to not

3   be effective against White.  Boersma said that White

4   was still able to push on the bathroom door.  Boersma

5   said that White was still in the bathroom during the

6   incident that they were in the bedroom.  Boersma stated

7   that Officer Cunningham then tasered White.  Based on

8   that, the first taser did not appear to be effective.

9   Boersma stated that white reacted the same to Officer

10  Cunningham's taser deployment."

11      A.   Okay.  Yeah.  So then I remembered the -- the

12  whole sequence of who fired what first.

13      Q.   Okay.

14      A.   Off the top of my mind now, I couldn't tell

15  you.

16      Q.   So what I just read refreshes your

17  recollection?

18      A.   That sounds right to me.

19      Q.   But you would certainly say that the statement

20  is accurate?

21      A.   Yes.

22      Q.   Okay.

23      A.   That's fair to say.

24      Q.   I take it as you sit here now you don't know

25  how many times Officer Cunningham activated his taser

                                                      58

DEPOSITION OF OFFICER BARRY BOERSMA

1   against Mr. White, fair?

2       A.   I do not.

3       Q.   The statement goes on to say that "Boersma

4   said that he and other officers continued to fight

5   against White as he struggled with the door and that

6   the taser still did not appear to have any effect on

7   White.  Boersma stated that he was then able to push at

8   the door and that White went down to the floor.

9   Boersma stated that he then entered the bathroom and

10  that Officer Munoz was also -- to also able to enter

11  the bathroom."  Grammatical errors are in the report.

12      A.   Okay.

13      Q.   Does that refresh your recollection?

14      A.   Yes.

15      Q.   So after Cunningham tased him, you were able

16  to push the door and wipe him down to the floor,

17  correct?

18      A.   Yes.

19      Q.   And was the door on top of White when he went

20  down to the floor, Mr. White?

21      A.   To be honest, I couldn't tell you if he had --

22  if it was from me pushing the door or if it finally was

23  the taser having some effect, I don't know.

24      Q.   Okay.  What happened to the door, did that go

25  down on top of Mr. White?  Where did it go?

                                                        59

DEPOSITION OF OFFICER BARRY BOERSMA

1       A.   No.  Sergeant Robinson finally ended up

2   grabbing it and getting out of the middle of the fray.

3       Q.   So he threw it somewhere in the bedroom?

4       A.   In the bedroom, yeah.

5       Q.   Okay.  How did Mr. White go down to the floor,

6   in what position was he?

7       A.   He crumpled down to his knees, and that's when

8   Officer Munoz might have got in there.  And then I

9   think might have even got down seated flat on his butt.

10      Q.   Okay.  And at that time, you could tell

11  that -- well, strike that.

12           When did you first realize he wasn't wearing a

13  shirt?

14      A.   You know, I don't know.  Probably when I

15  noticed it is when I went to grab him.

16      Q.   After he had gone down to the ground?

17      A.   Yeah.

18      Q.   After the -- after you made entry into the

19  bathroom?

20      A.   Yes.

21      Q.   Okay.  And, again, did it look like there were

22  any weapons in his possession?

23      A.   No.

24      Q.   Did it look like there were any weapons in the

25  bathroom that he might be able to possess?

                                                        60

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1        A.   Yeah.  And I think my hand was back there as
 2   well when I was trying to grab his arm and that's --
 3   maybe that's when my hand got hurt.
 4        Q.   You were aware that Officer Munoz was punching
 5   Mr. White?
 6        A.   Yes, because Mr. White was punching at him.
 7        Q.   I'm just asking what you saw.
 8        A.   Yes.
 9        Q.   You saw Officer Munoz actually strike
10   Mr. White, correct?
11        A.   I did.
12        Q.   Where?
13        A.   In the -- I think like the right shoulder.
14             MR. NISENBAUM:  One second.
15             (Off the record.)
16             (WHEREUPON, the record was read by the
17             reporter.)
18             MR. NISENBAUM:  Q.  All right.  Did you ever
19   strike Mr. White?
20        A.   No.
21        Q.   Okay.  At some point you put him in a carotid
22   restraint, correct?
23        A.   Yes.
24        Q.   All right.  Explain what happened up to that
25   point.
```

                                                              62

DEPOSITION OF OFFICER BARRY BOERSMA

```
 1        A.    Okay.  I was behind him, Officer Munoz was in
 2    front, he was kicking and punching Officer Munoz.  When
 3    I tried to grab his arm, it was very slippery and I
 4    couldn't hold on well.  And he started elbowing me and
 5    that's when I decided to use the carotid restraint.
 6        Q.    Okay.  So he was elbowing you and this is when
 7    he's elbowing your side and hand?
 8        A.    Right.
 9        Q.    And so he elbowed you in your side and your
10    hand and he was kicking at Officer Munoz?
11        A.    Yes.
12        Q.    Was he on his back at that time?
13        A.    I think he was flat on his butt.
14        Q.    Okay.  Flat on his butt?
15        A.    Yes.
16        Q.    Okay.
17        A.    So sitting upright and doing this and then
18    engaging Raul when he was trying to grab him, Officer
19    Munoz.
20        Q.    So you got on your knees to do this?
21        A.    Yes.
22        Q.    So you got on your knees.  Was your stomach --
23        A.    Yes.  I'm down behind him and I'm trying to
24    grab the arm and that's when I'm taking the shots.
25        Q.    Was your stomach pressed against his back?
```

DEPOSITION OF OFFICER BARRY BOERSMA

1      pressure, correct?

2          A.    Yes.

3          Q.    And were you, in fact, in contact with the

4      sides of his neck?

5          A.    Yes.

6          Q.    Okay.  And the sides of the neck is where the

7      carotid artery is, correct?

8          A.    Yeah, but I thought it was more forward.  So I

9      wasn't sure if I was really getting good contact.

10         Q.    You felt good contact with the skin, you just

11     don't know if you had contact with the arteries.

12         A.    That's correct.

13         Q.    And what kind of effort did you put into it,

14     did you apply it with?

15         A.    It doesn't take much.  You know, moderate

16     pressure.  I don't know how to -- you're not trying to

17     really squeeze the neck down to anything.  You're

18     certainly trying to apply pressure just on those

19     carotid arteries.

20         Q.    What you're trying to do is block blood flow

21     to the brain, right?

22         A.    Yes.

23         Q.    Such that you'll cause him to pass out?

24         A.    Yes, so we can get him handcuffed.

25         Q.    And you've been trained that if you apply it

                                                              66

DEPOSITION OF OFFICER BARRY BOERSMA

1    for too long, it can cause brain damage, correct?

2         A.   Yes.

3         Q.   And that's called anoxia, right?

4         A.   I don't know what it's called.

5         Q.   Brain injury caused by lack of oxygen to the

6    brain you understand can result from a carotid

7    restraint that is applied too long, correct?

8         A.   Yes.

9         Q.   Okay.  How long did you apply this carotid?

10        A.   I'd say it was about 30 seconds or less.  I

11   think less.

12        Q.   You did not count it in your head or did you?

13        A.   No.

14        Q.   Do you have any training regarding whether

15   you're supposed to keep track of how long you are

16   applying the carotid?

17        A.   Yes.

18        Q.   And what is your training in that regard?

19        A.   It's you're not supposed to apply it for more

20   than 30 seconds.

21        Q.   And that means you're supposed to count it off

22   in your head, correct?

23        A.   Yes, or estimate 30 seconds.

24        Q.   What they train you to do, if possible, is to

25   keep track of it mentally, assuming that you don't have

67

DEPOSITION OF OFFICER BARRY BOERSMA

1    carotid restraint it is today.

2         Q.    I remember being young and watching WWF, they

3    had a sleeper hold.  Is that what -- do you know what

4    I'm referring to, a sleeper hold?

5         A.    No.

6         Q.    Okay.

7         A.    I didn't watch WWF.

8         Q.    I think it's more well-known than that.

9         A.    Okay.

10        Q.    I was quite young, a child.

11              So during the count with the carotid, did you

12    complete your count to 30?

13        A.    I was estimating time and I think it was -- it

14    was prior to the 30 seconds that Officer Munoz got --

15    he quit resisting.  And I wouldn't say he went

16    completely limp, but he quit resisting.  And Officer

17    Munoz got hold of his hand and got the cuff on.  And

18    then I released the carotid and I was able to grab his

19    arm without any resistance.

20        Q.    So in your mind, the carotid was effective?

21        A.    You know, even now I'm not sure if it was me

22    or if he just got so wound up from struggling with us.

23    I think -- it might have been.  I could certainly say

24    that, yes, I think it might have been.

25        Q.    Okay.  Were you able to get the other cuff on?

                                                              71

DEPOSITION OF OFFICER BARRY BOERSMA

1      A.    Yes.

2      Q.    And you did that while he was still kind of

3  out of it?

4      A.    Yes.

5      Q.    Okay.  And then what happened?

6      A.    Officer Munoz had him.  We had him on his side

7  in the bathroom and then I was looking at him and he

8  had -- his teeth were clenched, but I couldn't tell if

9  he was breathing.  And I was getting concerned about

10  his breathing.  And we pulled him out into the living

11  room or the -- I'm sorry, the bedroom, just out into

12  the bedroom, Raul and I, and I still couldn't tell if

13  he was breathing and I was getting concerned so I'm

14  going to seek paramedics.  And I ran out, and as I was

15  running down the side of the mobile home out front, I

16  bumped into Officer Melville and I told him we needed a

17  CPR mask and to hurry.  And I went back in and when I

18  went back in, he was coming to.

19      Q.    Okay.  So he was coming to, what position was

20  he in?

21      A.    Let's see, you know, I don't remember.  He was

22  either on his side or seated upright.

23      Q.    Was he still in the bathroom?

24      A.    No, I don't think so.

25      Q.    Where was he?

DEPOSITION OF OFFICER BARRY BOERSMA

1      A.   I think he was in the bedroom.

2      Q.   Had the paramedics arrived yet?  They were

3  actually at the scene staging already, right?

4      A.   Yeah.  They were not there yet and I think

5  shortly after that, I mean, just a minute or so after

6  that, the fire paramedics were there.

7      Q.   Meaning they were going into the area?

8      A.   No.  I mean walking into the trailer.

9      Q.   That's what I mean.

10     A.   Yes.

11     Q.   Now, had they been staging before this?

12     A.   Yes.

13     Q.   Where were they staging at?

14     A.   I don't know.

15     Q.   Do you know if they were within a block?

16     A.   I don't know.

17     Q.   Typically when they stage, how far away do

18  they stage?

19     A.   I don't know.  I really don't know.

20     Q.   All right.  So what happened?

21     A.   Okay.  So Mr. White is kicking at people, he's

22  on the floor cuffed.  He kicks at the paramedics as

23  they are coming in.  And I remember saying, you know,

24  let's just back off, you know, he's not going anywhere.

25  He didn't seem to be able to sit up.  Or was he up?  I

73

DEPOSITION OF OFFICER BARRY BOERSMA

```
1     remember.  He was on the floor.  And when people would
2     walk by, he would kick out at them.  We just backed up
3     and let him kick.
4          Q.   You backed up and let him kick?
5          A.   Yeah.
6          Q.   He was handcuffed, so...
7          A.   Yeah.
8          Q.   And how long did you let that go on for?
9          A.   Boy, I'm going to say a couple minutes at
10    least.
11         Q.   And then what happened?
12         A.   The paramedics, the ambulance was arriving.
13    And I guess there's fire paramedics that were already
14    there, but the ambulance was arriving.  And I remember
15    it being discussed that we're going to have to secure
16    his legs, he can't be kicking everybody when they try
17    to load him on to the ambulance.  And Officer Keutnik,
18    I remember Officer Keutnik, and might have been Officer
19    Melville, but I'm not positive, ended up turning him
20    and over and Officer Keutnik put him in this figure
21    four, this leg hold.
22         Q.   Okay.  At any point in time did you see
23    Officer Munoz put a knee in Mr. White's back?
24         A.   In his back?
25         Q.   Yeah, while Mr. White was face down prone on
```

74

DEPOSITION OF OFFICER BARRY BOERSMA

1 STATE OF CALIFORNIA  )
         ) ss
2 COUNTY OF CONTRA COSTA )

3

4    I hereby certify that the witness, OFFICER BARRY
 BOERSMA, in the foregoing deposition appeared before me,
5 Angelica Gutierrez, a Certified Shorthand Reporter and
 disinterested person.

6

7    Said witness was then and there at the time and
 place previously stated, by me placed under oath to tell
 the truth, the whole truth and nothing but the truth in
8 the testimony given on the date of the within deposition;
 that the deposition is a true record of the witness'
9 testimony as reported by me.

10    The testimony of the witness and all questions
 and remarks requested by Counsel were reported under my
11 direction and control, caused to be transcribed into
 typewritten form by means of computer-aided transcription.

12

13    I am a Certified Shorthand Reporter licensed by
 the State of California, and I further certify that I am
 not interested in the outcome of the said action, nor
14 connected with, nor related to any of the parties in said
 action, nor to their respective counsel.  I am not of
15 counsel or attorney for either or any of the parties to
 the case named in the within caption.

16

    IN WITNESS WHEREOF, I subscribe my name this 3rd
17 day of September, 2014.

18 _/s/Angelica R. Gutierrez_____
 ANGELICA R. GUTIERREZ
19 CERTIFIED SHORTHAND REPORTER
 California License Number 13292

20

21

22

23

24

25

                   83