# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.W., a minor, by and through her Guardian Ad Litem, Tenaya Barber, Individually and as Successor in Interest of Decedent MICHAEL WHITE,<br><br>  Plaintiffs,<br><br>  vs.<br><br>ROBERT NICHELINI, et al.,<br><br>  Defendants. | Case No. 2:12-CV-1629-MCE-AC<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 19, 2016<br>Time: 2:00 p.m.<br>Location: Courtroom 7<br><br>Honorable Morrison C. England |

# EXHIBIT C

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

---o0o---

V.W., a minor, by and through her Guardian Ad Litem, Tenaya Barber, Individually and as a Successor in Interest of Decedent MICHAEL WHITE,

    Plaintiffs,

vs.

CITY OF VALLEJO, a municipal corporation; ROBERT NICHELINI, in his individual and official capacity as Chief of Police; Officer Does 1-25, individually, jointly and severally,

    Defendants.

Case No.: 2:12-CV-01629-LKK-AC

CERTIFIED COPY

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

THURSDAY, AUGUST 28, 2014

REPORTED BY: ANGELICA R. GUTIERREZ, CSR NO. 13292

BARBARA J. BUTLER & ASSOCIATES-Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

```
                              I N D E X


    EXAMINATION BY:                              PAGE

    MR. NISENBAUM                                  6




                          ---o0o---



    Appearance Page                                 3

    Exhibit Page                                    4

    Location                                        5

    Reporter's Certificate                         96

    Deponent Signature Page                        97

    Deponent Signature Waiver                      98

    Witness Letter                                 99

    Changes and/or Corrections                    100

    Attorney's Notes                              101
```

2

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

```
 1            Pursuant to Notice of Taking Deposition and on
 2       Thursday, August 28, 2014, commencing at the hour of 11:00
 3       a.m., thereof, at the Law Offices of John L. Burris, 7677
 4       Oakport Street, Suite 1120, Oakland, California, before
 5       me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified
 6       Shorthand Reporter and Deposition Officer of the State of
 7       California, there personally appeared:
 8
 9                       LIEUTENANT HERMAN ROBINSON
10
11       called as a witness by the Plaintiffs, who having been
12       duly sworn by me, to tell the truth, the whole truth and
13       nothing but the truth, testified as hereinafter set forth:
14
15                              ---o0o---
```

5

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

```
 1          Now, looking at the fourth paragraph of the
 2   first page here it says:  Sergeant Robinson -- this is
 3   Exhibit A to your deposition.  Sergeant Robinson stated
 4   that at approximately 16:15 to 16:20 hours he heard the
 5   police dispatch of an assault.
 6          Did you hear the dispatch of an assault?
 7      A.  I believe so.
 8      Q.  Okay.  It says further:  Sergeant Robinson
 9   said that the victim, located at 395 San Marcos Drive,
10   had reported that a large BMA had come across from
11   number 392 San Marcos and had grabbed her by the neck
12   and assaulted her.  Sergeant Robinson said that the
13   suspect then returned to 392 San Marcos.  Sergeant
14   Robinson, Officer Cunningham and Corporal Boersma were
15   dispatched to the call.
16          Is that accurate?
17      A.  Yes.
18      Q.  Okay.  Was there other information contained
19   in that report from dispatch?
20      A.  I don't recall.
21      Q.  Okay.  Do you recall hearing from, in that
22   report from dispatch, that the person who was the
23   reporting party was asking for an ambulance, not for
24   herself but for Mr. White; the person who assaulted
25   her?
```

38

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

```
 1      A.   I don't recall.
 2      Q.   Okay.  Do you recall having any information
 3 prior to encountering -- strike that.
 4           You encountered Mr. White at some point during
 5 this incident.
 6      A.   Yes, I did.
 7      Q.   Do you recall having any information prior to
 8 encountering Mr. White that Mr. White was acting
 9 erratically?
10      A.   After listening and talking with the victim,
11 and then walking out into the roadway and talking to
12 the female who lived in the trailer where Mr. White
13 was.
14      Q.   Okay.  And they give you information that he
15 was acting erratically?
16      A.   Yes, they did.
17      Q.   Did they also give you information that Mr.
18 White needed medical help?
19      A.   She didn't mention that, no --
20      Q.   Okay.
21      A.   -- that I recall.
22      Q.   Do you have any information prior to
23 encountering him that Mr. White needed medical help?
24      A.   I wasn't paying that much attention to the
25 radio call, it was just another assault.
```

39

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

1    Q.   I'm just asking you a question.
2    A.   Okay.  I did not know.
3    Q.   Okay.  So I'm going to play -- and this is
4  going to start at 2.  It's going to pick up shortly
5  before the actual call, it starts at about 208, 210 or
6  so.  And I'm going to play a call.  Tell me if you
7  recognize what I'm playing.
8         And, for the record, I'm playing track 2 of
9  the dispatch recording, the police dispatch recording
10 that has been produced by the defendant.
11        COURT REPORTER:  Do you want that transcribed?
12        MR. NISENBAUM:  Yes, please.
13        COURT REPORTER:  Okay.
14        MR. NISENBAUM:  Starting at 1:59.
15        "DISPATCHER:  I have a call for you.  Two call
16 three respond with fire.  Originally an elderly
17 neighbor stating that a male subject needed an
18 ambulance.  Something's not right with him.  She said
19 he came inside her unit, choked her and then went back
20 into his unit.
21        This is going to be at 395 San Marcos for the
22 original victim, and the responsible inside of 392 and
23 we're going to have Fire and Ambulance paged.
24        MR. NISENBAUM:  Q.  Okay.  Stopping it at
25 2:33.  Did you hear what I just played?

40

1  A.  Yes, I did.
2  Q.  And is that the first call of this incident
3  that you heard over the radio?
4  A.  Like I said, the only thing that peaked my
5  interest was the fact that Cunningham had a radio that
6  was inoperable.
7  Q.  It didn't peak your interest that the caller,
8  who reported that she had been choked was asking for an
9  ambulance, not for herself, but for the person who had
10 choked her?
11 A.  No.
12 Q.  And why was that of no interest to you?
13 A.  I had other things on my mind at the time.
14 Q.  At some point you decided to respond to this
15 call, correct?
16 A.  That's correct.
17 Q.  What other things did you have on your mind?
18 A.  Like I said, I was responding to the station
19 to take care of my administrative duties at the end of
20 the shift.
21 Q.  Okay.  You weren't doing your administrative
22 dutie4s while you were in the car, were you?
23 A.  No.
24 Q.  Okay.  And you didn't actually go to the
25 station, did you?

41

1  A.  No.
2  Q.  Yes, that's correct?
3  A.  That's correct.
4  Q.  You go to the scene and what do you see when
5  you first arrive?
6  A.  There was a gentleman out in the roadway and
7  he said:  There's a big black man and there's something
8  wrong with him.  He's high on dope or something.
9  Something similar to that.
10 Q.  He's crazier than hell, he's high on dope?
11 A.  Yeah.
12 Q.  Okay.  And then what's the next thing that
13 happened?
14 A.  Officer Boersma and I contacted the elderly
15 woman sitting on her front porch.
16 Q.  All right.  And what did she tell you?
17 A.  That she was assaulted by an individual that
18 she does not know.  She's seen him round the trailer
19 park.  He, apparently, was staying in the trailer
20 across the way from her.
21 Q.  Now, as I understand, it she exhibited obvious
22 physical injuries, correct?
23 A.  That's correct.
24 Q.  To her face and nose.
25     And you know that there was an ambulance that

56

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

1  A.  Possibly.
2  Q.  Do you have it in your mind that a person can
3  be impaired as -- can be mentally impaired as a
4  consequence of being intoxicated?
5  A.  It's a possibility.
6  Q.  And had you come to any conclusion about
7  Mr. White's level of impairment, mental impairment?
8  A.  From just the conversation that I had with the
9  lady across the way, and with the lady out in front of
10 the trailer, that he was highly intoxicated.
11 Q.  Did you take that to mean that he was highly
12 mentally impaired?
13 A.  Yes.
14 Q.  Okay.  So at the time -- you open the door,
15 Mr. White pushed back on the door?
16 A.  I believe so.
17 Q.  Okay.  Did it close completely?
18 A.  I don't know if it closed completely.
19     Cunningham was on the side of the door with
20 the doorknob open, and I was on the side of the door
21 with the hinges.
22 Q.  Okay.  Was there any other officer there yet?
23 A.  No.
24     And then as we were trying to make contact
25 with Mr. White Officer Boersma came in.

70

```
 1      Q.  Okay.  Did you actually assist in removing him
 2  from the bathroom physically?
 3      A.  No.
 4      Q.  All right.  So he was he dragged or pulled out
 5  of the bathroom?
 6      A.  I believe he had to be pulled out of the
 7  bathroom.
 8      Q.  And then what position was he put in in the
 9  living room or bedroom, I mean?
10      A.  I don't really recall, to tell the truth.
11      Q.  Was he -- he was handcuffed in the bathroom,
12  though?
13      A.  I believe so.
14      Q.  Okay.  And at that point in time when he was
15  handcuffed was he in a prone position?
16      A.  At that moment, yes.  And then we spun him
17  around and sat him up.
18      Q.  Was there any further use of force on him
19  after that?
20      A.  Other than to restrain him from kicking and
21  trying to get up, no.
22      Q.  Okay.  When you say to restrain him from
23  kicking and attempting to get up, what was done in that
24  regard?
25      A.  I believe myself or -- I don't recall
```

84

1  specifically who, but somebody, you know, kneeled on
2  his legs.
3      Q.  Okay.  And so he was in a prone position when
4  that occurred?
5      A.  No, I believe he was sitting up.
6      Q.  Okay.  You don't have any recollection of
7  anyone, while Mr. White was handcuffed, putting their
8  knee in the middle of his back while he was in a prone
9  position, correct?
10         We talked about that before, but after going
11  through this now it hasn't sparked a recollection?
12      A.  No.
13      Q.  Okay.  It says here that Sergeant Robinson
14  described White's resistance as offensive and that he
15  was trying to overcome everything that the officers
16  were attempting to use on him.
17         What did you mean by offensive, assuming that
18  you said that?
19      A.  That he was doing everything he could to be --
20  to prevent from being taken into custody.
21      Q.  Okay.  And as you understand it the term
22  offensive means --
23      A.  He was not passive.  He was very aggressive
24  toward the officers.
25      Q.  So you mean that he was an active resister?

85

```
 1     A.   Yes, he was.
 2     Q.   As opposed to a passive resistor?
 3     A.   That's correct.
 4     Q.   Did he strike any officer at any point in
 5  time, to your knowledge?
 6     A.   Not that I'm aware of.
 7     Q.   All right.  And again -- well, you're not
 8  aware of any officer being injured, correct?
 9     A.   Not to my knowledge.
10     Q.   Okay.  It says here Sergeant Robinson stated
11  that as White was seated up White went limp; do you see
12  that?  Page 2, halfway down.
13     A.   Yes.
14     Q.   Okay.  What did you actually see there?
15     A.   He stopped resisting.
16     Q.   He stopped resisting.
17          Was he handcuffed when he went limp?
18     A.   Yes, he was.
19     Q.   Okay.  So he had already been handcuffed,
20  correct?
21     A.   Yes.
22     Q.   So he was handcuffed before he was seated up?
23     A.   Yes, he was.
24     Q.   Okay.  How long before he was seated up?
25     A.   I remember having a brief conversation with
```

86

1  the officers about positional asphyxiation during this
2  time, and that we were not going have him, you know,
3  laying down, face down, nor on his back; that we were
4  going to have him on his side or we were going to have
5  him seated up.  And at that point I believe Officer
6  Munoz had him in a sitting position and a knee behind
7  his back to support him.
8      Q.  Okay.  And when you say he went limp, it's one
9  thing to stop resisting, the phrase "he's limp" seems
10 to indicate something more than that.
11     A.  I believe it was almost as if he had gone
12 unconscious.
13     Q.  Okay.  Did he appear to be unconscious?
14     A.  Like I said, he completely stopped resisting.
15     Q.  Okay.  The next sentence says:  Sergeant
16 Robinson stated that Officer Munoz moved White's head
17 and that White regained consciousness.  That would
18 indicated that White lost consciousness at some point.
19 Was that your observation?
20     A.  That was my observation, apparently.
21     Q.  For what period of time did he appear to be
22 unconscious?
23     A.  It was very briefly.  Less than probably 15
24 seconds.
25     Q.  Sergeant Robinson then called for medical

87

1  assistance for White, and we actually heard that call,
2  correct?
3      A.  Yes.
4      Q.  Okay.  Sergeant Robinson stated that when
5  White regained consciousness he began resisting,
6  attempting to get up, correct?
7      A.  Yes.
8      Q.  Okay.  What did he do that was resisting?  Was
9  it simply attempting to get up?
10     A.  Once again, he began thrashing around,
11 attempting to get up, he was kicking at the officers.
12     Q.  Okay.  So you rolled -- the officers rolled
13 Mr. White onto his stomach then, correct?
14     A.  Yes, they did.
15     Q.  Okay.  And by now Officers Keutnik and
16 Melville had arrived?
17     A.  Yes.
18     Q.  What did the do?  What did you see them do?
19     A.  I believe Keutnik and Melville tried to
20 restraint his legs until we could get the medical crew
21 here.  When the medical crew arrived we were unable to
22 get the gurney in to the mobile home due to the
23 constraints of the hallway.  So, ultimately, we picked
24 up Mr. White and carried him out to the gurney.
25     Q.  Did you see anyone on apply like a figure four

88

DEPOSITION OF LIEUTENANT HERMAN ROBINSON

```
1   STATE OF CALIFORNIA    )
                           ) ss
2   COUNTY OF CONTRA COSTA )

3

4           I hereby certify that the witness, LIEUTENANT
    HERMAN ROBINSON, in the foregoing deposition appeared
5   before me, Angelica Gutierrez, a Certified Shorthand
    Reporter and disinterested person.
6
            Said witness was then and there at the time and
7   place previously stated, by me placed under oath to tell
    the truth, the whole truth and nothing but the truth in
8   the testimony given on the date of the within deposition;
    that the deposition is a true record of the witness'
9   testimony as reported by me.

10          The testimony of the witness and all questions
    and remarks requested by Counsel were reported under my
11  direction and control, caused to be transcribed into
    typewritten form by means of computer-aided transcription.
12
            I am a Certified Shorthand Reporter licensed by
13  the State of California, and I further certify that I am
    not interested in the outcome of the said action, nor
14  connected with, nor related to any of the parties in said
    action, nor to their respective counsel.  I am not of
15  counsel or attorney for either or any of the parties to
    the case named in the within caption.
16
            IN WITNESS WHEREOF, I subscribe my name this 3rd
17  day of September, 2014.

18  __/s/Angelica R. Gutierrez_____
    ANGELICA R. GUTIERREZ
19  CERTIFIED SHORTHAND REPORTER
    California License Number 13292
20

21

22

23

24

25
                                                            96
```