# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.W., a minor, by and through her Guardian Ad Litem, Tenaya Barber, Individually and as Successor in Interest of Decedent MICHAEL WHITE,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>ROBERT NICHELINI, et al.,<br><br>　　　　Defendants. | Case No. 2:12-CV-1629-MCE-AC<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 19, 2016<br>Time: 2:00 p.m.<br>Location: Courtroom 7<br><br>Honorable Morrison C. England |

# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

---o0o---

V.W., a minor, by and through )
her Guardian Ad Litem, Tenaya )
Barber, Individually and as a )
Successor in Interest of )
Decedent MICHAEL WHITE, )
)
        Plaintiffs )
)
   vs. ) Case No.:
) 2:12-CV-01629-LKK-AC
CITY OF VALLEJO, a municipal )
corporation; ROBERT NICHELINI, )
in his individual and official )
capacity as Chief of Police; )
Officer Does 1-25, individually, )
jointly and severally, )
) CERTIFIED COPY
        Defendants. )
_____)

DEPOSITION OF JOHN CUNNINGHAM

THURSDAY, AUGUST 28, 2014

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

```
 1                        I N D E X
 2
 3    EXAMINATION BY:                                PAGE
 4    MR. NISENBAUM                                     6
 5
 6
 7                        ---o0o---
 8
 9    Appearance Page                                   3
10    Exhibit Page                                      4
11    Location                                          5
12    Reporter's Certificate                          108
13    Deponent Signature Page                         109
14    Deponent Signature Waiver                       110
15    Witness Letter                                  111
16    Changes and/or Corrections                      112
17    Attorney's Notes                                113
18
19
20                        --o0o--
21
22
23
24
25
                                                        2
```

DEPOSITION OF JOHN CUNNINGHAM

```
 1                        APPEARANCES
 2
 3    FOR THE PLAINTIFFS:
 4       LAW OFFICES OF JOHN L. BURRIS
         Airport Corporate Centre
 5       7677 Oakport Street, Suite 1120
         Oakland, California 94621
 6       (510) 839-5200
 7       BY:  BENJAMIN NISENBAUM, ATTORNEY AT LAW
 8
 9    FOR THE DEFENDANTS:
10       VALLEJO CITY ATTORNEY'S OFFICE
         555 Santa Clara Street
11       P.O. Box 3068
         Vallejo, California 94590
12       (707) 648-4545
13       BY:  FURAH Z. FARUQUI, ATTORNEY AT LAW
14
15
16
17
18
19
20
21
22
23
24
25
                                                         3
```

```
 1            Pursuant to Notice of Taking Deposition and on
 2       Thursday, August 28, 2014, commencing at the hour of 2:20
 3       p.m., thereof, at the Law Offices of John L. Burris, 7677
 4       Oakport Street, Suite 1120, Oakland, California, before
 5       me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified
 6       Shorthand Reporter and Deposition Officer of the State of
 7       California, there personally appeared:
 8
 9                          JOHN CUNNINGHAM
10
11       called as a witness by the Plaintiffs, who having been
12       duly sworn by me, to tell the truth, the whole truth and
13       nothing but the truth, testified as hereinafter set forth:
14
15                             ---oOo---
```

5

BARBARA J. BUTLER & ASSOCIATES-Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

```
 1    an elderly neighbor was stating that a male subject
 2    needed an ambulance.  Something is not right with him.
 3    She stated that he came inside her unit, choked her,
 4    and then went back into his unit.
 5            This is going to be at 395 San Marcos for the
 6    original victim, and the responsible inside of 392.
 7    And we're going have fire And ambulance paged."
 8            MR. NISENBAUM:  Stopping at 2:32.
 9            Was that the call that you heard?
10        A.  Yes, sir.
11        Q.  And so I take it then that you heard that this
12    was a call that -- for a man who needed emergency
13    medical help.
14        A.  What she said.
15        Q.  Okay.  And you heard that an ambulance was
16    going to be staging, correct?
17        A.  Yes.
18        Q.  And that would be for the man who needed the
19    emergency help, correct?
20        A.  Yes.
21        Q.  Okay.  The caller reported that the man who
22    needed the emergency medical help had choked her.
23        A.  Yes.
24        Q.  Now, you indicated that it was some kind of an
25    assault call.
```

                                                                24

DEPOSITION OF JOHN CUNNINGHAM

```
 1      A.   I thought it was more of a dispute call.  I'm
 2  trying to go by memory.
 3      Q.   Fair enough.  And I was just going by memory
 4  and I might be wrong.  You might have said dispute
 5  call.  I don't know.
 6           Okay.  But really it was a call for a man who
 7  needed emergency help, correct?
 8      A.   Okay.
 9      Q.   And am I right or wrong?
10      A.   Yes.
11      Q.   It's what you hear on the tape, right?
12      A.   Right.
13      Q.   Okay.  Where were you when you got that call
14  of a man who needed emergency medical help?
15      A.   I believe I was at station -- I don't know if
16  it's still there, station 6.  I'm trying to think of
17  the code.
18      Q.   Okay.
19      A.   And I'm trying to think of the address.  Any
20  way, I don't believe it's open anymore, the fire
21  station.
22      Q.   All right.  How far from the location of this
23  incident, approximately, were you?
24      A.   That's -- the call was on the other side of
25  the highway, on the other side of 80.  It's on the west
```

                                                              25

1      MR. NISENBAUM:  Q.  66.  The middle of the
2  page.  I'm going to start with the sentence:  Officer
3  Cunningham stated that.
4      A.   Okay.  Okay.  I see what you're talking about.
5      Q.   Officer Cunningham stated that he then saw the
6  woman push at the bathroom door and the suspect, White,
7  inside the bathroom twist the door closed.  Then
8  Officer Cunningham then stepped up to the door to push
9  on it and was able to see in the bathroom.  He saw
10 White in there without his shirt.  White was sweating
11 and manipulating something in his hand.  White then
12 pushed the door closed again.
13      Does that refresh your recollection?
14      A.   I didn't write this report.
15      Q.   I know that.
16      A.   No, it doesn't.
17      Q.   Okay.  And you wouldn't have told the
18 investigators anything that was untrue either?
19      A.   Of course not.
20      Q.   So what you told them was true to the best of
21 your recollection at the time?
22      A.   Yes.
23      Q.   Okay.  Did you say that you did or did not
24 review your interview?
25      A.   I didn't review this.

60

1 you.
2     A.    Right.
3     Q.    I would hope that they would have it accurate
4 but you never know. I've seen a lot of inaccuracies.
5     A.    One is in Idaho.
6     Q.    What's that?
7     A.    One of them is in Idaho. Chris Caldwell.
8 He's the DA. Meredith -- he since moved to Iowa.
9     Q.    Okay. By the way, you were interviewed by
10 someone from the DA's office and a Vallejo Police
11 officer.
12     A.    Officer Meredith and Curtis Caldwell.
13     Q.    Okay. With respect to how the door come off
14 its hinges, did you see it come of is hinges?
15     A.    Oh, yeah.
16     Q.    How did it come off its hinges?
17     A.    It's a mobile home. It's not a very sturdy
18 door. Comes off very easily, especially when the
19 struggle started.
20     Q.    Did it look to you like Mr. White ripped the
21 door off its hinges?
22     A.    I wouldn't say that. Just the struggle, and
23 it might have been all of us trying to get the door
24 open.
25     Q.    A lot of back and forth on the door?

72

1    A.    Yeah.
2    Q.    The screws are lousy?
3    A.    It's just a mobile home.
4    Q.    Yeah. So once the door came off the hinges
5  what happened next?
6    A.    That's when the struggle -- we tried to
7  restrain Mr. White.
8    Q.    Okay. And Mr. White, after the door came off
9  the hinges and the struggle and you tried to restrain
10 him, did Mr. White go down to the ground in some
11 manner?
12   A.    Yeah. At that point we're struggling to get
13 him to the floor.
14   Q.    Okay. Was the door on top of Mr. White?
15   A.    I don't believe so.
16   Q.    Do you know what happened to the door?
17   A.    I don't remember. I think we were all on it,
18 near or pushed it out to the side.
19   Q.    Okay. And Mr. White, was he more so on his
20 back at that time when we went to the ground?
21   A.    I don't remember. But I know we were
22 struggling every position.
23   Q.    Okay. And how long was it before the first
24 tasing of Mr. White by anyone from the time that you
25 made entry into the bathroom?

73

DEPOSITION OF JOHN CUNNINGHAM

```
 1   taser did you deploy yours?
 2        A.   Oh, wow.  Let's see.  Within 60 seconds.  Less
 3   than that.
 4        Q.   And where was Mr. White when you deployed your
 5   taser?
 6        A.   He was in front of me.
 7        Q.   What position was he in?
 8        A.   Like I said, he was not squatting, he was like
 9   in a kneeling, half standing, not really standing kind
10   of -- because everybody's fighting it's -- they are not
11   flat on the ground.
12        Q.   Right.  So you have three officers in the
13   bathroom with Mr. White.
14        A.   Well, there's Officer Munoz, Boersma, Sergeant
15   Robinson and myself.  So there's four of us.  The
16   original -- originally.
17        Q.   Right.  But Sergeant Robinson did not go in
18   the bathroom, did he?
19        A.   No it's -- the struggle took place right
20   outside the bathroom door, not in the bathroom.  I mean
21   there's no space in there.
22        Q.   Okay.  So the struggle then --
23        A.   Right where the door -- at the breech of the
24   door, you know.
25        Q.   Okay.  So basically kind of in between the
```

78

```
 1   bathroom and the bedroom then?
 2      A.   Yes.
 3      Q.   Okay.  So where -- on what part of Mr. White's
 4   body did you tase him?
 5      A.   I believe the front torso, but --
 6      Q.   By the way, have you had any training
 7   regarding tasing people in deployment mode in the chest
 8   area?
 9      A.   I'm not sure I understand what you're saying.
10      Q.   Well, at some point in time you're aware that
11   Taser modified their guidelines, correct?
12      A.   I can't hear you.
13      Q.   You're aware that Taser, at some point in
14   time, modified the guidelines on how the taser is
15   supposed to be used, correct?
16      A.   I think they changed it several times.
17      Q.   Right.  They got sued and lost a trial down in
18   Gilroy, I think.  Were you aware of that?
19      A.   No, not that I remember.
20      Q.   Okay.  Well, are you aware of Taser modifying
21   their guidelines regarding the location of a person's
22   body when tasing them because it interferes with the
23   heartbeat?
24      A.   I think don't shoot to the head.  I don't
25   remember anything else.
```

79

1  Q.  So you don't remember anything about Taser
2  modifying their guidelines --
3  A.  No, I don't remember that.
4  Q.  -- such that officers are supposed to avoid
5  using the taser in deployment mode in the cardiac area
6  of the person's chest, the cardiac band?
7  A.  I don't remember that.
8  Q.  Okay.
9  A.  Doesn't sound familiar to me.
10 Q.  Okay.  I'm sorry, what year did you retire?
11 A.  '12.  February 6th, 2012.
12 Q.  Okay.  So your taser was five seconds on
13 Mr. White?
14 A.  Three cycles.
15 Q.  Three cycles, five seconds each?
16 A.  Yes.  Yes.
17 Q.  Were they back to back to back?
18 A.  Yes.
19 Q.  So essentially fifteen continuous seconds?
20 A.  And there's a break in between.
21 Q.  How long a break?
22 A.  A few seconds.
23 Q.  Okay.  And the area that you deployed it, it
24 was it in his chest, right?
25 A.  I believe so.

80

DEPOSITION OF JOHN CUNNINGHAM

1    Q.   Okay.  And it was not in drive stun mode?
2    A.   No.
3    Q.   Dart deployment?
4    A.   No.  It was dart deployment.
5    Q.   And, in particular, can you point out on your
6  chest wherever you --
7    A.   I don't know where it went.
8    Q.   Okay.  But it was mores so center chest?
9    A.   At least I thought so.
10   Q.   All right.  Thank you.
11        And that actually did have an impact on
12 Mr. White, correct?
13   A.   After the third tase I saw the -- finally
14 restrained him a little bit to where he was -- I guess
15 he would be exhausted.
16   Q.   What happened after the third tase that caused
17 you to think that he was retrained and exhausted?
18   A.   I saw the fight had lessened with him.  He
19 wasn't fighting as bad, more combative.  The fight was
20 reduced.
21   Q.   Okay.  Do you recall that during each of the
22 five second cycles Mr. White would stop?
23   A.   He never stopped.
24   Q.   Okay.  So -- you know I'm reading from this
25 report, right?

81

1  A.  We were able to finally eventually handcuff
2  him, yes.
3  Q.  Okay.  And at the point in time when he was
4  handcuffed I assume then that that was the end of the
5  incident.  There was no reason for any more force to be
6  used against him, right?
7  A.  He's still kicking.  After we handcuffed him
8  he's still kicking.
9  Q.  Okay.  So I take it then that it was necessary
10  for an officer to put his knee in Mr. White's back, in
11  the middle of his back, and apply downward pressure,
12  keeping him restrained face down on the ground while he
13  was handcuffed with his hands behind his back; correct?
14  MS. FARUQUI:  Objection.  Lacks foundation.
15  Argumentative.  Speculation.
16  MR. NISENBAUM:  Q.  Go ahead.
17  A.  Officer Keutnik had to restrain his legs in a
18  trained -- called a figure four where you restrain the
19  legs to keep him from kicking.
20  Q.  Are you telling me that no officer put his
21  knee in the middle of Mr. White's back after he was
22  handcuffed and prone on the floor?
23  A.  No.
24  Q.  No one did that?
25  A.  No.  What he done is he restrains the legs and

92

BARBARA J. BUTLER & ASSOCIATES-Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

```
1            THE WITNESS: Until he's fully restrained we
2    have to do whatever is necessary to get the hobbles on
3    him. We have to hold him down hold their legs, on his
4    back, we have to do that.
5        Q. So you have to do whatever is necessary?
6        A. Absolutely.
7        Q. Okay. At some point in time you actually
8    applied your -- you had to do something to get
9    Mr. White to start breathing, right?
10       A. No. I believe he was trying to -- he was
11   clenching his jaw, and I was trying to massage his
12   jawbone, just to get a quick bite. He was clenching
13   his -- like his mouth was completely clenched tight.
14       Q. So you didn't think he was breathing right,
15   correct?
16       A. I don't remember. I think it was him probably
17   trying to consume something. But I remember massaging
18   his jawline.
19       Q. You had a concern about his breathing,
20   correct?
21       A. Probably.
22       Q. Okay. And you had a concern that he was not
23   breathing right.
24       A. Probably.
25       Q. Okay. And in order to check his breathing you
```

99

```
 1   applied pressure to the pressure points around his ears
 2   and upper jaw so he could open his mouth and breathe.
 3       A.   Correct.
 4       Q.   Okay.  And this was after you had pulled
 5   Mr. White up from a laying position, correct, after he
 6   was handcuffed?
 7       A.   After -- I think after we got his legs
 8   restrained.
 9       Q.   After you got his legs restrained?
10       A.   Yes.
11       Q.   Okay.  From the point in time -- tell me what
12   happened after Mr. White was handcuffed.
13       A.   He was kicking and we had the hobbles on his
14   legs.
15       Q.   Okay.  And then what happened next?
16       A.   We rolled him on his side and then, like I
17   said, my concern was for the breathing.  I had been
18   massaging his jaws to try to get him to open his mouth.
19       Q.   So did you see his chest moving as if he were
20   breathing during that time?
21       A.   Yeah, he was breathing.
22       Q.   So why were you concerned for his breathing if
23   he was breathing fine?
24       A.   Probably because he's got his jaw clenched
25   tight and inadvertently holding his breath.
```

100

```
 1    STATE OF CALIFORNIA      )
                               ) ss
 2    COUNTY OF CONTRA COSTA   )

 3

 4           I hereby certify that the witness, JOHN
      CUNNINGHAM, in the foregoing deposition appeared before
 5    me, Angelica Gutierrez, a Certified Shorthand Reporter and
      disinterested person.
 6
             Said witness was then and there at the time and
 7    place previously stated, by me placed under oath to tell
      the truth, the whole truth and nothing but the truth in
 8    the testimony given on the date of the within deposition;
      that the deposition is a true record of the witness'
 9    testimony as reported by me.

10           The testimony of the witness and all questions
      and remarks requested by Counsel were reported under my
11    direction and control, caused to be transcribed into
      typewritten form by means of computer-aided transcription.
12
             I am a Certified Shorthand Reporter licensed by
13    the State of California, and I further certify that I am
      not interested in the outcome of the said action, nor
14    connected with, nor related to any of the parties in said
      action, nor to their respective counsel.  I am not of
15    counsel or attorney for either or any of the parties to
      the case named in the within caption.
16
             IN WITNESS WHEREOF, I subscribe my name this 3rd
17    day of September, 2014.

18    __/s/Angelica R. Gutierrez_____
      ANGELICA R. GUTIERREZ
19    CERTIFIED SHORTHAND REPORTER
      California License Number 13292
20

21

22

23

24

25
                                                              108
```

BARBARA J. BUTLER & ASSOCIATES-Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)