1
2
3            UNITED STATES DISTRICT COURT
4        FOR THE EASTERN DISTRICT OF CALIFORNIA
5

6   V.W., a minor, by and through her Guardian Ad Litem, )   Case No. 2:12-CV-1629-MCE-AC
7   Tenaya Barber, Individually and as Successor in      )
    Interest of Decedent MICHAEL WHITE,                  )
8                                                        )   **DECLARATION OF BENJAMIN**
                                                         )   **NISENBAUM IN SUPPORT OF**
                  Plaintiffs,                            )   **PLAINTIFF'S OPPOSITION TO**
9                                                        )   **DEFENDANTS' MOTION FOR**
                                                         )   **SUMMARY JUDGMENT**
10        vs.                                            )
                                                         )
11  ROBERT NICHELINI, et al.,                            )
                                                         )   Date: May 19, 2016
12                                                       )   Time: 2:00 p.m.
                  Defendants.                            )   Location: Courtroom 7
13                                                       )
                                                         )
14                                                       )   Honorable Morrison C. England
                                                         )
15                                                       )
    _____ )
16
17
18
19
20
21
22
23            EXHIBIT G
24
25
26
27
28

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3                        -  -  -

 4        V.W., a minor, by and through
          her Guardian Ad Litem, Tanaya
 5        Barber, Individually and as
          Successor in Interest of Decedent
 6        MICHAEL WHITE,
                                            Case No.
 7                  Plaintiffs.      2:12-cv-01629-MCE-AC

 8             vs.

 9        ROBERT NICHELINI, et al,

10                  Defendants.
          _____/
11

12

13

14

15

16                     DEPOSITION OF

17                 WERNER U. SPITZ,M.D.

18             ST. CLAIR SHORES, MICHIGAN

19                  FEBRUARY 8, 2016

20
     ATKINSON-BAKER, INC.
21   COURT REPORTERS
     500 North Brand Boulevard, Third Floor
22   Glendale, California  91203
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  SHARON GARDZINSKI, CSR NO. 3915

25   FILE NO.:  AA0135D
```

                                                              1

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3                      - - -

4     V.W., a minor, by and through
      her Guardian Ad Litem, Tanaya
5     Barber, Individually and as
      Successor in Interest of Decedent
6     MICHAEL WHITE,
                                        Case No.
7              Plaintiffs,        2:12-cv-01629-MCE-AC

8          vs.

9     ROBERT NICHELINI, et al,

10             Defendants.
      _____/

11

12

13

14

15

16

17     Deposition of WERNER U. SPITZ, M.D., taken on behalf

18  of Defendants, at 23001 Greater Mack Avenue, St. Clair

19  Shores, Michigan, commencing at 1:18 p.m., Monday,

20  February 8, 2016, before Sharon Gardzinski, CSR No. 3915.

21

22

23

24

25

                                                        2

```
1                    A P P E A R A N C E S:

2         FOR PLAINTIFF:

3         LAW OFFICES OF JOHN BURRIS
          BY:   BENJAMIN NISENBAUM, ESQ.
4         7677 Oakport Street
          Suite 1120
5         Oakland, CA   94621
          (510)839-5200
6         bnisenbaum@hotmail.com

7
          FOR DEFENDANTS:
8
          GIBBONS & CONLEY
9         BY:   SEAN C. CONLEY, ESQ. SBN 130814
          2185 North California Boulevard
10        Suite 285
          Walnut Creek, CA   94596
11        (925)932-3600
          scc@gibbons-conley.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1
 2                    WERNER U. SPITZ, M.D.,
 3        an Expert Witness herein, having been first
 4        duly sworn, testified as follows:
 5                          EXAMINATION
 6   BY MR. CONLEY:
 7        Q.    Dr. Spitz --
 8        A.    Yes.
 9        Q.    -- my name is Sean Conley.  I represent the
10   defendants in this case designated as V.W. versus
11   Nichelini, et al.
12              And you've submitted a report under Rule 26 in
13   this case; correct?
14        A.    Yes.
15        Q.    And do you have that with you?
16        A.    Yes.  Yes, I do.
17        Q.    Thank you.
18              Now, if you look at your report on page 3 --
19        A.    Yes, sir.
20        Q.    -- the central paragraph there reports a
21   number of uses of force by police officers on Mr. White,
22   who's the decedent in this case.
23        A.    Yes.
24        Q.    And these include, among other things, your
25   report, your physical alteration -- I'm sorry --
```

5

1    altercation, Taser, corotid restraint, knee in the back,

2    and punching on the right side and hobbling.

3            Now, you've come to the conclusion, am I

4    correct, that these various uses of force caused

5    Mr. White's death?

6        A.   Yes.

7        Q.   Okay.

8        A.   Actually, the death was caused by

9    asphyxiation, primarily.  I mean, if I wish to include

10   other ways which may have contributed to death, the main

11   cause of death is asphyxiation.

12       Q.   Okay.  And your opinion is that the use of

13   force identified in this paragraph on page 3 caused that

14   asphyxiation?

15       A.   Yes.  There is -- when I say "use of force,"

16   or you say "use of force," what I understand is that

17   there was a corotid hold.  There was a pressure applied

18   to the back.  There was punching of the right side of the

19   body; of the torso, of the chest.  And there was an

20   altercation, as well, that may have played some role.

21   But the primary role is the former; the various ways in

22   which he was in prone position.

23           At one time he was subjected to a corotid hold

24   and he was punched and pressed upon the back.

25       Q.   All right.

1          So the primary triggering mechanisms for the

2    asphyxiation were the corotid restraint, pressure on the

3    back, punching on the right side of the torso and chest,

4    and prone position at some point?

5          A.   Well, the "prone position" is a method in

6    which police place individuals who are in a -- who are

7    being restrained.

8          So, yes, he was in prone position.  But if he

9    would have been left alone in prone position, I don't

10   think much would have happened to him.

11         But coupled with the other ways, namely

12   compression, namely punching, namely applying, as I said,

13   pressure on the back, and on top of that a corotid hold,

14   that is what complimented the prone position.

15         The prone position alone is not as significant

16   as the others, but all together they played a role.

17         Q.   All right.

18         So by itself, having him in the prone position

19   did not cause the asphyxia; correct?

20         A.   I never said it did, no.  I don't believe that

21   the prone position in and of itself would have

22   asphyxiated him.  But prone position -- prone position

23   with compression, with a corotid hold, those things are

24   not so good.

25         Q.   Okay.  So the corotid hold by itself did not

7

1          Q.   Are you assuming where the punches were

2    applied?

3          A.   I'm sorry?

4          Q.   To the torso and not to the arm or the

5    shoulder?

6          A.   Yes.  Because that's what the officer said.

7               The officer who applied that, Munoz, said that

8    he applied the punches to the right side of the body.

9               But I can tell you that when that statement is

10   rendered as it was, I take it that that is to the chest

11   area.  But in and of itself it would not have caused the

12   death.  I do not believe that.

13              But when it is applied to the chest, the

14   individual may even stop breathing as there are such

15   punches.  Because they are heavy-duty punches.

16         Q.   And that's the basis for your opinion, that

17   the punches had an affect, that they were heavy-duty

18   punches to the torso; correct?

19         MR. NISENBAUM:  Objection.  Argumentative.

20   Incomplete hypothetical.

21         A.   I'm suggesting to you that this man died of

22   all the trauma he was subjected to.  And that includes

23   the corotid hold, the pressure on the chest and the

24   punches, as well.

25

1    A.   I'm not aware of that specifically.  I'm only
2  aware that he was restrained for a duration of 24
3  minutes.  And when he -- when the restraint was finished,
4  he was taken out -- out of the trailer to be taken on a
5  gurney to the hospital.  At that time he was dead.
6    Q.   My question is about the corotid restraint.
7  And the testimony at any point, did you read as saying
8  that he lost consciousness during the process of the
9  corotid restraint?  Is that your understanding of what
10  happened?
11    A.   I'm sorry, would you tell me that again,
12  please?
13    Q.   For purposes of forming your opinion, were you
14  assuming that Mr. White lost consciousness during the
15  course of the corotid restraint?
16    A.   I cannot really do that because there were
17  other forces applied to him.  And it is the -- you have
18  to -- you cannot omit one or the other force.  That is
19  medically improper and scientifically unfounded to do
20  that.  So I have to consider all the manifestations.
21      Therefore, he started off healthy.  Or more or
22  less healthy.  Yes, he was under the influence of
23  cocaine, but he was active, agitated, fighting with the
24  officers.  But --
25    Q.   Okay.  He was agitated and fighting with the

14

1    officers after the corotid restraint and --

2        A.   For a while -- for a while he was probably

3    with a state -- in a state of reduced consciousness.  But

4    subsequently he recovered from that and he continued to

5    be agitated.

6            But --

7        Q.   What is your basis for --

8        A.   But at the same time there were other forces

9    also applied to him.  And he did -- he suffered the

10   adverse effect of those forms of restraint, also.

11   Subsequently, he -- or as a result of which he went into

12   cardiac arrest and died when he was wheeled out.

13           Actually, he died probably before he was even

14   taken out.  Because when he was taken out, when he was --

15   the two officers took him out, he was already in a --

16   unresponsive.  And when he was actually taken out, then

17   he was -- an electrocardiogram was taken and he showed a

18   flatline.

19       MR. CONLEY:  Move to strike as argumentative and

20   nonresponsive.

21       MR. NISENBAUM:  I oppose that motion.

22   BY MR. CONLEY:

23       Q.   Doctor, do you have a factual basis to say

24   that he had reduced consciousness as a consequence of the

25   corotid restraint?

                                                          15

1        MR. NISENBAUM:  Objection.

2        A.   He had -- probably had a state of at least

3  reduced consciousness.  Because when you deprive the

4  brain of oxygen, being that the brain is only two percent

5  of body weight but requires 20 percent of total oxygen, I

6  have to conclude that reducing or eliminating oxygen

7  supply to the brain is not very good for maintaining

8  consciousness for very long.

9  BY MR. CONLEY:

10       Q.   Okay.  Let's talk about the statement about

11  the prone position.

12        And let me ask you, how long do you believe

13  that Mr. White was in a prone position?

14       A.   He was in a prone position from when he was --

15        The interaction with the police started

16  sometime around -- what was it -- 4:24, and then it

17  terminated at 4:48.  That would mean 24 minutes.

18        He was placed in prone position as soon as

19  they could put him in prone position.  I don't know how

20  long that may have taken.

21        I do know that when the officers went -- two

22  officers went into the trailer to take him out to put him

23  on a gurney, he was already dead.

24       Q.   Let me ask you then, again, because I didn't

25  get an answer.  How long --

16

```
1          MR. NISENBAUM:  Objection.  Argumentative.
2    BY MR. CONLEY:
3          Q.   How long was he in prone position?
4          A.   I don't know.  Somewhere between point A and
5    point B.
6               But I must tell you that he was not placed in
7    prone position right at point A, and he was not taken out
8    of prone position at point B, but sometime before that.
9    Because otherwise he, unlikely, would have been in a
10   state of flatlining and electrocardiograph, just by
11   coincidence, as he was hitting the outside at the
12   trailer.
13              Because when the EMTs took the
14   electrocardiogram, he was already flatlining, and any
15   effort to maintain his life, to preserve his life, failed
16   at that point.  Because they tried CPR and they tried all
17   kind of things in the ambulance when they took him to the
18   hospital, but he did not respond.  And he was in a
19   similar condition when they brought him out of the -- the
20   police brought him out of the trailer.
21              So he was dead before he was taken out.  And
22   he was in prone position after he -- after the -- well,
23   sometime after the police put him in prone position.  But
24   I don't have a specific time for that.
25         Q.   Okay.  So you don't know how long he was in
```

17

```
 1   BY MR. CONLEY:

 2       Q.   All right.  Let's turn to your observation

 3   that Mr. White had an enlarged heart.  How pronounced was

 4   the enlargement?

 5       A.   The heart is only enlarged -- because I didn't

 6   want to necessarily contradict the pathologist who did

 7   the autopsy.

 8            The heart was not really enlarged.  And if it

 9   was enlarged -- because I'm giving her the benefit of the

10   doubt on that because she didn't do microscopic

11   examination.  I do not know how she would know whether

12   the heart was pathologically enlarged, or whether it

13   looked to her like it may have been enlarged.

14            She never measured the valve -- sorry.  The

15   thickness of the wall of the left ventricle of the heart.

16   She ventured an opinion that the heart was enlarged to

17   the tune of 450 grams, which according to the literature,

18   is not an enlargement at all.  But if it is enlarged, it

19   is minimal.

20       Q.   Okay.  All right.

21            And you attribute that enlargement to

22   hypertension?

23       A.   If it is enlarged, most enlargements of the

24   heart, by virtue of the hypertrophy, or thickness, excess

25   thickness of the left ventricular wall are due to
```

24

```
 1    of whatever enlargement of the heart was found on
 2    Mr. White?
 3         A.    I don't know how to do that, other than to
 4    testify that addiction to stimulants may cause
 5    enlargement of the heart.  So can genetic factors.
 6         Q.    Do you have information from any source that
 7    Mr. White was treated for any enlarged heart at any time
 8    prior to his death?
 9         A.    I do not have such information.  But that
10    doesn't tell me which -- what caused his cardiac
11    enlargement; whether it was cocaine or whether it was
12    because he inherited the gene that prevails in the
13    African-American race.
14         Q.    Are you aware, from any source, of whether he
15    treated at any time for hypertension?
16         A.    No, I'm not aware of that.
17         Q.    Okay.
18               You're aware that the toxicology report in
19    this case indicates that Mr. White had cocaine in his
20    blood?
21         A.    Yes, I'm aware that he had a low level, or a
22    recreational level of cocaine in his system.  However,
23    the report provided by Dr. Wang and by the pathologist
24    who did the autopsy is wrong, where they testify -- or
25    where Dr. Wang, or Mr. Wang, sorry -- where Mr. Wang
```

27

1   maintains that Benzoylecgonine, known as BE, is an active

2   metabolite.  I think he doesn't know what he's talking

3   about.

4          And the pathologist who did the autopsy also

5   made that determination, that Benzoylecgonine, where he

6   had an amount of 1.34 milligrams per liter, had -- in the

7   blood -- had a toxic effect on him.  Because

8   Benzoylecgonine is not an active metabolite.

9          It's time that they -- if they do coroners'

10  autopsies, they should know that.

11      Q.   Okay.

12          Based upon the information contained in the

13  blood test, can you express any opinion about when

14  Mr. White took this cocaine?

15      A.   Well, he probably took it -- considering the

16  relatively short half-life time of cocaine, which is

17  about somewhere between an hour -- somewhere between 45

18  minutes to an hour and a half, maybe, or an hour and a

19  quarter -- he probably took that either the evening

20  before, or maybe on the same day.  Or maybe both, you

21  know.  Maybe he took some on the evening before and then

22  the rest on the same day.

23      Q.   Okay.  And how much did he take?

24      A.   I don't know.  I don't know how much he has

25  taken.  He didn't take a whole lot.  But he had in his

28

1   blood, he had point 5 milligrams per liter of cocaine.

2   And the rest is the one point -- 1.34 milligram per liter

3   is the metabolite.

4       Q.   And do you know how he took it?

5       A.   Well, he probably took it by mouth.  Or by

6   mouth or snorted it.  I have no idea.  I do know that he

7   is alleged to have swallowed something out of a packet.

8   But I don't know how much he took.

9       Q.   Okay.  Can cocaine cause cardiac arrest?

10      A.   Well, that depends on the circumstances.

11  Different people have different susceptibility to the

12  effects of cocaine when it comes to causing cardiac

13  arrest at certain amounts.

14           But this individual didn't have any reason to

15  suspect that he had cardiac arrest when he died.  Well,

16  he had cardiac arrest, of course, because every dead

17  person has cardiac arrest.  But I don't think that that

18  is due to the cocaine, when, in fact, there was

19  interference with his ability to breathe.

20      Q.   Okay.

21           What is -- what level does cocaine become

22  potentially toxic?

23      A.   Cocaine can be toxic at even low levels.  The

24  fact that he was agitated and was in a state of acute

25  psychosis when he resisted the police in affecting their

1    restraint, I think that that indicates that there was a

2    toxic effect.  But it wasn't a fatal toxic effect.  He's

3    active and, obviously, alive when all this happened.

4           But when it stopped being funny is when the

5    corotid hold was applied and the pressure on the back and

6    the punches to the chest.  Those things are not -- are

7    medically not good for you.

8    Q.   Well, taking cocaine is not good for you

9    either; is it?

10   A.   Well, there are millions of people who take

11   cocaine, and probably some of these people don't fair

12   very well, maybe.

13          This guy was 47 years old and he was doing

14   pretty well until then.  So to assume that he died of

15   cocaine intoxication, I think, is uncalled for and

16   misleading and not jiving with the facts.

17   Q.   Cocaine can be fatal at point 54 milligrams

18   per liter; can't it?

19   A.   Well, it depends on the individual.  It

20   depends on whether this is his usual dose.  It depends on

21   a lot of factors.

22          And it depends specifically on the

23   circumstances of the event.  And the circumstances here

24   do not call for cocaine as the cause of death, but rather

25   the more likely -- by far the more likely interference

30

1    with his ability to breathe.

2           If you cannot breathe, or you have some other

3    method applied to you that interferes with oxygen's

4    availability to the brain, those are far more -- in this

5    case, far more significant than shoving it off on

6    cocaine.

7           Cocaine may have been the reason why there was

8    a cocaine psychosis in this individual, but not in the --

9    not causing the death.

10          When somebody is compressed like he was, and

11   somebody has pressure applied to the corotid arteries,

12   that is, in this case, by far, far more likely as the

13   cause of death.

14          We all know that when -- when the cause of

15   death is asphyxia, any type of asphyxia, the cause of

16   death must be -- must be determined by the circumstantial

17   evidence.  And that's exactly what I'm doing here, to --

18   as I said before --

19       Q.    What are the circumstances?

20       A.    The circumstances of the events.  The event

21   calls for asphyxiation, not for any cocaine intoxication.

22       Q.    Did cocaine have any contribution to the cause

23   of Mr. White's death?

24       A.    Cocaine -- the contribution that cocaine

25   afforded this case is that it brought the police.  If the

31

```
1          A.   I understand that.

2          MR. NISENBAUM:  Again, I'm going to object to that.

3    Argumentative.

4               He is answering your questions.  You're asking

5    questions which require explanation, and he's offering

6    those.

7    BY MR. CONLEY:

8          Q.   Now, in asphyxia cases, do you typically see

9    signs of brain swelling?  Or discoloration?  Or ischemic

10   asphyxiation?

11         MR. NISENBAUM:  Objection.  Vague.

12         A.   You want to know whether he had brain

13   swelling?  Is that what I understand you to -- what I

14   understand you to -- understand what you want me to

15   answer?

16   BY MR. CONLEY:

17         Q.   Yes.

18         A.   Let me check that.  (Witness reviewing

19   documents.)

20              He has a brain weight of 1,400 grams.  That is

21   within the spread of a normal brain.  However, you have

22   to also understand that I do not know what his brain

23   weighed before he died.

24              So I cannot really tell you whether this

25   400-gram brain was moderately swollen, or was not swollen
```

36

```
 1   at all, or was, indeed, swollen.  Because I don't know --
 2   maybe his normal brain weight was 1,200 grams.  In which
 3   case he had 200 grams of edema fluid in the brain.
 4            So I cannot really answer that.  But let me
 5   check some other thing.
 6            The unfortunate thing is that there is no
 7   microscopic examination.  That would have answered some
 8   of the questions.
 9        Q.   Was there any discoloration of the brain --
10        A.   No.
11        Q.   -- indicated?
12        A.   No.
13        Q.   Is that something you would expect to see in
14   asphyxia?
15        A.   If the asphyxia is long enough in being there,
16   then you find changes that are visible on microscopic
17   examination.  But otherwise you really don't see much of
18   anything.
19            You may see -- if the brain swelling goes on
20   for a while, for a significant time, then you may see
21   swelling, as well.  But you may not see swelling if the
22   brain is only swollen for a small length of time and only
23   very little swollen, then you don't see anything at all.
24        Q.   Okay.
25            How long is long enough to show discoloration
```

37

```
 1   in the brain?
 2        A.   Well, "to show discoloration in the brain,"
 3   you mean when the brain looks dusky, or -- you need
 4   hours.  You need a long time for that for the --
 5        Q.   "Hours"?
 6        A.   The brain is profused with low level -- low
 7   level -- with blood that is -- with reduced amount of
 8   oxygen.  Then the brain becomes dusky looking.  But for
 9   that you need hours.  That doesn't happen in a few
10   minutes, like in this case.  Remember that the whole
11   episode here --
12        MR. NISENBAUM:  Objection.  I'm --
13        A.   I'm sorry?
14   BY MR. CONLEY:
15        Q.   I'm trying to clarify.
16             Are you saying you would need hours of oxygen
17   deprivation in order to see discoloration?
18        A.   I would say at least an hour or two hours.
19   But normally in people who have conditions where they
20   breathe low -- blood with low -- I'm sorry -- air with
21   low oxygen concentration, that goes on for a while.  That
22   doesn't just occur from minute to minute.
23        Q.   Does the autopsy report indicate any
24   hemorrhaging?
25        A.   No.
```

38

1      Q.   Anywhere?

2      A.   No.

3      Q.   Does the autopsy report indicate any focal

4  bruising?

5      A.   Not that I know of.

6      Q.   Okay.   Can you identify any peer-reviewed

7  medical studies that demonstrate that a transient

8  application of a knee to someone's back can cause

9  asphyxia?

10      A.   Well, I don't know that there is literature

11  where people did experiments where they applied a knee on

12  the chest to cause asphyxia and then turn around and

13  wrote an article about it.   Because the police is going

14  to knock on their door.

15           There have been experiments by a colleague of

16  Dr. Velke, your witness, where maybe a few rooms away

17  from Dr. Velke's room there at the emergency department

18  of -- in San Diego in the hospital where they work

19  there's a Dr. Chan.   And he did experiments.   And I think

20  some of these experiments even involved Dr. Velke.

21           But -- and they both -- and Dr. Newman, also

22  in that department, wrote articles about those

23  experiments.   And then Dr. Velke went to Wyoming and

24  testified in Federal Court at the Daubert hearing that

25  all these experiments that they did are not applicable to

                                                              39

1   delirium.  Is the excited delirium diagnosis recognized

2   by the American College of Emergency Physicians?

3        A.   I think that that is -- to my knowledge, that

4   is correct.  But what is -- that the American College of

5   Emergency Physicians recognizes excited delirium.

6             But I have never understood what they see in

7   excited delirium that is different.  A different

8   diagnosis, or a different finding, or something that I

9   can call by a different name and convert an accidental

10  death or a traumatic cause of death.

11       Q.   All right.

12       A.   Hold on.

13            A traumatic cause of death over and above so

14  that there would be a natural cause of death, a natural

15  fictitious cause of death, because that's not a --

16  excited delirium is not really a diagnosis.  There's

17  nothing different.

18       Q.   Does the National Association of Medical

19  Examiners recognize excited delirium?

20       A.   Yeah, I understand that, too.

21            Do you know that Dr. Demayo, who plays with

22  this excited delirium nonsense, is the editor of the

23  journal where Dr. Chan publishes his papers.  Dr. Chan

24  and Dr. Velke.

25            So are you telling me that he doesn't have

```
 1    enough pull to get that -- as the association where he's
 2    an officer on the board of directors, being that he's the
 3    editor of the journal, don't you think that he has enough
 4    pull to get that as a -- recognition by the National
 5    Association of Medical Examiners?
 6              The reason I'm telling you all that is because
 7    there's nothing that distinguishes excited delirium from
 8    cocaine intoxication.
 9              So do I need another term?
10              Do I need a natural cause of death so that now
11    I call the -- these death by a harmless name to divert
12    attention from the trauma?
13              Also, I do not understand, and need some
14    understanding, why the coroner called this "an accident,"
15    when the pathologist called this "excited delirium"?
16              How does that make sense?
17              The natural cause of death "excited delirium,"
18    but the coroner doesn't agree.  The coroner signs it out
19    as "accident."  How does that make sense?
20              Is excited delirium an accidental cause of
21    death?
22         Q.   All right.
23              You make reference to an article on page 6 by
24    someone named Ronald O'Halloran?
25         A.   Yes.
```

52

REPORTER'S CERTIFICATE

I, SHARON GARDZINSKI, CSR No. 3915, Certified
Shorthand Reporter, certify;

That the foregoing proceedings were taken before me
at the time and place therein set forth, at which time
the witness was put under oath by me;

That the testimony of the witness, the questions
propounded, and all objections and statements made at the
time of the examination were recorded stenographically by
me and were thereafter transcribed;

That the foregoing is a true and correct transcript
of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under the laws of
Michigan that the foregoing is true and correct.

Dated this 18th day of February, 2016

_____
SHARON GARDZINSKI, C.S.R. No. 3915

77

# WERNER U. SPITZ, M.D., FCAP

*Forensic Pathology and Toxicology*
23001 Greater Mack
St. Clair Shores, Michigan 48080

Phone: (586) 776-2060   Fax: (586) 776-8722

Diane L. Lucke, B.S.
Administrative Assistant/Office Manager

E-mail: wuspitz@aol.com

December 18, 2015

Ben Nisenbaum, Esq.
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, CA  94621

**Re:   Michael White, deceased**
**       Our File No: 6425**

Dear Mr. Nisenbaum:

By way of introduction, the following is my abbreviated resume.

I was born in Stargard/POM, Germany. I studied medicine at the University of Geneva,
Switzerland and graduated from the Hebrew University Hadassah medical school in
Jerusalem, Israel in 1953. My entire professional life has been devoted to the practice of
Forensic Pathology: In the Middle East, Europe and since 1959, in the United States. I am
certified by the American Board of Pathology in anatomic pathology (1961) and in forensic
pathology (1965). During my career I have performed or supervised approximately 60,000
autopsies.

From 1953 to 1959, I worked at the Institute of Legal Medicine in Tel Aviv, Israel; From
1959 to 1961, I worked at the Office of the Chief Medical Examiner for the State of
Maryland, then from 1961 to 1963, I worked at the Institute of Legal Medicine in West
Berlin, Germany after which I returned to Maryland where I was the Deputy Chief at
the Medical Examiner's Office. In 1972, I moved to Detroit, Michigan where I was the Chief
Medical Examiner for the County of Wayne until 1988. During this time and until 2004, I
was also working as pathologist, then Chief Medical Examiner for the County of Macomb.

Re:  Michael White, deceased
December 8, 2015
Page two

While in Maryland, I was Associate Professor at Johns Hopkins University and the University of Maryland. From 1978, I also held a teaching appointment as Adjunct Professor at the University of Windsor, Ontario, Canada teaching forensic toxicology and at the Traffic Institute at the University of North Florida in Jacksonville teaching traffic accident investigators to understand the mechanisms and identification of injuries. I am a full professor, teaching Forensic Pathology at Wayne State University School of Medicine in Detroit.

I have testified in all states of the United States, including Alaska and Hawaii, and also before the U.S. Congress (Assassination of President John F. Kennedy). I have also testified numerous times in various courts in Windsor and other major cities across Canada.

I have lectured across the United States, in Canada, France, Germany, Israel, South America, Mexico and South Africa.

I am the author and editor of a leading textbook in Forensic Pathology, Medicolegal Investigation of Death, published by Charles C. Thomas, Springfield, Illinois, 2006, now in its 4th edition. This textbook addresses many of the issues in the case at hand in greater detail. Also, I have published over 90 scientific articles in medical journals, mostly peer reviewed. My Curriculum Vitae has been submitted under separate cover.

At your request I have reviewed and evaluated the materials in the aforementioned case, with regard to specific issues concerning the demise of Michael White, 47 year, African American male.

The materials received include:
- Police reports
- Scene photographs
- 911 calls and dispatch
- Coroner's File including the autopsy and toxicology report

Ben Nisenbaum, Esq.
Re:  Michael White, deceased
December 8, 2015
Page three

> Deposition of:

Lt. Herman Robinson

Officer John Cunningham

Officer Barry Boersma

Officer Michael Keutnik

Officer Raul Munoz

Elizabeth D. Claros

> Complaint

According to the records, on June 15, 2010 at approximately 4:24 p.m., police officers
from the City of Vallejo responded to a 911 call regarding an assault on an elderly woman,
by an individual later identified as Michael White.  Officers entered the home of White's
friend where White was inside the master bathroom and refused to come out (Boersma
dep. pp. 37-38). On arrival of the police, a physical altercation developed with the officers.
Officers Boersma, Munoz and Cunningham tased White repeatedly (Boersma dep. pp. 57-
58; Cunningham dep. pp. 78-80). Officer Boersma applied a carotid restraint, which
stopped blood flow to the brain, and caused White to go limp (Boesma dep. pp. 52, 64-67).
Officer Munoz placed his knee in White's back pinning him to the floor in prone position
and punched White repeatedly in his right side (Munoz dep. pp. 71-72, 74-75), while White
was violently resisting being handcuffed and hobbled (Boersma dep. p. 74; Keutnik dep.
pp. 22-23). Officer Cunningham noticed that White was not breathing properly after the
carotid restraint (Cunningham dep. pp. 99-100).  The officers carried White out of the
residence in handcuffs and a hobble and placed him face down on a gurney (Hill 000075).
When White was rolled over to supine position, he was found to be in distress and an EKG
showed no heart rate, flat lined (Hill 000075). EMTs started CPR which continued during
transport to Kaiser Hospital where he was pronounced dead at 5:22 PM.

An autopsy was ordered by the Solano County Coroner. The autopsy was performed the
next day, in the morning of June 16, 2010.  The cause of death was certified as excited
delirium syndrome.  The manner of death was listed as accident.

Re: Michael White, deceased
December 8, 2015
Page four

The autopsy indicates Mr. White was overweight with a protuberant abdomen, a weight of 216 lbs. and he measured 5'7" in height (BMI – 33.8). The pertinent autopsy findings consisted of 2 barbs in the left lateral torso and two in the right arm, mild enlargement of the heart which weighed 450 grams. The coronary arteries were patent.

Blood cocaine was determined at a level of 0.54 mg/L, which is a recreational level. Benzoyelecognine (BE) was also found on chemical blood analysis. The blood BE level was found to be 1.36 mg/L. BE is an inactive breakdown product of cocaine.

Enlargement of the heart is a manifestation of elevation of the blood pressure, i.e. hypertension, usually controllable with medication.

Prone, i.e. face down position is at all times a risky method of restraint, especially in overweight individuals, handcuffed behind their back, in a state of excitement and agitation who need more oxygen. Pressure on the back compressing the abdomen, as in prone position, pushes the abdominal organs up against the diaphragm. The organs cannot move downward because of the bony pelvis. The diaphragm is the primary respiratory muscle which runs between the chest and abdominal cavity, and functions as the bellows for the lungs. When the diaphragm rises, air from the lungs is expelled, when the diaphragm goes down, air from the outside is drawn into the lungs. Air contains oxygen which is essential for survival. Paralysis of the diaphragm stops breathing. Interference with normal breathing translates to reduced oxygenation of the blood which is the carrier of oxygen throughout the body, thus reduced availability of oxygen to the brain, the heart and other organs.

The brain weighs approximately 2% of body weight, but utilizes 20% of oxygen intake. The brain is the organ most sensitive to oxygen deprivation and the most affected in all types of asphyxation. When the heart receives less oxygen than it needs, it goes into a haywire rhythm or stops beating all together.

All things considered involving the death of Michael White, represent the classic elements of positional asphyxia during physical restraint as listed below:

- Prone restraint
- Pinning with pressure of an obese body to the ground (BMI – 33.8)
- Handcuffing behind the back
- Hobble restraint
- Timely relationship between restraint and loss of consciousness/death
- History of delirious, delusional behavior
- Conditions which require increased oxygen availability, such as strenuous excitement, agitation, stress, fear and air hunger, while the ability to breathe is compromised

Prone restraint not only resulted in reducing White's oxygen intake but also in carbon dioxide retention. Carbon dioxide is a strong acid and its retention leads to acidosis, i.e. increased acidity of the blood and tissues (Jauchem, JR, et al, For Sci Int, 2005, 161:200-30 and Nanthakumar, K, et al, J Am Coll Cardiol, 2006, 48:798-804). At the same time, agitation, stress, pain and fear from repeated and continuous taser applications and the struggle, causing increased muscular activity, and buildup of lactic acid, further contributed to acidosis. Acidosis sensitizes the heart to catecholamines, i.e. adrenaline and noradrenaline, resulting in arrhythmias of the heart beat and cardiac arrest. White arrived at the hospital in cardiac arrest. Lack of oxygen can occur from cardiac arrest or respiratory compromise. Either way, White experienced reduced blood flow and oxygen to his vital organs, primarily to his brain and heart, in his interactions with officers. Consequently, it is evident that the means of restraint used in this case clearly contributed to White's demise.

As to 'excited delirium,' it is my opinion that excited delirium (ED) is a controversial diagnosis, used to classify deaths, under the same or similar circumstances as in the case of Michael White, when no anatomical cause of death is found at autopsy.

The term excited delirium is an unproven, unrecognized theory. It is not listed in any of the accepted usual authoritative sources of reference such as Dorland's Medical Dictionary, nor is it recognized by the AMA, the American Psychiatric Association, the DSM, and there is no mention of excited delirium in the International Nomenclature of

Ben Nisenbaum, Esq.
Re: Michael White, deceased
December 8, 2015
Page six

Disease which is the accepted instrument for all billings by physicians and medical institutions nationwide. Excited delirium is a relatively new concept, supported by a handful of physicians, to write off deaths of this nature as disease related, rather than caused by mechanical means involving chest compression, interference with adequate breathing, hypoxia and cardiac arrhythmia. To my knowledge, no death has ever resulted from 'excited delirium' except when associated with physical restraint.

Ronald O'Halloran, past medical examiner of Ventura County, California asked why it is anytime a death occurs during ED the police are present (O'Halloran, RL, Frank, JG: Asphyxial Death During Prone Restraint Revisited, A Report of 21 Cases; Amer J of For Med and Path, 21(1):39-52).

It is clear that ED is none other but a long known reaction to catecholamines. If ED where a cause of death, why then does it occur exclusively during restraint in prone position, with compression causing immobilization of the chest and abdomen when the abdominal organs are pushed against the diaphragm.

With regards to the use of Taser in this case, it should be noted that a Taser Training Bulletin issued in 2005 reveals the following warning on Page 2, item 8:
"Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may impair breathing and respiration, particularly when the probes are placed across the chest and diaphragm." Michael White was repeatedly tasered by several officers, with two barbs removed at autopsy from the left lateral torso and two barbs from the right arm. "Taser guns generate electric energy which causes severe muscle contractions." "Repeated, prolonged and/or continuous exposure to Taser electrical discharges causes painful tetanic contractions of muscle tissue." When applied repeatedly it causes severe pain, even fear of impending doom.

Based on the above, it is my opinion that Michael White died as a result of asphyxia due to interference with his ability to breathe, during the restraint, when he was placed in prone position, pinned to the ground, which inhibited expansion of his chest in the breathing process, placed in a carotid hold and tasered multiple times.

Ben Nisenbaum, Esq.
Re: Michael White, deceased
December 8, 2015
Page seven

In the case of Michael White, there was a direct and uninterrupted relationship between the altercation with officers, specifically, the restraint and restriction of the breathing process causing loss of oxygen availability to the brain, loss of vital signs and death.

Michael White experienced conscious pain and suffering and the fear of impending doom during the restraint and while he was unable to breathe, fighting for air, suffering air hunger from being held down in prone position at a time when he needed more air, more breathing due to excitement, agitation, and fear for his life (Medical Physiology, Guyton and Hall, Elsevier and Saunders, 2006). The extensive applications of Taser shocks, with the pain and fear it causes, markedly enhanced these emotions.

As indicated by the autopsy, Michael White had a mildly enlarged heart, indicating elevated blood pressure, which in my opinion played no role in this case. With medical treatment, this condition would not necessarily reduce his life expectancy currently estimated at 80 years, based on the major life insurance companies' tables and the CDC.

All my opinions are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.

I reserve the right to amend this report should pertinent additional information become available.

Sincerely yours,

Werner U. Spitz, M.D.

WUS:dll
dk:nisc121815cor6425

My complete curriculum vitae and list of testimony (this is not up to date) is submitted by email.

Ben Nisenbaum, Esq.
Re: Michael White, deceased
December 8, 2015
Page seven

In the case of Michael White, there was a direct and uninterrupted relationship between the altercation with officers, specifically, the restraint and restriction of the breathing process causing loss of oxygen availability to the brain, loss of vital signs and death.

Michael White experienced conscious pain and suffering and the fear of impending doom during the restraint and while he was unable to breathe, fighting for air, suffering air hunger from being held down in prone position at a time when he needed more air, more breathing due to excitement, agitation, and fear for his life (Medical Physiology, Guyton and Hall, Elsevier and Saunders, 2006). The extensive applications of Taser shocks, with the pain and fear it causes, markedly enhanced these emotions.

As indicated by the autopsy, Michael White had a mildly enlarged heart, indicating elevated blood pressure, which in my opinion played no role in this case. With medical treatment, this condition would not necessarily reduce his life expectancy currently estimated at 80 years, based on the major life insurance companies' tables and the CDC.

All my opinions are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.

I reserve the right to amend this report should pertinent additional information become available.

Sincerely yours,

Werner U. Spitz, M.D.

WUS:dll
dk:nise121815cor6425

My complete curriculum vitae and list of testimony (this is not up to date) is submitted by email.

On January 14, 2016 I received Vallejo Fire Department records and Solarno County Prehospital Care Report – these records do not change my opinions as previously submitted on December 18, 2015.