UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| V.W., a minor, by and through her Guardian Ad Litem, Tenaya Barber, Individually and as Successor in Interest of Decedent MICHAEL WHITE,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT NICHELINI, et al.,<br><br>Defendants. | No. 2:12-cv-01629-MCE-AC<br><br>**MEMORANDUM AND ORDER** |

On June 15, 2010, police responded to a dispatch stating that Decedent Michael White assaulted a woman and appeared to be "strung out" on drugs. A neighbor had called 911, requesting an ambulance for White. However, Vallejo Police officers ended up arresting White, and the call ultimately resulted in White's death. Plaintiff is White's minor daughter, who brings this civil rights suit against the police officers involved in the arrest, as well as against the Vallejo Chief of Police at the time, Robert Nichelini. Defendants have moved for summary judgment on all claims against them, ECF No. 64, chiefly arguing that the undisputed facts entitle them to qualified immunity. For the reasons below, the motion is GRANTED IN PART and DENIED IN PART. Nichelini is

///

1

entitled to summary judgment, while the police officers involved in the arrest, Defendants Boersma, Robinson, Cunningham, Munoz and Koutnik, are not.[1]

## BACKGROUND

On June 15, 2010, a dispatcher for the City of Vallejo broadcast a request for police assistance:

> I have a call for you. Respond with fire. Originally an elderly neighbor stating that a male subject needed an ambulance. Something's not right with him. She stated he came inside her unit, choked her, and then went back into his unit. This is going to be at 395 San Marcos for the original victim X and the responsible inside of 392. And we're going to have fire and ambulance staged.

Statement of Undisputed Facts ("SUF"), ECF No. 67, ¶ 3; Dep. of Boersma, ECF No. 77-2, at 20. Having fire and ambulance "staged" means that they were to wait nearby until police determined it was safe for them to enter the scene. SUF, ¶ 4.

Defendants, Barry Boersma and Herman Robinson, who initially responded to the dispatch, spoke with an unidentified individual, and the contents of that conversation are disputed. Pl.'s Opp'n to Defs.' SUF, ECF No. 76-1, ¶ 5. The officers then spoke to the woman who had made the call referenced in the dispatch, Elizabeth Claros, though the exact contents of the conversation is also disputed. Id. ¶ 6–7. It is undisputed, though, that Claros reported that Mr. White approached her from behind and put his arm around her neck. Id. at 6. The officers then went to 392 San Marcos, the home of Linda Villasenor, and spoke with Villasenor. SUF, ¶ 8. She identified Michael White as her temporary houseguest. She reported that White had been taking drugs and stated she wanted him removed from her home. Id.

In the meantime, White had locked himself inside the bathroom of the Villasenor residence, id. ¶ 10, and additional officers had arrived. Robinson and Defendant John

---

[1] Because oral argument would not have been of material assistance, the Court ordered these matters submitted on the briefs in accordance with Local Rule 230(g).

Cunningham, later joined by Boersma and Defendant Raul Munoz, positioned themselves in the bedroom adjoining the bathroom, and attempted to persuade White to come out. Id. ¶¶ 10–11. At some point, the officers pushed in the bathroom door and observed White in the bathroom. Id. ¶ 13. Boersma also claims to have seen White put a baggie of a white substance, which Boersma believed to be drugs, in his mouth. Id. ¶ 14. The officers and White eventually began pushing back and forth on the bathroom door until the door came off its hinges. Id. ¶ 16.

Munoz then shot White with his Taser in dart mode, cycling it three times after the original hit. Id. ¶ 19. Cunningham also shot White with his Taser and cycled it three times. Id. ¶ 20. White, however, continued to resist the officers' attempts to handcuff him. Id. ¶ 21. During the struggle, Munoz punched White in his right side three times and Boersma placed a carotid hold on White. Id. ¶¶ 21–23. The officers were then able to handcuff White.

Medical personnel were called in, but White's kicking prevented them from providing care. Id. ¶ 26. A fifth responding officer, Defendant Mike Koutnik, then assisted in restraining White, who was on his stomach, by grabbing one of his legs. Id. ¶ 27. Cunningham then placed a restraint around White's legs, with the help of Koutnik, Munoz, and Robinson. Pl.'s Opp'n to Defs.' SUF, ¶ 28. The officers finally carried White outside and placed him on a gurney. SUF, ¶ 29. White died shortly thereafter. The cause of White's death is disputed. Defendants rely on the coroner for their position that White's death was caused by excited delirium syndrome, while Plaintiff provides a medical expert who opines White died of asphyxiation.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Defendants initially argue that the City of Vallejo's bankruptcy requires summary judgment be entered in their favor. They contend that because California law requires the City of Vallejo to defend and indemnify them, the instant lawsuit against them constitutes a debt that was discharged by the city's bankruptcy. Defendants then claim

///

that regardless of the effect of the bankruptcy, they are entitled to qualified immunity in any event because their actions were reasonable under the circumstances.

### A.  Effect of the City of Vallejo's Bankruptcy

The City of Vallejo was itself originally named as a defendant in this lawsuit. See Compl., ECF No. 1, at 2.  The Court dismissed the City, however, after the Court granted its unopposed motion for judgment on the pleadings based on its May 23, 2008, filing for Chapter 9 bankruptcy and the subsequent discharge of all debts and claims against the City.  Order, ECF No. 24, at 3–4.  For the same reason, Nichelini's motion for judgment on the pleadings was granted to the extent the suit named him in his official capacity.  Id. at 18.  However, because "[n]othing in the law, the City's discharge or the bankruptcy court's confirmation order indicates that [Nichelini]'s individual debts are also discharged," the Court allowed the suit to proceed against Nichelini in his individual capacity.  Id.

In their motion for summary judgment, Defendants have again argued that the City's bankruptcy discharges claims against them in their personal capacities.  Mem. of P & A in Supp. of Mot. for Summ. J., ECF No. 66, at 4.  Defendants argue that the prior Order's reasoning does not apply because it was rooted in "many potential factual issues" that have since been resolved, such as whether Defendants were acting within the scope of their employment or whether Defendants had asked the City to defend and indemnify them.  Id. at 5–6.  However, the essential facts are still the same:  Plaintiff has alleged that Defendants are personally liable, Plaintiff can collect only against Defendants in their personal capacity, and any rights of Defendants to a defense and indemnification are their own personal rights that do not affect Plaintiff's rights. Additionally, the Ninth Circuit has agreed with this Court's earlier analysis in describing the effect of the City of Vallejo's bankruptcy on a § 1983 award:

> We hold that California's indemnification statutes do not render a judgment or concomitant fee award against an indemnifiable municipal employee a liability of the municipal employer for purposes of adjusting or discharging the debts of a Chapter 9 debtor.  The Judgment is the Officers'

personal liability, not Vallejo's.

Deocampo v. Potts, 836 F.3d 1134, 1143 (9th Cir. 2016).

Accordingly, the City's bankruptcy has no effect on Defendants personal liability for their actions surrounding White's death, regardless of whether the City of Vallejo defends or indemnifies them.

### B.     Qualified Immunity

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  A qualified immunity analysis has two prongs:  (1) whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established." Id. at 201–202.  A court may address these two prongs in either order, "in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Accordingly, courts may "bypass[] the constitutional question in the qualified immunity analysis," i.e., the first prong, and address only the second prong when "it will 'satisfactorily resolve' the . . . issue without having 'unnecessarily to decide difficult constitutional questions." Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009) (quoting Brosseau v. Haugen, 543 U.S. 194, 201–02 (2004) (Breyer, J., concurring)).

Plaintiff here alleges a violation of White's Fourth Amendment right to be free from unreasonable seizures, which includes a right not to be subjected to unreasonable force while being seized.  Accordingly, an excessive force claim is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).  An officer is entitled to qualified immunity if the "use of force was 'premised on a reasonable belief that such force was lawful.'" Bryan v. MacPherson, 630 F.3d 805, 832 (9th Cir. 2010).  Before analyzing Defendants' entitlement to qualified immunity, though, the Court must address the parties' dispute

over whether Defendants' actions should be analyzed individually or cumulatively under the "integral participant" doctrine.

### 1. Integral Participant Doctrine

The integral participant doctrine "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." Hopkins v. Bonvicino, 573 F.3d 752, 770 (9th Cir. 2009). However, an individual is not an integral participant by "merely being present at the scene" of a constitutional violation. Jones v. Williams, 297 F.3d 930, 936 (9th Cir. 2002). Invoking the doctrine "require[s] the plaintiff to first establish the 'integral participation' of the officers in the alleged constitutional violation." Id. at 935.

Plaintiff has met this burden, or has at least demonstrated a genuine dispute of fact, with regard to all Defendants present at the scene. Boersma consulted with Munoz and Robinson for several minutes, was present during the struggle with White through the bathroom door, and ultimately attempted to place a carotid restraint hold on White. SUF, ¶¶ 11, 13–14, 23. Munoz similarly was part of the group of officers that consulted with each other before engaging with White and present during the bathroom door struggle. Id. ¶ 11, 13. He also punched White three times and hit White with his Taser, cycling it four times. Id. ¶ 19, 22. Robinson, too, was part of the trio that consulted with each other and participated in the bathroom door struggle. Id. ¶ 11, 13. Plaintiff also contends that Robinson kneeled on White's legs in helping to restrain him.[2] Dep. of Robinson, ECF No. 77-3, at 84–85. Cunningham, like Munoz, hit White with his Taser and cycled it three times. SUF, ¶ 20. Finally, Koutnik assisted his fellow officers in placing a restraint on White's legs. Dep. of Koutnik, ECF No. 77-6, at 22–23, 26.

Plaintiff alleges that because the cumulative force used by these officers was unreasonable, it is therefore proper to analyze their conduct cumulatively. Plaintiff has

---

[2] Defendants accuse Plaintiff of relying on "the canard about Sgt. Robinson kneeling on Mr. White, which never happened," and content that "Robinson never saw anybody kneel on Mr. White's back." Defs.' Reply in Supp. of Mot. for Summ. J., at 10. But Plaintiff makes no accusation in her motion that Robinson kneeled on White's back. See Pls.' Opp'n to Mot. for Summ. J., at 13 ("Sergeant Robinson, himself, testified that he kneeled on Mr. White's legs as he laid prone . . . ." (emphasis added)).

established that each defendant present at the scene actively participated in White's arrest, and Defendants' arguments to the contrary are not persuasive.

First, Defendants do not address the doctrine head on, only chiding Plaintiff generally for "attempt[ing] to impute each of the officer's acts to the other officers." Id. Defendants only provide specific arguments against the application of the doctrine to Robinson and Koutnik, based on their limited physical involvement in White's arrest. See Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 78, at 10. Even accepting Defendants' arguments as to Robinson and Koutnik, the doctrine is not rendered inapplicable to the entire series of events.

Second, Defendants have not shown that any of the officers present at White's arrest were mere bystanders such that the integral participant doctrine would not apply to them. Even those officers who did not strike or fire a Taser at White—that is, Robinson and Koutnik—participated sufficiently in physically helping to restrain White so as to face potential constitutional liability under the doctrine Robinson helped determine the officers' course of action, was part of the struggle through the bathroom door, and knelt on White's legs as White was being restrained. Similarly, Koutnik assisted the other officers in binding White's legs. See Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007) ("[H]elp in handcuffing the prone [arrestee] was, of course, meaningful participation in the arrest.").

### 2. Reasonableness of Arresting Officers

Despite Defendants' contrary argument, there are many factual disputes that make summary judgment inappropriate. Defendants paint a picture of "a violent felon in a drug[-]induced rage vigorously preventing officers from seeing what he was doing." Defs.' Mem. of P & A in Supp. of Mot. for Summ J., at 13. Plaintiff, conversely, contends that Defendants "unnecessarily escalated the encounter," provoking a violent altercation with White, who should have been treated as a person in need of medical attention instead of as a violent criminal. Pls.' Opp'n to Mot. for Summ. J, at 10–11.[3] Because the

---

[3] The parties also disagree over the ultimate cause of White's death. Defendants rely on the

reasonableness of Defendants' use of force depends on the specific circumstances of the arrest, the factual disputes between the parties require the Court to deny Defendants' motion for summary judgment. See Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) ("[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of "reasonableness."'" (quoting Scott v. Harris, 550 U.S. 372, 383 (2007))).

As described by the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989), relevant factors "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," id. at 396. Making all reasonable inferences in favor of Plaintiff, as required in considering this motion for summary judgment, Plaintiff has at least a plausible argument that the officers were unreasonable in their belief that the force used against White was justified.

Defendants argue that because White had "just commit[ted] serious and violent batteries, [and] was trespassing," the use of force applied by the officers was justified. Defs.' Mem. of P & A in Supp. of Mot. for Summ. J., at 11. Plaintiff, though, challenges Defendants' account and identifies evidence that creates genuine disputes over the relevant facts.

Plaintiff initially contends that the officers unreasonably misconstrued the dispatch call, believing that Claros needed the ambulance despite the dispatch indicating that it was White who needed medical attention. See Dep. of Boersma, ECF No. 77-2, at 20 ("Originally an elderly neighbor stating that a male subject needed an ambulance. Something's not right with him." (emphasis added)). Plaintiff also relies on Claros's interactions with the officers, which arguably should have informed them White was not a threat and had not committed any serious crime. First, Claros had no visible injuries. Dep. of Elizabeth Claros, ECF No. 77-1, at 34. Second, though Claros does not recall

---

coroner's conclusion that White died from excited delirium syndrome induced by his drug use, while Plaintiff's expert contends White died of asphyxiation. Defs.' Mem. of P & A in Supp. of Mot for Summ J., at 4.

the substance of her conversations with the officers when they arrived, id. at 27, Plaintiff contends that Claros' refusal of medical care should have informed the police officers that she was primarily concerned about White's wellbeing, Pl.'s Opp'n to Mot. for Summ. J., at 11. Plaintiff furthermore relies on Claros's testimony that she considered the assault insufficiently serious to call the police. Id.

Next, Plaintiff argues that White did not pose a threat and challenges the reasonableness of the officers' urgency in confronting White after he sequestered himself inside the bathroom. According to Plaintiff, White was only mumbling, not uttering any threats toward the officers or anyone else. See, e.g., Dep. of Barry Boersma, at 43–44. In support of the argument that White posed a threat, almost all of the officers offer a statement similar to the following: "I was aware from my decades of training and experience that bathrooms can contain many potential weapons, which can create a dangerous situation for both the officers and the individual in the bathroom." E.g., Decl. of Herman Robinson, ECF No. 70, ¶ 13. However, Defendants provide no specific facts that show White posed a danger to himself or others while he was in the bathroom, and fails to even describe what potential weapons are commonly found in bathrooms. A reasonable jury could find it unreasonable that the officers' believed force was necessary simply because White was in a bathroom.

Plaintiff also disputes Boersma's contention that he observed White attempting to ingest a baggie of drugs, the other reason Defendants provide for their haste in reaching White. Plaintiff, however, has demonstrated a genuine issue as to the existence of this baggie based on (1) expert testimony that White's toxicology report shows White could not have ingested any drugs at that time, and (2) the lack of evidence of any substance in White's mouth that would be consistent with Boersma's testimony. See Dep. of Werner Spitz, ECF No. 77-7, at 28; Decl. of Benjamin Nisenbaum, ECF No. 77-8, at 3.

Plaintiff also argues, and Defendants do not dispute, that there was no risk of flight. White was sequestered in the bathroom, with multiple officers standing outside its only door. See SUF, ¶¶ 10–11.

Finally, Defendants rely heavily on Ninth Circuit cases that address the constitutionality of Taser use generally at the time of the events in question.  Those cases found police officers' use of a Taser against an unarmed suspect who did not threaten or otherwise give the officers cause to use the Taser unconstitutional.  Nevertheless, the officers were entitled to qualified immunity because the unconstitutionality of Taser use in those circumstances had not yet been clearly defined.  See Mattos, 661 F.3d at 448; Bryan v. MacPherson, 630 F.3d 805, 832–33 (9th Cir. 2010).  However, Defendants' focus is too narrow.

First, Defendants used force against White beyond simply firing Tasers at him.  They grappled with him, punched him, placed a carotid restraint hold on him, and forced him into a prone position while handcuffing him and restraining his feet.  SUF, ¶¶ 16, 22––23, 27–28.  Second, a central issue is whether Defendants were reasonable in initiating the violent encounter with White, not merely whether the use of Tasers was reasonable after the officers initiated the physical confrontation.  Individuals have a clearly established "right to be free from the application of non-trivial force for engaging in mere passive resistance," including the application of a Taser.  Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013) (analyzing the reasonableness of the application of a Taser in 2008).  Thus, regardless of the reasonableness of Taser use in situations that call for some use of force, and whether it was reasonable here to use any non-trivial amount of force against White remains disputed.  See Velarde v. Union City Police Dep't, Case No. 13-cv-04011-JD, 2015 WL 6871579, at *5 (N.D. Cal. Nov. 9, 2015) (distinguishing Bryan and Gravelet-Blondin based on whether the arrestee "could not be reasonably viewed as a threat to officers' safety").  According to Plaintiff, nothing in White's demeanor or actions required initiation of a physical altercation by Defendants.  A jury could reasonably credit Plaintiff's account and find the officers' initiation of a physical struggle with White unreasonable.

As the Ninth Circuit has recognized, "increasing the use of force may, in some circumstances at least, exacerbate the situation" when police approach "an unarmed,

emotionally distraught individual who is creating a disturbance or resisting arrest." Deorle v. Rutherford, 272 F.3d 1272, 1283–84 (9th Cir. 2001).  Conversely, when attempting "to subdue an armed and dangerous criminal who has recently committed a serious offence . . . a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end."  Id.  Plaintiff paints the picture of the former, while Defendants paint the picture of the latter.  Based on the evidence before the Court for summary judgment, a reasonable jury could credit either account, and therefore Defendants' motion must be denied as to the arresting officers.

### C. Liability of Nichelini

Plaintiff makes a Monell training claim against Nichelini, which requires a showing that the alleged constitutional deprivation was the result of "a [local] government's policy or custom."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  When Monell liability is premised on a failure to train, a plaintiff must show "deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989).

Defendants argue that Plaintiff has provided no evidence of "any particular connection between Chief Nich[e]lini and any particular training of any involved officer." Defs.' Mem. of P & A in Supp. of Mot. for Summ. J., at 19.  In response, Plaintiff relies only on the circumstances of White's death, arguing that "the lack of training is abundantly clear, in that every involved officer . . . committed the same errors."  Pl.'s Opp'n to Mot. for Summ. J., at 16.  This is not sufficient to survive a motion for summary judgment.  If mere deficient performance were itself sufficient evidence of a failure to train, the requirements of Harris would be rendered virtually meaningless.  Accordingly, Defendants are entitled to summary judgment in their favor with respect to Nichelini.

///
///
///
///

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgement, ECF No. 64, is GRANTED IN PART and DENIED IN PART. Nichelini is entitled to summary judgment on the claims against him, but the Defendants have not met their burden in establishing that the arresting officers are entitled to qualified immunity.

IT IS SO ORDERED.

Dated: February 2, 2017

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE